UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-20616-CIV-LENARD/SIMONTON

ROBERT J. MYERBURG, M.D.,
individually,

     Plaintiff,

vs.

MEDTRONIC, INC.,
a Minnesota Corporation,

     Defendant.

_____/

**NIGHT BOX**
**FILED**

MAY 1 7 2004

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## DEFENDANT'S MOTION IN LIMINE TO STRIKE EXPERT TESTIMONY OF RAYMOND P.H. FISHE, PH.D. <u>AND ACCOMPANYING MEMORANDUM OF LAW</u>

     The defendant Medtronic, Inc. ("Medtronic") moves pursuant to Federal Rules of Evidence ("FRE") 104 and 702 to exclude the testimony of the plaintiff's expert witness, Raymond P.H. Fishe, Ph.D. ("Dr. Fishe"). Dr. Fishe is a professor of finance who is not qualified to render the opinions set forth in the Amended Expert Witness Disclosure Summaries ("Expert Witness Disclosure") filed by the plaintiff Dr. Robert Myerburg ("Dr. Myerburg").

## I.

## <u>MOTION</u>

     Dr. Myerburg alleges that he "presented a strategic business plan" ("Marketing Plan") to Medtronic that encouraged Medtronic to acquire an Automated External Defibrillator ("AED") manufacturer in order to increase its marketing and sales of Implantable Cardioverter/Defibrillators ("ICD's"). Exhibit A, Expert Witness Disclosure pp. 1-2.

CASE NO.  03-20616-CIV-LENARD/SIMONTON

The Marketing Plan contained four parts:  (1) participation in the AED market; (2) joint marketing and joint technical support by Medtronic and the AED company; (3) creation of a nationwide data base regarding AED sales and success rates; and (4) use of that data base for "target" marketing of Medtronic's product.  This strategy allegedly "combine[s] the marketing and use of automatic external defibrillator devices . . . , with . . . the marketing and use of implanted defibrillation devices which automatically treat cardiac arrests."  Compl. ¶ 27.  Dr. Myerburg proceeds under the demonstrably erroneous premise that elements within the Marketing Plan were unique and unknown to Medtronic, and the wholly unsupportable companion assertion that Medtronic "stole" his alleged "idea" and failed to compensate him.

Dr. Myerburg admits, however, that Medtronic sought to acquire Physio-Control, an AED manufacturer, before he ever presented his purported Marketing Plan to Medtronic and that Medtronic does not utilize any other elements of his plan.  Exhibit B, Chart of Claims.

Lacking any factual support for his liability claim, Dr. Myerburg has nonetheless retained Dr. Fishe, who has a Ph.D. in economics, to "examine the nature in which Dr. Myerburg had been damaged, to evaluate the economic cost associated, if there were damages, and, basically, look at [Dr. Myerburg's Marketing Plan] and evaluate what would be reasonable compensation if . . . there was determination of liability."  Exhibit C, Dr. Fishe Dep. p. 8:8-13.  Although Dr. Fishe is a well-qualified professor of finance at the University of Richmond, he has absolutely no specialized knowledge in the field of valuation of, or compensation for, marketing plans.  Exhibit A, Expert Witness Disclosure at Exhibit B.

Notwithstanding Dr. Fishe's lack of experience or training in the field, Dr. Myerburg has designated Dr. Fishe to opine that "compensation to Dr. Myerburg is . . . based on a portion of the

2

CASE NO.  03-20616-CIV-LENARD/SIMONTON

total benefits created from merging Medtronic with Physio-Control." Expert Witness Disclosure p. 2.  With no industry predicate or custom to support his methods or conclusions, and never having undertaken such a valuation in the past, Dr. Fishe proposes to define these "total benefits" as: "measured by stock price appreciation net of overall market movements was approximately $80 million on the announcement day and approximately $200 million with the following day included." Expert Witness Disclosure p. 3.

As demonstrated below, Dr. Fishe has neither the requisite education nor training to render his opinion.  As a direct consequence, he fails to employ reliable, legally acceptable methodology to provide such an opinion on the value of Dr. Myerburg's Marketing Plan.  Further, since Dr. Fishe never identified or even attempted to identify a causal link between the "elements" of Dr. Myerburg's Marketing Plan and the alleged value of the merger to Medtronic, the opinion is not relevant and does not aid the trier of fact.

## II.

## MEMORANDUM OF LAW

### A.   Standard for Admission of Expert Testimony

The Federal Rules of Evidence permit a witness who is "qualified as an expert by knowledge, skill, experience, training or education" to provide opinion testimony at trial.  Fed. R. Evid. 702 (2000).[1]  Expert testimony is admissible only when:  (1) the expert is qualified to testify

---

[1]      FRE 702 provides:  "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

3

CASE NO.  03-20616-CIV-LENARD/SIMONTON

competently regarding the matters he intends to address; (2) the methodology by which the expert

reaches his conclusion is sufficiently reliable as determined by the inquiry mandated in *Daubert v.*

*Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1997); and (3) the testimony assists the trier of fact,

through the application of scientific, technical, or specialized expertise, to understand the evidence.

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

District judges have broad discretion to exclude expert testimony.  *See Salem v. United*

*States Lines Co.*, 370 U.S. 31, 35 (1962); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18,

21 (2d Cir. 1996).  Inadmissible expert testimony is properly excluded through an in limine ruling,

the authority for which derives from the court's inherent power to act as a "gatekeeper" and

manage the course of trials.  *See Luce v. United States*, 469 U.S. 38, 42 n.4 (1984).  The object of

the gatekeeping requirement is to make sure that an expert "employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*

*Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert has the burden of laying proper foundation for the admission

of expert testimony.  *Allison*, 184 F.3d at 1306 ("The burden of laying the proper foundation for

the admission of the expert testimony is on the party offering the expert, and admissibility must be

shown by a preponderance of the evidence.") (citation omitted).  The Court must exclude such

testimony when plaintiffs fail to carry their burden of proof as to its admissibility.  *See McCorvey*

*v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256-58 (11th Cir. 2002) (affirming exclusion of

engineering expert's affidavit); *Allison*, 184 F.3d at 1306, 1309-22 (finding district court properly

4

CASE NO.  03-20616-CIV-LENARD/SIMONTON

excluded plaintiffs' three expert board-certified doctors)[2]; *Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279, 1284 (M.D. Fla. 2002) (granting motion to exclude testimony of expert electrical engineer); *accord United States v. Falcon*, 245 F.Supp.2d 1239 (S.D. Fla. 2003) (granting prosecution's motion in limine to exclude testimony of expert forensic psychologist where defendant failed to sufficiently demonstrate testimony satisfied FRE 702).

Thus, the burden is on Dr. Myerburg to demonstrate that Dr. Fishe is qualified to give testimony that assists the trier of fact, and that his testimony is both relevant and reliable.  As shown below, Dr. Myerburg has not and cannot meet this burden.

**B.    Dr. Fishe Fails to Meet the *Daubert* Standard**

Dr. Myerburg fails to meet his burden because:  (1) Dr. Fishe is not "qualified to testify competently regarding the matters he intends to address"; (2) Dr. Fishe's methodology is not "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*"; and (3) Dr. Fishe's testimony does not "assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Allison*, 184 F.3d at 1309-10 (citing FRE 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)); *see also Falcon*, 245 F.Supp.2d at 1241 (same); *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1338 (11th Cir. 2003) (same); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

---

2    Although the expert testimony at issue in *Allison* was scientific, the same general standards apply to expert testimony of all kinds.  *See Kumho*, 526 U.S. at 147.  Indeed, the *Allison* court relied on and cited to the Eleventh Circuit's earlier opinion in *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548 (11th Cir. 1998), *cert. denied*, 120 S.Ct. 309 (1999), which involved expert testimony from an accountant and a statistician.

Steel Hector & Davis LLP

CASE NO.  03-20616-CIV-LENARD/SIMONTON

147-52 (1999) (holding that courts "gatekeeping" function extends to all proffered expert testimony).

As demonstrated in the Expert Witness Disclosure, and in his deposition testimony, Dr. Fishe has no qualifications that would enable him to determine customary compensation for  Dr. Myerburg's Marketing Plan.  Dr. Fishe's methodology is also inherently unreliable as he fails to account for stock market fluctuations and fails to demonstrate in any rational way the manner in which Dr. Myerburg's Marketing Plan contributed in any way to those fluctuations.  Finally, Dr. Fishe's limited testimony, which he describes as a "starting point" and which solely calculates a two-day stock price increase of between $78 and $226 million, fails to assist the trier of fact in determining Dr. Myerburg's damages.  Any one of these three deficiencies justifies the exclusion of Dr. Fishe's testimony.  Taken together, they demonstrate unequivocally that Dr. Fishe's testimony is inadmissible under FRE 702, *Daubert*, and other controlling authority.

**A.**     **Dr. Fishe's Testimony Should be Excluded Because**
        **His Opinions Exceed the Scope of His Expertise**

Dr. Fishe does not satisfy the rigorous test that this Court must employ to evaluate his qualifications for the opinion he intends to proffer here.  In this Circuit, FRE 702 requires a showing that "the expert is qualified to testify competently *regarding the matters he intends to address*."  *See, e.g., City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 562-67 (11th Cir. 1998) (emphasis added) (affirming district court's exclusion of witness's "opinions regarding the law controlling the case" where such testimony was "outside of his competence").

Measured against this standard, Dr. Fishe is not qualified to render an opinion "aimed at defining what [Dr. Myerburg's] damages were."  Fishe Dep. p. 29:5-11.  Neither Dr. Fishe's

6

CASE NO. 03-20616-CIV-LENARD/SIMONTON

deposition testimony nor the Expert Witness Disclosure reveals any specific "knowledge, skill,

experience, training or education" in the field of valuation of, or compensation for, business or

marketing plans.[3] Fed. R. Evid. 702 (2003).

When repeatedly asked if he was an expert in the setting of fees for marketing plans,

Dr. Fishe repeatedly refused to answer the question, and instead stated that he was an expert in

economics, as if that were all that was required. Fishe Dep. pp. 24:22-25:8; 25:13-23. In addition,

proposing to provide what is essentially an excludable lay opinion on the value of Dr. Myerburg's

Marketing Plan, Dr. Fishe admits that he:

1) has never been retained to determine the value of a marketing arrangement.
   Fishe Dep. p. 23:7-9;

2) has never been retained to determine what a person should be paid by a company
   for a marketing plan. Fishe Dep. p. 23:12-15;

3) has never been retained to establish a fee for a marketing plan.
   Fishe Dep. pp. 25:24-26:1;

4) has never written on the subject of setting fees for marketing plans.
   Fishe Dep. p. 26:2-4;

5) has never even *seen* a marketing plan the compensation for which is based upon the
   change in the stock market price. Fishe Dep. pp. 54:25-55:13; 56:2-3; and

6) has never researched whether marketing plan compensation has ever been based
   upon a change in the stock market price. Fishe Dep. p. 56:2-8.

---

3    Dr. Myerburg has designated a second expert, Dr. James McClave, who at least claims to
have undertaken such a valuation in the past. While Dr. McClave's testimony is based on
insupportable factual assumptions, his methodology further demonstrates that Dr. Fishe is wholly
unqualified to offer the opinion he proposes. Moreover, Dr. Myerburg may not offer two experts
on the same topic.

CASE NO.  03-20616-CIV-LENARD/SIMONTON

When questioned as to his knowledge of custom and practice in the field of marketing plans, Dr. Fishe admitted that:  (1) he is unaware whether there is a standard method of setting fees for marketing plans (p. 26:10-12); (2) he does not know whether Medtronic has a customary manner of compensating for marketing proposals (p. 69:5-9); and (3) he does not know whether there is a customary method of compensation for marketing plans within the medical device industry (p. 69:10-12).

At one point during his testimony, Dr. Fishe mentioned undertaking some unspecified research aimed at determining whether there existed standard charges for marketing plans, but could not "recall" any such standard charges.  Dr. Fishe Dep. pp. 26:13-27:7.  This contrasts with Dr. Fishe then being unable to remember whether he actually conducted any searches to "determine whether there were usual customary charges for marketing plans."  Dr. Fishe Dep. p. 27:8-18.

In the absence of genuinely relevant knowledge, skill, experience, training, or education in determining the value of any marketing or business plans, Dr. Fishe simply lacks the necessary qualifications to testify.  An educated guess does not suffice.  FRE 702; *cf. United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) (noting witness's "claim to expertise . . . did not encompass the evaluation of testimony"); *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (affirming exclusion of purported handwriting expert who had reviewed literature in the field of document examination and co-authored article concerning same:  "His skill, experience, training and education as a lawyer did not make him any more qualified to testify as an expert on handwriting analysis than a lay person who read the same articles."); *Goodwin v. MTD Prods., Inc.*, 232 F.3d

8

CASE NO.  03-20616-CIV-LENARD/SIMONTON

600, 609 (7th Cir. 2000) (expert had "neither a medical degree nor any medical training, and . . .

[was] not qualified to give expert testimony on medical questions").

**B.      Dr. Fishe's Testimony Should Be Excluded Because
His Methodology Does Not Meet the *Daubert* Standard for Reliability**

Dr. Fishe's deposition testimony falls far short of meeting the "exacting analysis" of

reliability mandated by *Daubert. McCorvey,* 298 F.3d at 1257.  In assessing reliability of the

expert's methodology, "[t]he key consideration is whether the expert 'employs in the courtroom

the same level of intellectual rigor that characterizes the practice of an expert in the relevant

field.'" *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (quoting *Kumho*, 526

U.S. at 156); *see also Falcon*, 245 F.Supp.2d at 1242 (citing *Kumho*, 526 U.S. at 152); *Daubert*

509 U.S. 573 at 593 ("In determining the reliability of the scientific evidence, the court first

examines whether the theory or technique can be and has been tested."); *Siharath v. Sandoz*

*Pharmaceuticals Corp.*, 131 F.Supp.2d 1347 (N.D. Ga. 2001) (quotations omitted) ("At its core,

the scientific knowledge inquiry seeks to determine whether there is some objective, independent

validation of the expert's methodology.").

In *Daubert*, the Court listed "four non inclusive factors courts should consider in

determining reliability under Rule 702:  (1) whether the theory or technique can be tested;

(2) whether it has been subjected to peer review; (3) whether the technique has a high known or

potential rate of error;  and (4) whether the theory has attained general acceptance within the

scientific community." *Allison*, 184 F.3d at 1312 (citing *Daubert*, 509 U.S. at 593-94).

Viewed under this test, Dr. Myerburg has failed to meet his burden of proving reliability.

*Allison*, 184 F.3d at 1312 (burden is on proponent to prove "that by a preponderance of the

9

CASE NO.  03-20616-CIV-LENARD/SIMONTON

evidence, [the testimony] is reliable").  Here, Dr. Fishe invented his own untested methodology

and simply terminated his efforts.  No *Daubert* factor is satisfied.  To the contrary, while Dr. Fishe

opines that Dr. Myerburg's compensation for his Marketing Plan should be based on the stock

market's two-day reaction to the announcement of the merger between Medtronic and

Pysio-Control, he admits that he:

1) has never seen a marketing plan the compensation for which is based upon a change in the stock market price.  Fishe Dep. pp. 54:25-55:13; 56:2-3;

2) has never researched whether marketing plan compensation may be or has ever been based upon the change in the stock market price.  Fishe Dep. p. 56:2-8;

3) is unaware whether there is a standard method of setting fees for marketing plans (p. 26:10-12);

4) is unaware of any company that has ever agreed to pay for a marketing plan on the basis of the performance of the company's stock on a particular day (pp. 55:1-56:8);

5) does not know whether Medtronic has a customary manner of compensating for marketing proposals (p. 69:5-9); and

6) does not know whether there is a customary method of compensation for marketing plans within the medical device industry (p. 69:10-12).

Without such information, Dr. Fishe's methodology is wholly speculative and completely

unreliable.  He has never used it before, nor has anyone else.  *See McCorvey v. Baxter Healthcare

Corp.*, 298 F.3d 1253, 1256-1257 (11th Cir. 2002) (affirming district court's exclusion of

engineering expert where methodology was not scientifically reliable because "the expert:  did not

test alternative designs for the catheter; did not talk to medical personnel; was unable to cite

scientific literature in support of his theories; and did not consider or test possibilities for failure

10

CASE NO.  03-20616-CIV-LENARD/SIMONTON

that could have come from sources outside the product, such as the effect of improper storage conditions, contaminants, or human error.").

Moreover, Dr. Fishe's testimony does not contain adequate supportive references for his assertion that the stock market reacted positively because it focused on the combined marketing and sales of the two companies.  On the contrary, when asked if he examined any facts to support Dr. Myerburg's assertion that the objective of the merger was to improve marketing of the Medtronic ICDs, Dr. Fishe's response was almost unintelligible:

> I would have to review from proxies again.  It's *fairly* clear from the announcement, in how the news media received the announcement, that they talked about the synergies of the 2 companies and how they would both possibly benefit from being one combination, which I *would believe to be inferred* to represent greater sales for both companies.

Fishe Dep. pp. 42:18-43:7.  *Amorgianos v. Nat'l Railroad Passenger Corp.*, 137 F.Supp.2d 147, 191 (E.D.N.Y. 2001) ("The surmise and conjecture of an expert, however, no matter how good his or her credentials are, is still only that--surmise and conjecture, not admissible evidence."); *see also Daubert*, 509 U.S. at 590 ("The adjective 'scientific' implies a grounding in the methods and procedure of science.  Similarly the word 'knowledge' connotes more than subjective belief or unsupported speculation.").

Dr. Fishe's methodology also fails to examine whether the "synergies in marketing" in Dr. Myerburg's Marketing Plan actually accounted for the $80-$200 million in stock price increase. Fishe Dep. p. 66:12-13.  The only "proof" that Dr. Fishe has that Dr. Myerburg's "marketing synergies" caused the stock market to react is Bloomberg announcements that discuss "how good the idea would be to combine the 2 types of equipment companies."  Fishe Dep. p. 68:18-25.  Dr.

11

CASE NO.  03-20616-CIV-LENARD/SIMONTON

Fishe, however, fails to connect any of the aspects of Dr. Myerburg's Marketing Plan to the purported "synergy." Fishe Dep. pp. 72:7-75:18; 79:21-81:5.  In fact, the strongest support that Dr. Myerburg can give for his analysis is that the market is "pretty consistently correct." Fishe Dep. p. 64:19.

While Medtronic does not carry the burden to prove unreliability, Dr. Fishe's testimony does just that.  In fact, Dr. Fishe's methodology is not even supported by the terms of the Marketing Plan, which focuses on the benefit to Medtronic of an increase in the marketing and sales of implantable cardioverter/defibrillators and has no mention of the possibility of stock price increase. Fishe Dep. p. 41:4-12. *See also* Fishe Dep. p. 42:18-23.

In addition, Dr. Fishe acknowledges that Medtronic stock quickly dropped after the first two-day hike, but he asserts that there could have been any number of "reasons" that the market price dropped (i.e., mismanagement, accounting changes, etc.), and Dr. Myerburg should not be "assessed the cost of those other things." Fishe Dep. pp. 52:5-12; 53:15-20.  Dr. Fishe, however, did not employ any rigor in determining if *those* "reasons," as opposed to the market correcting its assessment of the merger, accounted for the price fluctuation. Fishe Dep. pp. 52:15-54:10.

A valuation methodology must demonstrate far more "intellectual rigor" before it may serve as a basis for concluding that Dr. Myerburg's damages may be measured by the stock market's two-day reaction to the announcement of the Pysio-Control merger. The "leaps of faith" necessary to reach such a conclusion render Dr. Fishe's opinions insufficiently reliable. *Rider*, 295 F.3d at 1202 ("To admit the plaintiffs' evidence, the Court would have to make several scientifically unsupported 'leaps of faith' in the causal chain. The *Daubert* rule requires more."); *Allison*, 184 F.3d at 1314 (affirming exclusion of expert whose testimony reflected "extrapolation

12

CASE NO.  03-20616-CIV-LENARD/SIMONTON

or 'leap' problems"); *Lord*, 223 F.Supp.2d at 1281 (excluding expert whose "stacked and tenuous inferences do not weigh in favor of reliability"); *Siharath*, 131 F.Supp.2d  at 1352 (quotations omitted) ("There is no fit where there is simply too great an analytical gap between the data and the opinion offered, as when an expert offers animal studies showing one type of cancer in laboratory mice to support causation of another type of cancer in humans.").

A number of other factors indicate that Dr. Fishe's methodology is unreliable.  Dr. Fishe failed to "focus" on the various elements of Dr. Myerburg's business plan and the purported benefit to Medtronic from those elements.  Instead, Dr. Fishe solely focuses on the "combination of an AED and ICD company and what value that created."  Fishe Dep. pp. 71:20-72:2.  Dr. Fishe does not know the specific reasons the market reacted positively, or the reasons the market rebounded.  Dr. Fishe does not even know whether Medtronic was viewing the acquisition of Physio-Control as a tool for developing its ICD business.  Fishe Dep. pp. 72:19-22; 73:6.

Expert witnesses have the potential to "be both powerful and quite misleading." *Daubert*, 509 U.S. at 579.  Courts have not hesitated in excluding an economic expert where his testimony is not supported by sufficient evidence or engaged in mere speculation.  *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (exclusion warranted where esteemed economic expert had not considered all relevant facts in relevant market when performing market share analysis); *Target Market Publishing v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998)  (where economic expert's projections of lost profits unsupported and based on mere speculation, district court may exclude proposed testimony); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996) (approving exclusion of testimony based on conjecture and faulty assumptions).

13

CASE NO.  03-20616-CIV-LENARD/SIMONTON

Finally, the Court cannot disregard its gatekeeper function and admit Dr. Fishe's testimony on the basis of his qualifications or convictions alone.  *See McCorvey*, 298 F.3d at 1257; *Allison*, 184 F.3d at 1309, 1309-1322 (affirming exclusion of three witnesses with "impeccable qualifications" where district court determined testimony of each was unreliable); *Lord*, 223 F.Supp.2d at 1284 (finding plaintiff failed to carry his burden of establishing reliability where there was no dispute as to witness's qualifications); *Bushore*, 1999 WL 1116920, at *1 (recommending exclusion of witness's testimony on causation despite his "impressive credentials" and "sincere belief" in proffered opinion, for failure to meet *Daubert* standards of reliability and relevance); *Shepherd v. Michelin Tire Corp.*, 6 F.Supp.2d 1307, 1312 (N.D. Ala. 1997) (granting motion in limine to preclude trial testimony of proffered witness in wrongful death product liability action, noting intelligence and sincerity do not add up to reliability under *Daubert*); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (Courts must assess whether the expert relied on data reasonably used by economic experts and had good grounds to rely on such data in drawing conclusions.); *see also General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) (Nothing requires a court to accept an opinion tied to existing data only through an expert's "ipse dixit.").

Thus, even if Dr. Myerburg could somehow meet his burden of proof as to Dr. Fishe's qualifications – which he cannot – the reliability standards of FRE 702 and *Daubert* would still bar his testimony.

**C.**      **Dr. Fishe's Testimony Does Not Assist the Trier of Fact**

As the Supreme Court said in *Daubert*:

> Rule . . . requires that the evidence or testimony assist the trier of
> fact to understand the evidence or to determine a fact in issue. This
> condition goes primarily to relevance.  Expert testimony which does

14

CASE NO.  03-20616-CIV-LENARD/SIMONTON

not relate to any issue in the case is not relevant and, ergo,
non-helpful. An additional consideration under Rule -- and another
aspect of relevancy -- is whether expert testimony proffered in the
case is sufficiently tied to the facts of the case that it will aid the jury
in resolving a factual dispute. The consideration has been aptly
described . . . as one of "fit."

*Siharath*, 131 F.Supp.2d at 1347 (quoting *Daubert*, 509 U.S. at 591).

Here, Dr. Fishe's opinion is limited to reviewing Medtronic's stock price for two days after
the merger announcement. Between the two days, the Medtronic stock price increased a total of
$226 million. That is the limited scope of the testimony. Dr. Fishe concludes that the price
increase "is the basis on which the objectively determined value of the synergy is established . . .
and the issue would be how much of that Dr. Myerburg should be compensated, if liability is
assessed, that his work was relevant and important to this[,] how much of this money should be
paid." Fishe Dep. pp. 43:13-44:6.

Dr. Fishe did not testify, and is not competent to testify, as to how, or in what measure, Dr.
Myerburg's purported business plan aided in the stock price increase. Dr. Fishe also did not testify,
and is not competent to testify, as to whether, and in what measure, business or marketing plan
compensation is related to stock price increase. In fact, Dr. Fishe does not determine Dr.
Myerburg's damages, and instead calculates that they are somewhere between the stock price
increase of $78 and $226 million. Fishe Dep. p. 56:15-25. This "starting point" comprises the
totality of Dr. Fishe's testimony. Fishe Dep. pp. 71:3-72:2.

This type of "opinion" is simply not the type of testimony that the Court should accept
under the standards pronounced in *Daubert* and *Kumho* as it fails to assist the trier of fact, through
the application of scientific, technical, or specialized expertise, to understand the evidence or to

15

CASE NO.  03-20616-CIV-LENARD/SIMONTON

determine a fact in issue.  *Allison*, 184 F.3d at 1312; *accord Allapattah Serv., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1335, 1337-38 (S.D. Fla. 1999).

Dr. Fishe's review of public records and the use of simple math is not necessary to aid the finder of fact.  *See, e.g., Bartak v. Bell Balyardt and Wells, Inc.*, 629 F.2d 523, 530 (8th Cir. 1980) ("where the subject matter is within the knowledge or experience of layman, expert testimony is superfluous").  As a result, this Court should exclude Dr. Fishe's testimony as the putative facts regarding the increase in stock price, if at all relevant, can be accurately and intelligently described to the fact finder by lay witnesses who can comprehend the facts and then draw conclusions based on those facts.  *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony properly excluded on the ground, among others, that proffered testimony "could offer nothing beyond the understanding and experience of the average citizen").  The finder of fact can review the same documents, and with appropriate argument of counsel, complete the same math.  Dr. Fishe's testimony is not required for this purpose and whatever scientific or technical expertise he may possess adds nothing to aid the trier of fact in this case.

### III.

### CONCLUSION

Dr. Fishe does not possess the knowledge, skill, experience, training or education required to qualify him to provide expert testimony on Dr. Myerburg's alleged damages.  As such, Dr. Fishe's testimony constitutes the precise unreliable "expert" opinion testimony that the *Daubert* and *Kumho Tire* opinions prohibit a party from submitting at trial.  Accordingly, Medtronic respectfully requests this Court to strike Dr. Fishe's expert designation.

16

CASE NO.  03-20616-CIV-LENARD/SIMONTON

## **CERTIFICATE OF SERVICE**

I CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail this 17th

day of May 2004, upon counsel for the plaintiff:

Guy B. Bailey, Jr., Esq.
Bailey & Dawes L.C.
Continental Plaza, Suite 301
3250 Mary Street
Coconut Grove, Miami, FL 33131

By: _____
Alvin B. Davis

MIA2001 278540v1

18

Steel Hector & Davis LLP

CASE NO.  03-20616-CIV-LENARD/SIMONTON

Dated:  May 17, 2004

STEEL HECTOR & DAVIS LLP
200 S. Biscayne Blvd.
Suite 4000
Miami, Florida 33131
Tel.:    305.577.2835
Fax:    305.577.7001

Counsel for the Defendant, Medtronic, Inc.

By: _____
Alvin B. Davis, P.A.
Florida Bar No. 218073
abd@steelhector.com
Digna B. French
Florida Bar No. 0148570
dfrench@steelhector.com

17

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 03-20616 – CIV-LENARD
MAGISTRATE JUDGE: ANDREA M. SIMONTON

ROBERT J. MYERBURG, M.D.
individually,

        Plaintiff,

vs.

MEDTRONIC, INC.,
a Minnesota corporation,

        Defendant

_____/

## PLAINTIFF'S AMENDED EXPERT WITNESS DISCLOSURE SUMMARIES

Pursuant to Local Rule 16.1 (K), and the Court's February 24th Order, Plaintiff, Dr. Robert Myerburg ("Dr. Myerburg"), discloses his expert's anticipated testimony including lists of the expert's qualifications to be offered at trial. These expert witnesses include Raymond P.H. Fishe, Ph.D. and James T. McClave, Ph.D, of Info Tech, Inc.

## Background

In February 1998, Dr. Robert J. Myerburg, M.D., presented a strategic business plan to Medtronic, Inc. ("Medtronic") officials encouraging Medtronic to

Myerburg, . .D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 2 of 14

acquire an Automated External Defibrillator ("AED") manufacturer in order to increase its marketing and sales of Implantable Cardioverter/Defibrillators ("ICD's"). Dr. Myerberg and Medtronic signed a confidentiality agreement in which Medtronic agreed to compensate Dr. Myerburg if the company adopted his business plan. Subsequently, on April 28, 1998, Medtronic notified Dr. Myerburg that it had no interest in his plan. However, in June 1998, Medtronics implemented the central idea in Dr. Myerburg's plan by acquiring Physio-Control, the then second-largest (now largest) producer of AED's in the advanced medical devices industry. The clear objective of this acquisition was to improve the marketing of Medtronic's ICD's.

## Raymond P.H. Fishe

*A. Content*

Professor Fishe's testimony will address:

In the discussion of compensation for the use of Dr. Myerburg's ideas, Professor Fishe will testify that compensation to Dr. Myerburg is, at the present state of disclosure by Medtronic, based on a portion of the total benefits created from merging Medtronic with Physio-Control. He will discuss that the benefits to

Myerburg, . D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 3 of 14

Medtronic shareholders as measured by stock price appreciation net of overall

market movements was approximately $80 million on the announcement day and

approximately $200 million with the following day included.  With respect to a

discussion of synergies presented in Dr. Myerburg's plan, Professor Fishe will

testify that Medtronic estimates show that after-tax benefits of $76 million will

arise from increasing SCD survival rates from 5% to 15%.

(1)     the economic damages that Dr. Myerburg suffered as a result of Medtronic,

        breach of the non-disclosure agreement it entered into with Dr. Myerburg;

(2)     the value received by Medtronic from the use of elements contained in Dr.

        Myerburg's plan;

(3)     the content of internal documents prepared by Medtronic, which showed

        that the acquisition of Physio-Control was a zero or negative net present

        value project;

(4)     the reaction in the stock market when the merger was announced, which

        showed that there were significant wealth gains to shareholders from

        combining ICD and AED businesses; and

(5)    the synergies in marketing described in Dr. Myerberg's plan, which create

valuable real options that help explain why the stock market reacted

positively to the merger announcement.

*B. Basis*

In reaching his opinion, Professor Fishe will testify that he reviewed and

relied on:

a.    Dr. Myerburg's Executive Summary;

b.    Financial data and statements collected from SEC filings (10K, 10Q, etc.),

Bloomberg Information Systems data, and Defendant's response to

Plaintiff's Request for Production;

c.    News reports in the financial press at the time the merger was announced

and subsequent reports;

d.    Historical stock market data collected from Trades and Quotes (TAQ) disk

supplied by the New York Stock Exchange;

e.    Medtronic Board Presentation, June 25, 1998 and other internal documents

related to the merger;

f.    Correspondence between Medtronic and Dr. Myerburg; and

g.   Academic articles and college textbooks that discuss real options in the context of mergers and corporate valuation and discounted cash flow analyses (e.g., Valuation: Measuring and Managing the Value of Companies by T. Copeland, T. Koller, J. Murrin).

## James McClave P.h. D

*A. Content*

Dr. McClave will testify about the economic damages suffered by Dr. Myerburg *assuming* that the finder of fact determines that Medtronic illegally capitalized on Dr. Myerburg's strategic plan.   His expertise is statistics and econometrics, and his complete CV is included as Exhibit B.

i. Damage Estimation Methodology

Damage experts typically estimate plaintiff compensatory damages by comparing the economic position of the plaintiff under two different scenarios: (a) the first scenario is that which would have existed if the defendant had not committed the alleged wrongful acts; and (b) the second scenario is that which actually occurred.   In this case, the first scenario, often referred to as the "but for"

Case 1:03-cv-20616-MGC   Document 93   Entered on FLSD Docket 05/18/2004   Page 25 of 162

Myerburg, . .D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 6 of 14

scenario, is the plaintiff's economic position *assuming* Medtronic and Dr. Myerburg had agreed to compensate Dr. Myerburg for his business plan, and had honored that agreement. Under the second scenario, what actually occurred, Dr. Myerburg was paid nothing for the business plan presented to Medtronic, and any income it produced for Medtronic. The economic difference to Dr. Myerburg's between the two scenarios constitutes the compensation he would have received from Medtronic for the implementation of his plan, as specified in the confidentiality agreement.

Dr. McClave will testify that these damages are best understood in the context of theft of intellectual property. In effect, Medtronic "stole" Dr. Myerburg's original, innovative strategic business plan, which was the subject of a detailed confidentialty agreement between Dr. Myerburg and Medtronic. In appropriating Myerburg's business strategy via the purchase of a leading maker of external defibrillators (Physio-Control), Medtronic positioned itself to substantially increase its sales of ICD's. Dr. McClave will testify that the present value to Medtronic of the revenue or profits from these increased ICD sales constitute a reasonable basis on which to compute Dr. Myerburg's economic damages.

Case 1:03-cv-20616-MGC   Document 93   Entered on FLSD Docket 05/18/2004   Page 26 of 162

Myerburg, . .D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 7 of 14

One method of calculating damages based on Medtronic's enrichment resulting from the alleged theft of Dr. Myerburg's plan is based on the total gain to Medtronic as a result of implementing the plan.  According to the *Reference Manual on Scientific Evidence*: "Under the Uniform Trade Secrets Law, the standard [for calculating damages] is disgorgement of defendant's gain."[1]  Another method is to calculate a "reasonable royalty rate" that would have been paid "but for" the infringement.[2]  Dr. McClave has utilized the second, more conservative method in his preliminary damage calculations.

Dr. McClave will base his calculations on the estimated future revenues and earnings resulting from implementation of Dr. Myerburg's strategic plan.  Dr. Myerburg developed three alternative scenarios in his plan, with the mid-estimate for gross revenues from incremental sales of ICD's in the United States at $104.5 million annually.  Dr. Myerburg's estimates were conservatively low as compared with Medtronic's own projections for the same period.  In a Medtronic spreadsheet entitled "Financial Upside Calculations," prepared to show gains in revenues from the adoption of this marketing strategy during the period of negotiations for the

---

[1] *Reference Manual on Scientific Evidence*, Federal Judicial Center, 2000 (2nd Edition).  [p. 317, footnote omitted.]
[2] *Ibid.*

Myerburg, ..D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 8 of 14

acquisition of Physio-Control, Medtronic estimated gross revenue gains from increased ICD sales in the United States of $247 million annually.  There are handwritten notes on the same document that indicate a more conservative estimate of $150 million in increased annual sales.  Dr. McClave has utilized the mid-point of these estimates, $198.5 million, in his calculations based on Medtronic's projections.  These are shown in Table 1 below.

### Table 1
### Annual Gross Revenue Estimates
### ($ Millions)

| Scenario | Dr. Myerburg | Medtronic |
|---|---|---|
| Low | 69.64 | 150.00 |
| Mid | 104.53 | NA |
| High | 125.44 | 247.00 |

Dr. McClave projected the revenues through a ten-year horizon using a 5% growth rate.  This is a conservatively low growth rate, considering the 17% and 47% annual increases in ICD sales experienced by Medtronic between 2001 and 2003.  He calculated the estimated gross profit associated with these sales, based on a gross profit of 70% of total revenue.  This gross profit rate is lower than that

Myerburg, . .D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 9 of 14

earned by Medtronic during the five year period between 1999 and 2003, which was never less than 73.9%.[3]   These projections of profits and revenues are contained in Table 2 below.

### Table 2
### Gross Revenue, Profit and Royalty Projections
### Based on  Median Revenue Scenario
### ($ Million)

| | Dr. Myerburg | | | Medtronic | | |
|---|---|---|---|---|---|---|
| Year | Revenue | Profit | Royalty | Revenue | Profit | Royalty |
| 1 | 104.53 | 73.17 | 18.29 | 198.50 | 138.95 | 34.74 |
| 2 | 109.76 | 76.83 | 19.21 | 208.43 | 145.90 | 36.47 |
| 3 | 115.25 | 80.67 | 20.17 | 218.85 | 153.19 | 38.30 |
| 4 | 121.01 | 84.71 | 21.18 | 229.79 | 160.85 | 40.21 |
| 5 | 127.06 | 88.94 | 22.24 | 241.28 | 168.89 | 42.22 |
| 6 | 133.41 | 93.39 | 23.35 | 253.34 | 177.34 | 44.33 |
| 7 | 140.08 | 98.06 | 24.51 | 266.01 | 186.21 | 46.55 |
| 8 | 147.09 | 102.96 | 25.74 | 279.31 | 195.52 | 48.88 |
| 9 | 154.44 | 108.11 | 27.03 | 293.27 | 205.29 | 51.32 |
| 10 | 162.16 | 113.51 | 28.38 | 307.94 | 215.56 | 53.89 |

Dr. McClave will further testify that Dr. Myerburg's expected earnings based on these projected sales depend on the results of the royalty negotiation that would have taken place between him and Medtronic "but for" the alleged illegal acts of Medtronic.  For these preliminary calculations, Dr. McClave has used a

---

[3] Medtronic 2003 Annual Report.

Myerburg, . D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 10 of 14

"rule of thumb" royalty rate, often quoted in the valuation literature, of 25% of gross profits.[4]  When applied to the projected gross profits under the two scenarios – Dr. Myerburg's and Medtronic's – the results over both the five- and ten-year period are as shown in Table 2 above.  The five- and ten-year periods are used to reflect a range of the "useful life" of Dr. Myerburg's plan.

Dr. McClave will testify that the final step using the DCF methodology is to reduce the projected royalty cash flows to present value.  This is accomplished by applying a discount rate to the expected future cash flows.  In this preliminary calculation Dr. McClave has used a 10% discount rate, reflecting the relatively low risk associated with this plan, and the fact that the plan has proved to be extremely successful since its implementation by Medtronic.  (Table 3, below, displays these calculations.)  Dr. McClave will testify that this discount rate is higher than the current weighted average cost of capital for Medtronic, which is less than 9%.

**Table 3**
**Present Value of Royalties (Median Scenario)**
**Discount Rate of  10%**

---

[4] See, for example, a recent presentation (October 2003) made to the American Society of Appraisers, at: http://www.bvappraisers.org/contentdocs/Conference/Royalty_Rates_in_ Intellectual_Property_Valuation.pdf

Myerburg, . .D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 11 of 14

**($ Million)**

| | Dr. Myerburg | | Medtronic | |
|---|---|---|---|---|
| Year | Royalty | PV | Royalty | PV |
| 1 | 18.29 | 16.63 | 34.74 | 31.58 |
| 2 | 19.21 | 15.87 | 36.47 | 30.14 |
| 3 | 20.17 | 15.15 | 38.30 | 28.77 |
| 4 | 21.18 | 14.46 | 40.21 | 27.47 |
| 5 | 22.24 | 13.81 | 42.22 | 26.22 |
| 6 | 23.35 | 13.18 | 44.33 | 25.03 |
| 7 | 24.51 | 12.58 | 46.55 | 23.89 |
| 8 | 25.74 | 12.01 | 48.88 | 22.80 |
| 9 | 27.03 | 11.46 | 51.32 | 21.77 |
| 10 | 28.38 | 10.94 | 53.89 | 20.78 |

Damages as Present Value of Future Royalties:
Five Year Total:  75.93            144.18
Ten Year Total: 136.10            258.44

The bottom of Table 3 also displays a range of damages based on the above preliminary calculations.   Using the mid-point of Dr. Myerburg's projected revenues, the damages total $75.9 million in present value (at the time of the alleged wrongful acts) using a five year projection, and $136.1 million over ten years.   Based on Medtronic's projection mid-point, Dr. Myerburg's damages increase to $144.2 million over five years, and $258.4 million over ten years.

Dr. McClave's calculations are necessarily preliminary, since discovery is on-going and the most recent document production is still being processed.   The

additional information will not alter the methodology utilized by Dr. McClave to compute the damages, but may alter some of the data he has used in these preliminary calculations. The projected revenues attributable to Dr. Myerburg's plan, as well as his expected royalty rate, are subject to change based on additional data and information.

*B. Basis*

Dr. McClave will testify that he reviewed and relied on the following material in reaching his conclusions:

a.  The Complaint in this action;

b.  Dr. Myerburg's strategic business plan presented to Medtronic in February 1998;

c.  Various internal documents of Medtronic, labeled "MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER;"

d.  Various worldwide web cites concerning intellectual property and associated royalty rates;

Myerburg, .D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 13 of 14

e. Various filings made by Medtronic to the SEC, including Forms 4K and annual 10K filings;

f. Medtronic 2003 Annual Report;

g. Reference Manual on Scientific Evidence, Federal Judicial Center, 2000 (2nd Edition).

h. A 2003 article published by K. Seidl and J. Senges in Cardiac Electrophysiology Review (2003; 7:5-13), entitled "Worldwide Utilization of Implantable Cardioverter/Defibrillators Now and in the Future";

i. "Royalty Rates in Intellectual Property Valuation," presentation by Thomas Giordano to the ASA Advanced Business Valuation Conference, October 16, 2003;

j. His professional training and experience, including the calculation of economic damages for numerous litigations;

k. Conversations with Dr. Myerburg.

Myerburg, ...D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 14 of 14

Respectfully submitted,
Bailey & Dawes, L.C.
Counsel for Robert J. Myerburg, M.D.
3250 Mary Street, Suite 301
Miami, Florida 33133
(305)374-5505
(305)374-6715 Fax

By: _____

FOR: Guy B. Bailey, Jr.
Florida Bar No. 96095
Kristina Bakardjiev
Florida Bar No. 0587400

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was mailed to Medtronic's counsel,

Alvin B. Davis, Esquire, Steel Hector & Davis, First Union Building, Suite 4000, 200

South Biscayne Boulevard, Miami, Florida 33131-2310, this _10th_ day of March,

2004.

_____
Of Counsel

Exhibit "A"

# Financial Upside Calculations   (US)



**Impact in Increase in SCA Survival Rate ($mil.)**

| | |
|---|---|
| SCA Incidence | 364000 |
| Increase in Survival Rate | 0.1 |
| Increased Patient Pool | 36400 |
| % Receiving ICD | 0.9 |
| Increased ICD Patients | 32760 |
| MDT Market Share | 0.41 |
| MDT Units | 13431.6 |
| ASP | 18424 |
| Incr. Revenue | $247 |
| PAT Margin | 0.306 |
| PAT | $78 |
| Shares OS | 468.6 |
| Market Value | $3,044 |
| PE | 40.2 |
| Market Value/Share | $6.50 |

**Impact of Incremental Market Share Gain ($mil.)**

| | |
|---|---|
| Current Market Size | $1,060 |
| Increased ICD Patients | 32,760 |
| ASP | 18424 |
| Incr. Market Revenue | $604 |
| Total Market Revenue | $1,664 |
| Incr. Market Share | 1% |
| Incremental Revenue | $17 |
| Incr. PAT | $5 |
| Market Value/Share | $0.44 |

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Exhibit "B"*

# *Curriculum Vita*

## Raymond P. H. Fishe

| | |
|---|---|
| *Contact* | Office:      (804) 287-1269<br>Office Fax:  (804) 289-8878 |
| *Home Address* | 2311 Baronsmede Road<br>Midlothian, VA  23113 |
| *University Address* | University of Richmond<br>Robins School of Business<br>1 Gateway Road<br>Richmond, VA  23173 |
| *e-mail* | pfishe@richmond.edu |
| *Course Web Site* | http://pfishe.pageout.net |
| *Personal* | Married (Patricia Gilbert), Two Children (Jennifer & Christopher) |
| *Current Rank* | Professor and Distinguished Chair in Finance |
| *Education* | University of Florida    B.S.B.A. (High Honors), June 1976<br>University of Florida    Ph.D., August 1979; Economics |
| *Administrative* | Chairman, Department of Finance, May 1994 to September 1998, with secondary appointment in the Finance Department. |
| *Government* | Senior Academic Fellow, U.S. Securities and Exchange Commission, Washington, DC, 1999-2000. |
| *Academic* | University of Richmond, Distinguished Professor of Finance, August 2003 to present.<br><br>University of Miami, Assistant Professor, August 1981 - June 1984; Associate Professor, June 1984 - June 1990; Professor of Economics, July 1990 to August 2003. |

Current Research          "The Behavior of Bid-Ask Spreads and Volume in
                          Options Markets During the Competition for Listings in
                          1999," (with P. Defontnouvelle and J. Harris),
                          forthcoming in *The Journal of Finance*.

                          "The Impact of Illegal Insider Trading in Dealer and
                          Specialist Markets: Evidence from a Natural
                          Experiment," (with M. Robe), forthcoming in the *Journal
                          of Financial Economics*, to be presented at the Western
                          Finance Association Meetings, 2003.

                          "Aftermarket Liquidity from Underwriter Short Covering:
                          A Clinical Study," (with E. Boehmer), forthcoming in the
                          *Journal of Corporate Finance*.

                          "Underwriter Short Covering Trades in Initial and
                          Seasoned Public Offerings of Securities," (with E.
                          Boehmer), in submission, September  2003.

                          "Do Institutions Hold IPOs with Better Long Run Market
                          Performance?," (with B. Boehmer and E. Boehmer),
                          draft, October 2002, presented at the NYU conference
                          on Entrepreneurship, Venture Capital & Initial Public
                          Offerings conference, April 2003, and will be presented
                          at the Western Finance Association Meetings, 2003.

                          "Who Receives IPO Allocations?  An Analysis 'Regular'
                          Investors," (with E. Boehmer), draft, November 2002,
                          invited to present at the University of Notre Dame and
                          University of Central Florida, April 2003.

                          "Equilibrium Rationing in Initial Public Offerings of
                          Equity," (with E. Boehmer), in revision, October 2001.

                          "Does Competition for Options Listings Lead to More
                          Informed Trading?" (with Tie Su), in preparation.

                          "How a Fund Family Benefits from a New Mutual Fund,"
                          (with Tim Burch), in preparation.

Journal Articles

"How Stock Flippers Affect IPO Pricing and Stabilization," *Journal of Financial and Quantitative Analysis* 37 (June 2002), 319-339.

"What Are the Research Standards for Full Professor of Finance,"*Journal of Finance* 53 (June 1998), 1053-1079.

"Seasonal Money Movements and the January Effect," (with L. Chen), *Atlantic Economic Journal* 22 (December 1994), 26-42.

"Good News, Bad News, Volume and the Monday Effect," (with T. Gosnell and D. Lasser), *Journal of Business Finance & Accounting*, (November 1993), 881-93.

"Informal Financial Arrangements and the Stability of Deposit Insurance in Less Developed Countries," (with L. Chen), *Southern Economic Journal* (July 1993).

"An Economic Analysis of Group Lending Programs in Developing Countries," (with J. Devereux), *The Developing Economies* (March 1993), 102-121.

"The Value of Time Spent in Price Comparison Shopping," (with D. Grewal and H. Marmorstein), *Journal of Consumer Research* 19 (June 1992), 52-61.

"The Federal Reserve Amendments of 1917: The Beginning of a Seasonal Note Issue Policy," *Journal of Money, Credit, and Banking,* 23 (August 1991), 308-326.

"The Adjustment of Expectations to a Change in Regime," (with M. Wohar), *American Economic Review* 80 (September 1990), 968-976.

"Information-Induced Heteroscedasticity in Price Expectations," (with T. Idson), *The Review of Economics and Statistics* 78 (May 1990), 304-312.

"Margin Requirements in Futures Markets: Their Relationship to Price Volatility," (with L. Goldberg, S. Sinha, and T. Gosnell), *Journal of Futures Markets* 10 (October 1990), 541-554.

"Why Do Corporations Distribute Assets?  An Analysis of Dividends and Capital Structure," (with L. De Alessi), *The Journal of Institutional and Theoretical Economics* 143 (March 1987), 34-51.

"Nonlinear Contracts, Zero Profits, and Moral Hazard," (with P. McAfee), *Economica* 54 (February 1987), 97-101.

"The Effects of Margins on Trading in Futures Markets," (with L. Goldberg), *Journal of Futures Markets* 6 (Summer 1986), 261-272.

"On Testing Hypotheses Using the Livingston Price Expectations Data," *Journal of Money, Credit, and Banking* 16 (November 1984), 520-26.

"On the Use of Bonus Payments in an Experimental Study of Electricity Demand," (with P. McAfee), *The Review of Economics and Statistics* 65 (August 1983), 506-511.

"Unemployment Insurance and the Reservation Wage of the Unemployed," *The Review of Economics and Statistics* 64 (February 1982), 12-17.

"Labor Force Earnings and College Choice of Young Women:  An Examination of Selectivity Bias and Comparative Advantage," (with R. Trost and P. Lurie), *Economics of Education Review* 1 (Spring 1981), 169-191.

"On the Estimation of Inflationary Expectations from Qualitative Responses," (with K. Lahiri), *Journal of Econometrics* 16 (May 1981), 89-102.

"Distributional Analysis of Regulatory Benefits and Costs of Air Quality Control," (with Berg, et. al.), *Journal of Environmental Economics and Management* 6 (November 1978), 222-243.

*Books*          *Microeconomics–Price Theory in Practice* (with Roger Miller), HarperCollins *Publishers*:  New York, 1995.

| | |
|---|---|
| *Teaching* | 2002 Excellence in Teaching Award, School of Business Administration, University of Miami |

*Executive MBA Programs:*
Corporate Finance
Advanced Corporate Finance
Managerial Economics

*Undergraduate:*
Fundamentals of Finance
Investment Analysis
Introduction to Futures & Options
Personal Financial Planning
Principles of Microeconomics
Energy Economics

*Graduate:*
Corporate Finance
Derivative Securities & Markets
Econometrics

*Seminars:*
"Trading with Limited Information," NASD Institute for Securities Market Professionals, December 2002.
"Corporate Governance: History & Policy," Ryder Corp. Executive Seminar, November 2002.
Faculty Instructor, "Economics for Leaders," *Foundation for Teaching Economics*, various USA sites, 1992-present.
"The Role of Science Courts" and "Urban Development and Poverty," for the George Strike Economic Issues Conferences, University of Cincinnati, 2000 & 2002.
"Derivatives and Risk Management," for Ryder Systems, Inc. Managers, 1996.
"Economics of Health Care," UM Alumni College, 1993.
"Economics Exploded," UM Alumni College, 1989.
Faculty Instructor, Third & Fourth Economics Institute for Administrative Law Judges, Law and Economics Center, University of Miami, 1986-88.

| | |
|---|---|
| *Dissertation & Thesis Advising* | Chairman, M.A. for Min Ho Shin, "Modelling Opportunistic Behavior and Quality Control in a Game-Theoretic Environment," December 1983.
Member, M.A. for Joon Woo Hon, "Korean General Trading Company," August 1984. |

Member, Ph.D. for Victor R. Restrepo, "The Florida Stone Crab Fishery: An Evaluation of Diverse Management Regimes Through the Use of a Simulation Model," 1985.

Member, Ph.D. for Moises F. Tacle, "A Model of Job Search and Allocation of Time," 1987.

Member, Ph.D. for Iman Ammus, "The Pattern of Government Expenditure and the Real Exchange Rate in a Small Open Economy," 1990.

Chairman, Ph.D. for Sujata Sinha, "The Role of Margin Requirements in Futures Markets: Reducing Trader Default and Market Price Volatility,"1993.

Chairman, Ph.D. for Quan Ding, "Ownership Choice and Foreign Direct Investment in the People's Republic of China," 1996.

Chairman, Ph.D. for Patrick Conroy, "Limit Orders Versus Market Orders: Theory and Evidence," 1997.

Chairman, Ph.D. for Aijun Besio, "Short Covering Transactions by Underwritiers in IPOs, 2002.

*Other Publications*    "The Role of Privatization in Florida's Growth," prepared for the Florida Chamber of Commerce and the Florida Council of 100, Law & Economics Center, University of Miami, and the Reason Foundation, Santa Monica, CA, 1987.

"Setting Margin Requirements in Futures Markets," (with L. Goldberg), *Tagung Geld, Banken und Versicherungen,* Universitat Karlsruhe, WG, December 1987.

"A Time Series Analysis of Popular Expectations Data," (with G. S. Maddala and K. Lahiri), in *Economic Applications of Time Series Analysis,* edited by Arnold Zellner (American Statistical Association, Washington, D.C.), 1983.

"Pricing Electricity in an Uncertain Environment," (with G. S. Maddala), in *Value of Service Reliability to Customers,* reference manual, sponsored by the Electric Power Research Institute, 1983.

"Marginal Cost Pricing Under Uncertainty," (with G. S. Maddala), Electric Power Research Institute, (July 1982), EA-2491.

"On the Number and Placement of Rating Periods for Time-of-Day Pricing," in *Incentive Electric Rates: Issues in Cost-Benefit Analysis*, Sanford V. Berg (ed.), New York:  Lexington Books, 1982.

"Direct Estimation of Inflationary Expectations from Survey Data," (with K. Lahiri), in *Time Series Analysis*, Anderson and Perryman (eds.) (Amsterdam:  North Holland), 1981.

"On the Estimation of Popular Price Expectations," (with K. Lahiri), *The Proceedings of the American Statistical Association*, Business and Economics Section, 1980.

"Technical Change, Frontier Production Functions, and Efficiency Measurement," (with G. S. Maddala), *The Proceedings of the American Statistical Association*, Business and Economics Section, 1979.

| | |
|---|---|
| *Papers Presented* | Paper presentations at annual meeting of the American Finance Association, American Economics Association, American Statistical Association, Eastern Finance Association (program committee 1999), Econometric Society, European Finance Association, Financial Management Association (program committee, 2002 & 2003), Southern Finance Association, Western Finance Association, Western Economic Association and several specialized and industry conferences. |
| *Professional Organizations & Activities* | American Finance Association<br>American Economic Association<br>Financial Management Association |
| *University Committee & Administrative Responsibilities* | UM Graduate Faculty, 1982-2003.<br>UM Institutional Research Board, 2001-2003.<br>Faculty Senate Budget Review Committee, 1993-94.<br>SBA Tenure & Promotion Review Committee, 1993-94.<br>UM Graduation Honors Committee, 1993-94.<br>President's Task Force on Academic Structure, Culture, Traditions, and Administrative Practices, 1993.<br>SBA By-laws Committee, 1992-94 |

Arts & Sciences Dean Search Committee, 1990-91.
UM Academic Personnel Board, 1990-91.
Chairman, Business and Social Sciences Subcommittee
of the Research Council, 1990-91.
SBA Finance Task Force, 1990.
SBA Dean Search Committee, 1988-90.
SBA School Council 1987-90.
MBA Curriculum Committee, 1987
Acting Director, M.A. in Law and Economics, 1983-84.
Chairman, Research Committee, Department of
Economics, 1983-84.
Chairman, Recruiting Committee, Department of
Economics, 1986-87.
Faculty Advisor to Lamda Chi Alpha Fraternity, 1985-86.

*Community Activities*       Director, Dade Economic Forum, 1988 to 1998.
Economic Advisory Board, *The Beacon Council*,
1988-2000.
Trustee, St. Stephen's Episcopal Day School, 1989-92.
Advisory Board, *New Miami* Magazine, 1988-92.
President, Miami Business Economists Association, 1986.
Monthly Series of Articles, "The Great Stock Market
Contest," *South Florida Magazine*, 1995.
Occasional columnist for *The Miami Review*
Numerous public speeches and interviews on radio
and television.

*Consulting*                 Occasional consulting with government agencies (IRS,
SEC, USDOJ), corporations and professional
associations.

*Occasional Referee*         *Journal of Finance*
*American Economic Review*
*Journal of Money, Credit, and Banking*
*Financial Management*
*The Review of Economics and Statistics*
*Journal of Futures Markets*
*Financial Review*

Trial Testimony or Affidavits Provided

by

**Raymond P. H. Fishe, Ph.D.**


Wilma Smith, et.al. v. *Foremost Insurance Company, et.al.* (2002)
Circuit Court of the 12th Judicial Circuit in and for DeSoto, Manatee and
Sarasota Counties

*Bank of America, N.A.* vs. Cityside, Inc, Richard Finger, and Phyllis Finger (2002)
Circuit Court of the 17th Judicial Circuit in and for Broward County

*United States of America* v. Joseph Falcone (1999)
U.S. District Court, Southern District of New York

*Allapattah Services, Inc, et.al.* v. Exxon Corporation (1999)
U.S. District Court, Southern District of Florida

*Al-Site Corporation* v. VSI International, Inc. (1997)
U.S. District Court, Southern District of Florida

*Gerald Spielman* v. Rite Industries (1996)
Arbitration Hearing, State of New York

General Motors-Pontiac Motor Division & Trevor H. Duhaney v. *Packer Pontiac Miami-
Division of Packer Corp. and Colonial Pontiac, Inc.* (1990)
Administrative Hearing, State of Florida

Nelson Hunt, Bunker Hunt, & Lamar Hunt vs. *Internal Revenue Service (IRS)* (1989)
U.S. Tax Court, Washington, D.C.

*Ashling Enterprises d/b/a Four Seasons Mobile Home* v. Browning (1987)
Circuit Court of the 11th Judicial Circuit in and for Dade County

Philip Dash, Jay Dash, and Dash Industries v. *Richard B. Marx, et.al.* (1984)
Circuit Court of the 11th Judicial Circuit in and for Dade County


Other testimony includes appearances before the Pari-Mutuel Commission, State of
Florida, on behalf of Hialeah, Inc. and State of Florida Administrative Hearings for Open
Heart Certification on behalf of the North Broward Hospital District.

*The party retaining Professor Fishe is shown in italics.


EXHIBIT
A

*Exhibit "C"*

## CURRICULUM VITA OF JAMES T. McCLAVE, Ph.D.
### President, Info Tech, Inc.
5700 Southwest 34th Street, Suite 1235, Gainesville, FL 32608-5371
Telephone: 352-381-4400, Fax: 352-381-4444
E-Mail: jim.mcclave@infotechfl.com

---

### Areas of Specialization

Statistics, Econometrics, Statistical and Econometric Modeling, Time Series and Regression Analysis, Forecasting, Biostatistics, Antitrust Liability Analysis and Damage Estimation, Employment Discrimination Analysis (Liability and Damages), Calculation of Business Damages, Collusion Detection Software Development and Training.

### Professional Background

President, Info Tech: Statistical Consulting, Information Systems Software Development, Data Management, Computer Analysis, Litigation Support, Expert Testimony, 1977-present.

Adjunct Professor, Business and Economic Statistics, Graduate School of Business, University of Florida, 1989-present.

Associate Professor, Department of Decision and Information Sciences, University of Florida, 1986-1989.

Associate Professor, College of Business Administration, University of Florida, 1981-1986.

Associate Professor, Department of Statistics, University of Florida, 1977-1981.

Assistant Professor, Department of Statistics, University of Florida, 1973-1977.

Visiting Assistant Professor, Department of Statistics, State University of New York at Buffalo, 1972-1973.

Assistant Professor, Department of Statistics, University of Florida 1971-1972.

Graduate Teaching Assistant, Department of Statistics, University of Florida, 1966-1971.

### Education

| | | | |
|---|---|---|---|
| 1971 | Ph.D. | Statistics | University of Florida |
| 1966 | B.S. | Physics | Bucknell University |

### Partial List of Courses Taught

Statistics and Econometric Modeling (TV Course for approximately 1000 students per term)
Statistics and Econometrics for MBA's
Introduction to Probability and Statistics
Engineering Statistics
Statistics for Computer Sciences
Mathematical Statistics
Statistical Methods for Social Sciences
Statistical Methods for Business
Statistical Methods for Biological Sciences
Applied Time Series Modeling and Forecasting
Stochastic Processes
Advanced Time Series Analysis



**info tech**
The Information Technology Company

Curriculum Vita of James T. McClave, Ph.D.

## Publications

### Books

Statistics for Business and Economics, 8th Edition, Prentice Hall, 2001 (with G. Benson).
A First Course in Business Statistics, 8th Edition, Prentice Hall, 2001 (with G. Benson and T. Sincich).
Statistics, 9th Edition, Prentice Hall, 2000 (with F. Dietrich and T. Sincich).
A First Course in Statistics, 7th Edition, Prentice Hall, 2000 (with T. Sincich).
Statistics for Engineers, 4th Edition, Duxbury Publishing Company, 1994 (with R. Scheaffer).
A Second Course in Business Statistics: Regression Analysis, Dellen Publishing Company, 1981 (with
    W. Mendenhall).

### Publications In Refereed Statistics and Economic Journals

Lanzillotti, Robert F., and McClave, J. T., "Comment: Meeting the "Ambiguity" Test Under *Daubert*", Antitrust,
    17( 2),  44-48, Spring 2003.
Blair, R. D., Kaserman, D. L., and McClave, J. T., "Competition on trial:  Florida deregulates trucking."
    Challenge, 30(4), 60-64, 1987.
Blair, R. D., Kaserman, D. L., and McClave, J. T., "Motor carrier deregulation:  the Florida experiment."  The
    Review of Economics and Statistics, 68, 159-164, 1986.
McClave, J. T., and Tipton, J., "Time series modeling:  a comparison of the maximum chi-square and Box-
    Jenkins approaches."  Time Series Analysis: Theory and Practice, 4, 155-161, 1983.
Spreen, T. H., Mayer, R. E., Simpson, J. R., and McClave, J. T., "Forecasting monthly slaughter cow prices
    with a subset autoregressive model."  Southern Journal of Agricultural Economics, 11, 127-131, 1979.
Littell, R. C., McClave, J. T.,  and Offen, W. W., "Goodness of fit tests for the two parameter Weibull
    distribution."  Communications in Statistics, B8(3), 257-269, 1979.
McClave, J. T., "Choosing the order of a moving average process:  the max chi-square."  Communications
    in Statistics, A7, 259-276, 1978.
Wackerly, D. D., McClave, J. T., and Rao, P. V., "Measuring nominal scale agreement between a rate and
    a known standard."  Psychometrika, 43, 213-223, 1978.
McClave, J. T., "Choosing the order of an autoregressive process:  the max chi-square technique."  Journal
    of the American Statistical Association, 73, 122-128, 1978.
McClave, J. T., and Marks, R. G., "Predicting hospital census using time series regression methods."
    Communications in Statistics, A6 (No. 12), 1187-1206, 1977.
McClave, J. T., "Subset Autoregression."  Technometrics, 17, 213-220, 1975.
McClave, J. T., "A comparison of moving average estimation procedures." Communications in Statistics, 3(9),
    865-883, 1974.
McClave, J. T., "On the bias of autoregressive approximations to moving averages."  Biometrika, 60, 559-605,
    1973.

### Other Publications

Hodgson, T.J., King, R.E., McClave, J.T., Sullivan, J.H., and Zegel, W.C., "Analysis and Modeling of a
    Proposed Mining and Benefication Process," Industrial and Engineering Chemical Research, 26, 2223-
    2228, 1987.
Newman, J. R., Novakova, I. E., and McClave, J. T., "The influence of industrial air emissions on the nesting
    ecology of the House Martin (Delichon urbica) in Czechoslovakia."  Biological Conservation, 31, 229-248,
    1985.


**info tech**
The Information Technology Company

Curriculum Vita of James T. McClave, Ph.D.

Doering, P. L., Brackbill, Y., McManus, K., Woodward, L., and McClave, J.T., "Prenatal drugs: patient information and its source." Contemporary Pharmacy Practice, 5(2), 112-119, 1982.

McClave, J. T., Sullivan, J. H., and Pearson, J. G., "Statistical analysis of fish chronic toxicity test data." Aquatic Toxicology and Hazard Assessment, Proceedings of the Fourth Annual Symposium on Aquatic Toxicology, ASTM, 1981.

Winchester, B. J., Delotelle, R. S., Newman, J. R., and McClave, J. T., "Ecology and management of the colonial pocket gopher:  a progress report." Proceedings of the Rare and Endangered Wildlife Symposium, 1979.

Rothrock, T. P., McClave, J. T., and Ailstock, J. P., "A computerized economic and statistical investigation of the Florida school bread market." Southeast Antitrust Review, 1, 13-54. 1978.

McLean, J.E., Ware, W.B., and McClave, J.T., "How analysis of covariance can yield misleading results in educational experiments - a Monte Carlo study." Proceedings of the American Statistical Association, 548-553, 1975.


## Consulting Experience

### Antitrust Litigation & Consulting (past five years)

Bandag v. Michelin.  Calculation of economic damages caused by alleged antitrust violations in the tire retreading market, 2001-2002.

Carbon Fiber Antitrust Litigation. Liability and damage analysis in class action price-fixing case, 2000-present.

Baker v. Jewel Food Stores, Inc. and Dominicks Finer Foods, Inc.  Analysis of retail prices in Chicago area stores, 2000-2002.

Marine Towing of Tampa v. Hvide Marine Towing, Inc.  Liability and damage analysis in restraint of trade case, 2000-2001.

Vitamins Antitrust Litigation.  Liability and damage analysis in class action price-fixing case, 2000-2002.

Nylon Carpet Antitrust.  Damage analysis for a national class action price-fixing case, 1999-2000.

Dekalb Tire v. Michelin, N.A.  Damage analysis in a price discrimination claim, 1999-2001.

Polypropylene Carpets MDL Litigation.  Damage analysis for national class action price-fixing case, 1998-2001.

AGES Group.  Damage calculations regarding penalties paid by AGES due to allegedly attempts to monopolize by Raytheon, 1998-1999.

Minnesota Milk. Econometric analysis of class certification issues in a price-fixing allegation, 1998.

Arch Aluminum v. Bevel Master.  Damage analysis in a price discrimination case, 1998.

Maris v. Anheuser-Busch.  Damage analysis in a case alleging illegal restraint of trade regarding A-B's prohibition of public ownership of its distributorships' equity.  1998-2000.

Ford Motor Company, General Motors Corporation, Chrysler Corporation, USX Corporation (U.S. Steel Group) and Republic Engineered Steels, Inc.  Damage analysis re: ferrosilicon alloy price-fixing conspiracy, 1997-1998.

New York Attorney General.  Damage analysis for alleged antitrust violations in the construction of the New York City Convention Center, 1991-2000.

### Employment Discrimination Litigation & Consulting (past five years)

Butler v. MBNA Technology, Inc., f/k/a MBNA Hallmark Information Services, Inc.  Damage analysis re: alleged age discrimination, 2003



3

Curriculum Vita of James T. McClave, Ph.D.

Farrow v. Bank of America Corp. Damage analysis for a gender bias allegation, 2003
Anderson, et al v. Goodyear Tire and Rubber Company. Statistical analysis of alleged damage to property values related to radiant heating systems, 2003.
Dodson v. Homes of Merit, Inc. Calculations of damages due to lost earnings for the plaintiff resulting from alleged discrimination, 2003.
Luna, et al v. Household Finance Corporation, et al. Construction, management, and analyses of large customer loan databases to enable econometric analyses of alleged discriminatory lending practices, 2003.
Pasley, et al v. Tyco International, Inc. Statistical and economic analysis of race discrimination allegations, 2003.
Thompson v. Motorola, Inc. Calculations of damages due to lost earnings for alleged discrimination, 2003.
Johnson v. Westside Regional Medical Center. Statistical and economic analysis of age discrimination allegations, 2003.
DiJoseph v. Invivo Research. Damage analysis re: alleged age discrimination matter, 2002.
Lea Cordoba v. Dillards, Inc. Damage analysis for lost earnings re: alleged wrongful termination, 2002.
Hubert Johnson v. Hallmark Information Services. Liability and damage analysis re: alleged race discrimination, 2002.
Santana, et al v. Blue Ribbon Meats, Inc. Analysis of workforce for a liability analysis in re: alleged age discrimination in a reduction-in-force, 2002.
Utility Contractors Association of North Florida v. City of Jacksonville. Analysis of minority participation and availability in Jacksonville construction projects, 2002.
Odom, et al. v. Microsoft. Damage analysis re: race discrimination claim, 2002.
Sanders, et al. v. Melton Truck Lines, et al. Damage analysis re: wrongful death claim, 2002.
Dancy v. Interstate Brands Corp. Liability and damage analysis re: race discrimination, 2001.
Branch v. Boeing. Damage analysis re: unlawful termination, 2001.
Bronner v. Taylor. Calculation of lost earnings and earnings capacity, 2001.
Elliott v. City of Port Orange. Review of lost earnings damage analysis, 2001.
Estrin v. Natural Answers. Damage analysis re: breach of contract claim, 2001.
Saari v. Florida Progress Corp. Calculations of the value of lost supplemental executive retirement plan, 2001.
Wilds v. Holdenback, et al. Calculation of lost earnings and earnings capacity, 2001.
Ruth v. Southern Bakeries, ButterKrust, et al. Liability analysis re: alleged race discrimination, 2001.
Thick v. Bray. Damage analysis re: wrongful termination matter, 2001.
Jacqueline Iaia v. Pembroke Pines Hospital. Statistical analysis re: discrimination claim, 2001.
Turner v. Moore. Consulting on damage re: wrongful termination matter, 2001.
Kocher v. Poe & Brown. Damage analysis re: alleged age discrimination, 2000.
Mullen v. H.E.R.E. Damage analysis re: race/national origin discrimination matter, 2000.
Lewis v. S & H Fabricating. Lost earnings analysis in a sex discrimination matter, 2000.
Bacon, et al v. Honda. Liability and damage analysis re: class action race discrimination allegation, 2000.
Firemen v. City of Orlando. Liability analysis in a racial discrimination in promotion matter, 1999.
Duvall v. O'Donnell Corp. Damage analysis re: age discrimination allegation, 1999.
Prospere v. HRS. Damage analysis re: racial discrimination allegation case, 1999.
Vereen v. GTE, Inc. Damage analysis re: accommodation of disability matter, 1999-2000.
Walkowiak v. Town of Kenneth City. Damage analysis re: wrongful termination allegation, 1999.
Sleeckx v. Shoney's. Damages in sexual harassment and wrongful termination matter, 1999.
Slaughter v. City of Melbourne. Damage analysis re: age discrimination allegation, 1999.
Hoffman, et al v. Honda. Damage analysis re: class action gender discrimination allegation, 1999-2001.
Hull v. Cash America. Damage analysis re: age discrimination, 1999.
Meehan v. Northlake Foods. Liability analysis re: sexual discrimination and hiring practices, 1999-2000.



4

Curriculum Vita of James T. McClave, Ph.D.

Velazquez v. Shoney's. Damage analysis re: national origin discrimination/wrongful termination, 1998-1999.

Frawley v. McArthur Dairy. Damage analysis re: wrongful discharge termination allegation, 1998.

Frederick v. McDonnell Douglas Corp. Damage analysis re: employment-related injury, 1998.

Whitman v. Rubin. Liability and damage analysis re: age discrimination allegation, 1998.

Moyer v. Bellsouth. Damage analysis re: disability discrimination/demotion/wrongful termination, 1998.

Michaels v. AAA. Liability analysis re: age discrimination, 1998.

Leon v. Barnett Bank. Damage analysis re: age discrimination/wrongful termination, 1998.

Sands v. Barnett Bank. Damage analysis re: racial discrimination/promotion, 1998.

Bazile v. USA. Damage analysis re: national origin discrimination/wrongful termination, 1998.

DeHart/Weeks v. Columbia Hospital. Damage analysis re: allegations of sexual harassment, constructive discharge, wrongful termination, 1997-1999.

Scholz v. Orlando Magic. Damage analysis for race discrimination and defamation allegations, 1995-2000.

## Biostatistical/Environmental Consulting & Litigation (past five years)

FCG. Statistical support for the rule challenge re: the identification of impaired surface waters, 2001-present.

Florida Institute of Phosphate Research. Statistical modeling in a meta-analysis of various sources of data collected on amounts of radioactivity in foods grown on Florida lands, 1999-2002.

PEPCO. Development of long-term $NO_x$ emissions limit, 1998-1999.

Florida Litter Survey. Design of sample survey to determine extent of litter on Florida roadways and beaches, 1993-2002.

Sugar Cane Growers Cooperative of Florida v. South Florida Water Management District. Statistical analysis of water quality data in the Everglades. 1992-present.

## Other Litigation Consultations (past five years)

Bonanza Beverage Co., Inc. v. Labatt USA. Damage analysis for breach of contract allegations, 2003

Gordon Dissolution. Occupational fatality and injury analysis, 2003

LSQ II, LLC v. KPMG Consulting, Inc. Damage analysis re: alleged breach of contract, 2003.

Welch vs. Brown & Williamson Tobacco Corporation, et al. Analysis of cigarette shipment and tax data re: punitive damages issues, 2003

Thompson v. Brown & Williamson Tobacco Corp., et al. Analysis of cigarette shipment and tax data re: punitive damages issues, 2003.

Roach v. Brown & Williamson Tobacco Corp., et al. Analysis of cigarette shipment and tax data re: punitive damages issues, 2003.

S.P.S. Technologies vs. Motorola, et.al. Damage analysis re: technology development failed joint venture, 2002.

NAACP v. A.A. Arms, et al. Consulting for attorneys for Colt Firearms on liability issues, 2002.

Coordinated California Firearms cases. Consulting for attorneys for Colt Firearms on liability issues, 2002.



DAG v. Exxon. Damage estimation corresponding to a lost business opportunity allegedly caused by discriminatory practices, 2002.

Southern Multifoods, Inc. v. Aventis Cropscience USA.. Damage analysis re: lost profits, 2002.

Second Chance Jai-Ali, LLC v. Ocala Breeders Sales Company. Damage analysis re: breach of contract, 2002.

Schnipper v. Mercedes-Benz USA, et al. Analysis of repair reports in defective product claim, 2002.

Deluca v. Liggett & Myers, et al. Confounding factors in smoking-related diseases, life expectancy/tobacco use and quitting statistics, 2002.

Longden v. Philip Morris, Inc. Confounding factors in smoking-related diseases and tobacco use, 2002.

West Virginia Tobacco Litigations. Punitive damage issues in individual personal injury cases, 2002.

Anderson Columbia Co., Inc. and Joe Anderson, Jr. v. Gannett Company, Inc., et al. Damage analysis in a defamation case, 2002.

Leslie Kemmerer v. Starwood Hotels & Resorts Worldwide, Inc. & Barry Sternlicht. Damage analysis in breach of contract case, 2002.

West Virginia Attorney General. Analysis of property tax issues in challenges brought by railroads and utilities, 2002.

Department of Highway Safety and Motor Vehicles v. Envirotest Technologies, Inc., et al. Statistical consulting re: auto emissions, 2002.

TST d/b/a Northco v. BellSouth Communications. Damage analysis for alleged tortuous interference case, 2002.

Testwuide, et al. v. U.S. Damage analysis re: property values in vicinity of military air base, 2002.

Pepin v. Pepin. Business valuation analysis of beer distributorship, 2002.

Global Healthcare v. Med Gen, Inc. Damage analysis for a breach of contract case, 2002.

Butland, et al. v. Rollins, Inc., Orkin Exterminating Company, Inc. et al. Damage analysis in a breach of contract case involving termite inspections, 2002.

N.A.A.C.P., et al., v. Katherine Harris, Volusia County, et al., duplicate voter registration issues, 2002.

Carnegie v. Thornton. Analysis of damages allegedly caused by accounting malpractice, 2001.

Zixlt v. VISA. Analysis of economic damages allegedly caused by Internet postings, 2001-2002.

Keitel v. Wendy's. Valuation issues re: South Florida Wendy's franchises, 2001-2002.

American Library Association v. U.S.A. Review of statistical issues re: accuracy of filters used to block pornographic Internet sites in libraries, 2001-2002.

Luna Brumfield v. Philip Morris, Inc. Analysis of CPS II re: relative risks associated with smoking and other risky behaviors, 2001-2002.

Kelly v. Nelson, Mullins, Riley & Scarborough, L.L.P. Damage analysis re: alleged breach of fiduciary duty, negligent misrepresentations, fraud, tortious interference with contract, unfair trade practice matter, 2001-present.

Elaine Conley et al v. R. J. Reynolds et al. Analysis of CPS II re: relative risks associated with smoking and other risky behaviors, 2001-2002.



Curriculum Vita of James T. McClave, Ph.D.

Andrews v. Kerr-McGee. Evaluation of statistical analysis comparing exposed and control populations in proximity to wood treatment plant, 2001-present.

Baker v. Petway (Jaguars). Damage analysis in breach of contract claim, 2001-2002.

Taghulk v. Service Corp. Calculation of damages - patent infringement, 2001.

HealthPlan v. Connecticut General Life (CIGNA). Review of the statistical sampling methodology for a case involving claims overpayment allegations, 2001.

De La Paz v. AHCA. Review statistical methodology used to estimate total overcharge to Medicaid Program based on a sample of provider claims, 2001.

Richard Boeken v. Philip Morris, Inc. Analysis of CPS II re: risky behaviors associated with smoking, 2001.

U.S. v. Naren Jadeja, et al. Statistical analysis in a criminal case involving Medicaid fraud allegations, 2000.

HCFA Statistical Sampling Guidelines. Consultation with U.S. Attorney's Office regarding the development of HCFA's guidelines for Medicare Part B audit sampling, 2000.

M.E. v. Bush Child Welfare. Sampling issues in class action re: State mental health services, 2000-2001.

McCaffery v. Colonial Bank. Analysis of insufficient fund charges, 2000.

Tracy, et. al. v. Dean Witter. Liability analysis in a gender discrimination case, 2000.

Physician's Health v. Foundation Health. Statistical analysis of patterns in a Medicare patient-stealing case, 2000.

Fabricant v. Sears. Damage analysis in credit card insurance case, 2000.

London v. Wal-Mart. Damage analysis in credit card insurance case, 2000.

Snow, et al. v. Compass Bank. Analysis of insufficient fund charges, 2000-2001.

Hyde v. Philip Morris, Inc. Confounding factors in smoking-related diseases, 2000.

Engle et al. v. R.J. Reynolds Tobacco Company. Damage analysis in a product liability class action against the Tobacco Industry. 1999-2000.

Estate of Sueann Mann v. R.J. Reynolds, et al. Confounding factors in smoking-related diseases, 2000.

Orlando SMSA v. Orange County. Damages in a matter involving the collection and remission of taxes on cellular phone charges, 1999-2000.

Rubenstein v. AHCA. Damage analysis re: alleged medicaid overpayment, 1999.

Braishfield v. McCahill. Damage analysis for a tortious interference claim, 1999.

Couch Construction v. Columbia County. Damage analysis in a breach of due process claim, 1999-2000.

DOJ Investigation of Vitreo-Retinal Consultants. Statistical sampling and analysis for Medicare fraud investigation, 1998-2000.

Buckley Powder v. State of Colorado. Analysis of proposed sampling plan to recover unconstitutionally collected interstate trucking taxes, 1998-2000.

Kalifeh v. AmSouth Bank. Analysis of insufficient fund charges, 1998-1999.

Universal Business Systems v. Disney Vacation. Damage analysis in a breach of contract case regarding timeshare software, 1998-1999.



Curriculum Vita of James T. McClave, Ph.D.

Cutler v. Orkin. Damage analysis in a breach of contract case involving termite inspections, 1998-2002.

Marketing Agents v. MCI. Damage analysis re: breach of contract, 1997-present.

Maris Distributing v. Anheuser-Busch, Inc. Liability and damage analysis re: alleged improper termination of distributorship, 1997-2001.

Young Oil v. Racetrac Petroleum. Analysis of retail gasoline pricing re: Alabama below-cost pricing allegations, 1996-2000.

Visiting Nurses Assoc. Dade v. USA. Estimation of overcharges in Medicare fraud case, 1996-1999.

## Other Consultations (past five years)

Shands Hospital Medicaid and Medicare Claims Review. Development of sampling and estimation techniques for hospital Medicaid and Medicare claims, 2002.

Jacksonville Physicians' Investigation. Review of statistical procedures used in a Medicaid payment audit, 1999.

NW Florida OB/GYN Investigation.   Review of statistical procedures used in a Medicaid payment audit, 1999.

Lauderdale Clinic Investigation. Consultation with U.S. Attorneys Office regarding Medicaid/Medicare audits, 1999.

AutoNation. RIF impact analysis, 1999.

UPS Wage/Hour Litigation. Liability and damage analyses in a wage and hour class certification matter, 1999-2002.

Nokia. Design, implementation, and analysis of market surveys, 1998-2000.

U.S. Department of Justice. Various statistical consulting tasks related to DOJ investigations of Medicaid and Medicare providers, 1997-present.

Florida Property Appraisers' Association. Consultation on technical legislative issues affecting Florida's property appraisers, including equalization taxes and Department of Revenue review of appraisals, 1985-present.

## Expert Witness Testimony (past five years)

Second Chance Jai-Alai, LLC. vs. Ocala Breeders Sales Company, Inc. et al., Fifth Circuit, Marion County, Florida, Case No. Case No. 1593-CAG. Deposition testimony re: economic damages in breach of contract case. May 28, 2003. Retained by Plaintiff.

U.S. vs. Dr. Gustavo E. Coll, Southern District of Florida, Case No.02-20363-Cr-Middlebrooks. Testimony in federal court re: claims sampling and estimated overpayment used for sentencing guidelines. May 19, 2003. Retained by US Department of Justice.

DAG Enterprises, Inc. and EYOB MAMO v. Exxon Mobil, District Court, District of Columbia, Case No. 1:CV00182-CKK. Deposition testimony re: economic damages for alleged race discrimination. April 9, 2003. Retained by Plaintiff.



**info tech**
The Information Technology Company

Curriculum Vita of James T. McClave, Ph.D.

John P. Kelly vs. Nelson, Mullins, Riley & Scarborough, L.L.P., a foreign limited partnership; and Glenn W. Sturm, District Court, Middle District of Florida, Tampa Division, Case No. 8:01-CV-1176-T-27MAP. Deposition re: economic damages resulting from alleged malpractice. February 17, 2003. Retained by Plaintiff.

Maureen Baker, et al., Jewel Food Stores, Inc.,et al.,Chicago Milk, State of Illinois, County of Cook, Circuit Court, Case No. L 9664. Testimony in state court, re: price-fixing allegations. February 13-14, 2003. Retained by Plaintiffs.

Everglades Hearings: Testimony at Environmental Regulatory Commission Hearing re: statistical issues related to phosphorus limits in the Everglades. December 13, 2002. Retained by Sugar Cane Growers Cooperative of Florida.

Carl N. DiJoseph, et al., v. Invivo Research, U.S. District Court, Middle District of Florida, Orlando, Case No. 99-1450-ORL-28C. Testimony in deposition re: damages in alleged age discrimination. November 13, 2002. Retained by Defendant.

Orlando v. SMSA Limited Partnership v. Orange County and Martha Haynie. Circuit Court, 9th Judicial Circuit, Orange County Florida, Case No. CIO 99-150 DIV 35. Testimony in deposition re: analysis of records for public service tax payments and methodology for calculating appropriate amount of tax. October 30, 2002. Retained by Plaintiff.

Juanita Washington, as personal representative of the Estate of Derrick Washington vs. Microsoft Corporation, U.S. District Court, Western District of Washington at Seattle, Case No. C01-1996P., Jozette Joyner v. Microsoft Corporation, and Pamela Odom v. Microsoft Corporation, Case No. C01-1632P. Testimony in deposition re: damages analysis in race discrimination case. October 25, 2002. Retained by Plaintiffs.

Everglades Hearings: Testimony at Environmental Regulatory Commission Hearing re: statistical issues related to phosphorus limits in the Everglades. October 24, 2002. Retained by Sugar Cane Growers Cooperative of Florida.

Maureen Baker, et al., v. Jewel Food Stores, Inc., a New York Corporation, and Dominick's Finer Foods, Inc., a Delaware Corporation, Circuit Court, Cook County, Case No. 00-L-9664. Testimony in deposition re: liability and damages issues in price-fixing case. October 21, 2002. Retained by Plaintiffs.

Jane Bronner, as next of kin of Darrow W. Bronner, Sr., and as Administratrix of the Estate of Darrow W. Bronner, Sr., Deceased, v. Kenneth D. Taylor, M.D., Eugene J. Pope, Jr., M.D., and the Heart Clinic, P.C., Case No. 02-1-0407-991, Superior Court of Cobb County, Georgia. Testimony in deposition re: damages analysis for wrongful death claim. October 10, 2002. Retained by Plaintiff.

In re: The marriage of Thomas A. Pepin and Terry Lea Pepin, Case No. 00-10812, Thirteenth Circuit, Hillsborough County, Florida Family Law Division. Testimony in deposition re: cost of equity, cost of debt and growth rates in the valuation of Pepin Distributing Company. September 18, 2002. Retained by Wife.

TST, Inc., d/b/a Northco v. BellSouth Communications, Inc., et al., U.S. District Court, Palm Beach, Florida, Case No. 01-8033-CIV-RYSKAMP/Vitunac. Testimony in deposition re: economic damages in breach of contract case. August 15, 2002. Retained by Plaintiff.

Global Healthcare Laboratories, Inc. v. Med Gen, Inc., U.S. District Court, Palm Beach, Florida. C.A. No. 01-8717-CIV-Hulk. Testimony in deposition re: economic damages in breach of contract case. July 30, 2002. Retained by Plaintiffs.



**info tech**
The Information Technology Company

9

Curriculum Vita of James T. McClave, Ph.D.

*Zixit Corporation and Zixcharge.COM v. VISA U.S.A. and VISA International Service Association*, U.S. District Court, Dallas County, Texas, Case No. CC99-10187. Testimony in trial re: causality issues, and economic damages allegedly caused by Internet postings. July 22, 2002. Retained by Defendants.

*Jacqueline Sanders, et al vs. Melton Truck Lines, Inc., et al.*, U.S. District Court, Cincinnati, Ohio, Case No. C-01-563. Testimony in deposition re: damage analysis for wrongful death claim, July 10, 2002. Retained by Plaintiffs.

*N.A.A.C.P., et al., v. Katherine Harris, Volusia County, et al.*, U.S. District Court, Southern District of Florida, Miami, Case No. 01-0120-CV-Gold/Simonton. Testimony in deposition re: duplicate voter registration issues. May 29, 2002. Retained by Defendant, Volusia County.

*Bandag, Incorporated v. Michelin Retread Technologies, Incorporated, et al., Michelin Retread Technologies, Incorporated and Michelin North America, Incorporated v. Bandag, Incorporated and Bridgestone/Firestone, Inc.*, U.S. District Court, Iowa, Case No. 3-99-CV-80165. Testimony in deposition re: calculation of economic damages caused by alleged antitrust violations in the tire retreading market. April 5, 2002. Retained by Defendants and Counterclaimants.

*Judith A. Hyde v. Philip Morris, Inc.*, U.S. District Court, Rhode Island, Case No. 97-359-ML. Testimony at trial re: declining relative risk for former smokers and smoker quitting rates. March 15-18, 2002. Retained by Defendant.

*Mark Butland, et al. v. Rollins, Inc., Orkin Exterminating Co, et al.*, Circuit Court, Hillsborough County, Florida, Case No. 99-2173. Testimony at trial re: sampling issues in evaluation of termite contractual services. January 24, 2002. Retained by Defendant.

*American Library Association, et al. v. USA*, et al., U.S. District Court, Eastern District of Pennsylvania, Case No. 01-CV-1303. Testify in deposition re: statistical evaluation of effectiveness of Internet filters. January 11, 2002. Retained by Defendant.

*Zixlt Corporation and Zixcharge.COM v. VISA U.S.A. and VISA International Service Association*, District Court, Dallas County, Texas, Case No. CC 99-10187. Testimony in deposition re: economic damages allegedly caused by Internet postings. November 14, 2001. Retained by Defendants.

*Roseanne Thick v. Charles Bray, et al.*, U.S. District Court, Orlando, Florida, Case No. 6:00-CV-1560-ORL-28C. Testimony in deposition re: damage analysis in wrongful termination matter. October 29, 2001. Retained by Plaintiff.

*Clifton Dancy v. Interstate Brands Corporation*, District Court, Orlando, Florida, Case No. 6:01-CV-289-ORL 22 KRS. Testimony in deposition re: liability and damages in race discrimination case. October 25, 2001. Retained by Plaintiff.

*Carnegie v. Thornton*. Testimony in deposition re: economic damages in accounting malpractice case. September 27, 2001. Retained by Plaintiff.

*Maris v. Anheuser-Busch, Inc.*, Circuit Court, Alachua County, Florida, Case No. 97-CA-22, Division J. Testimony at trial re: liability and damages in breach of contract claim. June 8-15, 2001. Retained by Plaintiff.

*Jacqueline Iaia v. Pembroke Pines Hospital*, Case No. 00-6227-Civ-Moreno. Testimony in Federal Court, Miami re: statistical analysis of discrimination claim. April 12, 2001. Retained by Defendant.

*Dekalb Tire Co., Inc., vs. Michelin North America, Inc.*, United States District Court, Northern District of Georgia, Atlanta Division. Testimony in deposition re: damages in Robinson-Patman claim. March 15, 2001. Retained by Plaintiff.


**info tech**
The Information Technology Company

10

Curriculum Vita of James T. McClave, Ph.D.

Richard Boeken v. Philip Morris, Inc., Superior Court, State of California, County of Los Angeles, Case No. B226593, Testimony in deposition re: statistical analysis of risky behaviors associated with smoking. February 17, 2001. Retained by Defendant.

Alina De La Paz vs. AHCA, State of Florida, Division of Administrative Hearings, DOAH Case No. 99-4154, Testimony in deposition re: evaluation of statistical methodology used in estimating Medicaid overcharges. February 8, 2001. Retained by Respondent.

Maris v. Anheuser-Busch, Inc., Circuit Court, Alachua County, Florida, Case No. 97-CA-22, Division J. Testimony in deposition re: liability and damages issues in breach of contract claim. February 6, 2001. Retained by Plaintiff.

Maris v. Anheuser-Busch, Inc., Circuit Court, Alachua County, Florida, Case No. 97-CA-22, Division J. Testimony in deposition re: liability and damages issues in breach of contract claim. January 9, 10 and 11, 2001. Retained by Plaintiff.

Carl Kocher v. Poe & Brown, Inc., United States District Court, Middle District of Florida, Tampa, Division, Case No. 99-491-Civ-T-17C. Testimony in deposition re: damage analysis for age discrimination claim. January 5, 2001. Retained by Defendant.

Bacon, et al. v. Honda of America Manufacturing, Inc., U.S. District Court, Southern District of Ohio, Eastern Division, Case C-2-99-803. Testimony in Federal Court class certification hearing re: race discrimination liability and damages. December 18, 2000. Retained by Plaintiffs.

Hyde v. Philip Morris, Inc., U.S. District Court, Rhode Island, Civil Action No. 97-359 ML. Testimony in deposition re: confounding factors in smoking-related diseases. October 31, 2000. Retained by Defendant.

Orlando SMSA Limited Partnership vs. Orange County, Circuit Court, 9th Circuit, Orange County, Florida, Case CIO 99-150 DIV 35. Testimony in deposition re: calculation of Public Use Tax. October 27, 2000. Retained by Plaintiff.

Maris Distributing Company v. Anheuser Busch, Inc., U.S. District Court, Ocala, Florida, Case No. 97-15-CIV-OC-10-C. Testimony at trial re: antitrust damages, October 23-24, and November 6, 2000. Retained by Plaintiff.

Lauren W. McCaffery, et al. v. Colonial Bank of Alabama, Circuit Court, Mobile County, Alabama, No. CV98-2488. Testimony in deposition re: issues relating to classwide damage calculations. September 21-22, 2000. Retained by Plaintiffs.

Bacon, et al. v. Honda of America Manufacturing, Inc., U.S. District Court, Southern District of Ohio, Eastern Division, Case C-2-99-803. Testimony in deposition re: race discrimination liability. August 15-16, 2000. Retained by Plaintiffs.

George W. Scholz v. RDV Sports, Inc., Circuit Court, Orange County, Florida, CI 92-7508. Testimony in court regarding damages. June 16, 2000. Retained by Plaintiff.

George W. Scholz v. RDV Sports, Inc., Circuit Court, Orange County, Florida, CI 92-7508. Testimony in deposition regarding damages. June 15, 2000. Retained by Plaintiff.

Snow v. Compass Bank, Circuit Court, Mobile, Alabama, CV 98-2384. Testimony in deposition regarding analysis of overdraft charges. May 26, 2000. Retained by Plaintiffs.

Guy F. Buscemi, et al v. United Parcel Service, Inc., United States District Court, District of New Jersey, Civil Action Number 97-5450 (WGB). Testimony in deposition regarding alleged driver mealtime work violations. May 24, 2000. Retained by Plaintiffs.

Buckley Powder v. State of Colorado, District Court, Denver, Colorado, Case No. 93CV450. Testify in court re: damage calculation methodology in an unconstitutional taxation matter. March 24, 2000. Retained by Defendant.



Curriculum Vita of James T. McClave. Ph.D.

Jereids, et al. v. City of Orlando, United States District Court, Middle District of Florida, Orlando Division. Testimony in deposition re: liability analysis in racial discrimination case. March 2, 2000. Retained by Defendant.

Polypropylene Carpet Antitrust Litigation, U.S. District Court for the Northern District of Georgia, MDL Docket No. 1075, Master File: 4:95-CV-193-HLM. Testify at Daubert hearing re: damage methodology in a price-fixing conspiracy claim. January 31-February 3, 2000. Retained by Plaintiffs.

Elna Hoffman, et al, v. Honda of America Mfg., Inc., U.S. District Court, Southern District of Ohio, Western Division at Dayton, Case No. 3-97-248. Testimony at hearing re: class certification damages issues. December 7, 1999. Retained by Plaintiff.

Elna Hoffman et al v. Honda of America Mfg., Inc., U.S. District Court, Southern District of Ohio, Western Division at Dayton, Case No. 3-97-248.  Testimony in deposition re: class certification damages issues. November 18, 1999. Retained by Plaintiff.

John Frederick and Lori Frederick v. United States of America, McDonnell Douglas Corporation, Crawford and Company and Billie B. Moskovitz, U.S. District Court, Middle District of Florida, Orlando, Florida, Case No. 98-226-CIV-ORL-22C. Testimony in deposition re: economic damages. September 21, 1999. Retained by Plaintiff.

Henry M. Rubinstein, D.C., v. State of Florida, AHCA, State of Florida Division of Administrative Hearings, Case No. 98-2772. Testimony in deposition re: statistical methods in Medicaid fraud detection. August 10, 1999. Retained by Defendant.

Maris Distributing Company  v. Anheuser Busch, Inc., U.S. District Court, Ocala, Florida, Case No. 97-15-CIV-OC-10-C. Testify at deposition re: damages. August 3, 1999. Retained by Plaintiff.

Couch Construction, LP, v. Columbia County, Florida, U.S. District Court, Middle District of Florida, Jacksonville Division, Case No. 98-938-CIV-J-20B. Testimony in deposition re: economic damages. July 26, 1999. Retained by Plaintiff.

Polypropylene Carpet Antitrust Litigation, U.S. District Court for the Northern District of Georgia, MDL Docket No. 1075, Master File: 4:95-CV-193-HLM. Testify at deposition re: damages in a price-fixing conspiracy claim. July 23, 1999. Retained by Plaintiffs.

Craig H. Hull v. Cash America International, Inc., U.S. District Court, Middle District of Florida, Orlando, Division, Case No. 98-607-CIV-ORL-19A, Testimony in deposition re: economic damages.  July 15, 1999. Retained by Plaintiff.

Polypropylene Carpet Antitrust Litigation, U.S. District Court for the Northern District of Georgia, MDL Docket No. 1075, Master File: 4:95-CV-193-HLM. Testify at deposition re: damages in a price-fixing conspiracy claim.  July 1, 1999. Retained by Plaintiffs.

Maris Distributing Company  v. Anheuser Busch, Inc., U.S. District Court, Ocala, Florida, Case No. 97-15-CIV-OC-10-C. Testify at deposition re: damages. June 23, 1999. Retained by Plaintiff.

Joseph Duvall v. Timothy J. O'Donnell Corp., Ninth Circuit, Orange County,  Florida, Case No. CI 97-8396. Testify in court re: damages in an unlawful termination in retaliation for a workman's compensation claim.  June 18, 1999. Retained by Plaintiff.

Polypropylene Carpet Antitrust Litigation, U.S. District Court for the Northern District of Georgia, MDL Docket No. 1075, Master File: 4:95-CV-193-HLM.  Testify at deposition re: damages in a price-fixing conspiracy claim. May 22-23, 1999. Retained by Plaintiffs.

Universal Business Systems v. Disney Vacation Club, Ninth Circuit, Orange County, Florida.  Case No.CIO 95-3614. Testify in court re: damages and lost profits in a breach of contract case. May 19, 1999. Retained by Defendant.



info tech
The Information Technology Company

12

Curriculum Vita of James T. McClave, Ph.D.

Helon H. Cutler, et al. v. Orkin Exterminating Company, Inc., et al., Circuit Court, Houston County, Alabama. Case No. 96-184. Testify in deposition re: review of Plaintiffs' expert's sampling methodology. April 29, 1999. Retained by Defendant.

Universal Business Systems v. Disney Vacation Club, Ninth Circuit, Orange County, Florida. Case No. CIO 95-3614, Testify in deposition re: damages and lost profits in a breach of contract case. April 27, 1999. Retained by Defendant.

Thomas E. Slaughter v. City of Melbourne, U.S. District Court, Middle District of Florida, Orlando Division. Case No. 97-946-CIV-ORL-19. Testify in court re: damages in an age discrimination claim. March 30, 1999. Retained by Plaintiff.

Amilkar Velazquez v. Shoney's, Inc., District Court, Orlando, FL, Case No. 97-1540-CIV-ORL-22C. Testify in deposition re: damages in a national origin discrimination case, February 19, 1999. Retained by Plaintiff.

Sugar Cane Growers Cooperative of Florida v. South Florida Water Management District, Division of Administrative Hearings, Florida, Case No. 92-303. Testify at hearing re: statistical analysis of phosphorus levels in the Everglades. February 17, 1999. Retained by Plaintiff.

Buckley Powder v. State of Colorado, District Court, Denver, Colorado, Case No. 93CV450. Testify in court re: damage calculation methodology in an unconstitutional taxation matter. February 12, 1999. Retained by Defendant.

Vicki DeHart/Edith Weeks v. Columbia Bartow Regional Memorial Healthcare System, District Court, Tampa, Florida, Case No. 97-1300-CIV-T-23C. Testify in deposition re: damages in a sexual harassment case. February 4, 1999. Retained by Plaintiff.

Paul Kalifeh v. Amsouth Bank, N.A., Circuit Court, Mobile County, Alabama, Case No. CV-98-2022. Testify in deposition re: extraction of data from AmSouth's database for analysis of insufficient funds charges. January 22, 1999. Retained by Plaintiff.

Thomas E. Slaughter v. City of Melbourne, U.S. District Court, Middle District of Florida, Orlando Division, Case No. 97-946-CIV-ORL-19C. Testimony at deposition regarding damages in an age discrimination claim. November 11, 1998. Retained by Plaintiff.

State of Washington v. American Tobacco, et al. Superior Court for the State of Washington, King County Case No. 96-2-15056-8 SEA. Testimony in deposition re: damages in fraud case. September 16-17, 1998. Retained by Defendant.

The AGES Group v. Raytheon Aircraft Co., Inc. and the Wackenhut Corp., United States District Court, Southern Division, Alabama, Case No. 96-A-1514-N. Testimony in deposition re: damages. August 13, 1998. Retained by Plaintiff.

Kelly DeRasmo v. City of Gainesville, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:97-CV118MMP. Testimony in deposition re: damages in a gender discrimination claim. July 8, 1998. Retained by Plaintiff.

Woodrow Allen, et al. v. Serve-Air Skycap Service, Inc., et al., U.S. District Court, Middle District of Florida, Tampa Division, Case No. 96-1306-CIV-T-23E. Testimony at trial regarding liability and damages in a racial discrimination claim. June 18, 1998. Retained by Defendant.

## Professional Activities and Awards

### University of Florida Department of Statistics "Outstanding Alumni" Award, 2002



Curriculum Vita of James T. McClave, Ph.D.

## University of Florida Committees

University of Florida Center for Entrepreneurship and Innovation, 2002.

University of Florida President's Council, 2001-present.

Business Leaders Forum, 1994-present.

College of Business Undergraduate Curriculum Committee, 1988-1989.

College of Business Teaching Committee, 1987-1988.

College of Business Associate Dean Search Committee, 1987.

College of Business and Liberal Arts and Sciences Task Force, 1986-1989

College of Business Computing Committee, 1986-1989.

University Senate, 1979-1980.

College of Liberal Arts and Sciences Tenure and Promotion Committee, 1978-1979, 1979-1980.

College of Arts and Sciences Curriculum Committee, member, 1976-1980.

College of Arts and Sciences Computer Sciences Committee Member, 1973-76; Chairman, 1974-1975.

Instruction and Research Users Committee, NERDC, member, 1974-1975.

## Council for Economic Outreach

## The Executive Committee (TEC)

## State of Florida Department of Education Committee

Statewide Common Course Designation and Number Project, Statistics Task Force Member, 1974-1981.

## Professional Associations

American Statistical Association

American Bar Association - Associate Member - Section of Antitrust Law

International Association of Assessing Officers

## Training and Presentations

"Collusion Detection Training, Ohio Department of Transportation, April 22-24, 2003.

"Collusion Detection Training", South Carolina Department of Transportation, March 12, 2003.

"Collusion Detection Training, "Short course in computerized collusion detection, Gainesville, Florida, February 25-27, 2003

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 20-22, 2001.

"Collusion Detection Training," Ohio Department of Transportation, April 18-20, 2000.



"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 22-24, 2000.

Missouri BAMS/DSS Data Analysis Presentation, December 13, 1999.

Nebraska BAMS/DSS Data Analysis Presentation, November 1, 1999.

Virginia Beach Fraud Conference, "Basics of Fraud and Collusion Detection," and "Computerized Fraud and Collusion Detection," May 5-7, 1999.

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 23-25, 1999.

"Collusion Detection Training," Colorado DOT, December 7-8, 1998.

"Top Ten Collusion Indicators for Estimators," Transportation Estimators Association, Portland, Maine, October 26-28, 1998.

"Collusion Detection Training," Texas DOT, September 1-2, 1998.

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 24-26, 1998.

"Collusion Detection Training," Colorado DOT, December 18-19, 1997.

"Collusion Detection Training," Vermont DOT, November 4-5, 1997.

"Bid Collusion Detection," AASHTO TRNS.PORT Users Group Conference, Portland, Oregon, October 4-7, 1997.

"Using Expert Witness to Prove Damages in a Business Torts Case," Business Torts Seminar, Asheville, North Carolina, October 10, 1997.

"Collusion Detection Training," New Mexico DOT, June 26-27, 1997.

"Collusion Detection Training," Missouri DOT, May 1-2, 1997

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 4-6, 1997.

"Collusion Detection Training," Indiana DOT, September 16-17, 1996.

"Entrepreneurism," *Fast Trac II* course, sponsored by University of Florida and North Florida Technology Innovation Center, April to July 1996.

"Collusion Detection Training," Short course in computerized collusion detection. April 23-25, 1996, Gainesville, Florida.

"Collusion Detection Training," Austin, TX, January 31-February 1, 1996.

"Collusion Detection Training," Nebraska DOT, Lincoln, Nebraska, November 28-30, 1995.

"Using On-Site Service Units for Collusion Detection Projects," BAMS User's Group Meeting, Mobile, Alabama, October 11, 1995.

"Statistical Methods for Medicaid Investigations," Medicaid Program Integrity Unit, Florida Health Care Administration. One-half day training in Tallahassee, FL, June 1995.

"Collusion Detection Training," New Mexico State Highway and Transportation Department , Santa Fe, New Mexico, September 1994.

"Collusion Detection Using BAMS," BAMS User's Group Meeting. One-day training course in Columbus, Ohio, October 1994.

"Collusion Detection Seminar," Connecticut Department of Transportation. One-day training course, December 1993.


The Information Technology Company

15

"Collusion Detection Seminar," Colorado Department of Transportation. One-day training course, November 1993.

Ohio Bar Association, "Computerized Analyses in Antitrust Investigations," CLE Course, October 1993.

Florida Attorney General. Provided a one-day training seminar to state procurement officials on the use of analytical tools to detect bidrigging and price-fixing, October 1993.

"Collusion Detection Seminar," Virginia Department of Transportation, One-day training course, February 1993.

United States General Services Administration, Inspector General's Office. Provide training in bid/price analysis and collusion detection, 1992.

California Department of Transportation. Provide training in bid analysis and collusion detection using BAMS, 1992.

New York City Department of Investigations. Three-day training program conducted on the use of computerized techniques to detect collusive behavior, 1990.

Florida Attorney General. Provided a one-day training seminar to state procurement officials on the use of analytical tools to detect bidrigging and price-fixing, 1989.

Texas Department of Transportation. Three days training provided to the bid analysis and collusion detection unit for the Texas DOT on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1989.

Virginia Department of Transportation. Three days training provided to the bid analysis and collusion detection unit for the Virginia DOT on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1989.

"Training Session: Use of Computerized Techniques in Bid Monitoring and Collusion Detection," FHWA Antitrust and Transportation Legal Affairs Meeting, Lake George, New York, November 1989.

"Market Analysis and Adaptive Estimation Impact on Construction Cost," BAMS Users' Group, San Antonio, Texas, February 1989.

"BAMS/DSS Collusion Detection Training: An Overview," BAMS Users' Group, San Antonio, Texas, February 1989.

"Special Address: Expert Systems and Cost Estimation," Cost Estimation Workshop, Columbus, Ohio, November 1988.

Florida Department of Transportation. Three-day training course provided to the bid analysis and collusion detection unit for the Florida DOT on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1988.

"Statistical Techniques for Item Level Price Estimation," BAMS Users' Group, Gainesville, Florida, March 1987.

"Detecting Collusion in Highway Contracting: An Evaluation of Statistical Methods," BAMS Users' Group, Gainesville, Florida, March 1987.

"The Role of the Textbook in Introductory Business Statistics Courses: The Efficient Market Hypothesis," Invited Paper, American Statistical Association Winter Meetings, January 1987.

"Damage Estimation at the Line Item Level for Highway Contracts," BAMS Users' Group, Gainesville, Florida, March 1986.

"Analysis of Toxicity Data," American Society of Testing and Measurement, Chicago, October 1979.

"Testing Goodness of Fit for Linear Time Series Models," American Statistical Association, National Meetings, Washington, D.C., August 1979.



Curriculum Vita of James T. McClave, Ph.D.

"Analysis of a Sealed Bid Market Using a Statistical Model," TAMS-OSSA National Meeting, New Orleans. Presented by T. Rothrock, 1979.

"Analysis of Toxicity Data to Determine No-Effect Levels," presented at the EPA Fisheries Laboratory, Duluth, 1978.

"Another Look at Some Famous Time Series - the Max Chi-Square Technique," Poster Session, American Statistical Association National Meeting, San Diego, 1978.

"Choosing the Order of Autoregressive and Moving Average Models: The Max Chi-Square Technique," National American Statistical Association Meeting, Boston, 1976.

"Subset Autoregression," invited paper presented to the Department of Statistical Science, State University of New York at Buffalo, 1975.

"Regression and Smoothing in Time Series," invited paper, University Statisticians of Southern Experiment Stations Conference, Gainesville, 1974.

"Introductory Statistics: The Normal Approach," Eastern Regional Meeting of the Institute of Mathematical Statistics, Blacksburg, 1972.

"On Estimation Problems for Stochastic Growth Processes," Joint National Meetings of the Institute of Mathematical Statistics and the American Statistical Association, Fort Collins, 1971.

"On Some Problems of Estimation and Prediction for a Class of Growth Process," Joint National Meetings of the Institute of Mathematical Statistics and the American Statistical Association, Laramie, 1970.

"On Some Problems of Estimation and Prediction for Stationary Time Series," Regional Meetings of the American Statistical Association, Tallahassee, 1970.

## Others

Acting Department Chairman, Department of Statistics, University of Florida, Summers of 1974, 1975, 1976.

Invited discussant in Time Series Session, Regional Meetings of the American Statistical Association and the Biometric Society, Rochester, 1975.

Session Chairman, Joint Regional Meetings of the American Statistical Association and the Institute of Mathematical Statistics and the Biometric Society, Tallahassee, 1974.

June 2003


**info tech**
The Information Technology Company

17

### CONSULTING SERVICES RATE SCHEDULE
**Professional Services**

| TITLE AND DESCRIPTION | HOURLY RATE |
|---|---|
| **Dr. Robert Lanzillotti - Eminent Scholar/Senior Economic Consultant** <br> Preeminent economist with widely recognized expertise and accomplishments. Dean Emeritus/Eminent Scholar, Professor of American Economic Institutions and Director, Public Policy Research Center, Graduate School of Business Administration, University of Florida. Conducts economic analysis and provides expert economic testimony. | $500 |
| **Dr. James T. McClave - President/Expert Consultant** <br> Info Tech's President and CEO with widely recognized expertise and accomplishments in statistics and econometrics. Ph.D. with over 30 years of experience. Directs key projects, provides expert testimony. | $500 |
| **Senior Litigation Consultant** <br> Senior personnel with law degree and extensive experience in managing and using computerized investigatory techniques in forensic analysis of complex civil litigations. | $350 |
| **Senior Consultant** <br> Senior personnel with extensive experience in conducting and managing complex civil litigation projects. Can provide expert testimony. | $300 |
| **Senior Consultant/Project Manager** <br> Senior personnel with extensive experience in conducting and managing project activities. | $275 |
| **Senior Analyst/Project Manager** <br> Senior personnel capable of designing and performing highly technical analyses and performing project management duties. | $250 |
| **Senior Analyst** <br> Senior personnel capable of designing and performing highly technical analyses. | $200 |
| **Consultant Analyst** <br> Personnel experienced in performing project work with minimal supervision. | $150 |
| **Programmer/Analyst** <br> Entry level programming and project analysis. Performs project work under close supervision. | $125 |
| **Project Assistant** <br> Experienced personnel providing technical assistance, literature/internet research, and project management support to senior level staff. | $75 |
| **Data Entry** <br> On- or off-line key entry of data, data verification. | $60 |

**Other Expenses**
Travel, copying, telephone and other direct expenses are invoiced at Info Tech's cost.
**Invoicing**
Invoices will be submitted monthly. Amounts not paid within sixty days of the invoice date will accrue interest at 1.5% per month

**Exhibit "D"**

# Medtronic

## June 25, 1998

# Board Presentation

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

6/25/98

# Physio Control

# Financials

PAGE 34
PREPARED BY: MJ

CONFIDENTIAL

Medtronic
Corporate Development

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

6/24/98

# Physio Control

## Assumptions

### Revenue

Total revenue estimates for 1998-2000 are provided by Physio Control's management.
Total Revenue over the 10 year period of the model is projected to sustain a CAGR of 12%.
The following annual growth rates were assumed for each product through 2008.

| Manual External Defibrillators | 8% CAGR |
|---|---|
| AEDs | 26% CAGR |
| Accessories | 2.4% CAGR |
| Electrodes | 10% CAGR |
| Service | 8% CAGR |
| Other | 4% CAGR |

Physio Control's AED revenue was $22 mil. in 1997 and is assumed to drive the growth rate in the model for the years beyond 2000.

### AED Market

Estimated WW AED market revenue was $40 mil in 1997. Market is projected to grow to $200 mil. in 2002 and to $530 mil. by 2008 (CAGR (Frost & Sullivan estimates the potential AED market size is $600 mil.)
Physio's share of the total AED market is 36% in 1998 and grows to 40% by 2003.
ASP's are assumed to be $2700 in 1998 and decline by a CAGR of 6% from 1998-2008.

### Income Statement

Gross margin improves by 3% (53%) in FY99 and achieves 60% GM by FY04.
Management's projections assume SG&A expense will decline from 29% of revenue in 1997 to 24% in 2000.
In the model, we hold SG&A at 27% through FY02 and decline to 26% thereafter to account for greater expenses required to aggressively drive AED market development in the future.
R&D expense in the model is increased by 1% beyond management's expectations to account for development of the "Citizen" at-home AED product.
Tax Rate is 37%.

### Merger Related Costs

$8 mil. in total transaction fees
$3 mil. in management severance costs
$3 mil. for IS systems (capitalized and amortized over 3 years)
Model does not assume any cost synergies are achieved in FY99 and only minimal savings are attained thereafter ($300-$500K annually)

### Deal Structure

Pooling Transaction
Assumes deal is closed by 10/30/98

### Valuation

DCF analysis assumes $27.50 per share is offered for all outstanding shares and options (20.1 mil. shares) The closing price of the stock was 20 3/4 on 6/19/98
Model does not assume any revenue synergies are captured by MDT
Terminal Value assumes a 5% annual growth rate of operating cash flows in perpetuity

Corporate Development
Medtronic ■

CONFIDENTIAL

Page 12
Print out 6/1/98

6/25/98

# Physio Control

## Financial Summary

- **Financial History[1]**

| | 1995 | 1996 | 1997 |
|---|---|---|---|
| Revenue | $149 | $173 | $175 |
| Gross Margin | 53% | 51% | 50% |
| PAT | $6 | $15 | $9 |
| Margin | 4% | 9% | 5% |

- **Financial Projections[2]**

| | FY99 | FY00 | FY01 | FY02 | FY03 | FY08 |
|---|---|---|---|---|---|---|
| Revenue | $213 | $237 | $261 | $296 | $338 | $569 |
| Gross Margin | 53% | 55% | 56% | 58% | 59% | 60% |
| PAT | $23 | $29 | $33 | $41 | $53 | $93 |
| Margin | 11% | 12% | 13% | 14% | 16% | 16% |
| Accretion/(Dilution) | $ 0.01 | $ 0.03 | $ 0.03 | $ 0.05 | $ 0.07 | $ 0.13 |

- **Valuation**
  - Shareholder Value     $527
  - Acquisition Cost      $527
  - NPV                   $0.1
  - WACC                  13%

(1) Physio Control's FYE (12/31)
(2) Medtronic FYE (4/30)

Medtronic
Corporate Development

CONFIDENTIAL

PAGE 36
PREPARED BY: MJ

MEDTRONIC CONFIDENTIAL   SUBJECT TO PROTECTIVE ORDER

# Physio Control
## EPS Analysis - Pooling

| | |
|---|---|
| Starbucks Shares Outstanding [1] | 20.1 |
| Starbucks Stock Price (6/18/98) | $20 3/4 |
| Acquisition Premium | 33% |
| Acquisition Price per Share | $27 1/2 |
| Medtronic Stock Price (6/18/98) | $59 5/8 |
| Exchange Ratio | 0.462x |
| Shares Issued to Starbucks | 9.41 |
| Acquisition Price | $551 |
| Transaction Expenses [2] | $8 |

*$ millions*
*FYE 4/30*

| | FY96 | FY97 | FY98 | FY99 [3] | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 | CAGR 98-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| Medtronic [4] | $ 2,172 | $ 2,438 | $ 2,605 | $ 2,984 | $ 3,432 | $ 3,946 | $ 4,538 | $ 5,219 | $ 6,002 | $ 6,902 | $ 7,937 | $ 9,128 | $ 10,497 | 16% |
| Starbucks | 157 | 174 | 185 | 213 | 237 | 261 | 296 | 338 | 385 | 433 | 481 | 527 | 569 | 12% |
| Medtronic w/ Starbucks | $ 2,329 | $ 2,612 | $ 2,790 | $ 3,197 | $ 3,668 | $ 4,207 | $ 4,835 | $ 5,557 | $ 6,387 | $ 7,335 | $ 8,419 | $ 9,655 | $ 11,067 | 16% |
| **PAT** | | | | | | | | | | | | | | |
| Medtronic [4] | $ 428.3 | $ 530.0 | $ 457.4 | $ 691.2 | $ 784.9 | $ 914.1 | $ 1,051.2 | $ 1,208.9 | $ 1,390.3 | $ 1,598.8 | $ 1,838.6 | $ 2,114.4 | $ 2,431.6 | 18% |
| Starbucks | $ 9.7 | $ 13.5 | $ 13.3 | $ 24.6 | $ 28.9 | $ 32.9 | $ 41.1 | $ 53.3 | $ 63.1 | $ 71.0 | $ 78.6 | $ 86.3 | $ 99.3 | |
| Medtronic w/ Starbucks | $ 438.0 | $ 543.5 | $ 470.7 | $ 715.8 | $ 823.7 | $ 947.0 | $ 1,092.3 | $ 1,262.2 | $ 1,453.4 | $ 1,669.7 | $ 1,917.4 | $ 2,200.7 | $ 2,524.8 | |
| Net Interest Gain/(Foregone) (AT) | | | | 0.4 | 1.3 | 2.2 | 3.2 | 4.6 | 6.2 | 8.1 | 10.2 | 12.6 | 15.2 | |
| Merger Related Costs (AT) [4] | | | | (2.3) | (0.6) | (0.6) | (0.2) | | | | | | | |
| Cost Synergies (AT) | | | | - | 0.3 | 0.4 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.7 | 0.7 | |
| Transaction Expense [5] | | | | (8.0) | | | | | | | | | | |
| Medtronic w/Starbucks | $ 438.0 | $ 543.5 | $ 470.7 | $ 706.0 | $ 824.7 | $ 948.9 | $ 1,095.6 | $ 1,267.2 | $ 1,460.1 | $ 1,678.4 | $ 1,928.2 | $ 2,213.9 | $ 2,540.0 | 18% |
| **Shares O/S (millions)** | | | | | | | | | | | | | | |
| Medtronic | 474.9 | 477.4 | 468.9 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | |
| Shares Issued to Starbucks | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | |
| Medtronic w/ Starbucks | 484.3 | 486.8 | 478.3 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | |
| **EPS** | | | | | | | | | | | | | | |
| Medtronic | $ 0.90 | $ 1.11 | $ 0.98 | $ 1.48 | $ 1.70 | $ 1.95 | $ 2.24 | $ 2.58 | $ 2.97 | $ 3.41 | $ 3.92 | $ 4.51 | $ 5.19 | |
| Medtronic w/ Starbucks | $ 0.90 | $ 1.12 | $ 0.98 | $ 1.50 | $ 1.73 | $ 1.99 | $ 2.29 | $ 2.65 | $ 3.05 | $ 3.51 | $ 4.03 | $ 4.63 | $ 5.32 | |
| Accretion/(Dilution) | $ 0.00 | $ 0.01 | $ 0.01 | $ 0.02 | $ 0.03 | $ 0.04 | $ 0.05 | $ 0.07 | $ 0.08 | $ 0.10 | $ 0.11 | $ 0.12 | $ 0.13 | |
| Medtronic w/Starbucks & Merger/Transaction Expense | $ 0.90 | $ 0.98 | $ 0.98 | $ 1.48 | $ 1.73 | $ 1.99 | $ 2.29 | $ 2.65 | $ 3.05 | $ 3.51 | $ 4.03 | $ 4.63 | $ 5.32 | |
| Total Accretion/(Dilution) | $ 0.00 | $ 0.01 | $ 0.01 | $ 0.00 | $ 0.03 | $ 0.03 | $ 0.06 | $ 0.07 | $ 0.09 | $ 0.10 | $ 0.11 | $ 0.12 | $ 0.13 | |

(1) Includes 2.837M shares of exercisable options
(2) Assumes total transaction expenses of $8 mil. for both parties investment banking and legal advisor fees. Transaction fees are not tax deductible in a pooling transaction
(3) Pooling transaction requires previous 3 years of financial results to be restated
(4) Medtronic FY98 AOP; growing at 15% thereafter
(5) Total merger related costs are assumed to be $8 mil. for management severance and IS systems integration (amortized over 3 years)

CONFIDENTIAL

Corporate Development
Medtronic

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Physio Control**
**Income Statement**

| $,000s FYE: 4/30 | FY96 [1] | FY97 [1] | FY98 [1] | FY99 | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 | CAGR 98-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Revenue** | $156,848 | $173,880 | $185,173 | $213,275 | $236,661 | $261,111 | $296,472 | $338,282 | $385,323 | $433,197 | $481,131 | $528,834 | $569,428 | 12% |
| Annual Growth Rate | | 11% | 6% | 15% | 11% | 10% | 14% | 14% | 14% | 12% | 11% | 10% | 8% | |
| **Cost of Sales** | $74,473 | $85,679 | $90,611 | $97,964 | $105,665 | $114,889 | $124,518 | $138,696 | $154,129 | $173,279 | $192,452 | $210,734 | $227,771 | 10% |
| % of Revenue | 47% | 49% | 49% | 46% | 45% | 44% | 42% | 41% | 40% | 40% | 40% | 40% | 40% | |
| **Gross Profit** | $82,375 | $88,201 | $94,561 | $115,312 | $130,996 | $146,222 | $171,954 | $199,587 | $231,194 | $259,918 | $288,678 | $318,100 | $341,657 | 14% |
| Gross Margin | 53% | 51% | 51% | 54% | 55% | 56% | 58% | 59% | 60% | 60% | 60% | 60% | 60% | |
| **Overhead Costs** | | | | | | | | | | | | | | |
| S,G & A | $45,369 | $46,110 | $51,334 | $55,432 | $63,898 | $70,500 | $80,047 | $87,953 | $100,184 | $112,631 | $125,094 | $136,977 | $148,051 | |
| % of Revenue | 29% | 27% | 28% | 26% | 27% | 27% | 27% | 26% | 26% | 26% | 26% | 26% | 26% | |
| R & D | $19,295 | $19,587 | $20,211 | $18,653 | $21,299 | $23,500 | $26,682 | $27,063 | $30,826 | $34,656 | $39,490 | $42,147 | $45,554 | |
| % of Revenue | 12% | 11% | 11% | 9% | 9% | 9% | 9% | 8% | 8% | 8% | 8% | 8% | 8% | |
| **Total** | $64,665 | $65,697 | $71,545 | $74,085 | $85,198 | $94,000 | $106,730 | $115,016 | $131,010 | $147,287 | $163,584 | $179,124 | $193,605 | |
| % of Revenue | 41% | 38% | 39% | 35% | 36% | 36% | 36% | 34% | 34% | 34% | 34% | 34% | 34% | |
| **Operating Income** | $17,710 | $22,504 | $23,017 | $41,228 | $45,798 | $52,222 | $65,224 | $84,571 | $100,184 | $112,631 | $125,094 | $138,977 | $148,051 | 20% |
| Operating Margin | 11% | 13% | 12% | 19% | 19% | 20% | 22% | 25% | 26% | 26% | 26% | 26% | 26% | |
| **Interest Inc / (Exp)** | ($2,506) | ($1,776) | ($1,910) | ($2,167) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **Income Taxes** | $5,497 | $7,187 | $7,810 | $14,452 | $16,945 | $19,322 | $24,133 | $31,291 | $37,068 | $41,674 | $46,285 | $50,681 | $54,779 | |
| Tax Rate | 36% | 35% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | |
| **Net Income** | $9,708 | $13,541 | $13,297 | $24,607 | $28,853 | $32,900 | $41,091 | $53,279 | $63,116 | $70,956 | $78,809 | $86,295 | $93,272 | 21% |
| Net Margin | 6% | 8% | 7% | 12% | 12% | 13% | 14% | 16% | 16% | 16% | 16% | 16% | 16% | |

(1) Adjusted to Medtronic FYE

Corporate Development
Medtronic

CONFIDENTIAL

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Physio Control
## DCF Valuation Analysis

$ 000s
FYE: 4/30

| | FY98 | FY99 [1] | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 | Gr1/rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows** | | | | | | | | | | | | |
| After-Tax Operating Income to Medtronic [1] | | $ 19,480 | $ 28,853 | 32,900 | $ 41,091 | $ 53,279 | $ 63,116 | $ 70,958 | 78,809 | $ 86,295 | 93,272 | |
| Incremental Working Capital | | $ (4,215) | $ (4,677) | $ (4,880) | $ (7,072) | $ (8,362) | $ (9,408) | $ (9,575) | $ (9,587) | $ (9,141) | $ (8,519) | |
| % of Incremental Revenue | | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | |
| Incremental Net Fixed Capital | | $ (1,054) | $ (1,169) | $ (1,223) | $ (1,768) | $ (2,091) | $ (2,352) | $ (2,394) | $ (2,397) | $ (2,285) | $ (2,130) | |
| % of Incremental Revenue | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | |
| Operating Cash Flows | $ - | $ 14,210 | $ 23,007 | 26,787 | $ 32,251 | $ 42,827 | $ 51,356 | $ 58,989 | $ 66,826 | $ 74,870 | 82,623 | |
| Residual Cash Flow | 5% | | | | | | | | | | 1,044,224 | |
| Total Cash Flows | $ - | $ 14,210 | $ 23,007 | 26,787 | $ 32,251 | $ 42,827 | $ 51,356 | $ 58,989 | $ 66,826 | $ 74,870 | $ 1,126,847 | |

Residual Growth Rate   5%

### MDT CORP DEV

| | $ | % of Total |
|---|---|---|
| PV of Operating Cash Flows | $ 223,491 | 42% |
| PV of Residual Cash Flow (5% perpetuity) [2] | $ 318,191 | 60% |
| PV of Opportunity | $ 541,682 | 103% |
| Cash & Equivalents (3/31/98) | $ 3,460 | 1% |
| Debt (3/31/98) | $ (18,400) | -3% |
| Shareholder Value | $ 526,712 | 100% |
| Per Share (non-diluted) | $ 30.6 | |
| Acquisition Cost (diluted) | $ (551,381) | |
| Cash Proceeds from Options Exercised [3] | $ 34,257 | |
| Acquisition Cost (Net) | $ (517,124) | |
| Transaction Expense [4] | $ (6,000) | |
| PV of Merger Costs | $ (3,705) | |
| PV of Cost Synergies | $ 2,211 | |
| Total Acquisition Cost | $ (528,619) | |
| NPV | $ 93 | |
| Discount Rate | 13.0% | |

### Market Summary

| | |
|---|---|
| Number of Shares Outstanding (000s) | 17,198 |
| In-the-Money Options | 2,852 |
| Fully Diluted Shares Outstanding | 20,050 |
| Price Close on 6/19/98 | $20 3/4 |
| Market Capitalization ($Millions) | $ 357 |
| Fully Diluted Market Value ($Millions) | $ 416 |

1) Company's operating cash flows are discounted back to July 31, 1998.
2) MDT version calculates terminal value by assuming a 5% growth rate of the Company's operating cash flows in perpetuity and discounting by 13% to arrive at the present value
3) Proceeds of $34.4 mil. obtained from the exercise of Starbucks shareholders' in-the-money options
4) Transaction expense includes fees for investment banking and legal advisors.

CONFIDENTIAL

Corporate Development
Medtronic

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

6/25/98

# Physio Control

## Financial Upside *(Not included in Valuation)*

### Not included in our valuation economics are the following opportunities:

- If the SCD survival rate increases from 5% to 15% (50% of the AHA goal) and MDT maintains its 41% market share, this would result in an incremental increase in:

  - Revenue        = $248m
  - Earnings (PAT)   = $76m
  - Market Value/Share   = $6.50

- If, SCD survival rates increased to 15%, in addition to the incremental gains captured with 41% MDT market share, each additional 1% of share gain would result in incremental:

  - Revenue        = $17m
  - Earnings (PAT)   = $5m
  - Market Value/Share   = $0.44

**Medtronic**
Corporate Development

CONFIDENTIAL

PAGE: 40
PREPARED BY: MJ

MEDTRONIC CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

6/25/98

# Physio Control

## *Further Opportunities:*

**Not included in our valuation economics are the following revenue opportunities:**

- Medtronic's relationships with Cardiologists & EPs to encourage adoption of AEDs in the community & home

- MDT's international distribution infrastructure to assist Starbucks in market development in these regions

**Not included in our valuation economics are the following operational and cost opportunities:**

- Common materials purchasing and utilization of Micro-Rel's componentry

- MDT Tachy and Starbuck's R&D programs in arrhythmia detection, waveforms, AMI detection

- Distribution of MDT's external pacemakers through Starbuck's sales reps

**Medtronic** ■
Corporate Development

CONFIDENTIAL

PAGE 41
PREPARED BY: MJ

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Medtronic / Physio-Control Exchange Ratio Analysis

## Assumes Closing on September 30, 1998 (a)

| Date | Medtronic Closing Price | Daily Exchange Ratio | Running Average |
|------|------------------------|---------------------|-----------------|
| 9/02/98 | $ 54.88 | 0.501 x | 0.501 x |
| 9/03/98 | 56.94 | 0.483 | 0.492 |
| 9/04/98 | 57.00 | 0.482 | 0.489 |
| 9/08/98 | 59.13 | 0.465 | 0.483 |
| 9/09/98 | 59.13 | 0.465 | 0.479 |
| 9/09/98 | 57.13 | 0.481 | 0.480 |
| 9/10/98 | 55.63 | 0.494 | 0.482 |
| 9/11/98 | 56.88 | 0.484 | 0.482 |
| 9/14/98 | 57.56 | 0.478 | 0.482 |
| 9/15/98 | 57.56 | 0.478 | 0.481 |
| 9/16/98 | 57.69 | 0.477 | 0.481 |
| 9/17/98 | 57.50 | 0.478 | 0.481 |
| 9/18/98 | 56.75 | 0.465 | 0.481 |
| 9/21/98 | | | |
| 9/22/98 | | | |
| 9/23/98 | | | |
| 9/24/98 | | | |
| 9/25/98 | | | |
| 9/28/98 | | | |
| 9/29/98 | | | |

(a) According to the Purchase Agreement, the transaction exchange ratio will be based on the average fraction of a Medtronic share that translates into $27.50 for the 19 trading days ending on the day before closing.

*Closing: 9-29-98*
*19 businesses up to and including 9-28-98*

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
SEP. 19. 1998   7:3...

# EXHIBIT B

# EXHIBIT B

Dr. Myerburg's Executive Summary is composed of four interrelated components. Dr. Myerburg has testified, under oath, that Medtronic was approached by a third party about acquiring an AED manufacturer—the first component of his plan—before he made his presentation to Medtronic. Dr. Myerburg also has testified, under oath, that Medtronic does not employ any of the other three components of his plan.

**I.**     **First Component:** "Participation in the AED market." *See* Dr. Myerburg's Executive Summary at pg. 5.

**Dr. Myerburg's Sworn Testimony:** "The fact that the concept was brought forward to [Medtronic] by Morgan Stanley I did not have any reason to doubt. . . . I have no reason to not accept the idea that Morgan Stanley brought the concept to them prior to my visit." Myerburg Dep. at 24:1-12; 128:17-19.

**II.**     **Second Component:** "Combined regional marketing." *See* Dr. Myerburg's Executive Summary at pg. 5.

**Dr. Myerburg's Sworn Testimony**:

Question - Does Medtronic use a single sales force for AEDs and ICDs?

Answer - "Not to my knowledge. That was something else we were trying to get -- that was part of the proposal." Myerburg Dep. 34:14-17.

Question - To your knowledge does Medtronic provide technical support for AEDs and ICDs from the same group or team?

Answer - "To my knowledge based on this area alone they do not. They use separate technical support teams." Myerburg Dep. at 38:21-39:2.

**III.**     **Third Component:** "Information management . . . key element." *See* Dr. Myerburg's Executive Summary at pg. 5.

**Dr. Myerburg's Sworn Testimony**:

Question -  To your knowledge Medtronic does not collect the data that you proposed collecting in your plan?

Answer -  "If you're referring to AED related matters, it is correct that to my knowledge, Medtronic does not collect such data. If you're talking about ICD data, there is at least in part

some of the data are collected and are available.  As for the AED's portion of it, I would have to say not to my knowledge."

Question - As to the ICDs was that information that they did not collect before you came along?

Answer - "No, it was not a matter of -- they have always collected data on ICDs."  Myerburg Dep. at 154:1-20.

**IV.     Fourth Component:**  "Marketing management driven by regional databases."   *See* Dr. Myerburg's Executive Summary at pg. 7.

**Dr. Myerburg's Sworn Testimony:**  See section III above.  As admitted by Dr. Myerburg, Medtronic has never collected the data he proposed it collect.  Accordingly, Medtronic has never utilized any such data to target markets of its ICD sales.

MIA2001 282817v1

# EXHIBIT C

ORIGINAL

1              IN THE UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF FLORIDA

3

4          _____

5   ROBERT J. MYERBURG, M.D.,        :

6              Plaintiff,            :

7   v.                              :    Case No.
                                         03-20616-CIV-LENARD
8   MEDTRONIC, INC.,                :

9              Defendant.           :

10         _____

11

12

13

14

15        DEPOSITION OF RAYMOND P.H. FISHE, Ph.D.

16

17                  April 8, 2004

18                Richmond, Virginia

19

20

21

22

23            HALASZ REPORTING & VIDEO
                  P.O. Box 1644
24          Richmond, Virginia  23218-1644
                  (804) 741-5215
25        Reported by:  Terri L. Dolinger, RPR

2

1          Deposition of RAYMOND P.H. FISHE, Ph.D.,

2    taken by and before Terri L. Dolinger, RPR, Notary

3    Public in and for the Commonwealth of Virginia at

4    large, and by notice and agreement to take depositions;

5    commencing at 10:15 a.m., April 8, 2004, in the law

6    offices of Hunton & Williams, 951 East Byrd Street,

7    Richmond, Virginia.

8

9    APPEARANCES:

10        For the Plaintiff:

11            Guy B. Bailey, Jr., Esquire
              Bailey & Dawes

12        For the Defendant:

13            Alvin B. Davis, Esquire
14            Steel Hector & Davis

15

16                  C O N T E N T S

17   Witness                                      Page
     Raymond P.H. Fishe, Ph.D.
18        Examination by Mr. Davis                 3

19

     Exhibits
20   1                                             4
     2                                             5
21   3                                             8
     4                                             11
22   5                                             12
     6                                             33
23   7                                             34
     8                                             35

24

25   NOTE:  Exhibit Nos. 4 and 5 retained by Mr. Davis.

3

```
 1                    PROCEEDINGS
 2              RAYMOND P.H. FISHE, Ph.D.,
 3     a witness, was sworn and examined, as follows:
 4                    EXAMINATION
 5   BY MR. DAVIS:
 6        Q     State your name, please.
 7        A     Raymond Patrick Hamilton Fishe.
 8        Q     Your address?
 9        A     2311 Baronsmeade, B-a-r-o-n-s-m-e-a-d-e,
10   Road, Midlothian, Virginia  23113.
11        Q     Where are you employed?
12        A     University of Richmond.
13        Q     Do you have a title?
14        A     I'm professor and distinguished chair in
15   finance.
16        Q     What are your duties, generally?
17        A     Generally, my duties are to teach students in
18   the business school principles of finance investments
19   and other courses that the business school offers in
20   the area of finance, and to do research in the topics
21   that I am currently interested in studying.
22        Q     How long have you been in that position?
23        A     This particular position I started in August
24   of last year.
25        Q     Where were you prior to that?
```

4

1      A      University of Miami.

2      Q      Why did you leave Miami?

3      A      They made me an offer I couldn't refuse.

4      Q      Richmond, I take it?

5      A      That is correct.

6      Q      When were you retained in this matter?

7      A      Around January, middle of January.

8      Q      Of this year?

9      A      Yes.

10     Q      And how much time have you spent on this

11   project?

12     A      I've sent a bill.  It should be in the

13   information provided to you.  If it's not, I brought it

14   with me.

15     Q      It's not.

16     A      That doesn't include any current hours since

17   the date that that was posted.

18             MR. DAVIS:  We'll mark this as exhibit

19   one to the deposition.  Guy, this is a letter dated

20   March 14 that went to Kristina.  Attached to it is an

21   invoice for services.

22             MR. BAILEY:  Yes.  I see it.  That's

23   exhibit one.

24             (Exhibit No. 1 marked for identification.)

25   BY MR. DAVIS:

5

1      Q     Do you have a retention agreement for this

2    matter?

3      A     I have a retention letter.

4      Q     Yes.

5      A     I have an oral agreement with Mr. Myerburg.

6      Q     May I see the letter?

7            MR. DAVIS:  We'll mark this as exhibit

8    2.  Exhibit 2 is going to be a letter of March 14.

9            (Exhibit No. 2 marked for identification.)

10   BY MR. DAVIS:

11     Q     What was the nature of your oral agreement?

12     A     When he contacted me and explained the matter

13   under dispute, I indicated to him at that time that I

14   would like to look a little further into the

15   transaction and the information that he had to provide

16   to me before I made a firm commitment to work with

17   him.

18     Q     And when was it that he contacted you?

19     A     Middle of January or early January; somewhere

20   in that period.

21     Q     Contact came from him and not Mr. Bailey's

22   office?

23     A     Contact was from him.

24     Q     What did he say to you?

25     A     He outlined to me, basically, the nature of

6

1    this dispute, that he had a business plan, that that

2    information was provided to Medtronic, and that he felt

3    that Medtronic had used the information in his business

4    plan in a manner that benefited them, and he felt the

5    confidentiality agreement that he signed and they

6    signed entitled him to some sort of remedies.

7         Q    What matters did you review prior to

8    accepting the retention?

9         A    He -- well, I was sent several documents.  I

10   have a letter that outlines exactly what those were.

11   But the confidentiality agreement was among the

12   documents, a letter from Medtronic, indicating they

13   were no longer interested in that particular plan that

14   he proposed, the plan itself.  I looked at a number of

15   things related to the transactions, actual merger

16   announcements, other kinds of information about the

17   transaction.

18        Q    Do you have the documents with you that you

19   received?

20        A    Yes.  I brought everything with me.

21        Q    May I see the documents you received?

22        A    Now, they're all commingled.  So you'll have

23   to sort them out.  But I have a letter that itemizes

24   them.  That's more useful.

25        Q    That's fine.  I assume I've seen all of them,

HALASZ REPORTING

7

1  as well?

2      A    Here is one letter.  I should have something

3  else regarding the business plan itself.  But I don't

4  seem to have that handy.  But the documents I received

5  are all here today for you to look at, if you would

6  like to see them.  It may not have had a cover letter

7  with it, but I can tell you what they sent me.  This

8  document was sent to me.  This document was sent to

9  me.

10     Q    Are these anything different than what is

11  listed here?

12     A    I'm not sure that's on the list.

13     Q    That's the April 20 letter?

14     A    I don't have --

15     Q    The one you just showed me?

16     A    Yes.  It is.

17           MR. DAVIS:  We'll mark this as exhibit

18  3.  Guy, exhibit 3 is A March 3, 2004, letter.

19           THE WITNESS:  Here is the January 8

20  Fed-Ex package that I received from Dr. Myerburg.  And

21  I can't tell you everything that was in here.  I don't

22  believe it even had a cover letter.  But that

23  information is when I first had access to these

24  documents.

25           MR. DAVIS:  I'll get copies of all 3 of

HALASZ REPORTING

8

1    these and give you back the originals.  Guy, I'm going

2    to give him originals of the documents and keep copies

3    for the file, if you don't object to that.

4              MR. BAILEY:  That's fine.  Thank you.

5              (Exhibit No. 3 marked for identification.)

6    BY MR. DAVIS:

7         Q    What were you retained to do, specifically?

8         A    I was asked to examine the nature in which

9    Dr. Myerburg had been damaged, to evaluate the economic

10   cost associated, if there were damages, and, basically,

11   look at his business plan and evaluate what would be

12   reasonable compensation if he had -- if there was a

13   determination of liability.

14        Q    And in addition to the time that's reflected

15   in exhibit one, can you estimate how much time you've

16   spent on this?

17        A    I never estimate my time.  I keep electronic

18   records of my time.

19        Q    Do you have electronic records of time since

20   March 10?

21        A    I do.  But I'm not sure I printed them out

22   for you.

23        Q    Well, that's fine.  That's why I asked for an

24   estimate.  You just handed me a disk.  This is where

25   you record your time?

9

1      A    I record it in an outlook file, which is a

2  mail management program, keeps track of calendars and

3  e-mail messages.  And that's where I record my time.

4  I'm not sure I transferred the most recent information

5  on there, to answer your question.  I'll be glad to

6  provide you a copy of the next written bill, if that's

7  needed.

8      Q    Yes.  Let's do that.

9           MR. DAVIS:  Guy, is that agreeable to

10  you?

11           MR. BAILEY:  Yes.  It is.

12  BY MR. DAVIS:

13      Q    You're being compensated at the rate of $350

14  an hour?

15      A    That is correct.

16      Q    Is that your customary rate?

17      A    That is my current customary rate.

18      Q    So you reviewed the materials that were

19  provided to you and then you reviewed additional

20  documents?

21      A    Yes.

22      Q    What additional documents did you review, in

23  addition to --

24      A    I looked at the filings with the SCC.

25  There's many filings by Physio-Controls and

10

1   Medtronics.  I didn't look at all of them.  There's

2   hundreds of filings.  I looked at the filings around

3   the merger.  I looked at the information that was

4   available in public sources, mainly using the Bloomberg

5   information system to find out what announcements were

6   made, what news information was related to the merger

7   announcement.

8               I looked at actual stock market data for

9   Medtronic and Physio-Controls, in addition to stock

10  market data for the S&P-500 index trust certificates

11  traded on the American Stock Exchange.  I looked at

12  another pile of information that was provided to me.

13  Some of this information I read carefully.  Some of it

14  I simply quickly scanned.

15      Q    Provided to you by whom?

16      A    Mr. Bailey; his law firm.

17      Q    Is that information that's included in the

18  March 3 letter or information in addition to that?

19      A    Let me make it clear that letter refers to a

20  number of documents, and the envelope I passed to you

21  contained these types of documents in it.  And I don't

22  have a cover letter to give you to tell you what was

23  itemized in the envelope.  It was from Dr. Myerburg.

24      Q    This big red-weld looks to me from here

25  like --

11

1       A    I agree with the observation those are all
2   the documents itemized.
3       Q    -- interrogatory answers and documents that
4   were produced?
5       A    That is correct.
6       Q    Do you have copies of the documents that you
7   obtained for public filings and stock market data that
8   you relied on?
9       A    Some of them.  Officer proxy statements and
10  things like that I read on line.  But I do have the
11  Bloomberg files.
12              MR. DAVIS:  I'm going to mark this as
13  composite 4.  And when we take a break, I'll arrange to
14  have it copied.  Why don't you mark this on the file.
15              (Exhibit No. 4 marked for identification.)
16  BY MR. DAVIS:
17      Q    Any other documents that you developed other
18  than what you received from Mr. Bailey or Dr.
19  Myerburg?
20      A    Yes.  I have analyzed, as I said, data here.
21  There's an analyst Excel program here that creates a
22  spreadsheet and includes my analysis of some of the
23  documents.  You said analysis, and this is it right
24  here.  This is why I gave this to you.
25      Q    Can I get a printout of that from you?

12

```
 1       A    You can have this.

 2       Q    I can have that?

 3       A    Yes.

 4       Q    Can you tell me how to get into this?

 5       A    It's much more convenient than hundreds of

 6  pages of Excel data and things.

 7       Q    I agree.

 8            MR. DAVIS:  We'll mark this as exhibit

 9  5.

10  BY MR. DAVIS:

11       Q    Do you have a copy of that for Guy as well?

12       A    He has a copy.  I sent him a copy.  It's a

13  Zipped file.  In other words, it wouldn't fit there.

14  I'm assuming you or someone in your company can unzip

15  it.  It's a standard program; can download it for

16  free.

17            (Exhibit No. 5 marked for identification.)

18            MR. DAVIS:  We've marked the disk as

19  exhibit 5, Guy.

20            MR. BAILEY:  Thank you.

21  BY MR. DAVIS:

22       Q    Any other materials that you developed or

23  extracted?

24       A    Not that I can recall at the present time.

25       Q    Is this the book referred to in your
```

13

1    references?

2        A    Yes.  I have many books similar to this.  I

3    brought it because I referred to it.

4        Q    May I see it?

5        A    Sure.

6        Q    This is a book titled, <u>Valuation Measuring</u>

7    <u>and Managing the Value of Companies</u>, by Copeland,

8    Koller, K-o-l-l-e-r, and Murrin, M-u-r-r-i-n.  And

9    that's published by McKinsey & Company.  So this is an

10   internal book that's produced by McKinsey?

11       A    I think John Wiley published it.

12       Q    John Wiley & Sons.

13            MR. DAVIS:  Just put this in the

14   record:  605 Third Avenue, New York  10158 dash 0012.

15   BY MR. DAVIS:

16       Q    Were there particular portions of this book

17   that you relied on?

18       A    No.  It's a basic reference.  There's, like I

19   said, several books that people refer to in developing

20   valuation models and formulas and understanding

21   theoretical approaches that are used in valuing

22   companies, valuing assets, valuing transactions.

23       Q    Do you recall any other books that you relied

24   on?

25       A    There's a great deal of references that I've

14

1   used over my academic career.  So I have read a lot of

2   material on this.

3       Q    I understand.

4       A    But I did not pull any single book off my

5   shelf and say I want to go see what Doma Darrin

6   (phonetic), who has another book, Investment Valuation,

7   says about this possible problem.  I didn't have to do

8   that in this case.

9       Q    Let me understand what you did.  You have

10  relied on these books over the years for your teaching

11  and your writing and your analysis; is that correct?

12      A    And my consulting and research and so on.

13      Q    All of the things that you do?

14      A    Yes.

15      Q    It's that body of information that you have

16  assembled in your mind over the years that you relied

17  on in doing your analysis, as opposed to going to

18  specific books for the purpose of this particular

19  retention?

20      A    To some degree.

21      Q    Well, how did I not state it in full degree?

22      A    I mentioned Copeland because I know Copeland

23  discusses real options and synergies.  So I could have,

24  in the past 3 months, gone and looked at Copeland and

25  said how does he treat real options.  I don't recall

15

1    off the top of my head if I did that, but I'm not going

2    to tell you or suggest to you that I might not have

3    done that.

4         Q    I'm not trying to limit what you did.  I'm

5    trying to understand what you did.  What are real

6    options, as you've used that term?

7         A    Do you know what an option is?

8         Q    Yes.

9         A    Most of the time when we think about an

10   option, we think about a choice that can be made.  And

11   if we think about it in the context of financial assets

12   -- for example, you can see actively traded options on

13   many common stock securities.  IBM, for example, has

14   options traded on its common stock on our -- I believe

15   IBM is actually listed on several exchanges, but

16   Chicago Board Options Exchange is one of them.  Those

17   particular securities allow the holders the choice of

18   purchasing the underlying security.

19              In this case, it's IBM common stock, if

20   it's a call option, or selling the underlying

21   securities if it's a put option.  Financial economists

22   have taken the idea embedded in the value of an option

23   and carried it into other venues, venues that represent

24   the opportunities that might be embedded in contracts,

25   that might be embedded in mergers, or other kinds of

16

1   situations that are not cut and dry common stock

2   purchases.

3            The classic example is an option that a

4   mining company might have to reopen a mine.  That's a

5   timing option where they watch the spot price of gold

6   and futures price of gold and the mine is now closed.

7   They can say, at some point in the future, I may

8   choose, because of this variable castic price of gold,

9   that I open the mine and extract some more of the metal

10  that's there and sell it, process it and sell it, that

11  has a value.  And that's what we call a real option.

12       Q    Those are discussed in that book?

13       A    He does discuss them; yes.

14       Q    Do you recall whether you reviewed that

15  Physio-Control proxy statement related to the merger of

16  Medtronic and Physio-Control that's involved in this

17  case?

18       A    I think I probably looked at it.  It's a

19  fairly long document.  Those proxy statements can be

20  long.  But I don't believe that I read the whole thing,

21  by any measure.  But I believe that in my search over

22  the SCC filings, I came across that document.

23       Q    Did you read the expert disclosure that was

24  filed on your behalf in this case?

25       A    Yes.

17

1      Q    Did you prepare that?

2      A    I prepared it up to the point when it was

3  finally submitted.  It seems there may have been some

4  editing, not in terms of conclusions made, but in terms

5  of syntax.

6      Q    Did you prepare the background section?

7      A    I don't know.  Let me see it and I'll tell

8  you.

9            MR. DAVIS:  Guy, I'm handing him a copy

10 of your amended expert disclosure.

11           MR. BAILEY:  I understand.

12 BY MR. DAVIS:

13     Q    The section I was referring to, Doctor, is on

14 the first page.

15     A    Background section.  I thought you meant

16 references.

17     Q    No.  Look on the first page.  It says

18 background.  Do you see that?

19     A    No.

20     Q    You don't.  Hand it back to me.  See the word

21 that says background?

22     A    Yes.

23     Q    Did you prepare that section?

24     A    Not that I recall.  If you were to read the

25 files on that disk, you'll find my amended statement

18

1    and conclusions as I sent them to the attorneys.

2    They're largely reflective of the material after my

3    name.

4        Q    How did Dr. Myerburg locate you; do you

5    know?

6        A    I was at the University of Miami.  He has --

7    he's a faculty member at the University of Miami.  I

8    believe he was given my name by one of the provosts.

9        Q    Have you ever testified in a case on behalf

10   of any client of Mr. Bailey's before?

11       A    No; not that I know of.

12       Q    Included in your references are a list of

13   cases in which you provided expert testimony, trial

14   testimony, or affidavits provided by Raymond P.H.

15   Fishe.  I'll hand you a copy of that.  That's exhibit A

16   to the disclosure.  The first one, Wilma Smith v.

17   Foremost.  Can you tell me what the topic of your

18   testimony or affidavit was in that case?

19       A    This was a case involving charges by an

20   insurance company, and at issue was whether these

21   charges were interest charges on the basis of the

22   selected billing program that the plaintiff chose.

23   This was car insurance.  I'm trying to remember the

24   exact details.  I don't know all the legal nuances of

25   this.  But some of -- I've got public record on this.

19

1    You can look up the public record for what I did.

2        Q    Actually, what you said is sufficient for

3    me.   It was to determine whether the charges should be

4    characterized as interest?

5        A    That's largely what I did; yes.

6        Q    Bank of America v. Cityside?

7        A    This was a case in which a loan was made at

8    one point or another, and then, at some point, the Bank

9    of America -- well, they ended up buying the company

10   that started the process.  Many bank mergers, but I

11   don't recall which bank made the original loan.  But

12   Bank of America was the final entity involved.  And

13   they made a loan to Richard Finger and Phyllis Finger

14   and his company, Cityside.

15            And, at some point, they decided to no

16   longer continue that relationship, and Cityside and the

17   Fingers sued them, indicating there was some

18   discrepancies, that allegations had been made about

19   what should have happened, what didn't happen, whether

20   they interfered.  There was a number of issues there.

21       Q    What was your purpose in that case?

22       A    My purpose was to try and determine the value

23   of Cityside as an ongoing enterprise.

24       Q    Are you saying Cityside or Seaside?

25       A    It's Cityside.  They were a business that

20

1   sold women's accessories.

2       Q    And for whom did you testify or by who were

3   you retained?

4       A    In that document, the italicized entry is my

5   client.

6       Q    Good.  United States v. Falcone?

7       A    That was a case of insider trading.

8       Q    What were you retained to do?

9       A    In insider trading cases, the government --

10  United States of America was my client.  There's many

11  things I understand that you have to prove under the

12  law.  One of the points under the law is materiality of

13  the actions.  And so this was somewhat of a complicated

14  case.  It involved the matters of civil theft, in which

15  several stock brokers had arranged to receive advanced

16  copies of Business Week magazine from a warehouse that

17  distributes that magazine.

18      Q    I don't mean to interrupt.  But that's

19  sufficient detail for my purposes.  Allapatta

20  (phonetic) Services v. Exxon?

21      A    This was a commercial dispute between Exxon's

22  dealers and Exxon Corporation, marketing corporation.

23  What had happened was after the --

24      Q    Gene Stern's case?

25      A    That is correct.

HALASZ REPORTING

21

1      Q    I know the case.  What were you retained to

2  do?

3      A    I was the economist testifying about the

4  circumstances regarding the discount for cash program,

5  the wholesale price data, whether the discount had been

6  provided in the data and the damages that resulted if

7  and when it was not provided.

8      Q    Allsight Corporation v. VSI?

9      A    This is a patent dispute.

10     Q    What were you retained to do?

11     A    In a patent matter, you have to show economic

12  viability to defend your patent.  And I was asked to

13  assess the economic viability of the patent.  Very

14  unusual case, very interesting.

15     Q    Spielman v. Wright Industries?

16     A    This is an arbitration case, simple labor

17  contract.

18     Q    What were you retained to do?

19     A    I was retained -- the individual,

20  Mr. Spielman, was fired, and I was hired to look at his

21  contract, and, if he was wrongly fired, what his

22  contract would have provided to him.

23     Q    Calculate the compensation that would have

24  been due to him?

25     A    Yes; straightforward.

HALASZ REPORTING

22

1    Q    GM v. Packer Pontiac?

2    A    Largely descriptive.  It's whether or not a

3  market area would support another dealership, looking

4  at aggregate data, population growth, that sort of

5  thing.

6    Q    The Hunts v. Internal Revenue Service?

7    A    The Hunt Brothers, Mr., Mr., and Mr. Hunt,

8  were engaged in an effort to acquire a large quantity

9  of silver.

10   Q    This is cornering the silver market

11  enterprise?

12   A    That is correct.

13   Q    What were you retained to do?

14   A    As part of that case, there was a civil

15  matter that was subsequently tried and resolved, and

16  there was a matter for the IRS.  I was hired by the IRS

17  to assess the value of silver that they contributed to

18  a partnership that was formed to resolve the liquidity

19  crisis that was created.

20   Q    Ashley Enterprises v. Browning?

21   A    That's tougher.  That's further back.  I'm

22  not sure off the top of my head what I did in that

23  case.  It was a case involving rents.  There were rent

24  control issues for mobile homes.  And I can't remember

25  exactly what I did, without trying to find those

23

1    files.

2        Q    And Dash v. Marks?

3        A    This was a case -- gosh.  This was a case of

4    advice from an attorney, if I remember correctly, about

5    options that the company had issued.  I can't remember

6    any more than that.

7        Q    Have you ever been retained to determine the

8    value of a marketing arrangement?

9        A    Not specifically like that; no.  I mean if

10   you value a company, you're valuing part -- all of its

11   businesses and marketing is often part of that.

12       Q    Have you ever been retained to determine what

13   a person should be paid by a company for a marketing

14   plan?

15       A    No.

16       Q    Did you ever review a retention letter

17   between Morgan Stanley and Physio-Control pertaining to

18   the acquisition or pertaining to the merger between

19   Physio-Control and Medtronic?

20       A    Not at the present time.

21       Q    You did review an executive summary that was

22   submitted by Dr. Myerburg to Medtronic?

23       A    The one that specifies his plan for them.

24       Q    You just showed me the document?

25       A    Yes.

24

1      Q     Can you tell me your understanding of the

2    components of his marketing plan?

3      A     Well, it's in several pieces.  He, basically,

4    talks about the market for sudden cardiac deaths, talks

5    about the current technologies that are available to

6    help prevent these deaths, and proposes a plan.  He has

7    several points in here; proposes a plan where Medtronic

8    would enter into the automated defibrillator market

9    devices.

10     Q     AED?

11     A     AED market.  And, in doing that, the greater

12   the distribution of these AEDs, the more likely -- I'm

13   speaking from my reference to the plan, not as a doctor

14   of medicine -- but the more likely an individual would

15   survive a sudden cardiac event.  And that would then

16   increase the opportunities to sell the other products

17   in other medical instruments that Medtronic provides.

18     Q     It's not a quiz on your memory.  I'll go

19   through it with the plan in front of you.  I want to

20   have your sense of it.

21     A     Sure.

22     Q     Do you regard yourself as an expert in the

23   setting of fees for marketing plans?

24              MR. BAILEY:  Object to the form of the

25   question.

25

1                    THE WITNESS:  I consider myself an

2    expert in economics.

3    BY MR. DAVIS:

4        Q    Do you regard yourself as an expert in the

5    setting of fees for marketing plans?

6                    MR. BAILEY:  Same objection.

7                    THE WITNESS:  I'll give you the same

8    answer.

9    BY MR. DAVIS:

10       Q    Well, you've told me what you are an expert

11   in?

12       A    That's right.

13       Q    I'm asking if you're an expert in setting

14   fees in marketing plans?

15       A    I'm an expert in economics.  It's a broad

16   field.  And a great number of people have Ph.D.s in

17   economics and specialize in a lot of aspects of that.

18   That training allows you to look at a number of details

19   of transactions, marketing plans, fees, and come up

20   with estimates based on sound economic principles.  The

21   application of sound economic principles would enable a

22   trained, competent economist to analyze that particular

23   question.

24       Q    Have you ever been retained to establish a

25   fee for a marketing plan?

HALASZ REPORTING

26

1      A    No.

2      Q    Have you ever written on that specific

3    subject; that is, setting of fees for marketing plans?

4      A    Not that I can recall.

5      Q    I went through the list of writings that were

6    contained in your resume, and it did not appear to me

7    that any of these address marketing plans, the fees for

8    marketing plans.  Do you agree with that?

9      A    I think that's a fair assessment.

10     Q    To your knowledge, is there a standard method

11   of setting fees for marketing plans?

12     A    Not to my knowledge.

13     Q    Have you ever looked to determine that?

14     A    I have done some reading on this question.

15   I've looked at issues related to what underwriters are

16   paid.  I've looked at Web searches and part of this

17   process to see what's up when you put in certain terms,

18   but I haven't a sense in this investigation that

19   there's a standard method for setting a fee.  There can

20   be usual, customary charges, but that doesn't mean

21   that's the standard for every example.

22     Q    Are there usual, customary charges for

23   marketing plans?

24     A    Not that I can refer to right now.

25     Q    You didn't uncover any of those in your

27

1    research in this case?

2        A    Well, I don't recall any.  When you do a Web

3    search, you get hundreds of hits at different documents

4    that come up.  And you look at some of them.  You don't

5    look at others.  So I can't tell you right now that I

6    saw anything that said the usual, customary charge for

7    a marketing plan is X.

8        Q    Did you structure any of your searches to

9    attempt to determine whether there were usual,

10   customary charges for marketing plans?

11       A    I'm trying to think of what I searched under,

12   and I'm not sure whether I searched under that

13   particular title, which would be one approach to that.

14   No.  I can't tell you I did that.  I don't remember

15   that I did or didn't do that.

16       Q    Do you have any record of the searches that

17   you did conduct?

18       A    No.

19       Q    This will sound very similar to the last

20   question, but we all have buzz words in our particular

21   field.  Are there generally accepted methods for

22   setting fees for marketing plans?

23       A    I'm not sure I can answer that question.

24       Q    Are you aware of any?

25       A    I'm aware of valuation techniques for

HALASZ REPORTING

28

1  documents, valuation -- excuse me -- for documents,

2  valuation techniques for assets and financial

3  agreements.  So whether the valuation techniques fall

4  under the generally accepted terminology, it sounds to

5  me like I couldn't answer that.  That sounds too much

6  like a legal determination for me to answer.

7       Q    But in your efforts in this case, you did not

8  come upon anything characterized as a generally

9  accepted method for setting of fees for marketing

10 plans; is that correct?

11      A    Not that I can recall.

12      Q    Were you asked, among the things you were to

13 do, to calculate an appropriate fee or payment for the

14 use of Dr. Myerburg's plan by Medtronic?

15             MR. BAILEY:  Object to the form of the

16 question.

17             MR. DAVIS:  What is your objection,

18 Guy?

19             MR. BAILEY:  The objection is to the

20 form on the basis that you are using the word calculate

21 as if it's some sort of accepted general formula.  He's

22 already said, I think, that he can't establish such a

23 thing.  Calculate seems to me to be an assumption

24 that's contrary to the testimony.

25 BY MR. DAVIS:

29

1      Q    Well, you calculate damages.  If --

2            MR. DAVIS:  I'm asking if he was asked

3    to calculate a fee as a form of damage in this case.

4            THE WITNESS:  I don't really think the

5    fee is the terminology that was used.  I think, as I

6    recall conversations with Dr. Myerburg and

7    conversations with Mr. Bailey, that the issue was given

8    that there's liability here; what is it that the

9    damages -- what are the damages that have arisen.  And

10   my efforts were aimed at defining what those damages

11   were.

12   BY MR. DAVIS:

13     Q    Now, you say -- given that there's liability,

14   did you determine there was liability, or were you

15   asked to assume there was liability?

16     A    I have to assume there's liability.

17     Q    You've made no effort to determine whether

18   there's liability or not?

19     A    I've made an effort to look and examine

20   characteristics of this matter as it relates to the

21   damages.  I have to assume, because I'm not the one to

22   determine liability, that it is determined.  If it's

23   not determined, then what I would do in the

24   calculations would be different.

25     Q    Well, if there were no liability, would you

30

1    calculate damages in any manner?

2         A    If there's absolutely no liability under the

3    contract matters that are at dispute here, then I

4    believe the proper finding is there's no damages.

5         Q    But even for your own purposes, you made no

6    effort to determine whether you thought there was

7    liability or not; is that correct?

8         A    I made an effort to -- requested information

9    on the documents that were provided by Medtronic to Dr.

10   Myerburg and through his attorneys, and I have received

11   a list of those documents most recently, on Monday,

12   that included over 700 entries.  And it certainly is --

13   as requested, I will pursue more of those items on the

14   list.

15              I have asked about the Morgan Stanley

16   role in the merger and what information that Morgan

17   Stanley put in writing about the nature of the merger.

18   So I've asked about what Morgan Stanley had to say.

19   But that was to inform me about that particular

20   advisory role and what they were telling Medtronic in

21   terms of why Medtronic should buy Physio-Controls.

22        Q    Well, do you intend to revise your report?

23        A    Sure.  If I have -- I've indicated to you --

24   well, I shouldn't say sure.  I may or may not.  I am

25   one who if I'm presented with evidence and information

HALASZ REPORTING

31

1    that differs from what I thought to be true, then --

2    and it changes what I have to say, I'll change what I

3    have to say because I no longer have a basis upon which

4    what I said previously was correct.  So I'll revise it

5    to say this is not what I understood to be true.

6         Q    You misunderstood the implication of my

7    question.  I was not assuming that you have an

8    opinion.  Whatever the facts are, that's your opinion.

9    What I was trying to get at is whether you and I have

10   to visit again.  What I had was your report.  If you're

11   going to change it, we'll need to do it again.  That

12   was the sole basis for my question.  You're a pleasant

13   fellow.  I don't mind meeting with you again.

14        A    Bottom line is on Monday, I received a list

15   of 700 documents.  As an expert, it's incumbent upon me

16   to review the list and see if there's documents on

17   there that would be relevant to what I have to say.

18   And, in that process, I may, in fact, see documents

19   that changes what I have to say.  If that results in us

20   meeting again, I'd be pleased to meet you again.

21        Q    Do you still have in front of you the

22   disclosure document?

23        A    (Indicating.)

24        Q    No.  The expert disclosure?

25        A    Yes.

32

```
 1        Q    Background section again.  It starts by
 2   saying, February, 1998, Dr. Myerburg presented a
 3   strategic business plan.  Is it your understanding that
 4   it's the use of this business plan or components of the
 5   business plan by Medtronic that gives rise to his claim
 6   for damages?
 7        A    That is my understanding.
 8        Q    Do you know whether it was in February?
 9        A    I believe it was in March, actually.  I don't
10   have a time line on that.  But that's what my
11   recollection is.
12        Q    Complaint recites -- in the facts we're
13   operating here, recite that it was on March 19?
14        A    I think that's exactly what I have in the
15   time line.  So if you let me look at it.
16        Q    Please.
17        A    I have March 19, 1998, visited Medtronics to
18   present plan.
19        Q    May I see that document?
20        A    Sure.
21        Q    Did you prepare that document?
22        A    No.
23        Q    Where did this come from?
24        A    I believe that came from Dr. Myerburg.
25             MR. DAVIS:  Mark this as exhibit 6.
```

HALASZ REPORTING

33

1   Guy, this is a 3-page document titled time line; begins

2   September of 1997.

3                    MR. BAILEY:   That's exhibit 6.

4              (Exhibit No. 6 marked for identification.)

5   BY MR. DAVIS:

6        Q    This time line indicates for December of

7   1997, under Myerburg, nothing.  Medtronic notified

8   Myerburg they would be interested in hearing about a

9   business plan.  And those are the only entries.  Were

10  you aware, in the course of your efforts, that in

11  December of 1997, Physio-Control retained Morgan

12  Stanley for the purpose of finding a buyer for

13  Physio-Control?

14       A    I didn't know when it was.  I knew they did

15  retain them.

16       Q    Were you aware that, among those potential

17  buyers, was Medtronic?  That is, among the potential

18  buyers that Morgan Stanley was retained to contact, was

19  Medtronic?

20       A    I'm not sure I can answer your question.  Let

21  me explain to you why.  I can deduce Medtronic was

22  among them because of what happened.  But I don't have

23  any document that says here is a list of who you should

24  go talk to.

25                    MR. DAVIS:  Let's mark this as exhibit

34

1   7.

2               (Exhibit No. 7 marked for identification.)

3   BY MR. DAVIS:

4       Q    Exhibit 7 is a letter of December 9, 1997,

5   from Catherine Friedman of Morgan Stanley to Richard

6   Martin, Physio-Control.  Have you ever seen that

7   document before?

8       A    I don't recall seeing it.  If it's in my

9   pile, I must have overlooked it.

10      Q    It recites, in the first paragraph, that

11  they're pleased to --

12      A    Can I ask you to wait?  And I'll read it real

13  quick.

14      Q    Sure.

15              MR. DAVIS:  Let's go off the record for

16  a minute.

17              (Discussion off the record.)

18              MR. DAVIS:  We're back on the record.

19  BY MR. DAVIS:

20      Q    Have you had a chance to review exhibit 7?

21      A    Yes.

22      Q    And having reviewed it, does that refresh

23  your recollection of whether you'd seen it before?

24      A    No.

25      Q    You still don't know whether you did or

35

1  didn't?

2       A    No.  I don't recall it.

3       Q    This recites Morgan Stanley was engaged in

4  connection with the proposed sale of the company on

5  December 9, 1997.  Do you see that?

6       A    Yes.

7       Q    It makes reference in the letter to an

8  attachment and approved list of companies to contact.

9  Included in the list is Medtronic.  Do you see that?

10      A    That is correct.

11      Q    Now, are you aware, in the body of facts that

12 were provided to you, that Morgan Stanley did contact

13 Medtronic?

14      A    I believe so.  Yes.  I believe -- well, the

15 time line refers to, I believe, something of that

16 nature and other information.  Do I need to keep this,

17 or can I give it back to you?

18      Q    No.

19      A    Time line.  Let me take a look at the time

20 line.  I thought it was on there, but I have either had

21 that told to me or it is on the time line.

22           MR. DAVIS:  Let's mark this as exhibit

23 8.

24           (Exhibit No. 8 marked for identification.)

25 BY MR. DAVIS:

36

1      Q    Exhibit 8 is an extract of -- well, it's a

2    cover letter from Richard Martin to Physio-Control

3    shareholders that accompanied the notice for special

4    meeting of shareholders and the proxy statement

5    relating to the merger, and attached to it is a notice

6    of the meeting, and then several pages from the proxy

7    statement, prospectus.  I'll show you that.  I'm

8    sorry.  This is attached to it as well, Dr. Fishe.

9              MR. DAVIS:  Guy, I've given him the same

10   pages that we went through with Dick Martin of the

11   proxy statement; pages 20, 21, 22 that contain the

12   chronology.

13             MR. BAILEY:  I understand you're clear

14   we're not calling Dr. Fishe on liability.

15             MR. DAVIS:  Yes.  I am.

16             THE WITNESS:  Go ahead.

17   BY MR. DAVIS:

18      Q    Do you recall whether you reviewed these

19   materials?

20      A    They don't look familiar.  Well, let me put

21   it this way.  I have looked at some parts of the proxy

22   statement.  Whether I saw this or not by itself, I

23   could well have seen this extraction that you're

24   referring to.  The cover letter I don't believe I've

25   seen.  But if it's in this pile, it may be.

37

1      Q    The cover letter is not relevant to any of my

2  questions.  It's only to give you a sense of what the

3  document contains.  I'm really only interested in the

4  pages beginning on page 21, background of the merger.

5      A    In the proxy statement?

6      Q    Yes.  Look at page 21.

7      A    Okay.  Beginning on 20, do you mean?

8      Q    No; just 21, background of the merger.  Do

9  you see that?

10     A    Okay.

11     Q    In doing your analysis, were you aware of the

12  fact that the board of Physio-Control authorized the

13  engagement of Morgan Stanley to consider proposals for

14  the acquisition?

15     A    Most certainly, I would have been.  Because

16  you wouldn't want to sell your company unless the board

17  agrees that's a prudent approach to follow.  I could

18  well have read this when I was reviewing those things,

19  processed that information, and moved on.  I didn't

20  remember the dates, to be quite clear.

21     Q    Do you have any facts or did you come across

22  any facts in the course of your efforts which would

23  indicate that the impetus for the acquisition of

24  Physio-Control by Medtronic came from Dr. Myerburg's

25  presentation, as distinct from the solicitation by

38

1    Morgan Stanley?

2        A    It's probably too early to offer an

3    observation, conclusory observation, on that, from what

4    I have reviewed.  My understanding is that Morgan

5    Stanley made a presentation to Medtronic.  The question

6    is what was said or what was provided in that

7    presentation versus what Dr. Myerburg had indicated

8    would be good reasons for such a merger.  And I think

9    what you're asking is whether there's a difference

10   between those 2, is the way I see your question, and I

11   don't have an answer, because I don't have Morgan

12   Stanley's presentation.

13       Q    What I'm asking is whether you, as you sit

14   here today, are aware of any facts that the impetus for

15   the acquisition for the merger came from Dr. Myerburg's

16   presentation, as distinct from the Morgan Stanley

17   contact and the visit by Medtronic to Physio-Control?

18       A    I don't know if I can answer that question.

19   It's pretty.

20       Q    Well, you can.

21       A    I don't know if I can answer the question.

22       Q    You can.  The question is are you aware of

23   any facts now, as you sit here?

24       A    Okay.  Let me explain what I see -- how I

25   understand that question.  When you say facts, facts

39

1    are documents.  Facts are things.  Facts are real

2    items.

3         Q    Yes.

4         A    Dr. Myerburg's business plan is a real item.

5    It's a fact.

6         Q    Yes.

7         A    That real item, that fact, outlines a synergy

8    between Medtronics and an AED company.  Physio-Controls

9    is an AED company.  That is a fact.  That's a reason

10   for combining the 2 companies.  There's a description

11   for why both companies can gain from that.  I don't

12   have such a description, from what -- in the context of

13   your question, I don't have such a description from

14   Morgan Stanley saying this is the reason, these are the

15   dollars, this is how you're going to benefit, this is

16   the money that's here.  I don't have that to say that

17   it wasn't Dr. Myerburg's plan that gave the board of

18   Medtronic the reason for pursuing this.

19        Q    Have you seen anything to indicate that

20   Medtronic moved to the merger because of their reliance

21   of Dr. Myerburg's plan?  We know he presented a plan.

22   We know the plan proposed reasons for the acquisition.

23   Is there anything you've seen to indicate that

24   Medtronic relied on that?

25        A    I have not seen a factual document that says

40

1   we're relying on this information by itself to make

2   this decision.  It could be that that was the most

3   important thing that they learned from Dr. Myerburg,

4   and that made a difference in the context of them going

5   ahead with the merger.  This company has acquired other

6   companies in the past, and they had a minority interest

7   previously in an AED company and did not, as I

8   understand it, pursue that prior to this event, making

9   it a majority and full ownership interest.

10              And, in fact, upon this purchase, they

11  had to change the nature of that relationship with --

12  what is it called -- Survival Link.  So what you're

13  asking me is about the nature of thinking of the board

14  of Medtronic and all the information they had when they

15  made this decision.  And I simply don't know, at the

16  present time, what that information was.

17      Q    That's fine.  You've answered my question.

18  Did you review the deposition of Mike Ellwein?

19      A    I don't think so.  I have some material

20  here.  Is it in the list?

21      Q    No.  It's not on the list.

22      A    If it's not on the list, I can guarantee you

23  I don't have it.

24      Q    Do you know who Mike Ellwein is or was?

25      A    No.  I don't.

41

1       Q    Do you have a copy of the disclosure in front

2   of you, of your expert disclosure?

3       A    (Indicating.)

4       Q    Yes.  Okay.  The disclosure, beginning on the

5   first page, indicates that Dr. Myerburg presented a

6   plan encouraging Medtronic to acquire an AED

7   manufacturer in order to increase its marketing and

8   sales of implantable cardioverter, slash,

9   defibrillator, or ICDs, which I'll refer to as ICDs

10  from now on to reduce the cost of the deposition.  To

11  your knowledge, did the acquisition of Physio-Control

12  increase sales of Medtronic's ICDs?

13      A    I haven't examined that question.

14      Q    Did it alter the marketing by Medtronic of

15  ICDs; that is, alter the manner in which it --

16      A    I have not examined that question.

17      Q    Do you expect to?

18      A    I could.

19      Q    You could.  I mean it's possible that you

20  could.  Have you been asked to do that?

21      A    Not currently.

22           MR. DAVIS:  Guy, are you going to ask

23  him to do that?

24           MR. BAILEY:  It hasn't separately come

25  up to this point.  I have asked him to review what he

HALASZ REPORTING

42

1   needs to review to give the testimony that he is

2   giving, and if he feels he needs to see something more,

3   then Dr. Fishe is certainly able to do more.  I haven't

4   asked him to do more.

5            MR. DAVIS:  There has to be some

6   finality to those disclosures so I can get my expert

7   prepared.  You agree with that; don't you?

8            MR. BAILEY:  I agree you're entitled to

9   know what Dr. Fishe is doing.  But I did not expect

10  that there might be a question that he would need to do

11  more.  If Dr. Fishe feels it's necessary to do more or

12  to examine that additional specific question, the only

13  thing I can suggest is that he do that, and perhaps we

14  could do a brief follow-up telephonic examination of

15  him on that specific subject.  I don't know what else

16  to do.

17  BY MR. DAVIS:

18       Q    This recites, in the last sentence above your

19  name, that the clear objective of this acquisition,

20  referring to the merger, was to improve the marketing

21  of Medtronic's ICDs.  Did you examine any facts to

22  support that conclusion that the objective was to

23  improve the marketing of Medtronic's ICDs?

24       A    I would have to review the proxies again.

25  It's fairly clear from the announcement, in how the

43

1    news media received the announcement, that they talked

2    about the synergies of the 2 companies and how they

3    would both possibly benefit from being one combination,

4    which I would believe to be inferred to represent

5    greater sales for both companies.  You have the

6    documents from Bloomberg.  You can look at what is said

7    in the public media about that.

8         Q    You say, in the content portion, you'll

9    testify that compensation is based on a portion of the

10   total benefits created from merging Medtronic with

11   Physio-Control.  How would you determine the total

12   benefits created by the merger?

13        A    Well, the methodology that's used here is to

14   assess what the market determines the value of the

15   combination to be at the time of the announcement.  And

16   on the data disk provided, you'll see the calculations

17   of those numbers.  But the event itself generated

18   abnormal returns for Medtronic and Physio-Control stock

19   price.  These dollars are related to Medtronic's stock

20   price, abnormal returns.  And that's the range and

21   amount.

22             On the first day, it was less than 80

23   million; 78 million dollars.  On the second day, it was

24   over 225; 226 million.  If you add the first day and

25   second day together, you get 226 million.  So that is

44

1    the basis on which the objectively determined value of

2    the synergy is established, from my work, and the issue

3    would be how much of that Dr. Myerburg should be

4    compensated, if liability is assessed, that his work

5    was relevant and important to this how much of this

6    money should be paid to damages to Dr. Myerburg.

7        Q    Well, under your methods -- methodology, what

8    would happen if the following day the stock price went

9    back down?

10       A    Typically, one focusing simply on the

11   announcement event, one does not go very far into the

12   future.  I provided this for 1-day and 2-day

13   information.  I have, on the data disk, all of the

14   transactions in the market on those days.

15       Q    Well, I understood your methodology.  You

16   looked here with the announcement, and the stock price

17   went up.  The next day it went up some more.  That

18   could happen for a host of reasons?

19       A    Right.

20       Q    How would that represent value to Medtronic

21   as a result of the use of his idea if, in fact, 3 days

22   later the stock went back down, and, if you looked at

23   it a year later, the stock was below the price?

24       A    First of all, let's understand the

25   methodology is adjusting for other events in the market

45

1    on that particular time.  So it's not without

2    controls.  So on the day the announcement is made, I

3    have control for other events in the market.

4         Q    I understand that.  You made that clear in

5    your report.

6         A    What happens if the Medtronic stock price

7    moves up and down in subsequent days?  There can be

8    other information, events, that I have simply not

9    analyzed here too that can be brought to bear and cause

10   that price to move.  Medtronic is a dynamic company.

11   There's other information that comes out about

12   Medtronic that can change things.  I'm focused on how

13   the market reacted to the news of this particular

14   event, trying to isolate the value of this event.

15        Q    If the stock price was $100 a share, and,

16   after the announcement, it went to $110 a share, and

17   then the following week, it was back at $100 a share,

18   how would you measure what benefit his plan provided to

19   Medtronic, the company, as opposed to those

20   shareholders that may have sold it when it went to

21   110?

22        A    Is that statement adjusted for all events in

23   the market?

24        Q    Adjusted the way you adjusted it; yes.  What

25   I'm trying to get at is -- and I'm sure you understand

46

1    -- is that assuming there's liability, which I'm sure

2    you concluded by now is a contested issue --

3         A    In dispute.

4         Q    -- how someone like Dr. Myerburg would be

5    compensated for a benefit he provided to the company?

6         A    Okay.

7         Q    If, for example, he came in and said here is

8    a great idea, acquire this company, and assuming we

9    took his idea and acquired it and then sales of our

10   ICDs went up ten percent and those sales could be

11   directly attributed to the acquisition, then you can

12   say, well, there's the value he contributed, and I

13   assume you would agree with me he wouldn't get the

14   total amount of the value.  He would get some

15   percentage of that value?

16        A    Generally.

17        Q    Here I understand your methodology, which was

18   to show that the market placed a value on this

19   acquisition that these -- at least a day or the next

20   day -- of 80 million.  And I don't know what the float

21   was.  So I don't know what percentage that represents.

22        A    It's in the disk.  You can see it.

23        Q    Okay.  But I mean they have millions of

24   shares.  So it's probably pennies her share.  How would

25   you use that momentary blip in the stock price as a

HALASZ REPORTING

47

1   basis for compensating Dr. Myerburg for his plan?

2              MR. BAILEY:  Object to the form of the

3   question.

4              THE WITNESS:  Okay.  Well, first of all,

5   you want to establish that the enterprise that was

6   combined had value.  So that's what this does.  It does

7   establish a value to the enterprise price that's being

8   combined.  Oftentimes, you do not find the acquiring

9   company stock price goes up on an announcement like

10  this.  There's maybe many reasons why that would

11  happen.  But, oftentimes, it doesn't go up.  It's a

12  pretty clear statement, from the perspective of the

13  stock market, that that combination was good for both

14  companies.

15  BY MR. DAVIS:

16      Q    That day?

17      A    Well, let me be careful, and I reserved my

18  thoughts on your 'that day' comment, because there's a

19  very well-established literature, academic literature

20  and practitioner literature, about efficiency of U.S.

21  capital markets, and there's a number of implications

22  of that efficiency.  And one of those implications is

23  that the market is looking into the future and

24  determining the price of assets currently.

25              So when a new announcement comes about,

48

1   such as this merger, and the market learns of that,

2   they look into the future and say what will this do,

3   what will this do for the company and the other company

4   involved.  And that is processed by the traders, by the

5   participants.  And there's, generally, a higher volume

6   on that day or change in volume as the individuals

7   resettle and rethink their portfolio positions and

8   process that information quickly so that now becomes

9   capitalized in the price of the company.  It's

10  well-established that we have a high degree of

11  efficiency in our markets.

12          So that information and its value is no

13  longer going to be -- how do I put this?  It's now in

14  the market price.  So what would happen to change that

15  particular context would be, well, we haven't revealed

16  everything about the merger and here's something we

17  haven't revealed, and it's bad or good, and the price

18  goes up again.

19          So there's things that can change the

20  price and other events that can change the price, quite

21  clearly.  But the point is, when it was announced and

22  the market responded to it and the news media said here

23  is the merger and here is the synergies that are here,

24  this looks like a pretty clever idea, these companies

25  are going to do well.  This is now in a capitalized

49

1   value, worth this much more.  It could be 80 million,

2   depending on whether you think the information dribbled

3   or came out quickly, up to 200 million.  I wouldn't go

4   beyond that in making a assessment of what the market

5   thought of this merger.  It's then old news.  It's

6   already in the press.

7                 Now, how much does Dr. Myerburg get is

8   largely a question of stating that there is liability

9   here.  Then, given that, what is his position.  And, in

10  bargaining for this wealth gain, there is a lot of

11  literature on bargaining, and what would he be able to

12  bargain for.  Well, his bargaining position in this

13  particular dispute was enhanced significantly by the

14  signing of a confidentiality agreement.  Because it

15  called for payment.

16                 So that changed the relationship with

17  bargaining between him and Medtronic, assuming there's

18  liability.  When we look at bargaining models, people

19  that do bargaining tests and experiments, practical and

20  experimental settings, there's a famous problem people

21  look at.  It's called a divide and choose problem.

22  You're probably familiar with it, where you have

23  participants in a various setting.

24                 I'll give you a simple example.  In one

25  setting, there's $20, and you get the opportunity to

50

1    divide up the $20 and I get the opportunity to decide

2    whether I want to accept my split.  And, if I refuse

3    that split you've come up with, neither of us gets any

4    money.

5              In theory, you should say, okay, I'll

6    give you 2 cents and I'll keep 19.98, because I walk

7    away with 2 cents, which is more than otherwise.  But,

8    in practice, what happens is it tends to be about

9    50/50.  Sometimes there's a variation about that.  But

10   that's where it tends to be.  Dr. Myerburg's

11   compensation, in that event, would largely be a

12   bargaining problem.

13        Q    Now, so your starting point -- and I don't

14   mean to oversimplify it, but since we're limited to my

15   abilities to comprehend, it may be an inevitable

16   result.  Your starting point was the value that the

17   market put on this transaction?

18        A    Absolutely.

19        Q    And the market made certain assumptions in

20   putting that value?

21        A    I'm sure it did.

22        Q    What if -- under your methods, what if, at a

23   later point, 6 months, it turned out that these

24   assumptions were incorrect and, as a consequence, the

25   market adjusted its value of the company?

51

1      A    What that -- give me a 'for if'.

2      Q    Sure.  I will.  I will.  Let's say that the

3  market assumed that, as a result of this acquisition,

4  Medtronic's share of the ICD market would increase --

5      A    Sure.

6      Q    -- which, in fact, was one of the components

7  of the plan.  What if, after 6 months, Medtronic's

8  share of the ICD market had stayed the same or

9  decreased, and, therefore, the market says, well, this

10  didn't work out the way we thought it was going to work

11  out, there's not going to be an increased number of ICD

12  sales and, therefore, we don't value the stock the way

13  we did that first optimistic day, would Dr. Myerburg

14  still be entitled to compensation based on the market's

15  original flutter?

16     A    My opinion would be the market's original

17  change was not flutter.  I reject the characterization

18  of it as flutter.  It's an indictment of the

19  terminology of efficient markets.

20     Q    Stop.  I'll take the word flutter out.  I

21  don't want that to affect the question.  Same question,

22  but what if the market adjusted downward because the

23  increase that was attributable to these assumptions,

24  taking into account all the other factors, turned out

25  to be incorrect?

52

1  A I believe, in this context of his business

2 plan and the confidentiality agreement, as I have read

3 it --

4  Q Yes.

5  A -- that he was proposing a synergy.  He was

6 proposing the value of being in the AED business for

7 Medtronic, and that the best assessment of that value,

8 in my estimation, is when it is announced, that the

9 merger combination is going to arise, there can be a

10 lot of reasons why something doesn't happen later that

11 Dr. Myerburg has absolutely no control and no influence

12 over.

13  Q That changes my question.  I understand

14 that.

15  A Management can make mistakes.  There can be

16 systematic behavior.  It can be accounting changes.  It

17 can be a number of things that altered the value of

18 what has been thought to be a good idea.  And Dr.

19 Myerburg isn't to be assessed the cost of those other

20 things.

21  Q I understand that.  That changes my question

22 slightly.  Assume, for purposes of my question, that he

23 said these things were going to occur, and assume they

24 didn't occur for reasons unrelated to Medtronic or its

25 management or anything else -- it just didn't work --

53

1    is it still your view he should be compensated based on

2    the market's initial reaction?

3        A    Yes.  In large part, I do believe that.  And

4    I'll explain why.  If you and I had an agreement and it

5    said I'm going to give you this information that is

6    going to make your business more valuable, and, in

7    fact, we shared this information with each other and we

8    agreed that you're going to pay me for this

9    information, it's very understandable if we were to

10   say, look, I'm not really fully sure how much valuable

11   your business is going to be --

12       Q    How much more valuable?

13       A    -- how much more valuable your business is

14   going to be -- much the same way Morgan Stanley's fee

15   is based on the size of the transaction -- I don't know

16   how much more valuable your business is going to be,

17   I'm willing to take the risk that it's going to be more

18   valuable because I believe it's a good idea, how would

19   we find out objectively -- so we're both not able to

20   influence that number -- how much more valuable is it

21   going to be, the answer would be we would say we've

22   signed this letter of intent, we're going to merge and

23   make this public announcement for publicly traded

24   companies, and we made this announcement and let,

25   objectively, the market determine the value.

54

1          And that's how we would know all of the

2   debate and all the words and ideas and all forecasts;

3   we would know, at that point, what they meant, because

4   they would be summarized.  The market is terribly good

5   at that.

6          And that's why I say that's where you

7   would stop.  The information has now been provided for

8   us to resolve our compensation.  And, beyond that, I

9   can't control what you do in your company.  I can't

10  control how you develop new ICDs and the AED market.  I

11  will present to you something that I found absolutely

12  fascinating in Monday's paper.  Well, I'll try to.

13      Q    Don't get my hopes up like that and dash

14  them.

15      A    I won't dash them.

16          MR. BAILEY:  I think you should dash his

17  hopes, whenever possible.

18          THE WITNESS:  This was in Monday's

19  paper.

20          MR. DAVIS:  Guy, this is an article

21  indicating that you're planning to retire.

22          MR. BAILEY:  It's a lie.  I can't afford

23  to retire.

24  BY MR. DAVIS:

25      Q    Let's go back to our damage calculation

55

1    here.  Are you aware of any company that has agreed to

2    pay someone for a marketing plan on the basis of what

3    the -- the performance of the company's stock on a

4    particular day?

5         A    Well, that's a very open-ended question.  I

6    haven't heard of a marketing plan.  Quite clearly,

7    there's compensation arrangements based on performance

8    of stock.  That's very obvious.  And that goes to the

9    ranks of the executives, including marketing

10   executives.  There's certainly compensation value.

11             I have not seen a document that

12   specifies compensation for a marketing plan that says

13   if your stock price changed by X that day, this is what

14   you would be paid.  I'm telling you that's the amount

15   of money this plan, this idea, this merger combination,

16   was determined to be worth, as assessed by the stock

17   market.

18        Q    Right.  I understand that.  I'm trying to

19   take it the next step, because that, as I understand

20   it, serves as the basis for compensation?

21        A    Right.

22        Q    And I want to know if you're aware of any

23   situation in which that served as a basis for

24   compensation for someone who presented a marketing plan

25   to a company.  I'm not talking about marketing

56

1   executives within a company where there's a

2   performance-based stock plan.  I'm talking about

3   somebody coming and saying I have a plan and the

4   company agrees it will accept the plan and it will pay

5   that person based on what the company's stock does at

6   some point in the future?

7       A    Not at the present time.  I haven't tried to

8   research that question, per se.

9       Q    Are you aware of whether Medtronic has ever

10  paid anyone on that basis?

11      A    No.

12      Q    Now, based on your analysis of the market's

13  response, what have you determined that Dr. Myerburg's

14  compensation should be, assuming there's liability?

15      A    Assuming there's liability, his compensation

16  could be as high as 80 million or as high as 200

17  million.  It can't be those numbers, but it can be

18  based upon those numbers, and so it should be based

19  upon those numbers.  It would not be surprising to me

20  if the courts deem -- and the finders of fact, whoever

21  they happen to be, deem -- that the company is liable

22  and that it used the plan and that it assessed the

23  degree in which it used his plan, in some fraction of a

24  way.  Then it takes the fraction and assesses it on the

25  basis of the value that's created.  I wouldn't be

57

1   surprised if the finders of fact did such a thing.

2       Q    You have not done that?

3       A    No.

4       Q    Do you plan to do that?

5       A    I'll repeat my observation earlier.  I have

6   700 documents, an index of 700 documents, to look at.

7       Q    I'm trying to find out what you've been asked

8   to do.  Have you been asked to calculate that number;

9   that is, the number he should be paid, if liability is

10  found to exist?

11      A    I've been asked to determine the damages.  I

12  feel like I've given a range for the damages here.  I

13  think it's reasonable that I should consider trying to

14  refine that information further, and I would proceed to

15  do that.  Now, among those documents I have to review,

16  that may give me information that let's me refine it

17  further, but I have not refined it further at the

18  present time.

19      Q    Okay.  On page 3 of 14 --

20           MR. DAVIS:  Let's go off the record for

21  a minute.

22           (Discussion off the record.)

23  BY MR. DAVIS:

24      Q    On page 3 of 14, you say, with respect to a

25  discussion of synergies presented in Dr. Myerburg's

58

1    plan -- do you see where I am --

2        A    Yes.

3        Q    -- professor Fishe will testify that

4    Medtronic estimates show that after-tax benefits of 76

5    million will arise from increasing SCD survival rates

6    from 5 percent to 15 percent?

7        A    Yes.

8        Q    Focusing on that, were SCD survival rates at

9    5 percent as of the time of the acquisition?

10       A    I believe somewhere in Dr. Myerburg's plan,

11   he refers to that, yes, or something less than that.  I

12   can't tell you whether it was less than that or at

13   that.  But that number is floated around in some of

14   these documents.  Yes.  But I don't know if it was 5,

15   3, 4.  I know there's a range of things I've seen on

16   that number.

17       Q    Has there been an increase to 15 percent?

18       A    I don't believe so.  I'm not a medical doctor

19   monitoring that.

20       Q    Right.  So this is simply a projection at

21   some point, if these rates increased, by --

22       A    Yes.

23       Q    -- 300 percent, essentially?

24       A    Correct.

25       Q    Based on your experience, would you expect a

59

1    company to compensate someone based on the possibility

2    that sales might increase?

3        A    I think those types of contracts would

4    certainly be rare.  I wouldn't feel -- I haven't seen

5    one.  Let me put it that way.  But I wouldn't feel it

6    reasonable to assert they don't exist.  Somebody may

7    sign a contract to that effect as a measure of their

8    belief as well.  It takes 2 parties to sign it.

9        Q    But would you agree with me that if you were

10   entering into a contract such as that, that there would

11   be some risk that it might not occur?

12       A    Absolutely.

13       Q    And that risk would be a factor in

14   determining what the compensation would be?

15       A    There's different ways to view the structure

16   of such a contract.  One might make a payment if you

17   were to, say, provide me knowledge and this might

18   happen, that knowledge costs you X.  And I don't have

19   control over all the things that might happen.  So you

20   have to pay me X to be able to have the opportunity to

21   create that event.

22       Q    That's a one-time payment?

23       A    That's a one-time payment.  Now, it's in your

24   hands and you go do what you can do.  Alternatively,

25   you might have a situation which is not unrealistic

60

1    that I'm going to give you some investigation and I

2    will be able to give you further information as time

3    goes on; venture capital type arrangements.  And I'll

4    -- we'll have to explore and see if this is going to

5    work out, and, as we go through the process, we'll know

6    more about whether this is actually a practical idea or

7    marketable component to it or find anybody to buy it.

8              So that's more of a 2-stage kind of

9    contract where there's some money that's paid, and

10   then, again, usually, there's an equity component in

11   these kind of structured contracts or fractional

12   component based on performance, and you see later on

13   what the person can do, give them incentive to get to

14   the next step through that particular incentive

15   contract.

16             So there's a number of ways one could

17   structure a contract that's tied to the actual events.

18   When a service business sells itself, oftentimes, key

19   employees will be kept for some period of time and

20   sales calls would be associated with the sale.

21        Q    Right.  Buy-out depends on how the company

22   does for the next 5 years?

23        A    Exactly.

24        Q    Have you seen anything to indicate what Dr.

25   Myerburg's plan for compensation would have been?

61

1        A     No.

2        Q     You said you did review the nondisclosure

3    agreement?

4        A     Yes.

5        Q     And you have not determined whether there was

6    a breach or not?

7        A     I'm not an expert to do that.

8        Q     I understand.  I'm not suggesting you should

9    be.  I'm simply trying to find out everything you've

10   looked at and opined on?

11       A     Sure.  Sure.

12       Q     Now, this also recites that you'll testify

13   about the value received by Medtronic from the use of

14   the elements contained in his plan, and you told me the

15   value that the market perceived from the benefit of

16   this plan.  Did you calculate, in any way, the value

17   received by Medtronic, the company, as distinct from

18   the value that the market showed?

19       A     I'm puzzled here.

20       Q     Let me clear up that look of consternation.

21   Medtronic is a public company and the stock is owned by

22   the public.  To the extent that the stock went up, the

23   public, assuming they went out and sold their stock,

24   would have received that benefit.  What I mean is what

25   benefits did Medtronic receive from the use of his plan

62

1    in terms of increased sales of ICDs, which, I think,

2    was the principal objective of his plan?  Did you

3    determine that?

4        A    You mean did I expose -- go and collect data

5    from Medtronic along their ICD sales subsequent to the

6    merger?

7        Q    Yes.

8        A    No.

9        Q    Is that not a meaningful distinction to you;

10   that is, the value that the owners of the stock

11   received, as distinct from the financial benefit that

12   the company received?

13       A    That's not a very meaningful characterization

14   of the differences.  Maybe I don't understand the law

15   enough to know legal entities versus shareholders'

16   limited liability and that sort of thing in a financial

17   context.  The company is an enterprise owned by the

18   shareholders.

19            So when I hear you ask me what is the

20   value received by Medtronic, that translates down to

21   what is the value received by the enterprise owned by

22   the shareholders.  And the best estimate of the

23   statement of the value received by the enterprise owned

24   by the shareholders is stock market price change, and

25   it does include a statement at the time of what these

63

1    parties that did the trading thought the future sales

2    would be, future value of the enterprise, future

3    changes that would add wealth to the owners of that

4    enterprise, owners of Medtronic.  That is value to that

5    enterprise.

6        Q    The content of internal documents prepared by

7    Medtronic showed that the acquisition was a 0 or

8    negative net present value project.  What does that

9    mean?

10       A    There were documents prepared under something

11   called Project Starbucks.

12       Q    That's the way the acquisition of

13   Physio-Control is referred to?

14       A    I took it to be that's what that referred

15   to.  And, in any merger of this nature, the financial

16   folks and marketing folks, various people, get together

17   and work out assumptions about what is going to happen

18   to the business, the Medtronic Company's financial

19   statements as a result of this combination, and they

20   will go and make pro formas and other kinds of

21   calculations from that.

22            I came across some of these.  I don't

23   know if I have all of them or what all the assumptions

24   that are embedded in them.  I'm not the person

25   preparing them.  But the ones that I saw showed a very

64

1    low gain to actually creating this acquisition, or, in

2    other cases -- and I think it dealt with whether you

3    had pooling of interest combination or not.  In other

4    cases, it was a very negative gain to this

5    combination.  Based upon whatever those assumptions

6    were, they weren't creating a lot of value, based on

7    the financial calculations.

8         Q    Does that mean that the market may have been

9    wrong when they assumed this value of the company

10   itself was not assuming?

11              MR. BAILEY:  Object to the form of the

12   question.

13   BY MR. DAVIS:

14        Q    I'm trying to figure out how you reconcile

15   those 2?

16        A    I think you would have to say that somewhere

17   along the line -- I don't believe the market is wrong.

18        Q    I gathered that.  The market is there.

19        A    It's pretty consistently; correct.  So I

20   would not say that.

21        Q    Well, you could look at the way the market

22   value -- the dot-coms -- and conclude that maybe the

23   market is wrong sometimes?

24        A    I wouldn't conclude that.  I think you're not

25   informed about the structure of the information flowing

65

1    in those businesses and what people said and believed

2    at that time.  But let me focus on the other question.

3        Q    Please.

4        A    Which is the analysis provided by the

5    financial folks at Medtronic.  And that is that those

6    analyses have assumptions in them.  And my

7    interpretation of the 2 calculations are, one, the

8    market calculation said there's a lot of value here

9    than your assumptions produced, and I would say

10   whatever the assumptions were, some of them were in

11   error.  Some of them weren't by the Medtronic

12   officials.  Some of them were in error.  And if they

13   changed the assumptions, they could well have created

14   830 million dollars in value for the transaction.

15       Q    What if 6 months down the road, the Medtronic

16   assumption turned out to be completely correct?

17                  MR. BAILEY:  Object to the form of the

18   question.

19                  THE WITNESS:  Again, I think I've

20   established why I'm not going 6 months down the road in

21   terms of the issues related to Dr. Myerburg.  He

22   doesn't control what Medtronic might do 6 months down

23   the road.  His plan is a plan that leads to action.

24   The action is to find an AED company that you should

25   combine with, and then you will be able to enter into

66

1    an arrangement through providing these AEDs and public

2    facilities that allows you to increase your sales of

3    ICDs.  And the market has spoken on that the day it was

4    announced.

5    BY MR. DAVIS:

6        Q    You mentioned in item 5 on page 4 of 14, the

7    synergies of marketing described in Dr. Myerburg's plan

8    which create valuable real options that help explain

9    why the stock market reacted positively to the merger

10   announcement?

11       A    Right.

12       Q    Did the synergies in marketing that he

13   described actually occur?

14       A    I don't know.

15       Q    What were the synergies in marketing?

16       A    As I understand the nature of his plan, he

17   was -- well, it's right here.  I can read it to you.

18   He was going to make these AEDs available in the same

19   way the advertisement I showed you suggests; in public

20   places, in police cars, more broadly available to

21   population concentrated areas where SED events -- well,

22   without the D -- events occurred.

23       Q    SCA?

24       A    Thank you.  SCA events they use for that.

25   That particular approach gives rise -- assuming that

67

1    it's the measured way implemented -- gives rise to an

2    opportunity to then sell an implantable device to the

3    people who did survive that may require regular medical

4    instrument to monitor the electronic characteristics of

5    their heart.  So that particular idea is a synergy.

6    And that's what I'm referring to when I talk about the

7    real options that are there.  That's something that you

8    have the choice.

9            You have the choice -- do you start in

10   Richmond, Virginia, New York City?  Where do you start

11   doing that?  You have a lot of real options to start

12   doing that, that's valuable.  The option to do that is,

13   theoretically, valuable, and if market has said here is

14   what we think it's worth --

15       Q    You don't know whether the synergies occurred

16   or not?

17       A    Here is a fact.  It started to occur.  I

18   showed you this a few times.  You can go to the

19   Website.  You can see the American Heart Association

20   does not endorse a single AED manufacturer for this

21   particular public provision of these AED devices.  But

22   Medtronic Physio-Controls is one of the manufacturers

23   that is participating institutions like you.  If you

24   have an opportunity to stop at the local grocer,

25   Ukrop's, you'll probably see one of those in the

68

1   store.

2       Q      That was going on before Dr. Myerburg ever

3   arrived on the scene; wasn't it?

4       A      I don't believe so; not this.

5       Q      Not placement of AEDs?

6       A      Well, placement of AEDs.  I'm sure that was

7   going on.

8       Q      And sponsorship of that by the American Heart

9   Association?

10      A      I believe they wanted to sponsor it.  I don't

11  know how effectively they implemented in other places.

12  The Website I'm referring to talks about Richmond

13  specifically.

14      Q      You don't know as a fact the American Heart

15  Association and Medtronic were sponsoring that kind of

16  activity long before Dr. Myerburg came along?

17      A      I don't know whether they were or weren't.

18      Q      They were.  There was lots of them.  Do you

19  have anything to point to the fact that these marketing

20  synergies caused the stock market to react the way it

21  did?

22      A      I can point to Bloomberg announcements to

23  talk about how good the idea would be to combine the 2

24  types of equipment companies.  I consider that; the

25  market's interpretation of why there was value there.

69

1      Q    Anything beyond that?

2      A    No.

3      Q    Do you have the plan in front of you?

4      A    Right.

5      Q    Do you know what -- well, first do you know

6   whether Medtronic has a customary manner of

7   compensating people who bring to it marketing

8   proposals?

9      A    No.

10     Q    Do you know if there is a customary method of

11  doing that in the medical device industry?

12     A    No.

13     Q    Let me ask you a general question.  The

14  answer to which I think I know.  To the extent there's

15  any discussion of survival rates, increases in survival

16  rates, data from different areas on survival rates, you

17  have accepted what Dr. Myerburg has put in his paper

18  and you have not conducted any independent analysis of

19  any of those data?

20     A    That is correct.

21     Q    And, therefore, you don't know whether the

22  assumptions that he was making in March of 1998 have

23  turned out to be correct or incorrect, as we sit here

24  today?

25     A    That is correct.

70

1                    Can we go off the record a second?

2       Q    Sure.

3                    (Discussion off the record.)

4                    MR. DAVIS:  We're back on the record.

5    BY MR. DAVIS:

6       Q    And this sort of related to the last question

7    where he discusses a rapidly developing momentum or

8    general development of AEDs for public access.  You

9    don't know whether there was or wasn't or whether that

10   occurred or hasn't occurred?

11      A    No.  I take his comments as statements that

12   are on the document.

13      Q    Now, we get to the proposed business plan,

14   and he outlines the fundamentals of his plan?

15      A    Right.

16      Q    Now, in using your method of arriving at

17   compensation --

18      A    I said arriving at damages.

19      Q    -- damages.  That's fine, which would be

20   compensation for him for his idea?

21      A    Compensation would be based on those numbers;

22   yes.

23      Q    In this case, compensation and damages would

24   be the same for purposes of our discussion?

25      A    If you said full liability is entitled to

71

1   everything that you call what he created, then go

2   ahead.  I'll assume that.

3       Q    I would never assume that.  So we have your

4   starting point of the stock market's valuation of this,

5   and then there would be some negotiation of what he

6   would be entitled to out of that increased value?

7       A    Right.  Presumably, that may -- I can't speak

8   for the protocol of Medtronic or Dr. Myerburg in

9   proceeding in negotiation.  So that would have occurred

10  before they observed how much money was being created.

11      Q    But in determining that, would it depend, in

12  part -- would your determination depend in part if you

13  had a plan that had 5 components, the number of

14  components of the plan that were actually utilized by

15  Medtronic?

16      A    I'm sure, in any negotiation, they would say

17  look, well, you have this idea and these ideas and

18  we're only going to proceed on this idea.  The idea

19  that I have been able to assess as an aspect of what,

20  the number of items here -- there's 5 of them -- the

21  idea that I've been able to focus on is the one of the

22  combination of an AED and ICD company and what value

23  that created.  I have not been able to focus on some of

24  these other things talking about information systems

25  management and those other kinds of things.  I haven't

72

1    focused on those.  In my analysis, I focus on the

2    combination of the 2 enterprises.

3        Q    So you haven't looked at any of the other

4    components of the plan?

5        A    Some of those would overlap a statement of

6    what the combination produces.

7        Q    Let's look at which one is which.

8    Participation in the AED market; that's what you've

9    talked about, essentially?

10       A    Correct.

11       Q    And this talks about creating an identity

12   that will provide a natural transition from one

13   product, the AED to the other, ICD?

14       A    Right.

15       Q    Do you know whether that occurred?

16       A    No.

17       Q    And, in this model, he says the AED is used

18   as a tool for developing ICD business rather than

19   business endpoint on its own.  In the documents you've

20   looked at for Medtronic, was Medtronic viewing the AED

21   as a tool for developing ICD business rather than as a

22   business endpoint on its own?

23               MR. BAILEY:  Excuse me.  Alvin, I

24   couldn't hear you.  You dropped your voice.  Would you

25   repeat it or have the reporter repeat the question

73

1     please?

2               MR. DAVIS:  Yes.  We'll let the

3     reporter.  This is a good test to see whether we're

4     writing any of this down.

5               (Question read back.)

6               THE WITNESS:  It could have been.  I

7     haven't seen the work papers that were used to create

8     the AED calculations to know whether growth rates or

9     the changes in revenues were there are -- would be

10    different if they didn't do the merger.

11    BY MR. DAVIS:

12        Q    Well, did anything that you looked at

13    indicate that Medtronic was not looking at the AED

14    business as a stand-alone business after the merger for

15    purposes of evaluating profitability?

16        A    I think I just answered that.  I don't know

17    what the work papers are that led to the presentation

18    to the board of the financial --

19        Q    I know what you said.  I'm asking if anything

20    you looked at showed that?

21        A    It could have been in there.  It could well

22    have been.  If we didn't have this merger, we wouldn't

23    have these growth projections that are particular to

24    Medtronic value.

25        Q    I'm sure my question was not clear.  I'm not

74

1    sure I can make it clear, however.  In evaluating the

2    acquisition of the AED company, did Medtronic look at

3    that AED company separate and apart from what

4    additional ICD sales it might generate?  Did it look to

5    see whether the AED company would be profitable or not,

6    just on projected sales of AEDs?

7        A    They most certainly looked at the company

8    Medtronic and sales in this acquisition.  So they

9    certainly did do that.  I don't know the rest of the

10   observation.  So I don't know in 2 documents I've

11   looked at whether backup information for those

12   documents would have had a different answer to that

13   question.

14       Q    Combined regional marketing is item B.  To

15   your knowledge, did Medtronic form a single sales force

16   for the marketing of AEDs and ICDs?

17       A    I don't know.

18       Q    Did they form a single technical support?

19       A    I don't know.

20       Q    Under information management, this says the

21   key element for the new marketing strategy centers

22   around information management.  Do you know whether

23   Medtronic adopted the information management system

24   that is proposed here?

25       A    No.  I don't know, at the present time,

75

1    whether they did that.

2        Q    On page 7 at the top of the page, it talks

3    about data being collected by technical support teams

4    provided back to the users, et cetera.  Do you know if

5    Medtronic has done any of that?

6        A    I could not tell you.

7        Q    Under financial analysis, he refers to, in

8    the -- I guess it's the second full sentence --

9    nonetheless, this proposal is based on certain

10   assumptions that give a broad overview of potential

11   financial impact.  Did you examine any of those

12   assumptions?

13       A    No.  Not -- well, to the extent that I read

14   the document and saw these assumptions, I saw

15   information in here about medical sales, ICD, and

16   sudden cardiac death.  And there's statements about

17   that in here, and I haven't examined them to know

18   whether they're right or wrong statements.

19       Q    That's what I'm trying to determine.  At the

20   bottom of the page, you said part of the proposed

21   corporate strategy is waiving or reducing the profit

22   margin in order to provide a competitive advantage in

23   the marketplace, talking about waiving or reducing the

24   profits margins on AEDs?

25       A    Right.

HALASZ REPORTING

76

```
1        Q     In your expertise and based on your studies,

2   analysis, research, knowledge, would that lead to a

3   possible antitrust issue, if they were to do that?

4        A     It could.

5              MR. BAILEY:  Object to the form of the

6   question.

7   BY MR. DAVIS:

8        Q     Your answer was it could?

9        A     It could.  You can be sued for lots of

10  things.  I'm not an attorney.  I'm only making that

11  observation based on an understanding of the antitrust

12  area, and so on.

13       Q     I understand.

14       A     That may not be something they can do.

15       Q     I'm not trying to degrade your level to the

16  level of attorney.  Do you have an understanding, from

17  your reading of the plan and the other information that

18  you've received, of how the fact that Medtronic owns an

19  AED company would lead to greater sales of Medtronic's

20  ICDs?

21             And, in asking that question, if we

22  assume that AEDs -- increased use of AEDs will increase

23  the number of survivors and, therefore, increase the

24  number of people that are potential ICD users, is there

25  anything you've derived from the plan that would
```

77

1   indicate why Medtronic would benefit from that

2   increased pool of potential ICD buyers some greater

3   degree than any other ICD manufacturer; that is, how do

4   you link the fact it was a Medtronic AED to the

5   purchase of a Medtronic ICD?

6       A    Can she read that again?  Is it just the last

7   part or is it --

8       Q    Let me try it again.  Let me tell you what

9   I'm getting at, and it can help frame the question.

10      A    All right.

11      Q    The basic logical assumption of his plan is

12  if he get more AEDs out there, more people will

13  survive, and, therefore, more people will buy ICDs.  We

14  all agree with that.  If Medtronic owns an AED company

15  and if AEDs sales increase and there's more people out

16  there, how does Medtronic get the benefit of that

17  increased pool of people in any greater measure than

18  any other ICD company?  Let's say there's 4 ICD

19  companies and let's say, for purposes of this, that

20  they each have 25 percent of the market.

21      A    The last part is where the answer would

22  change.

23      Q    Why?

24      A    Because let's assume that Medtronic doesn't

25  share equally with everybody in its share of the market

HALASZ REPORTING

78

1    and that it's a business, and the ICD business has

2    grown over time --

3        Q    Right.

4        A    -- and its market share has grown over time.

5        Q    Right.

6        A    Now, it then, with a higher market share,

7    receives a disproportionate gain if it's assigned based

8    on market share from an event such as greater survival

9    rates of an SCA.  So all of a sudden, in your ten

10   percent market share, it may not make a lot of sense to

11   you to be promoting -- well, I don't mean this in a bad

12   way.  But it may not make economic sense to have

13   another enterprise that's by sales of AEDs and

14   increasing their presence and maybe even offering some

15   kind of lower price scheme.

16            If all the other participants are

17   following that as a part of that philanthropic efforts,

18   it may not make a lot of sense to bear some of those

19   opportunity costs, if you don't get a reasonable

20   fraction of the gain.  But if you then have a larger

21   fraction of the gain because your market share is

22   higher, it may make economic sense for you to actually

23   think about this as a viable business enterprise.

24       Q    What would cause Medtronic to get a larger

25   market share simply because it acquires the AED

79

1   company?   That's what I'm trying to get at.

2         A     So I think your question is if I buy the AED

3   company, how does that grow my ICD market share versus

4   just grow any ICD sales?

5         Q     Yes.

6         A     Right.  Is that right?

7         Q     Yes.  Because if sales increase --

8         A     Well, they're 2 different things.

9         Q     Right.  If everybody has 25 percent of the

10  market, you acquire the company, more people are saved,

11  and everybody still has 25 percent of the market?

12        A     You haven't changed your market share.  Sales

13  went --

14        Q     As did everybody else?

15        A     As did everybody else.  Don't lose track of

16  that, because sales goes up.  There's a profit margin

17  on those.  You did make money from that.  You shouldn't

18  lose track of the fact there's economic benefit of the

19  activity, even if the market share didn't change.

20        Q     I promise I'll remember that forever.

21        A     If you acquire this AED company and events

22  happen as they're describing here, is it possible these

23  2 things can be linked?  Can one conceive of some

24  marketing relationships that developed to link the

25  Medtronic ICD name with the Medtronic AED

80

```
1   defibrillator.  I'm not a marketing person.  Could I
2   conceive of such links?  Could I ponder those types of
3   ideas?  Yes.  If you want me to suggest some, perhaps I
4   can come up with some for you.  It doesn't mean that's
5   valid in the industry.  I'm not in the business
6   thinking of this.
7              Could I say for the patients that were
8   saved by an AED in a building, that that information
9   might be in the newspaper and we monitor that and the
10  ICD folks would say let me see if we can send
11  information out to the docs that we're providing those
12  things in the buildings?  We're happy to do that and
13  send some health smart kit to the patient.  You can
14  give this away into the patient because we're happy
15  they survived.  Is there some marketing thing available
16  here?  Is there a marketable side?  Yes.  There is.  Is
17  it economically viable?  I don't know.  We'll analyze
18  that.
19      Q    You're not a marketing person, in any event.
20  Sounds like a better idea than any I've heard.  Do you
21  have any idea whether AED sales have, in fact,
22  increased since 1998?
23      A    No.
24      Q    And you have no idea whether --
25      A    I shouldn't say that.  I have financials that
```

81

1   I could look at to see what the financials are for the

2   company.  Some of the Bloomberg information has that.

3       Q    I'm talking about in the AED market,

4   generally?

5       A    No.  I haven't calculated that market.

6       Q    Okay.  Unless you revise or change or modify

7   your opinions or conclusions, I'm through.  And if you

8   do, I assume you'll notify Mr. Bailey, and he'll notify

9   me, if he remembers to do that.

10      A    Fine.  When I send him a bill, I assume he'll

11  send a copy.

12              MR. BAILEY:  I will remember to do it.

13  I have no questions.  We do not waive.

14

15              And, further, this deponent saith not.

16

17              (The deposition concluded at 12:35 p.m.)

18

19

20

21

22

23

24

25

HALASZ REPORTING

82

1                 C E R T I F I C A T E

2   COMMONWEALTH OF VIRGINIA:

3   COUNTY OF_____:

4

5             Before me, this day, personally appeared

6   RAYMOND P.H. FISHE, Ph.D., who, being duly sworn,

7   deposes and says that the foregoing transcript of his

8   deposition, taken in the matter, on the date, and at

9   the time and place set out on the title page hereof,

10   constitutes a true and accurate transcript of said

11   deposition.

12

13

14

15                       _____

16                       RAYMOND P.H. FISHE, Ph.D.

17             SUBSCRIBED AND SWORN to before me this

18   _____ day of_____, 2004, in the

19   jurisdiction aforesaid.

20

21   My Commission Expires:

22   _____       _____

23                       Notary Public

24

25

83

C E R T I F I C A T E

COMMONWEALTH OF VIRGINIA:

CITY OF RICHMOND:

       I, Terri L. Dolinger, RPR, a Notary Public in and for the Commonwealth of Virginia at Large, do hereby certify that the foregoing was reported by Stenographic means, which matter was held on the date, and at the time and place set forth on the title page hereof, and that the foregoing transcript constitutes a true and accurate transcript of same to the best of my ability.

       I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

       GIVEN under my hand and seal this _____ day of ___April___, 2004.


       Terri L. Dolinger, RPR,

       Notary Public