UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 03-20616 – CIV-LENARD/ SIMONTON

ROBERT J. MYERBURG, M.D.
individually,

       Plaintiff,

vs.

MEDTRONIC, INC.,
a Minnesota corporation,

       Defendant
_____/



## PLAINTIFF'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS FOR PARTIAL SUMMARY JUDGMENT OF LIABILITY AND SUPPORTING MEMORANDUM

Plaintiff, Robert J. Myerburg, M.D., ("Dr. Myerburg"), pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7.5, respectfully moves this Honorable Court to determine Medtronic, Inc., ("Medtronic") liable for breach of its agreement with Plaintiff and for fraud, and to enter an order for partial summary judgment against Medtronic, as a matter of law, on the issue of liability.

I. FACTUAL HISTORY

Dr. Myerburg, a leading specialist in the field of cardiology, contacted Medtronic, a corporation engaged in the business of therapeutic medical technology,

Case 1:03-cv-20616-MGC  Document 98  Entered on FLSD Docket 05/26/2004  Page 2 of 9

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Page 2 of 9

specializing in implantable and interventional therapies, with a marketing strategy and plan to increase its implantable cardiac defibrillator ("ICD") market share, in November 1997. Medtronic's delays caused a meeting not to be set until March 19, 1998 for Dr. Myerburg to present his proposal. The proposed confidentiality agreement, sent by Medtronic on January 23, 1998, was not signed until February 4, 1998. A copy of that confidentiality letter has been made part of the complaint as Exhibit "A".

Medtronic's confidentiality undertakings included its express promise that <u>it would make no use of all, or of any part, of Dr. Myerburg's business and marketing strategy without first entering upon a compensation arrangement</u> mutually satisfactory to both Dr. Myerburg and to Medtronic:

> **<u>If Medtronic wishes to use all or a portion of the "Confidential Information" for purposes other than evaluating the same, Medtronic {^} shall first enter into an agreement with Undersigned, under mutually acceptable terms, setting forth the compensation to be paid to undersigned for Medtronic's {^} use of the "Confidential Information".</u>**

[Exhibit A; p.2.; ¶5; emphasis in original]

On March 19, 1998, Dr. Myerburg traveled to Medtronic's Minneapolis headquarters to reveal and explain his marketing strategy and to present his proposals. Medtronic designated Jon Tremmel, its Vice President for "Tachy Marketing,"; Daniel Pelak, its Vice President of "Cardiovascular Marketing,";

Case 1:03-cv-20616-MGC   Document 98   Entered on FLSD Docket 05/26/2004   Page 3 of 9

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Page 3 of 9

Michael Toffoli, its Director of "USCV Tachy Arrhythmia Management Systems"; and Nancy Stephenson, its representative for "Physician Relations," to meet on its behalf to hear, to evaluate, and to respond to Dr. Myerburg's proposal.

At that presentation, in addition to his oral elaboration, Dr. Myerburg submitted the 12-page document entitled "Proposal for A Marketing Strategy to Enhance Tachyarrythmia Device Business," annexed in a redacted form and to the complaint as Exhibit "B". Exhibit B outlined his novel business plan and the strategy he had conceived. The essence of Dr. Myerburg's plan was to combine the marketing and use of automatic external defibrillator devices ("AED's" -- a form of defibrillator devices with "paddles" that paramedics and others use to deliver electric shocks that can restart hearts in cardiac arrests, sometimes employed by police, fire, and paramedic personnel), with the marketing and use of implanted defibrillation devices which automatically treat cardiac arrests.

Dr. Myerburg's plan presented:

    a. different marketing strategies;

    b. statistical analyses;

    c. an elaborate business plan;

    d. a financial analysis; and

    e. *pro forma* estimates.

Case 1:03-cv-20616-MGC   Document 98   Entered on FLSD Docket 05/26/2004   Page 4 of 9

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Page 4 of 9

Based on his proposal that Medtronic directly enter the AED market, Dr. Myerburg's presentation and plan included specific proposals concerning Medtronic's corporate configurations. Dr. Myerburg's presentation and plan also included specific strategic business plans for marketing AED and ICD devices within those markets.

Among other things, and central to his total plan, <u>Dr. Myerburg specifically proposed that Medtronic acquire control of an AED business through the purchase of an AED manufacturer,</u> through acquisition of licensing agreements, through acquisition of marketing agreements, or through some combination of all three, and thereby establish Medtronic's marketing of AEDs in multiple locations throughout the country, in parallel with its ICD marketing efforts.

At the March 19th, 1998 meeting, Medtronic's representatives told Dr. Myerburg that although Medtronic did have a small equity investment in an AED manufacturer called Survivalink, its own past experience caused it to have little interest in either acquiring or merging with an AED manufacturer.

<u>Medtronic's revision of the confidentiality letter also required Dr. Myerburg to refrain from presenting his proposal to others until Medtronic announced its decision.</u>

More than <u>five weeks later</u>, on April 28th, Toffoli wrote to Dr. Myerburg in Miami and purported to announce rejection of Dr. Myerburg's proposals, strategy, and plan. Dr. Myerburg annexed a copy of Toffoli's letter to his Complaint as

Case 1:03-cv-20616-MGC   Document 98   Entered on FLSD Docket 05/26/2004   Page 5 of 9

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Page 5 of 9

Exhibit "C". Toffoli stated:

> Medtronic's corporate position to date has been to support adoption of AEDs through two initiatives: (1) funding through the Medtronic Foundation to assist several communities to equip first responders with AEDs, and (2) funding towards organizations such as the American Heart Association to research AED outcomes.
>
> We are very committed to providing exemplary service to our customers in bradyarrhythmia and tachyarrhythmia management through a large and very busy cardiovascular organization who at this time cannot expand their roles to the AED support arena. To effectively do what you suggest would require extensive additional staffing and would be very costly and time consuming. Our analysis indicates that establishing and staffing regional AED marketing efforts **is not economically feasible** given other ongoing strategies that continue to require funding.
>
> **We have therefore decided that we are not interested in pursuing a more active role in the sales and distribution of external defibrillators.**
>
> [emphasis added]

During the period between Dr. Myerburg's March 19th presentation and disclosures to Medtronic in Minneapolis, and Toffoli's April 28th letter, Medtronic in fact engaged in active and rapid discussions with representatives of Physio-Control International, Inc. ("Physio"), the major AED manufacturer.

On June 29th, Medtronic publicly announced that it was acquiring Physio. By this action, Medtronic was embarking upon a marketing strategy unmistakably identical to Item #1 on page 5 of the plan (Exhibit B) Dr. Myerburg had presented it

confidentially. Dr. Myerburg annexed a copy of Medtronic's June 29th press release to his complaint as Exhibit "D".

Medtronic not only used Dr. Myerburg's business proposal but also used the period until April 28th to prevent Dr. Myerburg's presenting his strategy to others. By purporting to entertain the presentation by then delaying Dr. Myerburg's use of it with others, and then by falsely asserting its disinterest in Dr. Myerburg's strategy, Medtronic effectively defrauded Dr. Myerburg. It induced him not to approach others with his marketing strategy from mid-January until May 1998.

Medtronic's agents contradict themselves by claiming, after the fact, to have known immediately at the presentation that Medtronic would not be interested in Dr. Myerburg's proposal. Stephenson Depo, p 45, Exhibit F. Furthermore, upon hearing Medtronic's public announcement of the merger with Physio, Stephenson, in fact remarked she was sure Dr. Myerburg would believe that Medtronic stolen the idea. Stephenson Depo, p 55, Exhibit F.

The only differences between Medtronic's actual conduct and Dr. Myerburg's plan were that Medtronic simply expanded the scope of Dr. Myerburg's strategy to be worldwide rather than nationwide, and the details of field marketing may end up being somewhat different.

The parties' confidentiality agreement contains Medtronic's own specifically

stated pledge that "[i]f Medtronic wishes to use all or a portion" of Dr. Myerburg's confidential information "for purposes other than evaluating" it, Dr. Myerburg would have the right be compensated. *See* Exhibit B, ¶5, quoted at ¶20 above.

Although the broker Morgan Stanley had contacted Medtronic a number of times in previous years regarding the acquisition of an AED manufacturer, Medtronic decided to conclude the Physio acquisition only after Dr. Myerburg presented a detailed marketing plan advocating just such an acquisition.

## II. MEDTRONIC'S IMPUTED CORPORATE LIABILTY

Corporations, of course, act only through their officers and agents. *Morgan Intern. Realty, Inc. v. Dade Underwriters Ins. Agency, Inc., 617 So.2d 455* (Fla. 3[d] DCA 1993). And Medtronic is responsible for the acts of its individual agents which it designated as authorized to deal with Dr. Myerburg. Medtronic entered into a written agreement with Dr. Myerburg. It authorized its officers to determine the value of Dr. Myerburg's business and marketing plan. Medtronic waited five weeks to respond to his proposal, until its Physio acquisition was assessed. Medtronic, through those officers and agents, had actual knowledge of Dr. Myerburg's proposal. Medtronic may not now claim ignorance of that proposal. Under basic agency principles, the acts of a corporation's agents are considered to be those of a single legal actor. *Gutter v. E.I. Dupont De Nemours*, 124 F.Supp.2d

Case 1:03-cv-20616-MGC   Document 98   Entered on FLSD Docket 05/26/2004   Page 8 of 9

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Page 8 of 9

1291 (S.D. Fla. 2000). Actions of corporate directors and officers are attributable to the corporation itself. D*avies v. Owens-Illinois, Inc.*, 632 So.2d 1065 (Fla. 3$^d$ DCA, 1994).

Corporations are bound by the acts and statements of its agents done or made within the scope of their express or apparent authority, and it is not necessary that the corporation specifically authorize an agent to commit an act or make the statement to be liable for them. H*enley v. Lokey Oldsmobile-Countryside, Inc.*, 817 F.Supp. 938 (M.D.Fla.,1993)

Hence, Medtronic's only proffered "excuse" for its breach and fraud is to assert its officers engaged with the merger were different officers, bound by SEC rules for disclosure. But Stephen Roddenberry, Medtronic's own legal expert, has conceded that excuse has no validity. Roddenberry Depo, not yet available.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order for partial summary judgment, as a matter of law, on the issue of liability alone.

Myerburg, M.D. vs. Medtronic, Inc.<br>
Case No. 03-20616 CIV-LENARD<br>
Page 9 of 9

Respectfully submitted,

Bailey & Dawes, L.C.
Counsel for Robert J. Myerburg, M.D.
3250 Mary Street, Suite 301
Miami, Florida 33133
(305)374-5505
(305)374-6715 Fax

By: _____
Guy B. Bailey, Jr.
Florida Bar No. 96095

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was furnished via U.S. Mail to Medtronic's counsel, Alvin B. Davis, Esquire, Steel Hector & Davis, First Union Building, Suite 4000, 200 South Biscayne Boulevard, Miami, Florida 33131-2310, this 25th day of May, 2004.

_____
Of Counsel