NIGHT BOX
FILED

JUL 22 2004

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  03-20616-CIV-COOKE/McALILEY

ROBERT J. MYERBURG, M.D.,
individually,

      Plaintiff,

vs.

MEDTRONIC, INC.,
a Minnesota Corporation,

      Defendant.

_____/

## DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY AND/OR ANY RELIANCE OF ANY KIND ON THE DOCUMENT ENTITLED "FINANCIAL UPSIDE CALCULATIONS" AND ACCOMPANYING MEMORANDUM OF LAW

      The defendant Medtronic, Inc. ("Medtronic") moves for the entry of an order excluding from the trial any testimony or other reliance of any kind on the document entitled "Financial Upside Calculations" by plaintiff's expert, James McClave ("McClave") or any other witness. *See* attached Exhibit "A."

      McClave is plaintiff's damage expert.  He has calculated a range of damages allegedly suffered by plaintiff in this action.  The numbers upon which he relies for his calculations are found in Exhibit A.

      McClave did not create Exhibit A.  He does not know who did.  McClave Deposition ("Dep.") at 32:6-16, attached as Exhibit "B."  He does not know when it was created.  He does not know why it was created.  McClave Dep. at 32:14-33:10, attached as Exhibit "B."  He does not



CASE NO.  03-20616-CIV-COOKE/McALILEY

know if it was relied upon by Medtronic for any purpose whatsoever, and specifically does not

know if it was relied upon in regard to the merger that is at the heart of this litigation.  McClave

Dep. at 34:7-11, 40:2-6, 41:11-13, attached as Exhibit "B."  He does not know if the document

played any role in Medtronic's decision to merge with Physio-Control.  *Id.*  He does not know the

source of the numbers in the document nor does he know if they are correct.  McClave Dep. at

32:14-16, 39:23-40:1, attached as Exhibit "B."  While he has discerned that the document purports

to show the financial impact that might follow a 10% increase in the survival rate of sudden

cardiac arrest victims, he does not know why 10% was selected and, more importantly, does not

know if there has been a 10% increase or any increase in survival rates since the document was

created, whenever that was.  McClave Dep. at 32:17-33:10, 34:12-35:3, 39:23-40:1, attached as

Exhibit "B."[1]

Of equal importance, McClave has no knowledge of whether Medtronic's merger with a

company that sells automatic external defibrillators ("AEDs") such as Physio-Control would result

in an increase in survival rates and, similarly, no knowledge of whether any such increase has

occurred.  McClave Dep. at 29:13-30:19, attached as Exhibit "B."  Nor does he know if Medtronic

assumed any such increase at the time of the merger.  McClave Dep. at 32:17-33:10, attached as

Exhibit "B."[2]

---

[1]      McClave does acknowledge that any change in the 10% figure would have a direct
impact on his calculations.  McClave Dep. at 39:11-40:1, attached as Exhibit "B."

[2]      There is no evidence in the record of what the survival rate was in the summer of
1998 when the merger occurred or the survival rate as of the time of the McClave deposition.  The
only testimony regarding overall survival rates has come from the plaintiff himself who testified
that they have gone down.  Dr. Myerburg Dep. at 50:5-51:5, attached as Exhibit "C."

Steel Hector & Davis LLP

CASE NO.  03-20616-CIV-COOKE/McALILEY

McClave does not know, for a fact, a single thing about this document, its origins, purpose or content.  He made a series of unsubstantiated assumptions, which he did not verify in any way whatsoever, and then performed a mechanical calculation, entirely dependent upon his assumptions.  Accordingly, his testimony is speculative at best, and wholly unreliable.  It can in no way assist the jury in understanding the evidence or determining the facts in this case.  They can merely speculate along with him.  That is not the function of an expert or the jury.  McClave's reliance on this document lacks the indicia of trustworthiness required by Florida law and the Federal Rules of Evidence.

## I.

## MOTION

Dr. Myerburg alleges that he "presented a strategic business plan" (the "Plan") to Medtronic that in some yet to be defined way encouraged Medtronic to effectuate a merger with an Automated External Defibrillator ("AED") manufacturer.  Dr. Myerburg, however, was unaware of the merger activities that were underway already at Medtronic before his presentation.[3]  The purported thrust of Dr. Myerburg's Plan was to increase Medtronic's marketing and sales of Implantable Cardioverter/Defibrillators ("ICD's").  *See* attached Exhibit "D," Amended Expert Witness Disclosures pp. 1-2.  Dr. Myerburg alleges that Medtronic misappropriated his Plan when

---

[3]     Dr. Myerburg originally claimed credit for bringing the merger idea to Medtronic but has now conceded that the proposal originated with Morgan Stanley & Company.  Dr. Myerburg Dep. at 24:1-12; 128:17-19, attached as Exhibit "C."

3

CASE NO.  03-20616-CIV-COOKE/McALILEY

it acquired an AED manufacturer without compensating him, as Medtronic had allegedly agreed to do.

Dr. Myerburg intends to offer McClave's testimony to buttress his extraordinary $60 million damage claim.  McClave was to establish the potential increase in revenue allegedly enjoyed by Medtronic as a result of its use of the Plan.[4]  In that regard, McClave is of the view "that the present value to Medtronic of the revenue or profits from . . . increased ICD sales constitute a reasonable basis on which to compute Dr. Myerburg's economic damages."  *See* attached Exhibit "D," p. 6.[5]  McClave arrives at his damage estimate based exclusively on the numbers provided in the Financial Upside Calculations document.

As noted above, however, McClave's testimony consists of a compound series of admittedly naked, unsubstantiated assumptions and wholly speculative inferences, bearing no relationship to the acquisition at issue in this matter.  He does not know the source of the numbers he relied upon or their accuracy.  He does not know who created the document or its purpose.  He has no basis for assuming that the merger at issue would result in a 10% increase in survival rate and, in fact, does not know if there has been any increase at all or, if there had been, what relationship, if any, that increase had to the merger.  McClave's testimony and his reliance on the Financial Upside Calculations document are inherently untrustworthy and, in fact, as indicated below, inaccurate.  This is not simply an issue of the weight to be accorded his testimony.  There is

---

[4]    McClave has also assumed that Medtronic utilized the entirety of the Plan.  As noted in Medtronic's Memorandum of Law in Support of its Motion for Final Summary Judgment, that assumption is without any factual support.  *See* D.E. No. 89 at Section B.3, pp. 16-19.

[5]    That premise is itself incorrect since ICD sales can increase for a number of reasons other than increased survival rates.

4

CASE NO.  03-20616-CIV-COOKE/McALILEY

no basis for allowing the jury to weigh it at all.  Accordingly, Dr. Myerburg should be precluded from introducing any evidence or testimony at trial concerning this document.

## II.

## MEMORANDUM OF LAW

**A.**     **Standard for Admission of Expert Evidence and Testimony**

Reliability is an essential component for the admission of expert testimony under Florida and Federal law.  Federal Rule of Evidence 702 requires judges to ensure that any evidence admitted at trial be relevant and reliable.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).[6]  Moreover, expert testimony must be based on more than a subjective belief or speculation.  *Id.* at 589-90.

District judges have broad discretion to exclude expert testimony.  *See Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).  Inadmissible expert testimony is properly excluded through an in limine ruling, the authority for which derives from the court's inherent power to act as a "gatekeeper" and manage the course of trials.  *See Luce v. United States*, 469 U.S. 38, 42 n.4 (1984); *Lord v. Fairway Elec. Corp.*, 223 F.Supp.2d 1270, 1278 (M.D. Fla. 2002).  The object of the gatekeeping requirement is to make sure that an expert "employs in the courtroom the same level of intellectual

---

[6]     Federal Rule of Evidence 702 provides:  "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

5

CASE NO.  03-20616-CIV-COOKE/McALILEY

rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (holding that courts "gatekeeping" function extends to all proffered expert testimony); *Lord*, 223 F.Supp.2d at 1278 (M.D. Fla. 2002); *Allapattah Serv., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1335, 1338-40 (S.D. Fla. 1999).

The party offering the expert has the burden of laying a proper foundation for the admission of expert testimony. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). Testimony must be excluded when plaintiffs fail to carry that burden. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256-58 (11th Cir. 2002) (affirming exclusion of engineering expert's affidavit); *Allison*, 184 F.3d at 1306, 1309-22 (11th Cir. 1999) (finding district court properly excluded plaintiffs' three expert board-certified doctors)[7]; *Lord*, 223 F. Supp. 2d at 1279, 1284 (M.D. Fla. 2002) (granting motion to exclude testimony of expert electrical engineer); *accord United States v. Falcon*, 245 F.Supp.2d 1239 (S.D. Fla. 2003) (granting prosecution's motion in limine to exclude testimony of expert forensic psychologist where defendant failed to sufficiently demonstrate testimony satisfied FRE 702).

Under these facts, Dr. Myerburg simply cannot meet his burden of demonstrating that McClave's proffered testimony is both relevant and reliable, and that it will assist the trier of fact.

---

[7] Although the expert testimony at issue in *Allison* was scientific, the same general standards apply to expert testimony of all kinds. *See Kumho*, 526 U.S. at 147. Indeed, the *Allison* court relied on and cited to the Eleventh Circuit's earlier opinion in *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548 (11th Cir. 1998), *cert. denied*, 120 S.Ct. 309 (1999), involving expert testimony from an accountant and a statistician.

6

CASE NO.  03-20616-CIV-COOKE/McALILEY

**B.**    **McClave's Testimony and His Reliance on the Financial Upside**
**Calculations Document Amount to Nothing More Than Speculation**
**and Conjecture**

According to McClave, the purpose of the Financial Upside Calculations document, which

he never saw before receiving it from plaintiff or plaintiff's counsel, is to show that there is "an

increase in survivor rate due to AED utilization."  McClave Dep. at 32:6-13, 32:17-23, attached as

Exhibit "B."  The document itself says nothing of the kind and there is no testimony in this record

that addresses the document in any informed fashion.  It was handed to McClave and he guessed.

McClave concedes that his characterization is based on "assumptions" and "inferences."  *Id.* at

32:24-33:10, attached as Exhibit "B."  In fact, McClave does not know:  (1) who created the

financial document; (2) for what purpose it was created; (3) whether it was written as part of an

analysis of the acquisition at issue in this matter; (4) whether the numbers that appear on the

document are accurate; or (5) whether it was even used by Medtronic.  *Id.* at 32:14-33:10;

33:18-34:2; 34:7-11; 39:23-40:6; 41:11-13, attached as Exhibit "B."  McClave conducted no

independent investigation of the Financial Upside Calculations document or the numbers it

contains.  He knows only that the document was created by someone at Medtronic because he was

told by "counsel . . . or maybe Dr. Myerburg, or maybe both . . . ."  McClave Dep. at 32:6-13,

attached as Exhibit "B."  Guesswork, even an expert's guesswork, is by definition speculative and

unreliable.  McClave's rank assumptions regarding the Financial Upside Calculations document

are therefore inadmissible as a matter of law.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 589 (1993).

Courts have not hesitated in excluding experts and their testimony, including economic

experts, where their testimony is not supported by sufficient evidence or if they engaged in mere

7

CASE NO.  03-20616-CIV-COOKE/McALILEY

speculation.  In *Lord v. Fairway Elec. Corp.*, the court held that the proffered expert testimony of an electrical engineer was unreliable and therefore inadmissible given the expert's "stacked and tenuous inferences." *Lord*, 223 F.Supp.2d at 1281 - 1284 (M.D. Fla. 2002) (finding that the engineering expert failed to conduct testing to replicate the manufacturing process described by the expert, was unable to quantify the force used in his theory, and was unable to describe the location of the relevant item before it was found in a panel box).  As in *Lord*, McClave's proffered testimony is comprised of nothing more than "stacked and tenuous inferences" and is therefore inadmissible.  *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (exclusion warranted where esteemed economic expert had not considered all relevant facts in relevant market when performing market share analysis); *Target Market Publishing v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998)  (where economic expert's projections of lost profits were unsupported and based on mere speculation, district court may exclude proposed testimony); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996) (approving exclusion of testimony based on conjecture and faulty assumptions); *Navarro v. Fuji Heavy Indus.*, 117 F.3d 1027, 1031 (7th Cir.), *cert. denied,* 522 U.S. 1015 (1997) ("a conclusion without any support is not one based on expert knowledge and entitled to the dignity of evidence."); *Joy v. Bell Helicopter Textron*, 999 F.2d 549, 564 (D.C. Cir. 1993) (expert testimony that was unsupported by record and based on guesswork, speculation, and conjecture inadmissible); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 (5th Cir. 1987) (excluding expert opinion based on incomplete data); *Handi Caddy, Inc. v. Am. Home Prods. Corp.*, 557 F.2d 136, 141 (8th Cir. 1977) (vacating jury award where expert testimony relied on assumptions contradicted by the

8

CASE NO.  03-20616-CIV-COOKE/McALILEY

record); *All Am. Pool Surface v. Jordan*, 870 So. 2d 885 (Fla. 3d DCA 2004) (ordering a new trial given that the expert's testimony was based on speculation, conjecture, and assumptions).

To permit McClave to testify on this basis is simply an invitation to the jury to guess along with him.  As the Court noted in *Husky Indus., Inc. v. Black*, 434 So. 2d 988 (Fla. 4th DCA 1983), "[t]he judgment of an expert must be more than a guess."  *See also Bell Helicopter Textron*, 999 F.2d at 564 (expert testimony that was unsupported by the record and based on guesswork, speculation, and conjecture was inadmissible).

The fundamental, fatal unreliability of McClave's "evidence" is readily demonstrated. The starting point for the calculation in Exhibit A is the asserted number of cardiac arrests.  *See* attached Exhibit "A."  McClave does not know the source for that number or if it is correct. McClave Dep. at 33:18-34:2, attached as Exhibit "B."[8]  The calculation in the Exhibit then posits a 10% increase in survivors of cardiac arrest.  *See* attached Exhibit "A."  McClave does not know the source of that assumption either, or if it is realistic.  McClave Dep. at 39:23-40:1, attached as Exhibit "B."  He is not qualified to say and he never attempted to verify it.  And, more fatal still, he has no idea if there has been any increase at all in this rate, let alone a 10% increase.  McClave Dep. at 39:23-40:1, attached as Exhibit "B."  Plaintiff himself has testified that there has been no overall increase.  Dr. Myerburg Dep. at 50:5-51:5, attached as Exhibit "C."  McClave also has no idea of the number of survivors who actually receive an ICD.  McClave Dep. at 35:9-22, attached as Exhibit "B."  He can support neither the 50% assumption nor the 90% assumption, though he utilizes both.  McClave Dep. at 35:9-22, attached as Exhibit "B."  He then concedes, as he must,

---

[8]     The plaintiff himself has used a much lower number in his writings.  Dr. Myerburg Dep. at 34:3-6, attached as Exhibit "C."

CASE NO.  03-20616-CIV-COOKE/McALILEY

that if these numbers are not correct, his conclusions aren't either.  McClave Dep. at 39:11-22,

attached as Exhibit "B."

### C.   McClave's Testimony and Reliance on the Financial Upside Calculations Document Do Not Assist the Trier of Fact

As the Supreme Court said in *Daubert*:

> Rule 702 further requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue . . . An additional consideration under Rule 702 -- and another aspect of relevancy -- is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. The consideration has been aptly described . . . as one of "fit."

*Daubert*, 509 U.S. at 591 (emphasis added).

Here, McClave's testimony regarding the present value to Medtronic of any alleged

revenue or profits given the assumed increase in ICD sales is tied to no facts and is, by definition,

unreliable.  More importantly, there is no evidence that the Financial Upside Calculations

document was used by Medtronic in analyzing the acquisition in question.  McClave Dep. at

34:7-11, attached as Exhibit "B."  The document, and McClave's testimony and reliance on it, are

simply not "sufficiently tied to the facts of the case" and will therefore not assist the trier of fact in

resolving this dispute.  *See Daubert*, 500 U.S. at 591.  As far as McClave can testify, the document

bears absolutely no relation to the acquisition in question.  Accordingly, McClave's guesswork,

offered in the guise of opinion, is simply not the type of testimony that the Court can accept under

the standards pronounced in *Daubert, Kumho,* and Rule 702 as it fails to assist the trier of fact to

understand the evidence or to determine a fact in issue.  *Allison v. McGhan Med. Corp.*, 184 F.3d

10

CASE NO.  03-20616-CIV-COOKE/McALILEY

1300, 1306 (11th Cir. 1999); *accord Allapattah Serv., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1335,

1337-38 (S.D. Fla. 1999).

### III.

### CONCLUSION

For all of the foregoing reasons, Medtronic respectfully requests that this Court exclude

any testimony or other reliance of any kind on the Financial Upside Calculations document.

Dated:  July 22nd, 2004

STEEL HECTOR & DAVIS LLP
200 S. Biscayne Blvd.
Suite 4000
Miami, Florida 33131
Tel.:   305.577.2835
Fax:   305.577.7001

Counsel for the Defendant, Medtronic, Inc.

By: _____
      Alvin B. Davis, P.A.
      Florida Bar No. 218073
      abd@steelhector.com
      Digna B. French
      Florida Bar No. 0148570
      dfrench@steelhector.com

11

CASE NO.  03-20616-CIV-COOKE/McALILEY

## CERTIFICATE OF COUNSEL IN COMPLIANCE WITH LOCAL RULE 7.1.A.3

The undersigned hereby certifies that she has made a good faith effort to resolve the matters referred to in the preceding Motion.  Counsel for Medtronic has conferred with opposing counsel, Kristina Bakardjiev, in an attempt to resolve this dispute informally as set forth above. All efforts to resolve the matters contained in this Motion have failed.

By: _____
     Digna B. French

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail this 22nd day of July 2004, upon counsel for the plaintiff:

Guy B. Bailey, Jr., Esq.
Bailey & Dawes L.C.
Continental Plaza, Suite 301
3250 Mary Street
Coconut Grove, Miami, FL 33131

By: _____
     Alvin B. Davis

MIA2001 295956v1

12

# EXHIBIT A

# Financial Upside Calculations (US)

| | |
|---|---|
| Impact in Increase in SCA Survival Rate ($mil.) | |
| SCA Incidence | 350 364000 |
| Increase in Survival Rate | 0.1 |
| Increased Patient Pool | 36400 |
| % Receiving ICD | 0.9% |
| Increased ICD Patients | 32760 |
| MDT Market Share | 0.41 |
| MDT Units | 13431.6 |
| ASP | 18424 |
| Incr. Revenue | $247 |
| PAT Margin | 0.306 |
| PAT | $76 |
| Shares OS | 460.0 |
| Market Value | $3,044 |
| PE | 40.2 |
| Market Value/Share | $6.50 |

| | |
|---|---|
| Impact of Incremental Market Share Gain ($mil.) | |
| Current Market Size | $1,060 |
| Increased ICD Patients | 32760 |
| ASP | 18424 |
| Incr. Market Revenue | $604 |
| Total Market Revenue | $1,664 |
| Incr. Market Share | 1% |
| Incremental Revenue | $17 |
| Incr. PAT | $5 |
| Market Value/Share | $0.44 |

400,000
40,000 ~ 10% ↑ Survival
20,000  IV% ICD Yield
8,200  4/1% PAT
$150mn  @ 18k/unit

(100% Yield)

SCA

1% Survi
Yield

PLTF _____ DEFT ____ EXH
DEPO OF ____
FOR I.D. DATE ____ E.J.W.

# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                CASE NO.:  03-20616-CIV-LENARD
 3
    ROBERT J. MYERBURG, M.D., )
 4  individually,            )
                             )
 5             Plaintiff,    )
    vs.                      )
 6                           )         ORIGINAL
    MEDTRONIC, INC.,         )
 7                           )
               Defendant.    )
 8  _____ )

 9            DEPOSITION OF JAMES MCCLAVE

10  DATE:             April 21, 2004

11  TIME:             1:00 p.m.

12  PLACE:            305 N.E. 1st Street
                      Gainesville, Florida
13
    TAKEN BY:         Defendant
14
    REPORTER          EILEEN J. WILEY, RMR, Notary Public
15                    of State of Florida at Large

16  APPEARANCES:

17  FOR PLAINTIFF:    GUY B. BAILEY, JR., ESQ.
                      Continental Plaza, Suite 301
18                    3250 Mary Street
                      Coconut Grove, Miami, Florida 33131
19                        (Via conference call)

20  FOR DEFENDANT:    ALVIN B. DAVIS, ESQ.
                      200 S. Biscayne Blvd., Suite 4000
21                    Miami, Florida 33131

22

23

24

25
```

```
 1   me, which is mostly public at this point -- I
 2   understand there's been some production that may make
 3   it more specific, but from what I've been able to see
 4   it's the latter.  It's less than.  These projections
 5   are less than, considerably less than, the increases
 6   that have actually been experienced by Medtronic.
 7        Q.  Did you ever discuss this document with Dr.
 8   Myerburg?
 9        A.  I have not personally, no.
10        Q.  Did either of the other two that worked on
11   this?
12        A.  If they have, they didn't relate it to me.
13   We went our own way.  I believe certainly Dr. Baxter
14   and I and probably Dr. Lanzillotti and I have all
15   taken notice of the primary and secondary aspect, not
16   necessarily from this document, but just from the
17   point of view of economic common sense, that it's
18   probably not true that all of the increase in ICD
19   usage is attributable to AEDs.  And that's something
20   that needs to be recognized in the damage analysis,
21   and we believe that it is.  So I guess in that regard
22   we probably have discussed this.
23        Q.  Have AED sales increased over the same time
24   period?
25        A.  I don't recall seeing AED sales broken out,
```

```
 1    so I'm not sure.  I believe there's at least
 2    reference to the fact that they have, but I don't
 3    recall separate figures on those like I saw the ICDs.
 4         Q.   How would the acquisition of an AED company
 5    lead to an increase in ICD sales?
 6         A.   The plans, again both the Medtronic
 7    documents and the Myerburg document, are consistent
 8    on that issue.  It is an issue of AEDs keeping
 9    cardiac victims alive long enough to be treatable
10    with ICDs, and therefore there being an increased
11    survivor rate, out of hospital survivor rate, such
12    that they can be treated.
13         Q.   Has there be an increase in survivor rate?
14         A.   It's my understanding that the literature
15    indicates that it has.  That understanding is
16    obtained from Dr. Myerburg.  I'm not an expert in
17    cardiovascular literature, but it's my understanding
18    that there has been.
19         Q.   Well, do your calculations assume that
20    there has been an increase in survival rate?
21         A.   They may implicitly.  Unless there's some
22    other way that the AED and the ICD can be tied
23    together that I'm unaware of, then I think yes.
24    There's -- that's part of the plan, part of the
25    projection, is that there would be some increase and
```

1    that some percentage of those people would be ICD

2    patients.

3        Q.   But you don't know whether there has been

4    an increase in survival rates or not?

5        A.   Not ex -- no, not of anything I've read

6    directly.  It's my understanding that there has, but

7    I don't know what the data are on that.

8        Q.   If there has been no increase in survival

9    rate, how would the acquisition of an AED company

10   lead to an increase in the sale of ICDs?

11       A.   Well, there may be something I'm not

12   thinking of, but I don't see how it would, unless the

13   survival rate was declining prior to the AEDs and it

14   put a stop to that decline.  That would be a net

15   increase over what it would have been.  I don't know

16   what the trends were.  That would be one hypothetical

17   way.  But I think there has to be a net increase in

18   ICD patients that's tied to AEDs for my damage

19   analysis to be relevant.

20       Q.   What I haven't figured out here, and I'm

21   telling the truth, whatever Guy may say --

22            MR. BAILEY:  I'm sorry.  I just could not

23       hear what you just said.

24       Q.   Okay.  Here's what I don't understand.  If

25   you buy an AED company and if there's an increase in

JOHNS, STEPHENSON & BIERY/ADVANTAGE

```
 1    ICD sales, it would seem to me that in order for the

 2    acquisition of the AED company to be the basis for

 3    the increase in ICD sales, you'd have to show how

 4    that occurred.  It may be just coincidental or it may

 5    be ICD sales increased for completely other reasons.

 6    And I'm trying to get your understanding for your

 7    damage calculation of how the acquisition of an AED

 8    company would lead to an increase in ICD sales, if

 9    the survivor rate stayed flat.

10        A.   Well, again putting aside for just a minute

11    the last part of your question, if the survivor rate

12    stayed flat, that isn't what either Dr. Myerburg or

13    Medtronic projected.  They both projected significant

14    increases in survivor rate and a commensurate

15    increase in ICD sales.  Now if you're saying to me

16    assume both of those analyses were dead wrong, then

17    that could have an effect on my damage analysis.

18        Q.   Could you show me a document where

19    Medtronic assumed there's going to be an increase in

20    survival rates?

21        A.   Yes, the financial upside calculations that

22    were done.

23        Q.   Okay.  Let's talk about that.  That's

24    exhibit one.  Now where did you get this document?

25    Exhibit one is financial upside calculations with
```

1   some handwritten notes on it.

2       A.   This was produced I believe as part of a

3   set of documents which were represented to me to be

4   Medtronic projections, documents relating to the AED

5   market.

6       Q.   Tell me who presented that to you and what

7   exactly was said.

8       A.   I don't recall that.  I recall getting the

9   documents and having an understanding from counsel I

10  think, or maybe Dr. Myerburg, or maybe both, that

11  these were not calculations that he had done, but

12  were calculations that were done by someone in

13  Medtronic.

14      Q.   And do you know who at Medtronic did this

15  calculation?

16      A.   No, I don't.

17      Q.   Do you know what the purpose of this

18  calculation was?

19      A.   Only what's implied here, in that it's very

20  similar to what Dr. Myerburg did, although it uses

21  slightly different or somewhat different assumptions

22  in places.  But it's an increase in survivor rate due

23  to AED utilization.

24      Q.   Well, show me where that last part is

25  demonstrated, due to AED utilization.

1        A.   Well, again this was part of a set of

2   documents which went into AED utilization, the AED

3   market and the like.  So there's some assumption here

4   of an increase in survival rate.  And I made the

5   assumption in looking at this that it had to do with

6   the utilization of AEDs.

7        Q.   But you don't know that?

8        A.   I can't know that for certain.  I'm

9   assuming or I inferred that from the context of this

10  document.

11       Q.   Are you aware of the term sensitivity

12  study, where you take a calculation and then you say

13  if it increased by one percent, this would be the

14  result, if you increased by two percent, this would

15  be the result, increased by three percent, it would

16  be this result?

17       A.   I am.

18       Q.   Okay.  This indicates, the top line under

19  the heading, impact in increase in SCA survival rate,

20  then SCA incidence.  And there's a number 350, and

21  there's a number 364,000.  What did you understand

22  that number to be?

23       A.   364,000 incidents of cardiac arrest I

24  believe.

25       Q.   Do you know whether there are 364,000

```
 1    incidents of sudden cardiac arrest?

 2         A.    I don't personally, no.

 3         Q.    Do you know Dr. Myerburg has written that

 4    the estimate is between 250 and 300,000, that that's

 5    just sort of a best guess?

 6         A.    I may have read that.

 7         Q.    But this document written by whomever wrote

 8    it, whenever it was written, I mean do you know for a

 9    fact this was written as part of an analysis of the

10    acquisition of PhysioControl?

11         A.    For a fact I don't know that.

12         Q.    But this assumes an incidence of 364,000.

13    And then this shows that there was an increase in

14    survival rate of one percent?

15         A.    No, 10%.

16         Q.    I'm sorry, 10%?

17         A.    Yes, sir.

18         Q.    Yeah, right, 10%, .1, that you would have

19    an increased patient pool of 364,000?

20         A.    No, sir, 36,400.

21         Q.    I'm sorry, 36,400.  So what they've said is

22    that whatever the survival rate is if you increase it

23    by 10%, you'll increase the patient pool by 36,400?

24         A.    That's what this says.

25         Q.    Assuming that the incidence rate is
```

```
1     correct.  But you would apply 10% against whatever

2     the actual incident rate is.

3          A.   Correct.

4          Q.   Okay.  And then patients receiving ICDs,

5     that indicates what?

6          A.   90%.

7          Q.   90%?

8          A.   Yes.

9          Q.   Do 90% of those who survive receive ICDs?

10         A.   That was an issue in both Dr. Myerburg's

11    and what I believe to be Medtronic's calculations

12    that was subjected to several different assumptions,

13    anywhere from 50 to 90%.

14         Q.   Well, did you use 90% in your calculations?

15         A.   No.

16         Q.   Didn't you end up using these numbers?

17         A.   No.  I used a mid point.  If you look to

18    the right of that it says .5.  And there's also a

19    calculation done using 50%.  And I used a mid point

20    between the 50 and 90%, so I'm assuming roughly 70%.

21    I presented actually both, but what I actually

22    utilized was the mid point.

23         Q.   You used a mid point in incremental

24    revenue?

25         A.   Well, yes.  And the way you get to the two
```

1    different values of incremental revenue is by

2    different assumptions in the percent receiving ICD.

3         Q.   That's how you came to your mid point?

4         A.   Well, that's how -- again assuming this is

5    a Medtronic document, that's how Medtronic did it.

6    If you follow the calculations you can use the number

7    out to the right there, .5 that's handwritten, or you

8    can use the typed number of .9.  And one will lead to

9    150,000, I'm sorry, million, and the other to 247

10   million.

11        Q.   So we have an increased -- follow me the

12   way it's written.  If you assume 90%, then you'd have

13   90% of 36,400.  That equals 32,750.

14        A.   Yes.

15        Q.   And then the next number is Medtronic

16   market share.  That's .41.  So you multiply .41 times

17   that, and you arrive at 13,431.6 additional units of

18   ICDs sold by Medtronic for every one percent increase

19   in survival rate, I'm sorry, for every 10% increase?

20        A.   Every 10%, yes.

21        Q.   So does your calculation assume that there

22   has been a 10% increase in survival rate?

23        A.   No, not necessarily.  There could be

24   something less than that with a higher ICD or higher

25   market share than is assumed from Medtronic.  Some

 1    documents I've looked at indicate Medtronic's current

 2    market shares closer to 50% than 40%.  So there are a

 3    number of things.

 4         Q.   What do you use in your calculation?

 5         A.   I used the mid point of the range that this

 6    document came up with, which was 150 million to 247

 7    million.  I took the mid point of that as the best

 8    estimate.

 9         Q.   Well, both mid points according to you

10    assume a 10% increase in survival rate.

11         A.   Yes, they do, but they also assume, one of

12    them, a 90% ICD rate, another 50%.  Either of those

13    could be different.  And they both assume a 41%

14    Medtronic market share that could go up.  So you ask

15    me if my calculation assumed a 10% increase in

16    survival rate.  This calculation does.  But I would

17    argue that you can get to the 198 million number a

18    number of different ways.  And it doesn't necessarily

19    have to be tied to exactly a 10%.

20         Q.   But you used 10%?

21         A.   This document used 10%.

22         Q.   And you used the numbers from this

23    document?

24         A.   I used a mid point of numbers from this

25    document.

```
1        Q.   All right.  I'll get to that.  Okay.  Then

2   what did you understand ASP to mean?

3        A.   A selling price per unit.

4        Q.   And then increased revenue is what?

5        A.   I believe the multiplication of the selling

6   price times the Medtronic -- increased units sold by

7   Medtronic.

8        Q.   The 18,000 times the 13,000?

9        A.   Right.

10       Q.   Do you have a calculator?

11       A.   I don't.

12       Q.   Would you do that calculation for me?

13       A.   If you give me a pencil and paper and

14   plenty of time.

15       Q.   Just multiply, round it out.  Multiply

16   18,424 times 13,431.

17       A.   That will take me awhile.  It's been a long

18   time since I did long multiplication like this.  I

19   get 247 million.

20       Q.   Okay.  And then what's --

21       A.   Plus a little.

22       Q.   What's the next number indicate?

23       A.   I think that's a profit after tax margin.

24   I didn't pay -- anything below this didn't matter to

25   me.  But I looked at it, and it looked like that was
```

1    a profit after tax.

2         Q.   And then shares outstanding is the number

3    of shares and market value of the shares.  Is that

4    what you read that to be?

5         A.   I didn't get down -- other than to look at

6    that and say, yeah, that's the kind of thing you'd

7    want to do if you were doing an acquisition, you'd

8    want to figure out market value per share, I

9    didn't -- I'm not sure what that is.  I know those

10   are the kinds of calculations that one would do.

11        Q.   Now what impact would it have on your

12   calculation if the increase in survival rate was half

13   of that, of 10%?

14        A.   It depends if what you used is the percent

15   receiving ICDs and the market share.  If you left it

16   at .9 and .41, the number would be half, I believe.

17   Half of 247 would be about 125.

18        Q.   And similarly the 150 would be half of

19   that?

20        A.   If you changed both -- if you halved the

21   survival rate and knocked the percent receiving ICD

22   down to 50%, yeah.  It would be half of 150.

23        Q.   And you don't know for a fact what the

24   survival -- whether there has been an increase in

25   survival rates?

1     A.   Right.  I don't.

2     Q.   And you don't as a fact know whether this

3   calculation was performed in relation to the AED

4   acquisition or not, the PhysioControl acquisition or

5   not?

6     A.   Again, no.  That's an inference on my part.

7     Q.   Did you see any other documents that

8   assumed that there was going to a 10% increase in

9   survival rate?

10    A.   You're asking about Medtronic documents or

11  any documents?

12    Q.   Any documents.

13    A.   Well, Dr. Myerburg's plan has some

14  assumptions about that.  I'd have to look at it.  I

15  don't remember what he's using, 10%.  I think he used

16  a range of 5 to 15, but I'd have to look to be sure.

17    Q.   But you haven't looked at any documents

18  that show what the actual increase, if any, in

19  survival rates was?

20    A.   I don't think that I've seen anything like

21  that.  My goal was to look at what was contemplated

22  at the time that this deal would have been made.

23    Q.   Now what did you understand the handwritten

24  notes at the bottom of the page to mean?

25    A.   Those are the calculations that led to the

```
 1   150 million number, in other words the reduction in

 2   what they call the ICD yield to 50%.

 3       Q.   Well, but they also increased the sudden

 4   cardiac arrest incidence by 36,000; didn't they?

 5       A.   Yeah.  He's doing some rounding here.  He's

 6   increasing that.  He's decreasing the dollars per

 7   unit from 18.4 to 18.  So whoever was doing -- well,

 8   it looks to me like whoever was doing this was doing

 9   it on the fly perhaps in a meeting or something.  But

10   at any rate there's some rounding going on.

11       Q.   Do you know how, if at all, this document

12   was ever used by Medtronic?

13       A.   I don't know, no.

14       Q.   This exhibit two, the Valuation of

15   Medtronic Business Plan, did you ask him to send that

16   to you or did he just send it to you?

17       A.   I certainly didn't personally ask.  I don't

18   know if my staff did or not.

19       Q.   This makes reference to a paper from

20   Germany that analyzed ICD use from 1998 to 2002 using

21   Medtronic's data.  Do you have that paper?  Did you

22   receive that?

23       A.   No.

24       Q.   Your report you refer to this exhibit one

25   as -- you refer to this as a document, a spread sheet
```

 1    that was prepared to show gains in revenues from the

 2    adoption of this marketing strategy during the period

 3    of negotiations.  And how did you determine that

 4    that's what it was prepared for?

 5         A.   I believe that was representation of either

 6    counsel or Dr. Myerburg or both.  And I accepted that

 7    after reviewing it and the accompanying documents

 8    which did involve AED projections.

 9         Q.   Which documents are those?

10         A.   This stack of documents, which exhibit one

11    is the top document.  And then there are others that

12    go with it.

13              (Thereupon, a brief recess was taken.)

14              (Thereupon, Defendant's Exhibit 5 was

15         marked for identification.)

16              MR. DAVIS:  Five is a composite of what he

17         pulled from his stack which he says he looked at

18         relating to his calculations.  It's five pages.

19         First page is external defibrillator market

20         size.  Next four pages are pages 5,6 -- two

21         pages are five and six from projections for

22         Operation Starbucks.  And the fourth page is an

23         income statement of PhysioControl.  And the

24         fifth is a Medtronic PhysioControl combined

25         estimate.

1    Q.   Is there anything -- I think I probably

2  covered this in a different way, but is there

3  anything in exhibit one on the face of the exhibit to

4  indicate that the increase in survival rate that's

5  projected there will result from the acquisition of

6  an AED company or from the implementation of Dr.

7  Myerburg's plan?

8    A.   There's nothing on this particular document

9  that mentions AED, so no.

10    Q.   To your knowledge has the alleged

11  misappropriation of Dr. Myerburg's plan by Medtronic

12  had an impact on survival rates?

13    A.   I wouldn't have direct knowledge of that,

14  no.

15    Q.   Would you have indirect knowledge of it?

16    A.   Well, perhaps.  I mean certainly there has

17  been dramatic increase in Medtronic's ICD business

18  and market share.  And I think it's certainly

19  reasonable inference to tie some part of that to the

20  AED acquisition which is part of Dr. Myerburg's plan.

21  But that would be an indirect inference.

22    Q.   Did you make any attempt to determine what

23  portion, if any, of the increase in ICD sales by

24  Medtronic is attributable to their alleged

25  misappropriation of his plan?

# EXHIBIT C

1
          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA

2
             MIAMI DIVISION
          CASE NO.:  03-20616-CIV-LENARD

3

4
ROBERT J. MYERBURG, M.D,

5
        Plaintiff,

6
VS.
                      **ORIGINAL**

7
MEDTRONIC, INC.
a Minnesota Corporation,

8

9
        Defendant.

10
_____/

11

12
              200 South Biscayne Boulevard
              Miami, Florida

13
              January 16, 2004
              Friday, 9:00 a.m.

14

15

16
        DEPOSITION OF ROBERT MYERBURG, M.D.

17

18

19
      Taken before Kay S. Rosenfeld, Shorthand

20
Reporter and Notary Public in and for the State of Florida

21
at Large, pursuant to Notice of Taking Deposition filed in

22
the above cause.

23

24

25

24

```
 1        A.   The fact that the concept was brought forward to

 2   them by Morgan Stanley I did not have any reason to doubt.

 3        Q.   The concept, do you have any reason to doubt

 4   that the prospect of Medtronic acquiring Physio was

 5   brought to them prior to your visit?

 6             MR. HUGHES:  Object to the form.

 7             THE WITNESS:  I have no reason to not

 8             accept the idea that Morgan Stanley brought the

 9             concept to them prior to my visit.

10   BY MR. DAVIS:

11        Q.   The concept of --

12        A.   Purchasing Physio.

13        Q.   I have a few questions about your plan here.

14        A.   Sure.

15        Q.   The first page -- you may want to go through it

16   unless you recall it by memory.

17             Under the goal you say that the corporation will

18   provide, your strategy will provide the corporation with a

19   competitive advantage.

20             What is the competitive advantage that they

21   would have?

22        A.   Meaning competing with other implantable

23   defibrillators.

24        Q.   Do you have a competitive advantage over other

25   implantable manufacturers?
```

1    every purchase of an AED, which I have not seen --

2         A.   I have not seen many.  I have seen it now and

3    then.

4         Q.   How do you get this connection you're talking

5    about through the branding, why is that?

6         A.   I would expect the marketing force would do

7    that.  That was -- you're asking me to separate that

8    concept from sales and marketing and actually they

9    intrinsically interwoven in the ways that I have talked

10   about, the way certainly major pharmaceuticals co-market

11   different products, different product lines for

12   cardiovascular products, using a single sales force that

13   enhances the sale of both.

14        Q.   Does Medtronic use a single sales force for

15   AED's and ICD's?

16        A.   Not to my knowledge.  That was something else we

17   were trying to get -- that was part of the proposal.

18             To my knowledge, the only things I know that

19   they have done in this area is what I mentioned in Palm

20   Beach, which the Medtronic representative told me about.

21        Q.   Tell me everything he told you.

22        A.   He basically told me that they are putting AED's

23   in conjunction with hospitals.  They are selling through,

24   actually through the hospitals, who are then putting them

25   out in the community and they sell both lines and then

50

1  equation of estimated survival rates for different sources

2  of data.  Admittedly it is a very rough calculation.

3       Q.   You are willing to admit that?

4       A.   Yes.

5       Q.   Has the survival rate increased since you

6  prepared this, since 1998?

7       A.   Survival rates in communities that have put in

8  AED's have increased.

9       Q.   All right.

10      A.   In Miami it has increased, essentially doubled

11  for ventricular fibrillation, which is different from

12  overall survival.  I don't want to get into a completely

13  different issue but for ventricular fibrillation the rate

14  has doubled in the community.

15           Other communities have failed and they failed

16  because of the design strategy of the system, which was

17  simply putting them in and taking them out of police cars.

18           But anyway, the short answer to your question is

19  yes, the survival rate has increased in the communities

20  that put in AED's.

21      Q.   Overall or only when they put in AED's?

22      A.   I am talking about where they have put in AED's.

23           Now, let me see if I can answer your other

24  question.

25           I believe I'm going to reserve the right to

1    modify this if I have to because I am not really clear on

2    it, but I believe that in the overall survival rates are

3    actually decreasing because most communities still do not

4    have effective AED programs and I think there are some

5    data out there on that.

6         Q.   Have Medtronic's sales of ICD's in Miami doubled

7    since the AED program?

8         A.   I don't know.

9         Q.   Have ICD sales overall doubled, not just

10   Medtronic's, in the Miami community?

11        A.   Again, I don't know.  I don't have the data.  I

12   don't want to speculate.

13        Q.   What is the source of the information in Figure

14   1?

15        A.   Okay.  There are multiple sources.  As to each

16   panel do you want to speak separately?

17        Q.   Let's take the top left.

18        A.   Sure.

19        Q.   Out of hospital cardiac arrest survival.

20        A.   Cumulatively that chart I have published, I

21   devised and I published in a couple of different spots but

22   it is based on separate sources of data.

23             Do you want me to go over every source of data?

24        Q.   No.

25        A.   But they are all based on data.

128

```
 1   BY MR. DAVIS:

 2        Q.   Do you have any facts to indicate you're

 3   responsible for the acquisition of the business, Physio,

 4   by Medtronic?

 5             MR. HUGHES:  Object to the form.

 6             THE WITNESS:  Responsibility, no.

 7             I took the concept to them.

 8             Apparently Morgan Stanley had also taken a

 9             concept to them or had taken the concept to them

10             several years before that.  They never acted on

11             it until shortly after I visited.

12             Do I have a letter from them stating, "We

13             used your idea"?

14             No.

15             I have a letter stating, "We will not use

16             your idea."

17        Q.   You are aware that Morgan Stanley contacted them

18   about Physio specifically before you came in March?

19        A.   Yes.

20        Q.   You have no facts to indicate that it was your

21   plan as opposed to Morgan Stanley's that caused sales to

22   occur?

23        A.   I had been shown documents on our visit to

24   Medtronic which indicated, based on Morgan Stanley's

25   presentation, basically a phone call and a report of a
```

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 03-20616 – CIV-LENARD
MAGISTRATE JUDGE: ANDREA M. SIMONTON

ROBERT J. MYERBURG, M.D.
individually,

        Plaintiff,

vs.

MEDTRONIC, INC.,
a Minnesota corporation,

        Defendant

_____/

## PLAINTIFF'S AMENDED EXPERT WITNESS DISCLOSURE SUMMARIES

Pursuant to Local Rule 16.1 (K), and the Court's February 24th Order, Plaintiff, Dr. Robert Myerburg ("Dr. Myerburg"), discloses his expert's anticipated testimony including lists of the expert's qualifications to be offered at trial. These expert witnesses include Raymond P.H. Fishe, Ph.D. and James T. McClave, Ph.D, of Info Tech, Inc.

### Background

In February 1998, Dr. Robert J. Myerburg, M.D., presented a strategic business plan to Medtronic, Inc. ("Medtronic") officials encouraging Medtronic to

acquire an Automated External Defibrillator ("AED") manufacturer in order to increase its marketing and sales of Implantable Cardioverter/Defibrillators ("ICD's"). Dr. Myerberg and Medtronic signed a confidentiality agreement in which Medtronic agreed to compensate Dr. Myerburg if the company adopted his business plan. Subsequently, on April 28, 1998, Medtronic notified Dr. Myerburg that it had no interest in his plan. However, in June 1998, Medtronics implemented the central idea in Dr. Myerburg's plan by acquiring Physio-Control, the then second-largest (now largest) producer of AED's in the advanced medical devices industry. The clear objective of this acquisition was to improve the marketing of Medtronic's ICD's.

<u>Raymond P.H. Fishe</u>

*A. Content*

Professor Fishe's testimony will address:

In the discussion of compensation for the use of Dr. Myerburg's ideas, Professor Fishe will testify that compensation to Dr. Myerburg is, at the present state of disclosure by Medtronic, based on a portion of the total benefits created from merging Medtronic with Physio-Control. He will discuss that the benefits to

Myerburg, r  ). vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 3 of 14

Medtronic shareholders as measured by stock price appreciation net of overall market movements was approximately $80 million on the announcement day and approximately $200 million with the following day included.  With respect to a discussion of synergies presented in Dr. Myerburg's plan, Professor Fishe will testify that Medtronic estimates show that after-tax benefits of $76 million will arise from increasing SCD survival rates from 5% to 15%.

(1)     the economic damages that Dr. Myerburg suffered as a result of Medtronic, breach of the non-disclosure agreement it entered into with Dr. Myerburg;

(2)     the value received by Medtronic from the use of elements contained in Dr. Myerburg's plan;

(3)     the content of internal documents prepared by Medtronic, which showed that the acquisition of Physio-Control was a zero or negative net present value project;

(4)     the reaction in the stock market when the merger was announced, which showed that there were significant wealth gains to shareholders from combining ICD and AED businesses; and

(5)   the synergies in marketing described in Dr. Myerberg's plan, which create valuable real options that help explain why the stock market reacted positively to the merger announcement.

*B. Basis*

In reaching his opinion, Professor Fishe will testify that he reviewed and relied on:

a.   Dr. Myerburg's Executive Summary;

b.   Financial data and statements collected from SEC filings (10K, 10Q, etc.), Bloomberg Information Systems data, and Defendant's response to Plaintiff's Request for Production;

c.   News reports in the financial press at the time the merger was announced and subsequent reports;

d.   Historical stock market data collected from Trades and Quotes (TAQ) disk supplied by the New York Stock Exchange;

e.   Medtronic Board Presentation, June 25, 1998 and other internal documents related to the merger;

f.   Correspondence between Medtronic and Dr. Myerburg; and

g.      Academic articles and college textbooks that discuss real options in the
context of mergers and corporate valuation and discounted cash flow
analyses (e.g., Valuation: Measuring and Managing the Value of
Companies by T. Copeland, T. Koller, J. Murrin).

### James McClave P.h. D

*A. Content*

Dr. McClave will testify about the economic damages suffered by Dr.
Myerburg *assuming* that the finder of fact determines that Medtronic illegally
capitalized on Dr. Myerburg's strategic plan.   His expertise is statistics and
econometrics, and his complete CV is included as Exhibit B.

i. Damage Estimation Methodology

Damage experts typically estimate plaintiff compensatory damages by
comparing the economic position of the plaintiff under two different scenarios: (a)
the first scenario is that which would have existed if the defendant had not
committed the alleged wrongful acts; and (b) the second scenario is that which
actually occurred.  In this case, the first scenario, often referred to as the "but for"

Case 1:03-cv-20616-MGC   Document 130   Entered on FLSD Docket 07/23/2004   Page 46 of 96

Myerburg, ı ). vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 6 of 14

scenario, is the plaintiff's economic position *assuming* Medtronic and Dr. Myerburg had agreed to compensate Dr. Myerburg for his business plan, and had honored that agreement. Under the second scenario, what actually occurred, Dr. Myerburg was paid nothing for the business plan presented to Medtronic, and any income it produced for Medtronic. The economic difference to Dr. Myerburg's between the two scenarios constitutes the compensation he would have received from Medtronic for the implementation of his plan, as specified in the confidentiality agreement.

Dr. McClave will testify that these damages are best understood in the context of theft of intellectual property. In effect, Medtronic "stole" Dr. Myerburg's original, innovative strategic business plan, which was the subject of a detailed confidentialty agreement between Dr. Myerburg and Medtronic. In appropriating Myerburg's business strategy via the purchase of a leading maker of external defibrillators (Physio-Control), Medtronic positioned itself to substantially increase its sales of ICD's. Dr. McClave will testify that the present value to Medtronic of the revenue or profits from these increased ICD sales constitute a reasonable basis on which to compute Dr. Myerburg's economic damages.

One method of calculating damages based on Medtronic's enrichment resulting from the alleged theft of Dr. Myerburg's plan is based on the total gain to Medtronic as a result of implementing the plan. According to the *Reference Manual on Scientific Evidence*: "Under the Uniform Trade Secrets Law, the standard [for calculating damages] is disgorgement of defendant's gain."[1] Another method is to calculate a "reasonable royalty rate" that would have been paid "but for" the infringement.[2] Dr. McClave has utilized the second, more conservative method in his preliminary damage calculations.

Dr. McClave will base his calculations on the estimated future revenues and earnings resulting from implementation of Dr. Myerburg's strategic plan. Dr. Myerburg developed three alternative scenarios in his plan, with the mid-estimate for gross revenues from incremental sales of ICD's in the United States at $104.5 million annually. Dr. Myerburg's estimates were conservatively low as compared with Medtronic's own projections for the same period. In a Medtronic spreadsheet entitled "Financial Upside Calculations," prepared to show gains in revenues from the adoption of this marketing strategy during the period of negotiations for the

---

[1] *Reference Manual on Scientific Evidence*, Federal Judicial Center, 2000 (2nd Edition). [p. 317, footnote omitted.]
[2] *Ibid.*

Myerburg, ι  Ͻ. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 8 of 14

acquisition of Physio-Control, Medtronic estimated gross revenue gains from increased ICD sales in the United States of $247 million annually.   There are handwritten notes on the same document that indicate a more conservative estimate of $150 million in increased annual sales.   Dr. McClave has utilized the mid-point of these estimates, $198.5 million, in his calculations based on Medtronic's projections.   These are shown in Table 1 below.

### Table 1
### Annual Gross Revenue Estimates
### ($ Millions)

| Scenario | Dr. Myerburg | Medtronic |
|---|---|---|
| Low | 69.64 | 150.00 |
| Mid | 104.53 | NA |
| High | 125.44 | 247.00 |

Dr. McClave projected the revenues through a ten-year horizon using a 5% growth rate.   This is a conservatively low growth rate, considering the 17% and 47% annual increases in ICD sales experienced by Medtronic between 2001 and 2003.   He calculated the estimated gross profit associated with these sales, based on a gross profit of 70% of total revenue.   This gross profit rate is lower than that

earned by Medtronic during the five year period between 1999 and 2003, which was never less than 73.9%.[3]   These projections of profits and revenues are contained in Table 2 below.

### Table 2
### Gross Revenue, Profit and Royalty Projections
### Based on  Median Revenue Scenario
### ($ Million)

| | Dr. Myerburg | | | Medtronic | | |
|---|---|---|---|---|---|---|
| Year | Revenue | Profit | Royalty | Revenue | Profit | Royalty |
| 1 | 104.53 | 73.17 | 18.29 | 198.50 | 138.95 | 34.74 |
| 2 | 109.76 | 76.83 | 19.21 | 208.43 | 145.90 | 36.47 |
| 3 | 115.25 | 80.67 | 20.17 | 218.85 | 153.19 | 38.30 |
| 4 | 121.01 | 84.71 | 21.18 | 229.79 | 160.85 | 40.21 |
| 5 | 127.06 | 88.94 | 22.24 | 241.28 | 168.89 | 42.22 |
| 6 | 133.41 | 93.39 | 23.35 | 253.34 | 177.34 | 44.33 |
| 7 | 140.08 | 98.06 | 24.51 | 266.01 | 186.21 | 46.55 |
| 8 | 147.09 | 102.96 | 25.74 | 279.31 | 195.52 | 48.88 |
| 9 | 154.44 | 108.11 | 27.03 | 293.27 | 205.29 | 51.32 |
| 10 | 162.16 | 113.51 | 28.38 | 307.94 | 215.56 | 53.89 |

Dr. McClave will further testify that Dr. Myerburg's expected earnings based on these projected sales depend on the results of the royalty negotiation that would have taken place between him and Medtronic "but for" the alleged illegal acts of Medtronic.  For these preliminary calculations, Dr. McClave has used a

---

[3] Medtronic 2003 Annual Report.

"rule of thumb" royalty rate, often quoted in the valuation literature, of 25% of gross profits.[4] When applied to the projected gross profits under the two scenarios – Dr. Myerburg's and Medtronic's – the results over both the five- and ten-year period are as shown in Table 2 above. The five- and ten-year periods are used to reflect a range of the "useful life" of Dr. Myerburg's plan.

Dr. McClave will testify that the final step using the DCF methodology is to reduce the projected royalty cash flows to present value. This is accomplished by applying a discount rate to the expected future cash flows. In this preliminary calculation Dr. McClave has used a 10% discount rate, reflecting the relatively low risk associated with this plan, and the fact that the plan has proved to be extremely successful since its implementation by Medtronic. (Table 3, below, displays these calculations.) Dr. McClave will testify that this discount rate is higher than the current weighted average cost of capital for Medtronic, which is less than 9%.

**Table 3**
**Present Value of Royalties (Median Scenario)**
**Discount Rate of 10%**

---

[4] See, for example, a recent presentation (October 2003) made to the American Society of Appraisers, at: http://www.bvappraisers.org/contentdocs/Conference/Royalty_Rates_in_ Intellectual_Property_Valuation.pdf

Myerburg, ^ ). vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 11 of 14

**($ Million)**

|       | Dr. Myerburg | | Medtronic | |
|-------|--------|-------|---------|-------|
| Year  | Royalty | PV   | Royalty | PV    |
| 1     | 18.29  | 16.63 | 34.74  | 31.58 |
| 2     | 19.21  | 15.87 | 36.47  | 30.14 |
| 3     | 20.17  | 15.15 | 38.30  | 28.77 |
| 4     | 21.18  | 14.46 | 40.21  | 27.47 |
| 5     | 22.24  | 13.81 | 42.22  | 26.22 |
| 6     | 23.35  | 13.18 | 44.33  | 25.03 |
| 7     | 24.51  | 12.58 | 46.55  | 23.89 |
| 8     | 25.74  | 12.01 | 48.88  | 22.80 |
| 9     | 27.03  | 11.46 | 51.32  | 21.77 |
| 10    | 28.38  | 10.94 | 53.89  | 20.78 |

Damages as Present Value of Future Royalties:
Five Year Total:  75.93            144.18
Ten Year Total: 136.10            258.44

The bottom of Table 3 also displays a range of damages based on the above preliminary calculations.   Using the mid-point of Dr. Myerburg's projected revenues, the damages total $75.9 million in present value (at the time of the alleged wrongful acts) using a five year projection, and $136.1 million over ten years.   Based on Medtronic's projection mid-point, Dr. Myerburg's damages increase to $144.2 million over five years, and $258.4 million over ten years.

Dr. McClave's calculations are necessarily preliminary, since discovery is on-going and the most recent document production is still being processed.   The

Myerburg, : Ɔ. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 12 of 14

additional information will not alter the methodology utilized by Dr. McClave to compute the damages, but may alter some of the data he has used in these preliminary calculations. The projected revenues attributable to Dr. Myerburg's plan, as well as his expected royalty rate, are subject to change based on additional data and information.

*B. Basis*

Dr. McClave will testify that he reviewed and relied on the following material in reaching his conclusions:

a. The Complaint in this action;

b. Dr. Myerburg's strategic business plan presented to Medtronic in February 1998;

c. Various internal documents of Medtronic, labeled "MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER;"

d. Various worldwide web cites concerning intellectual property and associated royalty rates;

Myerburg, ??. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 13 of 14

e. Various filings made by Medtronic to the SEC, including Forms 4K and annual 10K filings;

f. Medtronic 2003 Annual Report;

g. Reference Manual on Scientific Evidence, Federal Judicial Center, 2000 (2nd Edition).

h. A 2003 article published by K. Seidl and J. Senges in Cardiac Electrophysiology Review (2003; 7:5-13), entitled "Worldwide Utilization of Implantable Cardioverter/Defibrillators Now and in the Future";

i. "Royalty Rates in Intellectual Property Valuation," presentation by Thomas Giordano to the ASA Advanced Business Valuation Conference, October 16, 2003;

j. His professional training and experience, including the calculation of economic damages for numerous litigations;

k. Conversations with Dr. Myerburg.

Myerburg, . D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 14 of 14

Respectfully submitted,
Bailey & Dawes, L.C.
Counsel for Robert J. Myerburg, M.D.
3250 Mary Street, Suite 301
Miami, Florida 33133
(305)374-5505
(305)374-6715 Fax

By: _____
For: Guy B. Bailey, Jr.
Florida Bar No. 96095
Kristina Bakardjiev
Florida Bar No. 0587400

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was mailed to Medtronic's counsel,

Alvin B. Davis, Esquire, Steel Hector & Davis, First Union Building, Suite 4000, 200

South Biscayne Boulevard, Miami, Florida 33131-2310, this $\underline{10^{th}}$ day of March,

2004.

_____
Of Counsel

**Exhibit "A"**



MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit "B"**

# Curriculum Vita

## Raymond P. H. Fishe

| | |
|---|---|
| *Contact* | Office:      (804) 287-1269 <br> Office Fax:  (804) 289-8878 |
| *Home Address* | 2311 Baronsmede Road <br> Midlothian, VA  23113 |
| *University Address* | University of Richmond <br> Robins School of Business <br> 1 Gateway Road <br> Richmond, VA  23173 |
| *e-mail* | pfishe@richmond.edu |
| *Course Web Site* | http://pfishe.pageout.net |
| *Personal* | Married (Patricia Gilbert), Two Children (Jennifer & Christopher) |
| *Current Rank* | Professor and Distinguished Chair in Finance |
| *Education* | University of Florida   B.S.B.A. (High Honors), June 1976 <br> University of Florida   Ph.D., August 1979; Economics |
| *Administrative* | Chairman, Department of Finance, May 1994 to September 1998, with secondary appointment in the Finance Department. |
| *Government* | Senior Academic Fellow, U.S. Securities and Exchange Commission, Washington, DC, 1999-2000. |
| *Academic* | University of Richmond, Distinguished Professor of Finance, August 2003 to present. <br><br> University of Miami, Assistant Professor, August 1981 - June 1984; Associate Professor, June 1984 - June 1990; Professor of Economics, July 1990 to August 2003. |

*Current Research*

"The Behavior of Bid-Ask Spreads and Volume in Options Markets During the Competition for Listings in 1999," (with P. Defontnouvelle and J. Harris), forthcoming in *The Journal of Finance*.

"The Impact of Illegal Insider Trading in Dealer and Specialist Markets: Evidence from a Natural Experiment," (with M. Robe), forthcoming in the *Journal of Financial Economics*, to be presented at the Western Finance Association Meetings, 2003.

"Aftermarket Liquidity from Underwriter Short Covering: A Clinical Study," (with E. Boehmer), forthcoming in the *Journal of Corporate Finance*.

"Underwriter Short Covering Trades in Initial and Seasoned Public Offerings of Securities," (with E. Boehmer), in submission, September 2003.

"Do Institutions Hold IPOs with Better Long Run Market Performance?," (with B. Boehmer and E. Boehmer), draft, October 2002, presented at the NYU conference on Entrepreneurship, Venture Capital & Initial Public Offerings conference, April 2003, and will be presented at the Western Finance Association Meetings, 2003.

"Who Receives IPO Allocations?  An Analysis 'Regular' Investors," (with E. Boehmer), draft, November 2002, invited to present at the University of Notre Dame and University of Central Florida, April 2003.

"Equilibrium Rationing in Initial Public Offerings of Equity," (with E. Boehmer), in revision, October 2001.

"Does Competition for Options Listings Lead to More Informed Trading?" (with Tie Su), in preparation.

"How a Fund Family Benefits from a New Mutual Fund," (with Tim Burch), in preparation.

**Journal Articles**

"How Stock Flippers Affect IPO Pricing and Stabilization," *Journal of Financial and Quantitative Analysis* 37 (June 2002), 319-339.

"What Are the Research Standards for Full Professor of Finance,"*Journal of Finance* 53 (June 1998), 1053-1079.

"Seasonal Money Movements and the January Effect," (with L. Chen), *Atlantic Economic Journal* 22 (December 1994), 26-42.

"Good News, Bad News, Volume and the Monday Effect," (with T. Gosnell and D. Lasser), *Journal of Business Finance & Accounting*, (November 1993), 881-93.

"Informal Financial Arrangements and the Stability of Deposit Insurance in Less Developed Countries," (with L. Chen), *Southern Economic Journal* (July 1993).

"An Economic Analysis of Group Lending Programs in Developing Countries," (with J. Devereux), *The Developing Economies* (March 1993), 102-121.

"The Value of Time Spent in Price Comparison Shopping," (with D. Grewal and H. Marmorstein), *Journal of Consumer Research* 19 (June 1992), 52-61.

"The Federal Reserve Amendments of 1917: The Beginning of a Seasonal Note Issue Policy," *Journal of Money, Credit, and Banking*, 23 (August 1991), 308-326.

"The Adjustment of Expectations to a Change in Regime," (with M. Wohar), *American Economic Review* 80 (September 1990), 968-976.

"Information-Induced Heteroscedasticity in Price Expectations," (with T. Idson), *The Review of Economics and Statistics* 78 (May 1990), 304-312.

"Margin Requirements in Futures Markets: Their Relationship to Price Volatility," (with L. Goldberg, S. Sinha, and T. Gosnell), *Journal of Futures Markets* 10 (October 1990), 541-554.

"Why Do Corporations Distribute Assets?  An Analysis of Dividends and Capital Structure," (with L. De Alessi), *The Journal of Institutional and Theoretical Economics* 143 (March 1987), 34-51.

"Nonlinear Contracts, Zero Profits, and Moral Hazard," (with P. McAfee), *Economica* 54 (February 1987), 97-101.

"The Effects of Margins on Trading in Futures Markets," (with L. Goldberg), *Journal of Futures Markets* 6 (Summer 1986), 261-272.

"On Testing Hypotheses Using the Livingston Price Expectations Data," *Journal of Money, Credit, and Banking* 16 (November 1984), 520-26.

"On the Use of Bonus Payments in an Experimental Study of Electricity Demand," (with P. McAfee), *The Review of Economics and Statistics* 65 (August 1983), 506-511.

"Unemployment Insurance and the Reservation Wage of the Unemployed," *The Review of Economics and Statistics* 64 (February 1982), 12-17.

"Labor Force Earnings and College Choice of Young Women:  An Examination of Selectivity Bias and Comparative Advantage," (with R. Trost and P. Lurie), *Economics of Education Review* 1 (Spring 1981), 169-191.

"On the Estimation of Inflationary Expectations from Qualitative Responses," (with K. Lahiri), *Journal of Econometrics* 16 (May 1981), 89-102.

"Distributional Analysis of Regulatory Benefits and Costs of Air Quality Control," (with Berg, et. al.), *Journal of Environmental Economics and Management* 6 (November 1978), 222-243.

Books            *Microeconomics–Price Theory in Practice* (with Roger Miller), HarperCollins *Publishers*:  New York, 1995.

| | |
|---|---|
| *Teaching* | 2002 Excellence in Teaching Award, School of Business Administration, University of Miami |
| | *Executive MBA Programs:*<br>Corporate Finance<br>Advanced Corporate Finance<br>Managerial Economics |
| | *Undergraduate:*<br>Fundamentals of Finance<br>Investment Analysis<br>Introduction to Futures & Options<br>Personal Financial Planning<br>Principles of Microeconomics<br>Energy Economics |
| | *Graduate:*<br>Corporate Finance<br>Derivative Securities & Markets<br>Econometrics |
| | *Seminars:*<br>"Trading with Limited Information," NASD Institute for Securities Market Professionals, December 2002.<br>"Corporate Governance: History & Policy," Ryder Corp. Executive Seminar, November 2002.<br>Faculty Instructor, "Economics for Leaders," *Foundation for Teaching Economics*, various USA sites, 1992-present.<br>"The Role of Science Courts" and "Urban Development and Poverty," for the George Strike Economic Issues Conferences, University of Cincinnati, 2000 & 2002.<br>"Derivatives and Risk Management," for Ryder Systems, Inc. Managers, 1996.<br>"Economics of Health Care," UM Alumni College, 1993.<br>"Economics Exploded," UM Alumni College, 1989.<br>Faculty Instructor, Third & Fourth Economics Institute for Administrative Law Judges, Law and Economics Center, University of Miami, 1986-88. |
| *Dissertation & Thesis Advising* | Chairman, M.A. for Min Ho Shin, "Modelling Opportunistic Behavior and Quality Control in a Game-Theoretic Environment," December 1983.<br>Member, M.A. for Joon Woo Hon, "Korean General Trading Company," August 1984. |

Member, Ph.D. for Victor R. Restrepo, "The Florida Stone Crab Fishery:  An Evaluation of Diverse Management Regimes Through the Use of a Simulation Model," 1985.

Member, Ph.D. for Moises F. Tacle, "A Model of Job Search and Allocation of Time," 1987.

Member, Ph.D. for Iman Ammus, "The Pattern of Government Expenditure and the Real Exchange Rate in a Small Open Economy," 1990.

Chairman, Ph.D. for Sujata Sinha, "The Role of Margin Requirements in Futures Markets:  Reducing Trader Default and Market Price Volatility,"1993.

Chairman, Ph.D. for Quan Ding, "Ownership Choice and Foreign Direct Investment in the People's Republic of China," 1996.

Chairman, Ph.D. for Patrick Conroy, "Limit Orders Versus Market Orders:  Theory and Evidence," 1997.

Chairman, Ph.D. for Aijun Besio, "Short Covering Transactions by Underwriters in IPOs, 2002.

*Other Publications*

"The Role of Privatization in Florida's Growth," prepared for the Florida Chamber of Commerce and the Florida Council of 100, Law & Economics Center, University of Miami, and the Reason Foundation, Santa Monica, CA, 1987.

"Setting Margin Requirements in Futures Markets," (with L. Goldberg), *Tagung Geld, Banken und Versicherungen,* Universitat Karlsruhe, WG, December 1987.

"A Time Series Analysis of Popular Expectations Data," (with G. S. Maddala and K. Lahiri), in *Economic Applications of Time Series Analysis,* edited by Arnold Zellner (American Statistical Association, Washington, D.C.), 1983.

"Pricing Electricity in an Uncertain Environment," (with G. S. Maddala), in *Value of Service Reliability to Customers,* reference manual, sponsored by the Electric Power Research Institute, 1983.

"Marginal Cost Pricing Under Uncertainty," (with G. S. Maddala), Electric Power Research Institute, (July 1982), EA-2491.

"On the Number and Placement of Rating Periods for Time-of-Day Pricing," in *Incentive Electric Rates: Issues in Cost-Benefit Analysis*, Sanford V. Berg (ed.), New York: Lexington Books, 1982.

"Direct Estimation of Inflationary Expectations from Survey Data," (with K. Lahiri), in *Time Series Analysis*, Anderson and Perryman (eds.) (Amsterdam: North Holland), 1981.

"On the Estimation of Popular Price Expectations," (with K. Lahiri), *The Proceedings of the American Statistical Association*, Business and Economics Section, 1980.

"Technical Change, Frontier Production Functions, and Efficiency Measurement," (with G. S. Maddala), *The Proceedings of the American Statistical Association*, Business and Economics Section, 1979.

| | |
|---|---|
| *Papers Presented* | Paper presentations at annual meeting of the American Finance Association, American Economics Association, American Statistical Association, Eastern Finance Association (program committee 1999), Econometric Society, European Finance Association, Financial Management Association (program committee, 2002 & 2003), Southern Finance Association, Western Finance Association, Western Economic Association and several specialized and industry conferences. |
| *Professional Organizations & Activities* | American Finance Association<br>American Economic Association<br>Financial Management Association |
| *University Committee & Administrative Responsibilities* | UM Graduate Faculty, 1982-2003.<br>UM Institutional Research Board, 2001-2003.<br>Faculty Senate Budget Review Committee, 1993-94.<br>SBA Tenure & Promotion Review Committee, 1993-94.<br>UM Graduation Honors Committee, 1993-94.<br>President's Task Force on Academic Structure, Culture, Traditions, and Administrative Practices, 1993.<br>SBA By-laws Committee, 1992-94 |

Arts & Sciences Dean Search Committee, 1990-91.
UM Academic Personnel Board, 1990-91.
Chairman, Business and Social Sciences Subcommittee
of the Research Council, 1990-91.
SBA Finance Task Force, 1990.
SBA Dean Search Committee, 1988-90.
SBA School Council 1987-90.
MBA Curriculum Committee, 1987
Acting Director, M.A. in Law and Economics, 1983-84.
Chairman, Research Committee, Department of
Economics, 1983-84.
Chairman, Recruiting Committee, Department of
    Economics, 1986-87.
Faculty Advisor to Lamda Chi Alpha Fraternity, 1985-86.

| | |
|---|---|
| *Community Activities* | Director, Dade Economic Forum, 1988 to 1998.<br>Economic Advisory Board, *The Beacon Council*,<br>    1988-2000.<br>Trustee, St. Stephen's Episcopal Day School, 1989-92.<br>Advisory Board, *New Miami* Magazine, 1988-92.<br>President, Miami Business Economists Association, 1986.<br>Monthly Series of Articles, "The Great Stock Market<br>    Contest," *South Florida Magazine*, 1995.<br>Occasional columnist for *The Miami Review*<br>Numerous public speeches and interviews on radio<br>and television. |
| *Consulting* | Occasional consulting with government agencies (IRS,<br>SEC, USDOJ), corporations and professional<br>associations. |
| *Occasional Referee* | *Journal of Finance*<br>*American Economic Review*<br>*Journal of Money, Credit, and Banking*<br>*Financial Management*<br>*The Review of Economics and Statistics*<br>*Journal of Futures Markets*<br>*Financial Review* |

## Trial Testimony or Affidavits Provided

### by

## Raymond P. H. Fishe, Ph.D.

Wilma Smith, et.al. v. *Foremost Insurance Company, et.al.* (2002)
    Circuit Court of the 12th Judicial Circuit in and for DeSoto, Manatee and
    Sarasota Counties

*Bank of America, N.A.* vs. Cityside, Inc, Richard Finger, and Phyllis Finger (2002)
    Circuit Court of the 17th Judicial Circuit in and for Broward County

*United States of America* v. Joseph Falcone (1999)
    U.S. District Court, Southern District of New York

*Allapattah Services, Inc, et.al.* v. Exxon Corporation (1999)
    U.S. District Court, Southern District of Florida

*Al-Site Corporation* v. VSI International, Inc. (1997)
    U.S. District Court, Southern District of Florida

*Gerald Spielman* v. Rite Industries (1996)
    Arbitration Hearing, State of New York

General Motors-Pontiac Motor Division & Trevor H. Duhaney v. *Packer Pontiac Miami-
Division of Packer Corp. and Colonial Pontiac, Inc.* (1990)
    Administrative Hearing, State of Florida

Nelson Hunt, Bunker Hunt, & Lamar Hunt vs. *Internal Revenue Service (IRS)* (1989)
    U.S. Tax Court, Washington, D.C.

*Ashling Enterprises d/b/a Four Seasons Mobile Home* v. Browning (1987)
    Circuit Court of the 11th Judicial Circuit in and for Dade County

Philip Dash, Jay Dash, and Dash Industries v. *Richard B. Marx, et.al.* (1984)
    Circuit Court of the 11th Judicial Circuit in and for Dade County

Other testimony includes appearances before the Pari-Mutuel Commission, State of
Florida, on behalf of Hialeah, Inc. and State of Florida Administrative Hearings for Open
Heart Certification on behalf of the North Broward Hospital District.

*The party retaining Professor Fishe is shown in italics.



EXHIBIT

A

Exhibit "C"

**CURRICULUM VITA OF JAMES T. McCLAVE, Ph.D.**
**President, Info Tech, Inc.**
5700 Southwest 34th Street, Suite 1235, Gainesville, FL 32608-5371
Telephone: 352-381-4400, Fax: 352-381-4444
E-Mail: jim.mcclave@infotechfl.com

## Areas of Specialization

Statistics, Econometrics, Statistical and Econometric Modeling, Time Series and Regression Analysis, Forecasting, Biostatistics, Antitrust Liability Analysis and Damage Estimation, Employment Discrimination Analysis (Liability and Damages), Calculation of Business Damages, Collusion Detection Software Development and Training.

## Professional Background

President, Info Tech: Statistical Consulting, Information Systems Software Development, Data Management, Computer Analysis, Litigation Support, Expert Testimony, 1977-present.
Adjunct Professor, Business and Economic Statistics, Graduate School of Business, University of Florida, 1989-present.
Associate Professor, Department of Decision and Information Sciences, University of Florida, 1986-1989.
Associate Professor, College of Business Administration, University of Florida, 1981-1986.
Associate Professor, Department of Statistics, University of Florida, 1977-1981.
Assistant Professor, Department of Statistics, University of Florida, 1973-1977.
Visiting Assistant Professor, Department of Statistics, State University of New York at Buffalo, 1972-1973.
Assistant Professor, Department of Statistics, University of Florida 1971-1972.
Graduate Teaching Assistant, Department of Statistics, University of Florida, 1966-1971.

## Education

| | | | |
|------|-------|------------|----------------------|
| 1971 | Ph.D. | Statistics | University of Florida |
| 1966 | B.S. | Physics | Bucknell University |

## Partial List of Courses Taught

Statistics and Econometric Modeling (TV Course for approximately 1000 students per term)
Statistics and Econometrics for MBA's
Introduction to Probability and Statistics
Engineering Statistics
Statistics for Computer Sciences
Mathematical Statistics
Statistical Methods for Social Sciences
Statistical Methods for Business
Statistical Methods for Biological Sciences
Applied Time Series Modeling and Forecasting
Stochastic Processes
Advanced Time Series Analysis


**info tech**
The Information Technology Company

## Publications

### Books

Statistics for Business and Economics, 8th Edition, Prentice Hall, 2001 (with G. Benson).

A First Course in Business Statistics, 8th Edition, Prentice Hall, 2001 (with G. Benson and T. Sincich).

Statistics, 9th Edition, Prentice Hall, 2000 (with F. Dietrich and T. Sincich).

A First Course in Statistics, 7th Edition, Prentice Hall, 2000 (with T. Sincich).

Statistics for Engineers, 4th Edition, Duxbury Publishing Company, 1994 (with R. Scheaffer).

A Second Course in Business Statistics: Regression Analysis, Dellen Publishing Company, 1981 (with W. Mendenhall).

## Publications in Refereed Statistics and Economic Journals

Lanzillotti, Robert F., and McClave, J. T., "Comment: Meeting the "Ambiguity" Test Under *Daubert*", Antitrust, 17( 2), 44-48, Spring 2003.

Blair, R. D., Kaserman, D. L., and McClave, J. T., "Competition on trial: Florida deregulates trucking." Challenge, 30(4), 60-64, 1987.

Blair, R. D., Kaserman, D. L., and McClave, J. T., "Motor carrier deregulation: the Florida experiment." The Review of Economics and Statistics, 68, 159-164, 1986.

McClave, J. T., and Tipton, J., "Time series modeling: a comparison of the maximum chi-square and Box-Jenkins approaches." Time Series Analysis: Theory and Practice, 4, 155-161, 1983.

Spreen, T. H., Mayer, R. E., Simpson, J. R., and McClave, J. T., "Forecasting monthly slaughter cow prices with a subset autoregressive model." Southern Journal of Agricultural Economics, 11, 127-131, 1979.

Littell, R. C., McClave, J. T., and Offen, W. W., "Goodness of fit tests for the two parameter Weibull distribution." Communications in Statistics, B8(3), 257-269, 1979.

McClave, J. T., "Choosing the order of a moving average process: the max chi-square." Communications in Statistics, A7, 259-276, 1978.

Wackerly, D. D., McClave, J. T., and Rao, P. V., "Measuring nominal scale agreement between a rate and a known standard." Psychometrika, 43, 213-223, 1978.

McClave, J. T., "Choosing the order of an autoregressive process: the max chi-square technique." Journal of the American Statistical Association, 73, 122-128, 1978.

McClave, J. T., and Marks, R. G., "Predicting hospital census using time series regression methods." Communications in Statistics, A6 (No. 12), 1187-1206, 1977.

McClave, J. T., "Subset Autoregression." Technometrics, 17, 213-220, 1975.

McClave, J. T., "A comparison of moving average estimation procedures." Communications in Statistics, 3(9), 865-883, 1974.

McClave, J. T., "On the bias of autoregressive approximations to moving averages." Biometrika, 60, 559-605, 1973.

## Other Publications

Hodgson, T.J., King, R.E., McClave, J.T., Sullivan, J.H., and Zegel, W.C., "Analysis and Modeling of a Proposed Mining and Benefication Process," Industrial and Engineering Chemical Research, 26, 2223-2228, 1987.

Newman, J. R., Novakova, I. E., and McClave, J. T., "The influence of industrial air emissions on the nesting ecology of the House Martin (Delichon urbica) in Czechoslovakia." Biological Conservation, 31, 229-248, 1985.



Doering, P. L., Brackbill, Y., McManus, K., Woodward, L., and McClave, J.T., "Prenatal drugs:  patient information and its source." Contemporary Pharmacy Practice, 5(2), 112-119, 1982.

McClave, J. T., Sullivan, J. H., and Pearson, J. G., "Statistical analysis of fish chronic toxicity test data." Aquatic Toxicology and Hazard Assessment, Proceedings of the Fourth Annual Symposium on Aquatic Toxicology, ASTM, 1981.

Winchester, B. J., Delotelle, R. S., Newman, J. R., and McClave, J. T., "Ecology and management of the colonial pocket gopher:  a progress report." Proceedings of the Rare and Endangered Wildlife Symposium, 1979.

Rothrock, T. P., McClave, J. T., and Ailstock, J. P., "A computerized economic and statistical investigation of the Florida school bread market." Southeast Antitrust Review, 1, 13-54. 1978.

McLean, J.E., Ware, W.B., and McClave, J.T., "How analysis of covariance can yield misleading results in educational experiments - a Monte Carlo study." Proceedings of the American Statistical Association, 548-553, 1975.


## Consulting Experience

### Antitrust Litigation & Consulting (past five years)

Bandag v. Michelin.  Calculation of economic damages caused by alleged antitrust violations in the tire retreading market, 2001-2002.

Carbon Fiber Antitrust Litigation. Liability and damage analysis in class action price-fixing case, 2000-present.

Baker v. Jewel Food Stores, Inc. and Dominicks Finer Foods, Inc.  Analysis of retail prices in Chicago area stores, 2000-2002.

Marine Towing of Tampa v. Hvide Marine Towing, Inc.  Liability and damage analysis in restraint of trade case, 2000-2001.

Vitamins Antitrust Litigation.  Liability and damage analysis in class action price-fixing case, 2000-2002.

Nylon Carpet Antitrust. Damage analysis for a national class action price-fixing case, 1999-2000.

Dekalb Tire v. Michelin, N.A.  Damage analysis in a price discrimination claim, 1999-2001.

Polypropylene Carpets MDL Litigation.  Damage analysis for national class action price-fixing case, 1998-2001.

AGES Group.  Damage calculations regarding penalties paid by AGES due to allegedly attempts to monopolize by Raytheon, 1998-1999.

Minnesota Milk. Econometric analysis of class certification issues in a price-fixing allegation, 1998.

Arch Aluminum v. Bevel Master.  Damage analysis in a price discrimination case, 1998.

Maris v. Anheuser-Busch.  Damage analysis in a case alleging illegal restraint of trade regarding A-B's prohibition of public ownership of its distributorships' equity.  1998-2000.

Ford Motor Company, General Motors Corporation, Chrysler Corporation, USX Corporation (U.S. Steel Group) and Republic Engineered Steels, Inc. Damage analysis re: ferrosilicon alloy price-fixing conspiracy, 1997-1998.

New York Attorney General.  Damage analysis for alleged antitrust violations in the construction of the New York City Convention Center, 1991-2000.


### Employment Discrimination Litigation & Consulting (past five years)

Butler v. MBNA Technology, Inc., f/k/a MBNA Hallmark Information Services, Inc.  Damage analysis re: alleged age discrimination, 2003



Curriculum Vita of James T. McClave, Ph.D.

Farrow v. Bank of America Corp.  Damage analysis for a gender bias allegation, 2003

Anderson, et al v. Goodyear Tire and Rubber Company.  Statistical analysis of alleged damage to property values related to radiant heating systems, 2003.

Dodson v. Homes of Merit, Inc.  Calculations of damages due to lost earnings for the plaintiff resulting from alleged discrimination, 2003.

Luna, et al v. Household Finance Corporation, et al.  Construction, management, and analyses of large customer loan databases to enable econometric analyses of alleged discriminatory lending practices, 2003.

Pasley, et al v. Tyco International, Inc.  Statistical and economic analysis of race discrimination allegations, 2003.

Thompson v. Motorola, Inc.  Calculations of damages due to lost earnings for alleged discrimination, 2003.

Johnson v. Westside Regional Medical Center.  Statistical and economic analysis of age discrimination allegations, 2003.

DiJoseph v. Invivo Research.  Damage analysis re: alleged age discrimination matter, 2002.

Lea Cordoba v. Dillards, Inc. Damage analysis for lost earnings re: alleged wrongful termination, 2002.

Hubert Johnson v. Hallmark Information Services.  Liability and damage analysis re: alleged race discrimination, 2002.

Santana, et al v. Blue Ribbon Meats, Inc.  Analysis of workforce for a liability analysis in re: alleged age discrimination in a reduction-in-force, 2002.

Utility Contractors Association of North Florida v. City of Jacksonville.  Analysis of minority participation and availability in Jacksonville construction projects, 2002.

Odom, et al. v. Microsoft.  Damage analysis re: race discrimination claim, 2002.

Sanders, et al. v. Melton Truck Lines, et al.  Damage analysis re: wrongful death claim, 2002.

Dancy v. Interstate Brands Corp.  Liability and damage analysis re: race discrimination, 2001.

Branch v. Boeing.  Damage analysis re: unlawful termination, 2001.

Bronner v. Taylor.  Calculation of lost earnings and earnings capacity, 2001.

Elliott v. City of Port Orange.  Review of lost earnings damage analysis, 2001.

Estrin v. Natural Answers.  Damage analysis re: breach of contract claim, 2001.

Saari v. Florida Progress Corp.  Calculations of the value of lost supplemental executive retirement plan, 2001.

Wilds v. Holdenback, et al.  Calculation of lost earnings and earnings capacity, 2001.

Ruth v. Southern Bakeries, ButterKrust, et al.  Liability analysis re: alleged race discrimination, 2001.

Thick v. Bray.  Damage analysis re: wrongful termination matter, 2001.

Jacqueline Iaia v. Pembroke Pines Hospital.  Statistical analysis re: discrimination claim, 2001.

Turner v. Moore.  Consulting on damage re: wrongful termination matter, 2001.

Kocher v. Poe & Brown.  Damage analysis re: alleged age discrimination, 2000.

Mullen v. H.E.R.E.  Damage analysis re: race/national origin discrimination matter, 2000.

Lewis v. S & H Fabricating.  Lost earnings analysis in a sex discrimination matter, 2000.

Bacon, et al v. Honda.  Liability and damage analysis re: class action race discrimination allegation, 2000.

Firemen v. City of Orlando.  Liability analysis in a racial discrimination in promotion matter, 1999.

Duvall v. O'Donnell Corp.  Damage analysis re: age discrimination allegation, 1999.

Prospere v. HRS.  Damage analysis re: racial discrimination allegation case, 1999.

Vereen v. GTE, Inc.  Damage analysis re: accommodation of disability matter, 1999-2000.

Walkowiak v. Town of Kenneth City.  Damage analysis re: wrongful termination allegation, 1999.

Sleeckx v. Shoney's.  Damages in sexual harassment and wrongful termination matter, 1999.

Slaughter v. City of Melbourne.  Damage analysis re: age discrimination allegation, 1999.

Hoffman, et al v. Honda.  Damage analysis re: class action gender discrimination allegation, 1999-2001.

Hull v. Cash America.  Damage analysis re: age discrimination, 1999.

Meehan v. Northlake Foods.  Liability analysis re: sexual discrimination and hiring practices, 1999-2000.



**info tech**
The Information Technology Company

4

Velazquez v. Shoney's.  Damage analysis re: national origin discrimination/wrongful termination, 1998-1999.

Frawley v. McArthur Dairy.  Damage analysis re: wrongful discharge termination allegation, 1998.

Frederick v. McDonnell Douglas Corp.  Damage analysis re: employment-related injury, 1998.

Whitman v. Rubin.  Liability and damage analysis re: age discrimination allegation, 1998.

Moyer v. Bellsouth.  Damage analysis re: disability discrimination/demotion/wrongful termination, 1998.

Michaels v. AAA.  Liability analysis re: age discrimination, 1998.

Leon v. Barnett Bank.  Damage analysis re: age discrimination/wrongful termination, 1998.

Sands v. Barnett Bank.  Damage analysis re: racial discrimination/promotion, 1998.

Bazile v. USA.  Damage analysis re: national origin discrimination/wrongful termination, 1998.

DeHart/Weeks v. Columbia Hospital.  Damage analysis re: allegations of sexual harassment, constructive discharge, wrongful termination, 1997-1999.

Scholz v. Orlando Magic.  Damage analysis for race discrimination and defamation allegations, 1995-2000.

## Biostatistical/Environmental Consulting & Litigation (past five years)

FCG.  Statistical support for the rule challenge re: the identification of impaired surface waters, 2001-present.

Florida Institute of Phosphate Research.  Statistical modeling in a meta-analysis of various sources of data collected on amounts of radioactivity in foods grown on Florida lands, 1999-2002.

PEPCO.  Development of long-term $NO_x$ emissions limit, 1998-1999.

Florida Litter Survey.  Design of sample survey to determine extent of litter on Florida roadways and beaches, 1993-2002.

Sugar Cane Growers Cooperative of Florida v. South Florida Water Management District.  Statistical analysis of water quality data in the Everglades.  1992-present.

## Other Litigation Consultations (past five years)

Bonanza Beverage Co., Inc. v. Labatt USA.  Damage analysis for breach of contract allegations, 2003

Gordon Dissolution.  Occupational fatality and injury analysis, 2003

LSQ II, LLC v. KPMG Consulting, Inc.  Damage analysis re: alleged breach of contract, 2003.

Welch vs. Brown & Williamson Tobacco Corporation, et al.  Analysis of cigarette shipment and tax data re: punitive damages issues, 2003

Thompson v. Brown & Williamson Tobacco Corp., et al.  Analysis of cigarette shipment and tax data re: punitive damages issues, 2003.

Roach v. Brown & Williamson Tobacco Corp., et al.  Analysis of cigarette shipment and tax data re: punitive damages issues, 2003.

S.P.S. Technologies vs. Motorola, et.al.  Damage analysis re: technology development failed joint venture, 2002.

NAACP v. A.A. Arms, et al.  Consulting for attorneys for Colt Firearms on liability issues, 2002.

Coordinated California Firearms cases.  Consulting for attorneys for Colt Firearms on liability issues, 2002.



DAG v. Exxon. Damage estimation corresponding to a lost business opportunity allegedly caused by discriminatory practices, 2002.

Southern Multifoods, Inc. v. Aventis Cropscience USA.. Damage analysis re: lost profits, 2002.

Second Chance Jai-Ali, LLC v. Ocala Breeders Sales Company. Damage analysis re: breach of contract, 2002.

Schnipper v. Mercedes-Benz USA, et al. Analysis of repair reports in defective product claim, 2002.

Deluca v. Liggett & Myers, et al. Confounding factors in smoking-related diseases, life expectancy/tobacco use and quitting statistics, 2002.

Longden v. Philip Morris, Inc. Confounding factors in smoking-related diseases and tobacco use, 2002.

West Virginia Tobacco Litigations. Punitive damage issues in individual personal injury cases, 2002.

Anderson Columbia Co., Inc. and Joe Anderson, Jr. v. Gannett Company, Inc., et al. Damage analysis in a defamation case, 2002.

Leslie Kemmerer v. Starwood Hotels & Resorts Worldwide, Inc. & Barry Sternlicht. Damage analysis in breach of contract case, 2002.

West Virginia Attorney General. Analysis of property tax issues in challenges brought by railroads and utilities, 2002.

Department of Highway Safety and Motor Vehicles v. Envirotest Technologies, Inc., et al. Statistical consulting re: auto emissions, 2002.

TST d/b/a Northco v. BellSouth Communications. Damage analysis for alleged tortuous interference case, 2002.

Testwuide, et al. v. U.S. Damage analysis re: property values in vicinity of military air base, 2002.

Pepin v. Pepin. Business valuation analysis of beer distributorship, 2002.

Global Healthcare v. Med Gen, Inc. Damage analysis for a breach of contract case, 2002.

Butland, et al. v. Rollins, Inc., Orkin Exterminating Company, Inc. et al. Damage analysis in a breach of contract case involving termite inspections, 2002.

N.A.A.C.P., et al., v. Katherine Harris, Volusia County, et al., duplicate voter registration issues, 2002.

Carnegie v. Thornton. Analysis of damages allegedly caused by accounting malpractice, 2001.

Zixit v. VISA. Analysis of economic damages allegedly caused by Internet postings, 2001-2002.

Keitel v. Wendy's. Valuation issues re: South Florida Wendy's franchises, 2001-2002.

American Library Association v. U.S.A. Review of statistical issues re: accuracy of filters used to block pornographic Internet sites in libraries, 2001-2002.

Luna Brumfield v. Philip Morris, Inc. Analysis of CPS II re: relative risks associated with smoking and other risky behaviors, 2001-2002.

Kelly v. Nelson, Mullins, Riley & Scarborough, L.L.P. Damage analysis re: alleged breach of fiduciary duty, negligent misrepresentations, fraud, tortious interference with contract, unfair trade practice matter, 2001-present.

Elaine Conley et al v. R. J. Reynolds et al. Analysis of CPS II re: relative risks associated with smoking and other risky behaviors, 2001-2002.



*Curriculum Vita of James T. McClave, Ph.D.*

Andrews v. Kerr-McGee. Evaluation of statistical analysis comparing exposed and control populations in proximity to wood treatment plant, 2001-present.

Baker v. Petway (Jaguars). Damage analysis in breach of contract claim, 2001-2002.

Taghulk v. Service Corp. Calculation of damages - patent infringement, 2001.

HealthPlan v. Connecticut General Life (CIGNA). Review of the statistical sampling methodology for a case involving claims overpayment allegations, 2001.

De La Paz v. AHCA. Review statistical methodology used to estimate total overcharge to Medicaid Program based on a sample of provider claims, 2001.

Richard Boeken v. Philip Morris, Inc. Analysis of CPS II re: risky behaviors associated with smoking, 2001.

U.S. v. Naren Jadeja, et al. Statistical analysis in a criminal case involving Medicaid fraud allegations, 2000.

HCFA Statistical Sampling Guidelines. Consultation with U.S. Attorney's Office regarding the development of HCFA's guidelines for Medicare Part B audit sampling, 2000.

M.E. v. Bush Child Welfare. Sampling issues in class action re: State mental health services, 2000-2001.

McCaffery v. Colonial Bank. Analysis of insufficient fund charges, 2000.

Tracy, et. al. v. Dean Witter. Liability analysis in a gender discrimination case, 2000.

Physician's Health v. Foundation Health. Statistical analysis of patterns in a Medicare patient-stealing case, 2000.

Fabricant v. Sears. Damage analysis in credit card insurance case, 2000.

London v. Wal-Mart. Damage analysis in credit card insurance case, 2000.

Snow, et al. v. Compass Bank. Analysis of insufficient fund charges, 2000-2001.

Hyde v. Philip Morris, Inc. Confounding factors in smoking-related diseases, 2000.

Engle et al. v. R.J. Reynolds Tobacco Company. Damage analysis in a product liability class action against the Tobacco Industry. 1999-2000.

Estate of Sueann Mann v. R.J. Reynolds, et al. Confounding factors in smoking-related diseases, 2000.

Orlando SMSA v. Orange County. Damages in a matter involving the collection and remission of taxes on cellular phone charges, 1999-2000.

Rubenstein v. AHCA. Damage analysis re: alleged medicaid overpayment, 1999.

Braishfield v. McCahill. Damage analysis for a tortious interference claim, 1999.

Couch Construction v. Columbia County. Damage analysis in a breach of due process claim, 1999-2000.

DOJ Investigation of Vitreo-Retinal Consultants. Statistical sampling and analysis for Medicare fraud investigation, 1998-2000.

Buckley Powder v. State of Colorado. Analysis of proposed sampling plan to recover unconstitutionally collected interstate trucking taxes, 1998-2000.

Kalifeh v. AmSouth Bank. Analysis of insufficient fund charges, 1998-1999.

Universal Business Systems v. Disney Vacation. Damage analysis in a breach of contract case regarding timeshare software, 1998-1999.



**info tech**
The information Technology Company

7

Cutler v. Orkin.  Damage analysis in a breach of contract case involving termite inspections, 1998-2002.

Marketing Agents v. MCI.  Damage analysis re: breach of contract, 1997-present.

Maris Distributing v. Anheuser-Busch, Inc.  Liability and damage analysis re: alleged improper termination of distributorship, 1997-2001.

Young Oil v. Racetrac Petroleum.  Analysis of retail gasoline pricing re: Alabama below-cost pricing allegations, 1996-2000.

Visiting Nurses Assoc. Dade v. USA.  Estimation of overcharges in Medicare fraud case, 1996-1999.

## Other Consultations (past five years)

Shands Hospital Medicaid and Medicare Claims Review.  Development of sampling and estimation techniques for hospital Medicaid and Medicare claims, 2002.

Jacksonville Physicians' Investigation.  Review of statistical procedures used in a Medicaid payment audit, 1999.

NW Florida OB/GYN Investigation.   Review of statistical procedures used in a Medicaid payment audit, 1999.

Lauderdale Clinic Investigation.  Consultation with U.S. Attorneys Office regarding Medicaid/Medicare audits, 1999.

AutoNation.  RIF impact analysis, 1999.

UPS Wage/Hour Litigation.  Liability and damage analyses in a wage and hour class certification matter, 1999-2002.

Nokia.  Design, implementation, and analysis of market surveys, 1998-2000.

U.S. Department of Justice.  Various statistical consulting tasks related to DOJ investigations of Medicaid and Medicare providers, 1997-present.

Florida Property Appraisers' Association.  Consultation on technical legislative issues affecting Florida's property appraisers, including equalization taxes and Department of Revenue review of appraisals, 1985-present.

## Expert Witness Testimony (past five years)

Second Chance Jai-Alai, LLC. vs. Ocala Breeders Sales Company, Inc. et al., Fifth Circuit, Marion County, Florida, Case No. Case No. 1593-CAG.  Deposition testimony re: economic damages in breach of contract case.  May 28, 2003.  Retained by Plaintiff.

U.S. vs. Dr. Gustavo E. Coll, Southern District of Florida, Case No.02-20363-Cr-Middlebrooks.  Testimony in federal court re: claims sampling and estimated overpayment used for sentencing guidelines.  May 19, 2003.  Retained by US Department of Justice.

DAG Enterprises, Inc. and EYOB MAMO v. Exxon Mobil, District Court, District of Columbia, Case No. 1:CV00182-CKK.  Deposition testimony re: economic damages for alleged race discrimination.  April 9, 2003.  Retained by Plaintiff.



**info tech**
The Information Technology Company

Curriculum Vita of James T. McClave, Ph.D.

John P. Kelly vs. Nelson, Mullins, Riley & Scarborough, L.L.P., a foreign limited partnership; and Glenn W. Sturm, District Court, Middle District of Florida, Tampa Division, Case No. 8:01-CV-1176-T-27MAP. Deposition re: economic damages resulting from alleged malpractice. February 17, 2003. Retained by Plaintiff.

Maureen Baker, et al., Jewel Food Stores, Inc., et al.,Chicago Milk, State of Illinois, County of Cook, Circuit Court, Case No. L 9664. Testimony in state court, re: price-fixing allegations. February 13-14, 2003. Retained by Plaintiffs.

Everglades Hearings: Testimony at Environmental Regulatory Commission Hearing re: statistical issues related to phosphorus limits in the Everglades. December 13, 2002. Retained by Sugar Cane Growers Cooperative of Florida.

Carl N. DiJoseph, et al., v. Invivo Research, U.S. District Court, Middle District of Florida, Orlando, Case No. 99-1450-ORL-28C. Testimony in deposition re: damages in alleged age discrimination. November 13, 2002. Retained by Defendant.

Orlando v. SMSA Limited Partnership v. Orange County and Martha Haynie. Circuit Court, 9th Judicial Circuit, Orange County Florida, Case No. CIO 99-150 DIV 35. Testimony in deposition re: analysis of records for public service tax payments and methodology for calculating appropriate amount of tax. October 30, 2002. Retained by Plaintiff.

Juanita Washington, as personal representative of the Estate of Derrick Washington vs. Microsoft Corporation, U.S. District Court, Western District of Washington at Seattle, Case No. C01-1996P., Jozette Joyner v. Microsoft Corporation, and Pamela Odom v. Microsoft Corporation, Case No. C01-1632P. Testimony in deposition re: damages analysis in race discrimination case. October 25, 2002. Retained by Plaintiffs.

Everglades Hearings: Testimony at Environmental Regulatory Commission Hearing re: statistical issues related to phosphorus limits in the Everglades. October 24, 2002. Retained by Sugar Cane Growers Cooperative of Florida.

Maureen Baker, et al., v. Jewel Food Stores, Inc., a New York Corporation, and Dominick's Finer Foods, Inc., a Delaware Corporation, Circuit Court, Cook County, Case No. 00-L-9664. Testimony in deposition re: liability and damages issues in price-fixing case. October 21, 2002. Retained by Plaintiffs.

Jane Bronner, as next of kin of Darrow W. Bronner, Sr., and as Administratrix of the Estate of Darrow W. Bronner, Sr., Deceased, v. Kenneth D. Taylor, M.D., Eugene J. Pope, Jr., M.D., and the Heart Clinic, P.C., Case No. 02-1-0407-991, Superior Court of Cobb County, Georgia. Testimony in deposition re: damages analysis for wrongful death claim. October 10, 2002. Retained by Plaintiff.

In re: The marriage of Thomas A. Pepin and Terry Lea Pepin, Case No. 00-10812, Thirteenth Circuit, Hillsborough County, Florida Family Law Division. Testimony in deposition re: cost of equity, cost of debt and growth rates in the valuation of Pepin Distributing Company. September 18, 2002. Retained by Wife.

TST, Inc., d/b/a Northco v. BellSouth Communications, Inc., et al., U.S. District Court, Palm Beach, Florida, Case No. 01-8033-CIV-RYSKAMP/Vitunac. Testimony in deposition re: economic damages in breach of contract case. August 15, 2002. Retained by Plaintiff.

Global Healthcare Laboratories, Inc. v. Med Gen, Inc., U.S. District Court, Palm Beach, Florida. C.A. No. 01-8717-CIV-Hulk. Testimony in deposition re: economic damages in breach of contract case. July 30, 2002. Retained by Plaintiffs.



Curriculum Vita of James T. McClave, Ph.D.

Zixit Corporation and Zixcharge.COM v. VISA U.S.A. and VISA International Service Association, U.S. District Court, Dallas County, Texas, Case No. CC99-10187. Testimony in trial re: causality issues, and economic damages allegedly caused by Internet postings. July 22, 2002. Retained by Defendants.

Jacqueline Sanders, et al vs. Melton Truck Lines, Inc., et al., U.S. District Court, Cincinnati, Ohio, Case No. C-01-563. Testimony in deposition re: damage analysis for wrongful death claim, July 10, 2002. Retained by Plaintiffs.

N.A.A.C.P., et al., v. Katherine Harris, Volusia County, et al., U.S. District Court, Southern District of Florida, Miami, Case No. 01-0120-CV-Gold/Simonton. Testimony in deposition re: duplicate voter registration issues. May 29, 2002. Retained by Defendant, Volusia County.

Bandag, Incorporated v. Michelin Retread Technologies, Incorporated, et al., Michelin Retread Technologies, Incorporated and Michelin North America, Incorporated v. Bandag, Incorporated and Bridgestone/Firestone, Inc., U.S. District Court, Iowa, Case No. 3-99-CV-80165. Testimony in deposition re: calculation of economic damages caused by alleged antitrust violations in the tire retreading market. April 5, 2002. Retained by Defendants and Counterclaimants.

Judith A. Hyde v. Philip Morris, Inc., U.S. District Court, Rhode Island, Case No. 97-359-ML. Testimony at trial re: declining relative risk for former smokers and smoker quitting rates. March 15-18, 2002. Retained by Defendant.

Mark Butland, et al. v. Rollins, Inc., Orkin Exterminating Co, et al., Circuit Court, Hillsborough County, Florida, Case No. 99-2173. Testimony at trial re: sampling issues in evaluation of termite contractual services. January 24, 2002. Retained by Defendant.

American Library Association, et al. v. USA, et al., U.S. District Court, Eastern District of Pennsylvania, Case No. 01-CV-1303. Testify in deposition re: statistical evaluation of effectiveness of Internet filters. January 11, 2002. Retained by Defendant.

Zixit Corporation and Zixcharge.COM v. VISA U.S.A. and VISA International Service Association, District Court, Dallas County, Texas, Case No. CC 99-10187. Testimony in deposition re: economic damages allegedly caused by Internet postings. November 14, 2001. Retained by Defendants.

Roseanne Thick v. Charles Bray, et al., U.S. District Court, Orlando, Florida, Case No. 6:00-CV-1560-ORL-28C. Testimony in deposition re: damage analysis in wrongful termination matter. October 29, 2001. Retained by Plaintiff.

Clifton Dancy v. Interstate Brands Corporation, District Court, Orlando, Florida, Case No. 6:01-CV-289-ORL 22 KRS. Testimony in deposition re: liability and damages in race discrimination case. October 25, 2001. Retained by Plaintiff.

Carnegie v. Thornton. Testimony in deposition re: economic damages in accounting malpractice case. September 27, 2001. Retained by Plaintiff.

Maris v. Anheuser-Busch, Inc., Circuit Court, Alachua County, Florida, Case No. 97-CA-22, Division J. Testimony at trial re: liability and damages in breach of contract claim. June 8-15, 2001. Retained by Plaintiff.

Jacqueline Iaia v. Pembroke Pines Hospital, Case No. 00-6227-Civ-Moreno. Testimony in Federal Court, Miami re: statistical analysis of discrimination claim. April 12, 2001. Retained by Defendant.

Dekalb Tire Co., Inc., vs. Michelin North America, Inc., United States District Court, Northern District of Georgia, Atlanta Division. Testimony in deposition re: damages in Robinson-Patman claim. March 15, 2001. Retained by Plaintiff.



**info tech**
The Information Technology Company

Curriculum Vita of James T. McClave, Ph.D.

Richard Boeken v. Philip Morris, Inc., Superior Court, State of California, County of Los Angeles, Case No. B226593, Testimony in deposition re: statistical analysis of risky behaviors associated with smoking. February 17, 2001. Retained by Defendant.

Alina De La Paz vs. AHCA, State of Florida, Division of Administrative Hearings, DOAH Case No. 99-4154, Testimony in deposition re: evaluation of statistical methodology used in estimating Medicaid overcharges. February 8, 2001. Retained by Respondent.

Maris v. Anheuser-Busch, Inc., Circuit Court, Alachua County, Florida, Case No. 97-CA-22, Division J. Testimony in deposition re: liability and damages issues in breach of contract claim. February 6, 2001. Retained by Plaintiff.

Maris v. Anheuser-Busch, Inc., Circuit Court, Alachua County, Florida, Case No. 97-CA-22, Division J. Testimony in deposition re: liability and damages issues in breach of contract claim. January 9, 10 and 11, 2001. Retained by Plaintiff.

Carl Kocher v. Poe & Brown, Inc., United States District Court, Middle District of Florida, Tampa, Division, Case No. 99-491-Civ-T-17C. Testimony in deposition re: damage analysis for age discrimination claim. January 5, 2001. Retained by Defendant.

Bacon, et al. v. Honda of America Manufacturing, Inc., U.S. District Court, Southern District of Ohio, Eastern Division, Case C-2-99-803. Testimony in Federal Court class certification hearing re: race discrimination liability and damages. December 18, 2000. Retained by Plaintiffs.

Hyde v. Philip Morris, Inc., U.S. District Court, Rhode Island, Civil Action No. 97-359 ML. Testimony in deposition re: confounding factors in smoking-related diseases. October 31, 2000. Retained by Defendant.

Orlando SMSA Limited Partnership vs. Orange County, Circuit Court, 9th Circuit, Orange County, Florida, Case CIO 99-150 DIV 35. Testimony in deposition re: calculation of Public Use Tax. October 27, 2000. Retained by Plaintiff.

Maris Distributing Company v. Anheuser Busch, Inc., U.S. District Court, Ocala, Florida, Case No. 97-15-CIV-OC-10-C. Testimony at trial re: antitrust damages, October 23-24, and November 6, 2000. Retained by Plaintiff.

Lauren W. McCaffery, et al. v. Colonial Bank of Alabama, Circuit Court, Mobile County, Alabama, No. CV98-2488. Testimony in deposition re: issues relating to classwide damage calculations. September 21-22, 2000. Retained by Plaintiffs.

Bacon, et al. v. Honda of America Manufacturing, Inc., U.S. District Court, Southern District of Ohio, Eastern Division, Case C-2-99-803. Testimony in deposition re: race discrimination liability. August 15-16, 2000. Retained by Plaintiffs.

George W. Scholz v. RDV Sports, Inc., Circuit Court, Orange County, Florida, CI 92-7508. Testimony in court regarding damages. June 16, 2000. Retained by Plaintiff.

George W. Scholz v. RDV Sports, Inc., Circuit Court, Orange County, Florida, CI 92-7508. Testimony in deposition regarding damages. June 15, 2000. Retained by Plaintiff.

Snow v. Compass Bank, Circuit Court, Mobile, Alabama, CV 98-2384. Testimony in deposition regarding analysis of overdraft charges. May 26, 2000. Retained by Plaintiffs.

Guy F. Buscemi, et al v. United Parcel Service, Inc., United States District Court, District of New Jersey, Civil Action Number 97-5450 (WGB). Testimony in deposition regarding alleged driver mealtime work violations. May 24, 2000. Retained by Plaintiffs.

Buckley Powder v. State of Colorado, District Court, Denver, Colorado, Case No. 93CV450. Testify in court re: damage calculation methodology in an unconstitutional taxation matter. March 24, 2000. Retained by Defendant.

**info tech**
The Information Technology Company

11

Curriculum Vita of James T. McClave, Ph.D.

Jereids, et al. v. City of Orlando, United States District Court, Middle District of Florida, Orlando Division. Testimony in deposition re: liability analysis in racial discrimination case. March 2, 2000. Retained by Defendant.

Polypropylene Carpet Antitrust Litigation, U.S. District Court for the Northern District of Georgia, MDL Docket No. 1075, Master File: 4:95-CV-193-HLM. Testify at Daubert hearing re: damage methodology in a price-fixing conspiracy claim. January 31-February 3, 2000. Retained by Plaintiffs.

Elna Hoffman, et al. v. Honda of America Mfg., Inc., U.S. District Court, Southern District of Ohio, Western Division at Dayton, Case No. 3-97-248. Testimony at hearing re: class certification damages issues. December 7, 1999. Retained by Plaintiff.

Elna Hoffman et al v. Honda of America Mfg., Inc., U.S. District Court, Southern District of Ohio, Western Division at Dayton, Case No. 3-97-248. Testimony in deposition re: class certification damages issues. November 18, 1999. Retained by Plaintiff.

John Frederick and Lori Frederick v. United States of America, McDonnell Douglas Corporation, Crawford and Company and Billie B. Moskovitz, U.S. District Court, Middle District of Florida, Orlando, Florida, Case No. 98-226-CIV-ORL-22C. Testimony in deposition re: economic damages. September 21, 1999. Retained by Plaintiff.

Henry M. Rubinstein, D.C., v. State of Florida, AHCA, State of Florida Division of Administrative Hearings, Case No. 98-2772. Testimony in deposition re: statistical methods in Medicaid fraud detection. August 10, 1999. Retained by Defendant.

Maris Distributing Company v. Anheuser Busch, Inc., U.S. District Court, Ocala, Florida, Case No. 97-15-CIV-OC-10-C. Testify at deposition re: damages. August 3, 1999. Retained by Plaintiff.

Couch Construction, LP, v. Columbia County, Florida, U.S. District Court, Middle District of Florida, Jacksonville Division, Case No. 98-938-CIV-J-20B. Testimony in deposition re: economic damages. July 26, 1999. Retained by Plaintiff.

Polypropylene Carpet Antitrust Litigation, U.S. District Court for the Northern District of Georgia, MDL Docket No. 1075, Master File: 4:95-CV-193-HLM. Testify at deposition re: damages in a price-fixing conspiracy claim. July 23, 1999. Retained by Plaintiffs.

Craig H. Hull v. Cash America International, Inc., U.S. District Court, Middle District of Florida, Orlando, Division, Case No. 98-607-CIV-ORL-19A, Testimony in deposition re: economic damages. July 15, 1999. Retained by Plaintiff.

Polypropylene Carpet Antitrust Litigation, U.S. District Court for the Northern District of Georgia, MDL Docket No. 1075, Master File: 4:95-CV-193-HLM. Testify at deposition re: damages in a price-fixing conspiracy claim. July 1, 1999. Retained by Plaintiffs.

Maris Distributing Company v. Anheuser Busch, Inc., U.S. District Court, Ocala, Florida, Case No. 97-15-CIV-OC-10-C. Testify at deposition re: damages. June 23, 1999. Retained by Plaintiff.

Joseph Duvall v. Timothy J. O'Donnell Corp., Ninth Circuit, Orange County, Florida, Case No. CI 97-8396. Testify in court re: damages in an unlawful termination in retaliation for a workman's compensation claim. June 18, 1999. Retained by Plaintiff.

Polypropylene Carpet Antitrust Litigation, U.S. District Court for the Northern District of Georgia, MDL Docket No. 1075, Master File: 4:95-CV-193-HLM. Testify at deposition re: damages in a price-fixing conspiracy claim. May 22-23, 1999. Retained by Plaintiffs.

Universal Business Systems v. Disney Vacation Club, Ninth Circuit, Orange County, Florida. Case No.CIO 95-3614. Testify in court re: damages and lost profits in a breach of contract case. May 19, 1999. Retained by Defendant.


**info tech**
The Information Technology Company

Curriculum Vita of James T. McClave. Ph.D.

Helon H. Cutler, et al. v. Orkin Exterminating Company, Inc., et al., Circuit Court, Houston County, Alabama. Case No. 96-184. Testify in deposition re: review of Plaintiffs' expert's sampling methodology. April 29, 1999. Retained by Defendant.

Universal Business Systems v. Disney Vacation Club, Ninth Circuit, Orange County, Florida. Case No. CIO 95-3614, Testify in deposition re: damages and lost profits in a breach of contract case. April 27, 1999. Retained by Defendant.

Thomas E. Slaughter v. City of Melbourne, U.S. District Court, Middle District of Florida, Orlando Division, Case No. 97-946-CIV-ORL-19. Testify in court re: damages in an age discrimination claim. March 30, 1999. Retained by Plaintiff.

Amilkar Velazquez v. Shoney's, Inc., District Court, Orlando, FL, Case No. 97-1540-CIV-ORL-22C.Testify in deposition re: damages in a national origin discrimination case, February 19, 1999. Retained by Plaintiff.

Sugar Cane Growers Cooperative of Florida v. South Florida Water Management District, Division of Administrative Hearings, Florida, Case No. 92-303. Testify at hearing re: statistical analysis of phosphorus levels in the Everglades. February 17, 1999. Retained by Plaintiff.

Buckley Powder v. State of Colorado, District Court, Denver, Colorado, Case No. 93CV450. Testify in court re: damage calculation methodology in an unconstitutional taxation matter. February 12, 1999. Retained by Defendant.

Vicki DeHart/Edith Weeks v. Columbia Bartow Regional Memorial Healthcare System, District Court, Tampa, Florida, Case No. 97-1300-CIV-T-23C. Testify in deposition re: damages in a sexual harassment case. February 4, 1999. Retained by Plaintiff.

Paul Kalifeh v. Amsouth Bank, N.A., Circuit Court, Mobile County, Alabama, Case No. CV-98-2022. Testify in deposition re: extraction of data from AmSouth's database for analysis of insufficient funds charges. January 22, 1999. Retained by Plaintiff.

Thomas E. Slaughter v. City of Melbourne, U.S. District Court, Middle District of Florida, Orlando Division, Case No. 97-946-CIV-ORL-19C. Testimony at deposition regarding damages in an age discrimination claim. November 11, 1998. Retained by Plaintiff.

State of Washington v. American Tobacco, et al. Superior Court for the State of Washington, King County Case No. 96-2-15056-8 SEA. Testimony in deposition re: damages in fraud case. September 16-17, 1998. Retained by Defendant.

The AGES Group v. Raytheon Aircraft Co., Inc. and the Wackenhut Corp., United States District Court, Southern Division, Alabama, Case No. 96-A-1514-N. Testimony in deposition re: damages. August 13, 1998. Retained by Plaintiff.

Kelly DeRasmo v. City of Gainesville, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:97-CV118MMP. Testimony in deposition re: damages in a gender discrimination claim. July 8, 1998. Retained by Plaintiff.

Woodrow Allen, et al. v. Serve-Air Skycap Service, Inc., et al., U.S. District Court, Middle District of Florida, Tampa Division, Case No. 96-1306-CIV-T-23E. Testimony at trial regarding liability and damages in a racial discrimination claim. June 18, 1998. Retained by Defendant.

## Professional Activities and Awards

### University of Florida Department of Statistics "Outstanding Alumni" Award, 2002



Curriculum Vita of James T. McClave, Ph.D.

## University of Florida Committees

University of Florida Center for Entrepreneurship and Innovation, 2002.

University of Florida President's Council, 2001-present.

Business Leaders Forum, 1994-present.

College of Business Undergraduate Curriculum Committee, 1988-1989.

College of Business Teaching Committee, 1987-1988.

College of Business Associate Dean Search Committee, 1987.

College of Business and Liberal Arts and Sciences Task Force, 1986-1989

College of Business Computing Committee, 1986-1989.

University Senate, 1979-1980.

College of Liberal Arts and Sciences Tenure and Promotion Committee, 1978-1979, 1979-1980.

College of Arts and Sciences Curriculum Committee, member, 1976-1980.

College of Arts and Sciences Computer Sciences Committee Member, 1973-76; Chairman, 1974-1975.

Instruction and Research Users Committee, NERDC, member, 1974-1975.

## Council for Economic Outreach

## The Executive Committee (TEC)

## State of Florida Department of Education Committee

Statewide Common Course Designation and Number Project, Statistics Task Force Member, 1974-1981.

## Professional Associations

American Statistical Association

American Bar Association - Associate Member - Section of Antitrust Law

International Association of Assessing Officers

## Training and Presentations

"Collusion Detection Training, Ohio Department of Transportation, April 22-24, 2003.

"Collusion Detection Training", South Carolina Department of Transportation, March 12, 2003.

"Collusion Detection Training, "Short course in computerized collusion detection, Gainesville, Florida, February 25-27, 2003

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 20-22, 2001.

"Collusion Detection Training," Ohio Department of Transportation, April 18-20, 2000.



**info tech**
The Information Technology Company

Curriculum Vita of James T. McClave, Ph.D.

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 22-24, 2000.

Missouri BAMS/DSS Data Analysis Presentation, December 13, 1999.

Nebraska BAMS/DSS Data Analysis Presentation, November 1, 1999.

Virginia Beach Fraud Conference, "Basics of Fraud and Collusion Detection," and "Computerized Fraud and Collusion Detection," May 5-7, 1999.

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 23-25, 1999.

"Collusion Detection Training," Colorado DOT, December 7-8, 1998.

"Top Ten Collusion Indicators for Estimators," Transportation Estimators Association, Portland, Maine, October 26-28, 1998.

"Collusion Detection Training," Texas DOT, September 1-2, 1998.

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 24-26, 1998.

"Collusion Detection Training," Colorado DOT, December 18-19, 1997.

"Collusion Detection Training," Vermont DOT, November 4-5, 1997.

"Bid Collusion Detection," AASHTO TRNS.PORT Users Group Conference, Portland, Oregon, October 4-7, 1997.

"Using Expert Witness to Prove Damages in a Business Torts Case," Business Torts Seminar, Asheville, North Carolina, October 10, 1997.

"Collusion Detection Training," New Mexico DOT, June 26-27, 1997.

"Collusion Detection Training," Missouri DOT, May 1-2, 1997

"Collusion Detection Training," Short course in computerized collusion detection, Gainesville, Florida, February 4-6, 1997.

"Collusion Detection Training," Indiana DOT, September 16-17, 1996.

"Entrepreneurism," *Fast Trac II* course, sponsored by University of Florida and North Florida Technology Innovation Center, April to July 1996.

"Collusion Detection Training," Short course in computerized collusion detection. April 23-25, 1996, Gainesville, Florida.

"Collusion Detection Training," Austin, TX, January 31-February 1, 1996.

"Collusion Detection Training," Nebraska DOT, Lincoln, Nebraska, November 28-30, 1995.

"Using On-Site Service Units for Collusion Detection Projects," BAMS User's Group Meeting, Mobile, Alabama, October 11, 1995.

"Statistical Methods for Medicaid Investigations," Medicaid Program Integrity Unit, Florida Health Care Administration. One-half day training in Tallahassee, FL, June 1995.

"Collusion Detection Training," New Mexico State Highway and Transportation Department , Santa Fe, New Mexico, September 1994.

"Collusion Detection Using BAMS," BAMS User's Group Meeting. One-day training course in Columbus, Ohio, October 1994.

"Collusion Detection Seminar," Connecticut Department of Transportation. One-day training course, December 1993.


The Information Technology Company

15

"Collusion Detection Seminar," Colorado Department of Transportation. One-day training course, November 1993.

Ohio Bar Association, "Computerized Analyses in Antitrust Investigations," CLE Course, October 1993.

Florida Attorney General. Provided a one-day training seminar to state procurement officials on the use of analytical tools to detect bidrigging and price-fixing, October 1993.

"Collusion Detection Seminar," Virginia Department of Transportation, One-day training course, February 1993.

United States General Services Administration, Inspector General's Office. Provide training in bid/price analysis and collusion detection, 1992.

California Department of Transportation. Provide training in bid analysis and collusion detection using BAMS, 1992.

New York City Department of Investigations. Three-day training program conducted on the use of computerized techniques to detect collusive behavior, 1990.

Florida Attorney General. Provided a one-day training seminar to state procurement officials on the use of analytical tools to detect bidrigging and price-fixing, 1989.

Texas Department of Transportation. Three days training provided to the bid analysis and collusion detection unit for the Texas DOT on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1989.

Virginia Department of Transportation. Three days training provided to the bid analysis and collusion detection unit for the Virginia DOT on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1989.

"Training Session: Use of Computerized Techniques in Bid Monitoring and Collusion Detection," FHWA Antitrust and Transportation Legal Affairs Meeting, Lake George, New York, November 1989.

"Market Analysis and Adaptive Estimation Impact on Construction Cost," BAMS Users' Group, San Antonio, Texas, February 1989.

"BAMS/DSS Collusion Detection Training: An Overview," BAMS Users' Group, San Antonio, Texas, February 1989.

"Special Address: Expert Systems and Cost Estimation," Cost Estimation Workshop, Columbus, Ohio, November 1988.

Florida Department of Transportation. Three-day training course provided to the bid analysis and collusion detection unit for the Florida DOT on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1988.

"Statistical Techniques for Item Level Price Estimation," BAMS Users' Group, Gainesville, Florida, March 1987.

"Detecting Collusion in Highway Contracting: An Evaluation of Statistical Methods," BAMS Users' Group, Gainesville, Florida, March 1987.

"The Role of the Textbook in Introductory Business Statistics Courses: The Efficient Market Hypothesis," Invited Paper, American Statistical Association Winter Meetings, January 1987.

"Damage Estimation at the Line Item Level for Highway Contracts," BAMS Users' Group, Gainesville, Florida, March 1986.

"Analysis of Toxicity Data," American Society of Testing and Measurement, Chicago, October 1979.

"Testing Goodness of Fit for Linear Time Series Models," American Statistical Association, National Meetings, Washington, D.C., August 1979.

**info tech**
The Information Technology Company

Curriculum Vita of James T. McClave, Ph.D.

"Analysis of a Sealed Bid Market Using a Statistical Model," TAMS-OSSA National Meeting, New Orleans. Presented by T. Rothrock, 1979.

"Analysis of Toxicity Data to Determine No-Effect Levels," presented at the EPA Fisheries Laboratory, Duluth, 1978.

"Another Look at Some Famous Time Series - the Max Chi-Square Technique," Poster Session, American Statistical Association National Meeting, San Diego, 1978.

"Choosing the Order of Autoregressive and Moving Average Models: The Max Chi-Square Technique," National American Statistical Association Meeting, Boston, 1976.

"Subset Autoregression," invited paper presented to the Department of Statistical Science, State University of New York at Buffalo, 1975.

"Regression and Smoothing in Time Series," invited paper, University Statisticians of Southern Experiment Stations Conference, Gainesville, 1974.

"Introductory Statistics: The Normal Approach," Eastern Regional Meeting of the Institute of Mathematical Statistics, Blacksburg, 1972.

"On Estimation Problems for Stochastic Growth Processes," Joint National Meetings of the Institute of Mathematical Statistics and the American Statistical Association, Fort Collins, 1971.

"On Some Problems of Estimation and Prediction for a Class of Growth Process," Joint National Meetings of the Institute of Mathematical Statistics and the American Statistical Association, Laramie, 1970.

"On Some Problems of Estimation and Prediction for Stationary Time Series," Regional Meetings of the American Statistical Association, Tallahassee, 1970.

## Others

Acting Department Chairman, Department of Statistics, University of Florida, Summers of 1974, 1975, 1976.

Invited discussant in Time Series Session, Regional Meetings of the American Statistical Association and the Biometric Society, Rochester, 1975.

Session Chairman, Joint Regional Meetings of the American Statistical Association and the Institute of Mathematical Statistics and the Biometric Society, Tallahassee, 1974.

June 2003



**info tech**
The Information Technology Company

## CONSULTING SERVICES RATE SCHEDULE
### Professional Services

| TITLE AND DESCRIPTION | HOURLY RATE |
|---|---|
| **Dr. Robert Lanzillotti - Eminent Scholar/Senior Economic Consultant**<br>Preeminent economist with widely recognized expertise and accomplishments. Dean Emeritus/Eminent Scholar, Professor of American Economic Institutions and Director, Public Policy Research Center, Graduate School of Business Administration, University of Florida. Conducts economic analysis and provides expert economic testimony. | $500 |
| **Dr. James T. McClave - President/Expert Consultant**<br><br>Info Tech's President and CEO with widely recognized expertise and accomplishments in statistics and econometrics. Ph.D. with over 30 years of experience.   Directs key projects, provides expert testimony. | $500 |
| **Senior Litigation Consultant**<br>Senior personnel with law degree and extensive experience in managing and using computerized investigatory techniques in forensic analysis of complex civil litigations. | $350 |
| **Senior Consultant**<br>Senior personnel with extensive experience in conducting and  managing complex civil litigation projects. Can provide expert testimony. | $300 |
| **Senior Consultant/Project Manager**<br>Senior personnel with extensive experience in conducting and managing project activities. | $275 |
| **Senior Analyst/Project Manager**<br>Senior personnel capable of designing and performing highly technical analyses and performing project management duties. | $250 |
| **Senior Analyst**<br>Senior personnel capable of designing and performing highly technical analyses. | $200 |
| **Consultant Analyst**<br>Personnel experienced in performing project work with minimal supervision. | $150 |
| **Programmer/Analyst**<br>Entry level programming and project analysis.  Performs project work under close supervision. | $125 |
| **Project Assistant**<br>Experienced personnel providing technical assistance, literature/internet research,  and project management support to senior level staff. | $75 |
| **Data Entry**<br>On- or off-line key entry of data, data verification. | $60 |

**Other Expenses**
Travel, copying, telephone and other direct expenses are invoiced at Info Tech's cost.
**Invoicing**
Invoices will be submitted monthly.  Amounts not paid within sixty days of the invoice date will accrue interest
        at 1.5% per month

Exhibit "D"

# Medtronic

## June 25, 1998

## Board Presentation

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



# Physio Control

# Financials

6/25/90

CONFIDENTIAL

PAGE 34
PREPARED BY: MJ

**Medtronic**
Corporate Development

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Physio Control
## Assumptions

### Revenue

Total revenue estimates for 1998-2000 are provided by Physio Control's management.
Total Revenue over the 10 year period of the model is projected to sustain a CAGR of 12%.
The following annual growth rates were assumed for each product through 2008.

| Manual External Defibrillators | 8% CAGR |
|---|---|
| AEDs | 26% CAGR |
| Accessories | 2.4% CAGR |
| Electrodes | 10% CAGR |
| Service | 8% CAGR |
| Other | 4% CAGR |

Physio Control's AED revenue was $22 mil. in 1997 and is assumed to drive the growth rate in the model for the years beyond 2000

### AED Market

Estimated WW AED market revenue was $40 mil in 1997.  Market is projected to grow to $200 mil. in 2002 and to $530 mil. by 2008 (CAGR (Frost & Sullivan estimates the potential AED market size is $600 mil.)
Physio's share of the total AED market is 36% in 1998 and grows to 40% by 2003.
ASP's are assumed to be $2700 in 1998 and decline by a CAGR of 6% from 1998-2008.

### Income Statement

Gross margin improves by 3% (53%) in FY99 and achieves 60% GM by FY04.
Management's projections assume SG&A expense will decline from 29% of revenue in 1997 to 24% in 2000.
In the model, we hold SG&A at 27% through FY02 and decline to 26% thereafter to account for greater expenses required to aggressively drive AED market development in the future.
R&D expense in the model is increased by 1% beyond management's expectations to account for development of the "Citizen" at-home AED product.
Tax Rate is 37%.

### Merger Related Costs

$8 mil. in total transaction fees
$3 mil. in management severance costs
$3 mil. for IS systems (capitalized and amortized over 3 years)
Model does not assume any cost synergies are achieved in FY99 and only minimal savings are attained thereafter ($300-$500K annually)

### Deal Structure

Pooling Transaction
Assumes deal is closed by 10/30/98

### Valuation

DCF analysis assumes $27.50 per share is offered for all outstanding shares and options (20.1 mil. shares)  The closing price of the stock was 20 3/4 on 6/19/98
Model does not assume any revenue synergies are captured by MDT
Terminal Value assumes a 5% annual growth rate of operating cash flows in perpetuity

Corporate Development
Medtronic

CONFIDENTIAL

Page 23
Printed 6/24/98
6/24/98

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

6/25/98

# Physio Control

## Financial Summary

- **Financial History**[1]
  - Revenue
    Gross Margin
    PAT
    Margin

| | 1995 | 1996 | 1997 |
|---|---|---|---|
| Revenue | $149 | $173 | $175 |
| Gross Margin | 53% | 51% | 50% |
| PAT | $6 | $15 | $9 |
| Margin | 4% | 9% | 5% |

- **Financial Projections**[2]
  - Revenue
    Gross Margin
  - PAT
    Margin
  - Accretion/(Dilution)

| | FY99 | FY00 | FY01 | FY02 | FY03 | FY08 |
|---|---|---|---|---|---|---|
| Revenue | $213 | $237 | $261 | $296 | $338 | $569 |
| Gross Margin | 53% | 55% | 56% | 58% | 59% | 60% |
| PAT | $23 | $29 | $33 | $41 | $53 | $93 |
| Margin | 11% | 12% | 13% | 14% | 16% | 16% |
| Accretion/(Dilution) | $ 0.01 | $ 0.03 | $ 0.03 | $ 0.05 | $ 0.07 | $ 0.13 |

- **Valuation**
  - Shareholder Value
  - Acquisition Cost
  - NPV
  - WACC

| | |
|---|---|
| Shareholder Value | $527 |
| Acquisition Cost | $527 |
| NPV | $0.1 |
| WACC | 13% |

(1) Physio Control's FYE (12/31)
(2) Medtronic FYE (4/30)

Medtronic ■
Corporate Development

CONFIDENTIAL

PAGE 30
PREPARED BY: MJ

METRONIC CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

# Physio Control
## EPS Analysis - Pooling

| | |
|---|---|
| Starbucks Shares Outstanding [1] | 20.1 |
| Starbucks Stock Price (8/10/98) | $20 3/4 |
| Acquisition Premium | 33% |
| Acquisition Price per Share | $27 1/2 |
| Medtronic Stock Price (8/10/98) | $58 5/8 |
| Exchange Ratio | 0.469x |
| Shares Issued to Starbucks | 9.41 |
| Acquisition Price | $551 |
| Transaction Expenses [2] | $9 |

$$\phi 8 \, 0413$$

| $ millions FYE: 4/30 | FY96 | FY97 | FY98 | FY99 [3] | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 | CAGR 98-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| Medtronic [4] | $ 2,172 | $ 2,438 | $ 2,605 | $ 2,984 | $ 3,432 | $ 3,946 | $ 4,530 | $ 5,219 | $ 6,002 | $ 6,902 | $ 7,937 | $ 9,128 | $ 10,497 | 15% |
| Starbucks | 157 | 174 | 185 | 213 | 237 | 261 | 296 | 338 | 385 | 433 | 481 | 527 | 569 | 12% |
| Medtronic w/ Starbucks | $ 2,329 | $ 2,612 | $ 2,790 | $ 3,197 | $ 3,668 | $ 4,207 | $ 4,835 | $ 5,557 | $ 6,387 | $ 7,335 | $ 8,419 | $ 9,655 | $ 11,067 | 15% |
| **PAT** | | | | | | | | | | | | | | |
| Medtronic [4] | $ 428.3 | $ 530.0 | $ 457.4 | $ 691.2 | $ 794.9 | $ 914.1 | $ 1,051.2 | $ 1,208.9 | $ 1,390.3 | $ 1,598.8 | $ 1,838.6 | $ 2,114.4 | $ 2,431.6 | 18% |
| Starbucks | $ 9.7 | $ 13.5 | $ 13.3 | $ 24.6 | $ 28.9 | $ 32.8 | $ 41.1 | $ 53.3 | $ 63.1 | $ 71.0 | $ 76.8 | $ 84.3 | $ 93.3 | 21% |
| Medtronic w/ Starbucks | $ 438.0 | $ 543.5 | $ 470.7 | $ 715.8 | $ 823.7 | $ 947.0 | $ 1,092.3 | $ 1,262.2 | $ 1,453.4 | $ 1,669.7 | $ 1,917.4 | $ 2,200.7 | $ 2,524.8 | 18% |
| Net Interest Gain/(Foregone) (AT) | | | | 0.4 | 1.3 | 2.2 | 3.2 | 4.6 | 6.2 | 8.1 | 10.2 | 12.6 | 15.2 | |
| Merger Related Costs (AT) [5] | | | | (2.3) | (0.6) | (0.6) | (0.2) | | | | | | | |
| Cost Synergies (AT) | | | | | 0.3 | 0.4 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.7 | 0.7 | |
| Transaction Expense [2] | | | | (9.0) | | | | | | | | | | |
| Medtronic w/Starbucks | $ 438.0 | $ 543.5 | $ 470.7 | $ 706.0 | $ 824.7 | $ 949.9 | $ 1,095.6 | $ 1,267.2 | $ 1,460.1 | $ 1,678.4 | $ 1,928.2 | $ 2,213.9 | $ 2,540.6 | 18% |
| **Shares O/S (millions)** | | | | | | | | | | | | | | |
| Medtronic | 474.9 | 477.4 | 468.9 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | 468.6 | |
| Shares issued to Starbucks | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | 9.4 | |
| Medtronic w/ Starbucks | 484.3 | 486.8 | 478.3 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | 478.0 | |
| **EPS** | | | | | | | | | | | | | | |
| Medtronic | $ 0.90 | $ 1.11 | $ 0.90 | $ 1.48 | $ 1.70 | $ 1.95 | $ 2.24 | $ 2.58 | $ 2.97 | $ 3.41 | $ 3.92 | $ 4.51 | $ 5.19 | 19% |
| Medtronic w/ Starbucks | $ 0.90 | $ 1.12 | $ 0.98 | $ 1.50 | $ 1.73 | $ 1.99 | $ 2.29 | $ 2.65 | $ 3.05 | $ 3.51 | $ 4.03 | $ 4.63 | $ 5.32 | 19% |
| Accretion/(Dilution) | $ 0.00 | $ 0.01 | $ 0.01 | $ 0.02 | $ 0.03 | $ 0.04 | $ 0.06 | $ 0.07 | $ 0.08 | $ 0.10 | $ 0.11 | $ 0.12 | $ 0.13 | 31% |
| Medtronic w/Starbucks & Merger/Transaction Expense | $ 0.90 | $ 1.12 | $ 0.98 | $ 1.48 | $ 1.73 | $ 1.99 | $ 2.29 | $ 2.65 | $ 3.05 | $ 3.51 | $ 4.03 | $ 4.63 | $ 5.32 | 19% |
| Total Accretion/(Dilution) | $ 0.00 | $ 0.01 | $ 0.01 | $ 0.00 | $ 0.03 | $ 0.04 | $ 0.06 | $ 0.07 | $ 0.08 | $ 0.10 | $ 0.11 | $ 0.12 | $ 0.13 | 11% |

[1] Includes 2.552M shares of exercisable options
[2] Assumes total transaction expenses to be $9 mil. for both parties investment banking and legal advisor fees. Transaction fees are not tax deductible in a pooling transaction
[3] Pooling transaction requires previous 3 years of financial results to be restated
[4] Medtronic FY99 AOP, growing at 15% thereafter
[5] Total merger related costs are assumed to be $4 mil. for management severance and IS systems integration (amortized over 3 years)

Corporate Development
Medtronic

CONFIDENTIAL

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Physio Control
### Income Statement

| $000s<br>FYE: 4/30 | FY96[1] | FY97[1] | FY98[1] | FY99 | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 | CAGR<br>98-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Revenue** | $156,846 | $173,880 | $185,173 | $213,275 | $236,661 | $261,111 | $296,472 | $338,262 | $385,323 | $433,197 | $481,131 | $528,834 | $569,428 | 12% |
| Annual Growth Rate | | 11% | 6% | 15% | 11% | 10% | 14% | 14% | 14% | 12% | 11% | 9% | 8% | |
| Cost of Sales | $74,473 | $85,697 | $90,611 | $97,964 | $105,665 | $114,889 | $124,518 | $138,696 | $154,129 | $173,279 | $192,452 | $210,734 | $227,771 | 10% |
| % of Revenue | 47% | 49% | 49% | 46% | 45% | 44% | 42% | 41% | 40% | 40% | 40% | 40% | 40% | |
| **Gross Profit** | $82,375 | $88,201 | $94,561 | $115,312 | $130,996 | $146,222 | $171,954 | $199,587 | $231,194 | $259,918 | $288,678 | $318,100 | $341,657 | 14% |
| Gross Margin | 53% | 51% | 51% | 54% | 55% | 56% | 58% | 59% | 60% | 60% | 60% | 60% | 60% | |
| **Overhead Costs** | | | | | | | | | | | | | | |
| S, G & A | $45,369 | $46,110 | $51,334 | $55,432 | $63,898 | $70,500 | $80,047 | $87,953 | $100,184 | $112,631 | $125,094 | $136,977 | $148,051 | |
| % of Revenue | 29% | 27% | 28% | 26% | 27% | 21% | 27% | 26% | 26% | 26% | 26% | 26% | 26% | |
| R & D | $19,205 | $19,587 | $20,211 | $18,653 | $21,299 | $23,500 | $26,682 | $27,063 | $30,826 | $34,656 | $38,490 | $42,147 | $45,554 | |
| % of Revenue | 12% | 11% | 11% | 9% | 9% | 9% | 9% | 8% | 8% | 8% | 8% | 8% | 8% | |
| **Total** | $64,665 | $65,697 | $71,545 | $74,085 | $85,198 | $94,000 | $106,730 | $115,016 | $131,010 | $147,287 | $163,584 | $179,124 | $193,605 | |
| % of Revenue | 41% | 38% | 39% | 35% | 36% | 36% | 36% | 34% | 34% | 34% | 34% | 34% | 34% | |
| **Operating Income** | $17,710 | $22,504 | $23,017 | $41,226 | $45,798 | $52,222 | $65,224 | $84,571 | $100,184 | $112,631 | $125,094 | $136,977 | $148,051 | 20% |
| Operating Margin | 11% | 13% | 12% | 19% | 19% | 20% | 22% | 25% | 26% | 26% | 26% | 26% | 26% | |
| Interest Inc / (Exp) | ($2,508) | ($1,776) | ($1,910) | ($2,167) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Income Taxes | $5,497 | $7,187 | $7,810 | $14,452 | $16,945 | $19,322 | $24,133 | $31,291 | $37,068 | $41,674 | $46,285 | $50,681 | $54,778 | |
| Tax Rate | 36% | 35% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | 37% | |
| **Net Income** | $9,706 | $13,541 | $13,297 | $24,607 | $28,853 | $32,900 | $41,091 | $53,279 | $63,116 | $70,958 | $78,809 | $88,295 | $93,272 | 22% |
| Net Margin | 6% | 8% | 7% | 12% | 12% | 13% | 14% | 16% | 16% | 16% | 16% | 16% | 16% | |

(1) Adjusted to Medtronic FYE

MEDTRONIC CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

## Physio Control
## DCF Valuation Analysis

$ 000s
FYE: 4/30

### Cash Flows

| | FY98 | FY99 [1] | FY00 | FY01 | FY02 | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| After-Tax Operating Income to Medtronic [1] | | $ 19,480 | $ 28,853 | 32,900 | $ 41,091 | $ 53,279 | $ 63,116 | $ 70,958 | $ 78,809 | $ 88,295 | $ 93,272 |
| Incremental Working Capital | | $ (4,215) | $ (4,677) | $ (4,890) | $ (7,072) | $ (8,362) | $ (9,408) | $ (9,575) | $ (9,587) | $ (9,141) | $ (8,519) |
| % of Incremental Revenue | | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% |
| Incremental Net Fixed Capital | | $ (1,054) | $ (1,169) | (1,223) | (1,768) | (2,091) | (2,352) | (2,394) | (2,397) | (2,285) | (2,130) |
| % of Incremental Revenue | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| Operating Cash Flows | $ - | $ 14,210 | $ 23,007 | 26,787 | $ 32,251 | $ 42,827 | $ 51,356 | $ 58,989 | $ 66,826 | $ 74,870 | 82,623 |
| Residual Cash Flow (Residual Growth Rate 0%) | | | | | | | | | | | 1,044,224 |
| Total Cash Flows | $ - | $ 14,210 | $ 23,007 | 26,787 | $ 32,251 | $ 42,827 | $ 51,356 | $ 58,989 | $ 66,826 | $ 74,870 | $ 1,126,847 |

### MDT CORP DEV

| | $ | % of Total |
|---|---|---|
| PV of Operating Cash Flows | $ 223,461 | 42% |
| PV of Residual Cash Flow (5% perpetuity) [2] | $ 318,191 | 60% |
| PV of Opportunity | $ 541,652 | 103% |
| Cash & Equivalents (3/31/98) | $ 3,460 | 1% |
| Debt (3/31/98) | $ (18,400) | -3% |
| Shareholder Value | $ 526,712 | 100% |
| Per Share (non-diluted) | $ 30.6 | |
| Acquisition Cost (diluted) | $ (551,381) | |
| Cash Proceeds from Options Exercised [3] | $ 34,257 | |
| Acquisition Cost (Net) | $ (517,124) | |
| Transaction Expense [4] | $ (6,000) | |
| PV of Merger Costs | $ (3,705) | |
| PV of Cost Synergies | $ 2,211 | |
| Total Acquisition Cost | $ (525,618) | |
| NPV | $ 93 | |
| Discount Rate | 13.0% | |

### Market Summary

| | |
|---|---|
| Number of Shares Outstanding (000s) | 17,188 |
| In-the-Money Options | 2,852 |
| Fully Diluted Shares Outstanding | 20,050 |
| Price Close on 6/19/98 | $20 34 |
| Market Capitalization ($Millions) | $ 357 |
| Fully Diluted Market Value ($Millions) | $ 416 |

(1) Company's operating cash flows are discounted back to July 31, 1998
(2) MDT version calculates terminal value by assuming a 5% growth rate of the Company's operating cash flows in perpetuity and discounting by 13% to arrive at the present value
(3) Proceeds of $34.4 mil. obtained from the exercise of Starbucks shareholders' in-the-money options
(4) Transaction expense includes fees for investment banking and legal advisors.

Corporate Development
Medtronic

CONFIDENTIAL

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

6/25/98

# Physio Control

## *Financial Upside (Not included in Valuation)*

### Not included in our valuation economics are the following opportunities:

- If the SCD survival rate increases from 5% to 15% (50% of the AHA goal) and MDT maintains its 41% market share, this would result in an incremental increase in:

  - Revenue           = $248m
  - Earnings (PAT)   = $76m
  - Market Value/Share = $6.50

- If, SCD survival rates increased to 15%, in addition to the incremental gains captured with 41% MDT market share, each additional 1% of share gain would result in incremental:

  - Revenue           = $17m
  - Earnings (PAT)   = $5m
  - Market Value/Share = $0.44

**Medtronic ■**
Corporate Development

CONFIDENTIAL

PAGE 40
PREPARED BY: MJ

MEDTRONIC CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

6/25/98

# Physio Control

## *Further Opportunities:*

**Not included in our valuation economics are the following revenue opportunities:**

- Medtronic's relationships with Cardiologists & EPs to encourage adoption of AEDs in the community & home

- MDT's international distribution infrastructure to assist Starbucks in market development in these regions

**Not included in our valuation economics are the following operational and cost opportunities:**

- Common materials purchasing and utilization of Micro-Rel's componentry

- MDT Tachy and Starbuck's R&D programs in arrhythmia detection, waveforms, AMI detection

- Distribution of MDT's external pacemakers through Starbuck's sales reps

**Medtronic** ■
Corporate Development

CONFIDENTIAL

PAGE 41
PREPARED BY: MJ

MEDTRONIC CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Medtronic / Physio-Control Exchange Ratio Analysis
## Assumes Closing on September 30, 1998 (a)

| Date | Medtronic Closing Price | Daily Exchange Ratio | Running Average |
|---|---|---|---|
| 9/02/98 | $ 54.88 | 0.501 x | 0.501 x |
| 9/03/98 | 56.94 | 0.483 | 0.492 |
| 9/04/98 | 57.00 | 0.482 | 0.489 |
| 9/08/98 | 59.13 | 0.465 | 0.483 |
| 9/09/98 | 59.13 | 0.465 | 0.479 |
| 9/09/98 | 57.13 | 0.481 | 0.480 |
| 9/10/98 | 55.63 | 0.494 | 0.482 |
| 9/11/98 | 56.88 | 0.484 | 0.482 |
| 9/14/98 | 57.56 | 0.478 | 0.482 |
| 9/15/98 | 57.56 | 0.478 | 0.481 |
| 9/16/98 | 57.69 | 0.477 | 0.481 |
| 9/17/98 | 57.50 | 0.478 | 0.481 |
| 9/18/98 | 56.75 | 0.485 | 0.481 |
| 9/21/98 | | | |
| 9/22/98 | | | |
| 9/23/98 | | | |
| 9/24/98 | | | |
| 9/25/98 | | | |
| 9/28/98 | | | |
| 9/29/98 | | | |

(a) According to the Purchase Agreement, the transaction exchange ratio will be based on the average fraction of a Medtronic share that translates into $27.50 for the 19 trading days ending on the day before closing.

Closing: 9-29-98
19 business up to and including 9-28-98

Goldman Sachs