UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 03-20616 – CIV-COOKE
MAGISTRATE JUDGE: McALILEY

ROBERT J. MYERBURG, M.D.
individually,

      Plaintiff,

vs.

MEDTRONIC, INC.,
a Minnesota corporation,

      Defendant

## PLAINTIFF'S MOTION IN LIMINE TO STRIKE EXPERT TESTIMONY OF DANIEL M. MCGAVOCK, AND ACCOMPANYING MEMORANDUM OF LAW

The Plaintiff, Robert J. Myerburg, M.D. ("Dr. Myerburg"), moves pursuant to Federal Rules of Evidence ("FRE") 104 and 702 to exclude the testimony of Defendant's rebuttal expert witness, Daniel M. McGavock, ("McGavock"). McGavock, is a certified public accountant, ("CPA"), who is not qualified to render the opinions set forth in Medtronic, Inc.'s Supplemental Expert Witness Disclosures.

Law Offices
BAILEY & DAWES, L.C.
CONTINENTAL PLAZA, SUITE 301, 3250 MARY STREET, MIAMI, FLORIDA 33133 · TEL 305 374 5505 · FAX 305 374 6715

## I
## SUMMARY OF MCGAVOCK'S PROPOSED TESTIMONY

1.      McGavock's proposed testimony is based on a variety of biased assumptions.  He assumes that if Medtronic improperly used Dr. Myerburg's marketing and business proposal, Dr. Myerburg should merely be compensated as if Medtronic had engaged him as a consultant, proposing a business strategy, and therefore be compensated on a fixed hourly basis.

2.      McGavock's **erroneous** assumptions corrupt the credibility and **foundation of his testimony. For exa**mple, had Medtronic initiated the solicitation of such **a plan from Dr. Myerburg an**d contractually specified the limited terms of such an engagement, the present conflict would not have arisen.

3.      Instead, Medtronic and its expert would have the Court accept the supposition that corporations which choose to exploit non-commissioned marketing and business plans, can later avoid liability by claiming that such information should be valued as if it were received by an employee or sub-contracted consultant.

4.      In his evaluations of Dr. Myerburg's damages, McGavock makes the threshold determination **that Dr.** Myerburg's information did not contain any novel or proprietary information. **McGavock Depo. 44: 6-11, Exhibit A.** He states that

Case 1:03-cv-20616-MGC   Document 131   Entered on FLSD Docket 07/28/2004   Page 3 of 51

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 3 of 12

"the idea to participate in the automatic external defibrillator ("AED") market was not a novel concept and had been long considered by Medtronic, which made an equity investment in, and had a joint marketing arrangement with, an AED manufacturer since 1996." Medtronic, Inc.'s Supplemental Expert Witness Disclosures, P. 2, Exhibit B.

5.     McGavock's only analysis of "novelty" lacks any legal elements or standards, and is myopically based on acceptance Medtronic's allegation that Morgan Stanley had previously pitched a merger with Physio-Control which it twice turned down, as proof that it did not use Dr. Myerburg's proposal. And the fact remains that Medtronic did not decide to acquire Physio-Control until after Dr. Myerburg presented his ideas and research. Medtronic's change of heart to acquire an AED company is thus never contemplated in McGavock's analysis of Dr. Myerburg's uniquely persuasive plan.

6.     This determination is a legal conclusion that lacks any factual support and fails to offer any scientific basis or methodology beyond McGavock's experience as a CPA. McGavock Depo. 45: 1-8, Exhibit A. He testified "... I mean, it's really based on my experience, not only in reviewing business and marketing plans, but in preparing them on behalf of clients." *Id.*

7.     Conversely, McGavock admits that in order for something to be legally protectable:

> you will have evidence of legal protection through either, you know, a patent or an issued trademark. And then the real question, and frankly my definition was incomplete, it's got to be legally protectable and have value coming from that protection. And in order to have value, it needs to be unique and novel. Whether it's a trademark or a patent or a trade secret, there has to be novelty and uniqueness and protectability for it be a useful intellectual property right.
>
> McGavock Depo. 43:1-10, Exhibit A.

8.     **As demonstrated below** and evidenced by his deposition and his **curriculum vitae, McGavock has neither** the requisite academic credentials nor the training to render such an opinion. Medtronic, Inc.'s Supplemental Expert Witness Disclosures, P. 2, Exhibit B. As a direct consequence, he fails to employ a reliable, legally acceptable basis other than his experience as a CPA. Therefore, the opinion should be stricken because it is beyond the scope of McGavock's expertise and does not aid the trier of fact.

## II
## MEMORANDUM OF LAW

### A.    Standard for Admission of Expert Testimony

The Federal Rules of Evidence permit a witness who is "qualified as an expert by knowledge, skill, experience, training or education" to provide opinion testimony at trial. Fed. R. Evid. 702 (2000). The party offering the expert has the

burden of laying the proper foundation for the admission of expert testimony. *Allison v. McGham*, 184 F.3d 1300, 1306 (11th Cir. 1999).

Rules 702 and 703 militate against the general policy of admission of evidence by giving courts discretion to preclude expert testimony unless it passes more stringent standards of reliability and relevance.[1] Under the *Daubert* standard, expert testimony is admissible only when: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence. *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1997); *Allison v. McGham Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

Determining whether or not to exclude expert testimony is squarely within the District Judge's discretion. *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Inadmissible expert testimony is properly excluded by means of an in limine ruling, the authority for which is derived from the Court's inherent power to

---

[1] These stricter standards of reliability and relevance are necessary because of the potential impact on the jury of expert testimony.

act as a "gatekeeper" and manage the course of the trials. *Luce v. United States*,

469 U.S. 38, 42 n. 4 (1984).

The *Daubert* Court also listed four non-inclusive factors courts should

consider in determining reliability under Rule 702:

(1) whether the theory or technique can be tested;

(2) whether it has been subjected to peer review;

(3) whether the technique has a high known or potential rate of error; and

(4) whether the theory has attained general acceptance within the

scientific community. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.[2]

## B.   McGavock Is Not Qualified To Testify Competently Regarding the Matters He Intends To Address

McGavock is not qualified to determine whether Dr. Myerburg's proposal to

Medtronic was novel or proprietary information beyond a mere proposed business

strategy. Specifically, McGavock posits, "Dr. Myerburg's idea to participate in the

automatic external defibrillator ("AED") market was not a novel concept and had

been long considered by Medtronic, which made an equity investment in, and had

a joint marketing arrangement with, an AED manufacturer since 1996." McGavock

hinges his valuation of the economic damages suffered by Dr. Myerburg

---

[2]  The Supreme Court noted that inquiry envisioned by Rule 702 is one of scientific validity and the evidentiary relevance underlie the proposed submission. The focus is on principles and methodology, not on the conclusions that they generate. See Daubert, 509 U.S. 579

exclusively on his determination that Dr. Myerburg's "information" had no proprietary rights or intellectual property rights.    McGavock's subjective speculations and conjectures are not permissible expert testimony. *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000) (despite experts credentials, speculation is not permitted).[3]    Although McGavock is qualified in conducting various valuations, he has no qualifications in patents, trademarks, intellectual property or proprietary rights to offer such expert testimony.

McGavock's curriculum vitae evidences that he is a trained and experienced accountant, capable of conducting financial and tax analysis of various transactions.  Without the necessary training or practical experience, McGavock's expertise is founded only on his self started company and he holds himself out not only as a litigation consultant able to perform valuation analysis, but also able to determine whether certain information is legally protectable or has proprietary rights.  He is utterly unqualified to make such determinations.  *See* FRE 702; *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999)(affirming exclusion of

[3] *See Also Brito v. County of Palm Beach, Fla.*, 753 So.2d 109 (Fla. 4th DCA, 1998) expert cannot simply assume the facts which form the basis of his opinion.

purported handwriting expert who had reviewed literature in the field of document examination and co-authored article concerning same: "his skill, experience, training, and education as a law did not make him any more qualified to testify as an expert on handwriting analysis than a lay person who read the same articles."); *Goodwin v. MTD prods. Inc.*, 232 F.3d 600, 609 (7th Cir. 2000)(expert had "neither a medical degree nor any medical training, and...not qualified to give expert testimony on medical questions").

McGavock's only academic endeavors have been in the discipline of accounting. He attained a Bachelor's of Science at the University of Indiana, School of Business. **He is a CPA** licensed by the state of Illinois and his professional experience has been, for the most part, limited to areas of financial and account treatment analyses. After graduating from the University of Indiana, he worked as a financial analyst, in which his principal role was to deal with helping make business decisions. At no time in that position or his subsequent positions, did he conduct analysis to determine the proprietary rights or intellectual property rights of business plans or strategies.

After leaving that position, McGavock worked for a company called Peterson and Company based in Chicago, Illinois, **where he** worked on various consulting assignments in the area of intellectual property **damages** analysis as well

Case 1:03-cv-20616-MGC   Document 131   Entered on FLSD Docket 07/28/2004   Page 9 of 51

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 9 of 12

as damages analysis in other areas. McGavock Depo. 25: 16-19, Exhibit A. In that position McGavock performed audits on licensing agreements, which he described as "where the licensor wants to review whether or not the licensee has paid or complied with the terms of a license agreement." McGavock Depo. 26: 17-20, Exhibit A. Again, in that position, he did not perform work that would have enabled him to obtain experience in being able to determine the proprietary rights or intellectual property of information.

In addition, none of the articles authored by McGavock were juried articles or subject to scholarly review by his peers in the industry. When questioned whether his article titled *Intangible Asset Valuation and Royalty Rates* was a juried article, his response was "I don't believe so, not under your definition" see McGavock Depo. 35: 7-8, Exhibit A. When asked the same question concerning his co-authored article titled *Unrelated-Party Licensing Practices and Factors Affecting Royalty Rates: Results of a Survey*, he again responded in the negative stating "I don't believe so under your definition." McGavock Depo. 38: 13, Exhibit A.

Furthermore, none of the articles authored by McGavock were sponsored or in any way governed by any academic or scientific societies, to wit:

Q.      Unless it's a scientific society or university or academic society, yes, sir. You would agree that none of them were published for such organizations?

A.      Well, I'm not sure how you classify the licensing executive society because it's a 501C3 organization dedicated to education, and in fact funds educational, I would say for universities.

Q.      It's not an academic society, it is not a scientific society, is it, sir?

A.      I don't believe so.

McGavock Depo. at 40: 17-24, Exhibit A. Similarly, McGavock's professional affiliations do not evidence his qualifications to determine proprietary rights or intellectual property rights of Dr. Myerburg's "information". Of the ten or so professional associations or societies in which he claims membership, he has ceased to be a member of two of the organizations; another two or three are either defunct or have just been formed and do not have any history of serious scholarship; and the rest are associations with minimal membership requirements. McGavock Depo. 7-19, Exhibit A.

In the absence of genuinely relevant knowledge, skill, experience, training, or education in determining the proprietary rights or intellectual property of any plans/strategy or proposals, McGavock simply lacks the necessary qualifications to testify that Dr. Myerburg's "information" did not contain any novel or proprietary information. FRE 702; *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999)

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 11 of 12

## C.    McGavock Opinions Are Based on Conjecture and Speculation

McGavock bases his unspecific testimony on assumptions and conclusions which cannot be the proper foundation for expert testimony. Expert opinions must be based on facts which enable the expert to express a reasonablely accurate conclusion not one based on subjective belief. McGavock makes conclusions using legal terms such as "novelty" and "intellectual property rights" without citing any authority other than his own conjecture. *Elcock v. Kmart Corp.*, 233 F. 3d 734 (3$^{d}$ Cir. 2000)

## CONCLUSION

McGavock does not possess the knowledge, skill, experience, training or education required to qualify him to provide expert testimony on whether Dr. Myerburg's "information" has no proprietary rights and is merely a proposed business strategy.    Additionally, McGavock bases his opinion on his own subjective beliefs and Medtronic's speculative conjectures. As such, McGavock's testimony constitutes the precise unreliable "expert" opinion testimony that the *Daubert* and *United States v. Paul* opinions prohibit a party from submitting at trial.    Accordingly, Dr. Myerburg respectfully requests this Court to strike McGavock's expert designation.

Myerburg, M.D. vs. Medtronic, Inc.
Case No. 03-20616 CIV-LENARD
Magistrate Judge Simonton
Page 12 of 12

Respectfully submitted,

Bailey & Dawes, L.C.
Counsel for Myerburg
3250 Mary Street, Suite 301
Miami, Florida 33133
(305)374-5505
(305)374-6715 Fax

By: _____
Guy B. Bailey, Jr.
Florida Bar No. 96095
Kristina M. Bakardjiev
Florida Bar No. 587400
Owei Z. Bellah
Florida Bar No. 617598

## CERTIFICATE OF COUNSEL

Counsel hereby certifies that a good faith effort has ~~been~~ made to resolve the matters set forth above. Counsel for Dr. Myerburg and Medtronic have conferred to attempt a resolution of this matter and such efforts have failed.

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was mailed to Medtronic's counsel,

Alvin B. Davis, Esquire, Steel Hector & Davis, First Union Building, Suite 4000, 200

S. Biscayne Boulevard, Miami, Florida 33131-2310, this _27th_ day of July, 2004.

_____
Of Counsel

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3                    MIAMI DIVISION

 4                                    ORIGINAL
 5   ROBERT J. MYERBURG, M.D.,    )

 6   individually,               )

 7             Plaintiff,         )

 8      vs.                       ) No. 03-20616

 9   MEDTRONIC, INC., a Minnesota )

10   corporation,                )

11             Defendant.         )

12

13             The discovery deposition of DANIEL M.

14   McGAVOCK, taken in the above-entitled cause, before

15   Raelene Stamm, a notary public of Cook County,

16   Illinois, on the 18th day of May, 2004, at

17   200 North LaSalle Street, Suite 300, Chicago,

18   Illinois, pursuant to notice.

19

20

21

22

23   Reported by:   Raelene Stamm, CSR

24   License No.:    084-004445
```

```
 1    APPEARANCES:

 2          BAILEY & DAWES, by

 3          MR. GUY BAILEY (via telephone)

 4          3250 Mary Street, Suite 301

 5          Miami, Florida  33133

 6          (305) 374-5505

 7               On behalf of the Plaintiff;

 8

 9          STEEL, HECTOR & DAVIS, by

10          MR. ALVIN B. DAVIS  (via telephone)

11          First Union Building, Suite 4000

12          200 South Biscayne Boulevard

13          Miami, Florida  33131

14               On behalf of the Defendant.

15

16

17

18

19

20

21

22

23

24
```

1     Q.    Okay.  Now, just trying to go through some

2   of these things here.  You're on the advisory

3   counsel of the Intellectual Property Management

4   Institute.  What is that, sir?

5     A.    That is a group that has been formed to

6   develop educational materials on the issue of

7   intellectual property management and evaluation.

8     Q.    And formed by whom, sir?

9     A.    A gentleman by the name of Gordan Smith.

10     Q.    When was it formed approximately?

11     A.    I believe it was formed three or four

12   years ago initially.

13     Q.    Okay.  When you say initially, what do you

14   mean?  Was there some reforming of it?

15     A.    Well, there's been very little activity

16   that I can recall since Mr. Smith asked me to be on

17   the advisory counsel.  However, recently I did

18   receive a correspondence from him regarding the

19   organization's activities.  I do know that

20   Mr. Smith had some health problems that took him

21   out of circulation for a while, so that may explain

22   it.

23     Q.    Okay.  So in any event this is a new

24   organization that's sort of still getting off the

```
 1   ground I gather?

 2        A.   Yes, that's a fair characterization.

 3        Q.   Okay.  It's not recognized by any state?

 4   It's not licensed or recognized by any state or

 5   university association or anything like that yet?

 6        A.   I don't believe so.

 7        Q.   Okay.  The National Patent Board is what?

 8        A.   That was a group formed by I believe both

 9   a combination of private attorneys as well as some

10   representatives of corporations, and it was

11   envisioned to be a forum to mediate patent disputes

12   as an alternative to going into litigation or into

13   a more formalized arbitration procedure.

14        Q.   You used the past tense.  Is that defunct?

15        A.   I believe it is.  I'm -- I've not heard

16   anything from them in recent years.  It was fairly

17   active about three to four years ago, but to my

18   knowledge it hasn't done much since then.

19        Q.   All right.  Sir, what is the Intellectual

20   Property Owner's Association?

21        A.   That is a very large organization

22   comprised of major corporations that own and

23   develop intellectual property rights such as

24   patents, and it also includes outside attorneys as
```

1   well as consulting firms like mine.

2       Q.    All right.  Sir, how long has that been in

3   existence?

4       A.    That organization has been around for a

5   long time.  It is a very large membership, and it's

6   been around for at least ten years, probably much

7   longer than that.  My involvement started probably

8   about ten years ago.

9       Q.    All right.  Sir, and your -- you serve on

10  the arbitration and mediation committee of that

11  organization?

12      A.    Correct.

13      Q.    Have you served on other committees of

14  that association?

15      A.    Yes.

16      Q.    Can you tell me what they are?

17      A.    The intellectual property management

18  committee, and I participated on that committee

19  during the period 2000 through 2003.

20      Q.    Okay.  Any other committees?

21      A.    No.

22      Q.    How were you selected?

23      A.    For that committee?

24      Q.    Or for membership in this association.

```
 1        A.   I believe -- well, for membership in the
 2   association --
 3        Q.   Are you a member?
 4        A.   Yes, I am.  I don't believe it required a
 5   rigorous selection process.  It was an organization
 6   that initially I was invited to give a presentation
 7   regarding the assessment of intellectual property
 8   rights.  And subsequent to that presentation, I
 9   decided to join the organization and then became
10   involved in a couple of the committees.
11        Q.   Okay.  Is that an organization where you
12   pay an initiation fee and then pay yearly dues?
13        A.   Yes.
14        Q.   Is it open to anyone who wants to join?
15        A.   I believe so.  But I'm not -- you know,
16   I'd have to look at the guidelines.  I think you
17   have to be involved with the business and legal
18   aspects of intellectual property.
19        Q.   Okay.  The Licensing Executives Society
20   which I see you refer to as LES, what is that, sir?
21        A.   That is a professional society dedicated
22   to the field of intellectual property licensing.
23   It's a worldwide organization comprised of probably
24   close to 10,000 members of which there's probably
```

1    over 5,000 members in the United States.

2        Q.    And is that a law established

3    organization?

4        A.    Yes.

5        Q.    Are you a member of it?

6        A.    Yes.

7        Q.    How were you made a member of it?

8        A.    As I recall I joined the Licensing

9    Executive Society in 1986 or '87.  I simply joined

10   the society and agreed to pay the dues to

11   participate in the society.

12       Q.    So it's open to anyone who wants to pay

13   the dues?

14       A.    Again, I think there is a requirement that

15   you are involved in the field of licensing.

16       Q.    Well, I guess I'm bothered by your word

17   thinking in that answer because this says you're

18   the national membership chair.  What are the

19   requirements for membership?

20       A.    What I just said, that as I recall the

21   society has had a longstanding policy of admitting

22   members who are dedicated or spend a good portion

23   of their time on intellectual property licensing

24   matters.

1          And licensing is construed as a broad term

2     and would include any form of business transactions

3     including the transfer of intellectual property

4     rights such as a joined venture.  So it's a fairly

5     broad definition of who can join.  I think as I

6     recall as membership chairman, I had to review

7     individual applications.  And on occasion we did

8     reject applications on the basis that they had --

9     that the individual had nothing to do with

10    licensing.  And part of that was to discourage, you

11    know, various vendors or service providers getting

12    involved in the organization just to sell some sort

13    of service such as insurance that really has

14    nothing to do with what the organization's mission

15    is about, or stockbrokers or those types.

16         Q.    Would someone involved in, oh, I don't

17    know, franchising something like Burger King be

18    admitted to that society?

19         A.    You mean an owner of a franchise?

20         Q.    Yeah.

21         A.    Possibly.

22         Q.    Okay.  When were you chair of the

23    membership committee?

24         A.    I was chair of the membership committee in

1    19 -- I believe it was 1999 and 2000.

2        Q.   Okay.  All right.  Thank you.  And that

3    says you served on the evaluation taxation

4    committee of LES and the planning -- IP planning

5    and asset utilization community committee, and I

6    don't mean to go through all these.  The next three

7    were the same organization.  Let's see, the

8    entrepreneur and residence, that was something to

9    do with Indiana Business School, they invited you

10   to be available to deal with its business students?

11       A.   Yes.

12       Q.   That was a year-long thing?

13       A.   No.  That was over actually only over a

14   week period of time.  And I was selected as part of

15   the entrepreneurship program at Indiana University

16   to come down and participate in a variety of

17   business school classes and basically tell the

18   story of how we started our company.

19       Q.   How you started INTECAP?

20       A.   Correct.

21       Q.   Okay.  The International Trademark

22   Association, do you still belong to that?

23       A.   I am no longer a member of the

24   International Trademark Association.

```
 1        Q.    You were a member for two years?

 2        A.    I was a member longer than that, but I was

 3   only a member of their taxation task force for two

 4   years.

 5        Q.    Okay.  What is that?

 6        A.    That was a committee formed to deal with

 7   taxation issues related to trademark rights.

 8        Q.    Okay.  Was, again, was there some sort of

 9   minimum requirement in terms of credentials before

10   you could join?

11        A.    Again, for the general membership, I don't

12   believe there were very stringent guidelines other

13   than you had to be involved with trademark

14   activities.  The taxation task form, however, would

15   have involved some selection process

16        Q.    Okay.  Why did you leave the organization?

17        A.    Mainly it was really just a matter of

18   where to spend my time.  I have several partners

19   that are involved with that organization, so I

20   didn't see the need from a firm standpoint to stay

21   involved.  And I was heavily involved in the

22   Licensing Executive Society, so it was just a

23   matter of being more efficient with my time.

24        Q.    Okay.  The National Technology Transfer
```

```
 1   Center, is what?

 2        A.   That's a government funded organization

 3   that is dedicated to commercializing technology

 4   that was developed in the public sector and

 5   commercializing the technology in the private

 6   sector.

 7        Q.   Are you still involved with that?

 8        A.   I haven't been recently, no.

 9        Q.   Okay.  And the National Association of

10   Business Economics, what is that?

11        A.   That's another professional organization.

12   And it's comprised of economists, financial

13   consultants, and I believe that would be it.  It's

14   focused on education and tracking various economic

15   indicators.

16        Q.   You said -- are you still involved in

17   that?

18        A.   Yes.

19        Q.   How long have you been involved in that?

20        A.   I've been involved with that for at least

21   five years.

22        Q.   Are there requirements for joining this

23   group?

24        A.   I don't know.  I would assume there are,
```

1    but I don't know what they are.

2        Q.    Okay.  Are there any other organizations

3    that you're affiliated with now that didn't make it

4    to this particular CV?

5        A.    Not that I can think of.

6        Q.    Okay.  Thank you.  Can you give me a

7    thumbnail then of what you presented at Indiana

8    Business School that one week about INTECAP?  What

9    is INTECAP?  How did you form it?  What does it do?

10       A.    Okay.  We formed the company in 1988.

11   Originally it was called IPC group.  And at the

12   entrepreneur and residency program at Indiana

13   University I talked about how I started the company

14   and talked about the sort of things we did.

15       Q.    Okay.  Well, can you just give me a

16   thumbnail description of that company as it exists

17   today?

18       A.    Oh, sure.  We are a business consulting

19   firm focused on intellectual property matters as

20   well as the evaluation of economic damages and

21   commercial litigation.

22       Q.    Is it a fair summary that one of the two

23   major functions of your company is to provide

24   forensic testimony in forensic presentations in

1    court and arbitration disputes?

2        A.    Well, I think a good portion of our work

3    does relate to evaluating economic damages and

4    commercial disputes, a subset of that would be

5    potentially providing expert testimony if required.

6    We do also get involved in evaluating liability

7    issues, for example, helping to detect fraud with

8    regard to financial transactions.

9        Q.    You have not in this case been employed to

10   deal with issues of fraud, however?

11       A.    No.   I don't believe that there is a fraud

12   case in this case, is there.

13       Q.    Well, I just wanted to ask you now what

14   you're going to testify about.   So you're

15   testifying only about the matters set forth in the

16   summary that we've already referred to generally,

17   correct?

18       A.    Yeah, broadly speaking.   Although, you

19   know, within what's described in the summary, there

20   may be additional issues that I would raise.

21       Q.    Are you aware of any additional issues

22   that are not referred to in the summary?

23       A.    Well, I would expect that -- I guess I

24   wouldn't know at this point.   I think when you

```
 1   start asking me questions, those issues will come
 2   out.  The statement itself is fairly brief and high
 3   level and intended to be a general overview of
 4   opinions.  It's not a complete recitation of what
 5   my testimony might be.
 6        Q.   I understand.  I just -- I guess I'm
 7   asking at this juncture, are there areas that are
 8   not mentioned that you know that you plan to
 9   testify about?
10        A.   Nothing that I can think of that would
11   fall outside of what's described in the statement.
12        Q.   Okay.  Can you tell me in terms of INTECAP
13   what percentage of your revenue comes from
14   providing forensic assistance to lawyers and
15   working for companies?
16        A.   And you're defining forensic assistance as
17   generally dealing with commercial disputes?
18        Q.   Well, let's start with that.
19        A.   Because, you know, forensic accounting at
20   least in the accounting field does have a more
21   specific meaning related to fraud detection and
22   financial statement problems.
23        Q.   Okay.  Apart from fraud detection then,
24   what percentage of INTECAP's revenue in the last
```

```
 1    three years has come from providing expert
 2    testimony in business disputes?
 3         A.    I would say it's in the -- probably in the
 4    range of two thirds.
 5         Q.    How many people do you employ at INTECAP?
 6         A.    We currently employ at INTECAP roughly 170
 7    employees.
 8         Q.    Have you published or made public your
 9    revenue in that company?
10         A.    Yes.
11         Q.    Okay.  Where is that published?
12         A.    That would be published by the company
13    that just acquired us.
14         Q.    Who is that?
15         A.    A company called Charles River and
16    Associates.
17         Q.    And did they give a value to your company
18    in that aquisition that they published?
19         A.    They disclosed a purchase price.
20         Q.    What was the purchase price?
21         A.    $81.5 million.
22         Q.    What portion of INTECAP did you own as of
23    the time of the purchase?
24         A.    That's confidential.
```

1      Q.    Were you the major stockholder in that

2  company before the merger?

3      A.    I was a stockholder.   I'm not sure how you

4  identify or define major.

5      Q.    Okay.  Well, let's do it this way.  How

6  many stockholders were there?

7      A.    There were quite a few.

8      Q.    Well, ballpark?  Ballpark is a legal term

9  that I know that CPAs are not familiar with, but

10  give me your best shot please.

11     A.    I think the number of shareholders would

12  be in the range of 50.

13     Q.    Okay.  Were there any shareholders with a

14  larger percent of shares than you had?

15     A.    Yes.

16     Q.    How many?

17     A.    I believe two.

18     Q.    They had more than you had?

19     A.    Correct.

20     Q.    What was your job title in INTECAP before

21  the merger?

22     A.    Just before the merger?

23     Q.    Yes.

24     A.    Managing director.

1   making business decisions, incremental business

2   decisions.  For example, one of the issues I had to

3   address was whether or not they should build a new

4   manufacturing facility as opposed to expanding

5   their warehousing operations in various

6   geographies, and so it was a cost benefit analysis.

7       Q.   Okay.  After that what did you do?  How

8   long were you there?

9       A.   That was an internship through the

10  entrepreneurship program, so I was there for about

11  six months.

12      Q.   Okay.  Then where did you go?

13      A.   I joined a company called Peterson and

14  Company based in Chicago.

15      Q.   What did you do there?

16      A.   I worked on various consulting assignments

17  in the area of intellectual property damages

18  analysis as well as damages analysis in other

19  areas.

20      Q.   Okay.  And you were there for how long?

21      A.   For about three years.

22      Q.   Were you in your view functioning in these

23  various entities that you described so far as a

24  certified public accountant or were you now

1    branching out into some other area of expertise?

2        A.    Well, I was expanding my experience base

3    and area of expertise particularly in the area of

4    intellectual property.  But during that time frame

5    and through today, I've always met my requirements

6    for continuing education to maintain my status as a

7    certified public accountant.

8        Q.    Would you say that you have however ceased

9    practicing as a CPA?

10       A.    Well, I'm not sure how to answer that so

11   broadly.  If your question is do I perform audits

12   of financial statements, the answer is no, I do not

13   do that.  I do perform audits of license agreements

14   however.

15       Q.    What is involved in performing an audit of

16   a licensing agreement?

17       A.    It would be a situation where the licensor

18   wants to review whether or not the licensee has

19   paid or complied with the terms of a license

20   agreement.

21       Q.    Okay.  I understand.  Are there particular

22   AICPA rules that apply to that?

23       A.    I don't believe so, not outside of the

24   general rules for performing audit type services.

1  specifically being asked permission to use those

2  materials by, for example, Northwestern University.

3  So that's why I answered the question the way I

4  did.

5      Q.   Okay.  I understand.  Is this -- was this

6  a juried article?

7      A.   I don't believe so, not under your

8  definition.

9      Q.   Okay.  And the one or two line summary of

10  the subject matter of this article would be what?

11      A.   It was our attempt to capture data

12  regarding how companies go about licensing

13  intellectual property rights and some of the

14  business considerations that go into licensing."

15      Q.   Okay.  Now, I think, let's see.  Let's go

16  back to Number 4.  If we talked about it, I'm

17  sorry, it's going right through my head.  That

18  article is for the transfer pricing handbook.  Who

19  publishes that?

20      A.   That was published by -- boy, I'm not

21  sure.  I think it was John Wiley and Sons.

22      Q.   Okay.  But that's a commercial publisher.

23  They sell books to people in different areas.  This

24  is not something by any kind of an academic or

1    articles on this list?

2        A.    I'm not really sure how to answer that.

3        Q.    Well, did you think you were the main

4    contributor to the articles on the list?

5        A.    I would say in all cases it was a team

6    effort.  I would have been the more senior person

7    involved in most of these activities, so I probably

8    would have been -- had the most influence on the

9    structure and the ultimate content.  But everyone

10   contributed.

11       Q.    Okay.  Let's look at Number 6.  Is that a

12   juried article?

13       A.    I don't believe so under your definition.

14       Q.    Okay.  And can you give me just a brief

15   summary of what that article said?

16       A.    This article summarized the same data

17   reflected in item Number 8.  So it was based upon

18   the same survey, but it was looking at the data

19   from the perspective of intercompany transfer

20   pricing issues.

21       Q.    Okay.  And then Number 7, factors

22   affecting royalty rates, what's the gist of that

23   article?

24       A.    That was essentially a reprint of

                                                    33

1    organization at the Northwestern University.  They

2    had a technology transfer organization there, and

3    this was their publication.

4        Q.   Is it a fair summary to say that you

5    belong to no academic or professional groups that

6    are not commercial in their orientation?

7        A.   I'm not sure how to answer that.  I

8    think --

9        Q.   Is it a fair summary to say that none of

10   the articles you presented were sponsored or in any

11   way governed by any academic or scientific

12   societies as opposed to commercial organizations?

13       A.   So what you're saying is even if it's a

14   nonprofit organization, in your definition it still

15   could be a commercial organization?

16       Q.   Unless it's a scientific society or

17   university or academic society, yes, sir.  You

18   would agree that none of them were published for

19   such organizations?

20       A.   Well, I'm not sure how you classify the

21   licensing executive society because it's a

22   501C3 organization dedicated to education, and in

23   fact funds educational, I would say for

24   universities.

1    evidence of legal protection through either, you

2    know, a patent or an issued trademark.  And then

3    the real question, and frankly my definition was

4    incomplete, it's got to be legally protectable and

5    have value coming from that protection.  And in

6    order to have value, it needs to be unique and

7    novel.  Whether it's a trademark or a patent or a

8    trade secret, there has to be novelty and

9    uniqueness and protectability for it to be a useful

10   intellectual property right.

11       Q.    So your position is that unless something

12   has all of those, it is not intellectual property?

13       A.    That's correct.  In my opinion based on my

14   experience, it needs to be unique, legally

15   protectable and useful or used.

16       Q.    Are you familiar with the Uniform Trade

17   Secret Center?

18       A.    Yes.

19       Q.    Sir?

20       A.    Yes.

21       Q.    And is it your understanding that those

22   things which are protectable, intellectual property

23   under that statute must have all of the attributes

24   you just mentioned?

```
 1        A.    Well, I think the words might be a little

 2   different, but I think the general intent is very

 3   similar to what I described.  If you want to read

 4   to me the language -- in fact, I can look at a

 5   document and try to confirm for you right now.

 6        Q.    Well, I don't need you to do that.  I was

 7   just trying to ask a question.  Let me go to your

 8   summary of your position.  You take the position

 9   that Dr. Myerburg's, quote, information, closed

10   quote, nothing more than a proposed business

11   strategy, closed quote.  That's your opinion?

12        A.    Yes.

13        Q.    It is similar to those proposed by

14   management consulting firms, correct?

15        A.    Correct, or general business consulting

16   firms or marketing consulting firms.  I think

17   Dr. Myerburg doesn't refer to a business plan.

18   It's more what he refers to a marketing strategy.

19        Q.    Would you accept that your statement that

20   this is nothing more than a proposed business

21   strategy is a legal concept, legal conclusion?

22        A.    No.  I think it's a business conclusion.

23        Q.    A business conclusion?  If we were to look

24   in the literature, the encyclopedia, the studies
```

```
 1   produced by medical or business schools rather, the

 2   universities with MBAs, would there be a place

 3   where we could find something that would support

 4   your conclusion?

 5        A.   I would think some.  I mean, it's really

 6   based on my experience, not only in reviewing

 7   business and marketing plans, but in preparing them

 8   on behalf of clients.

 9        Q.   You --

10        A.   The only thing I would add is

11   Dr. Myerburg's plan doesn't really qualify as a

12   complete plan because a lot of the concepts

13   disclosed are not even hashed out in terms of what

14   would be required to have an executable business

15   plan.  And so it's -- I'm not even sure it would

16   qualify as a traditional complete business or

17   marketing plan.

18        Q.   It's your opinion then that it was of no

19   value?

20        A.   Yes, that's correct.

21        Q.   And it's your opinion that it was

22   obviously of no value?

23        A.   In what context?

24        Q.   Well, the minute that a seasoned business
```

45

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS - (312) 263-0052

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  03-20616-CIV-LENARD/SIMONTON

ROBERT J. MYERBURG, M.D.,
individually,

       Plaintiff,

vs.

MEDTRONIC, INC.,
a Minnesota Corporation,

       Defendant.

_____/

## MEDTRONIC, INC.'S SUPPLEMENTAL EXPERT WITNESS DISCLOSURES

In accordance with Local Rule 16.1.K and this Court's December 5, 2003 Order

Adopting Joint Scheduling Report, Setting Pretrial Conference and Trial, Establishing Pretrial

and Trial Procedures and Establishing Pretrial Deadlines, the following is Medtronic, Inc.'s

supplemental disclosure of expert witnesses it expects to call at trial:

1.     Daniel M. McGavock
      InteCap, Inc., Managing Director
      101 North Wacker Drive
      Suite 1600
      Chicago, IL  60606

     Summary of the expert's anticipated testimony, including the substance of facts and
opinions and a summary of the grounds for each opinion:

Mr. McGavock will testify about the economic damages suffered by Dr. Myerburg, if

any, assuming that Medtronic improperly used Dr. Myerburg's confidential marketing strategy

("Dr. Myerburg's Information"). Mr. McGavock is anticipated to testify that:

- Dr. Myerburg's Information is nothing more than a proposed business strategy,
  similar to those proposed by management consulting firms. Management consulting
  firms are typically compensated on a fixed fee or an hourly basis. In fact, Dr.

Myerburg testified that he has been compensated for providing his marketing opinions in a similar manner, based on a daily rate and not as a percentage of future revenue. Accordingly, Mr. McGavock will testify that the appropriate measure of damages is a fixed consulting fee or a fee based on an hourly or a daily consulting rate, assuming a finding of Medtronic's unauthorized use of Dr. Myerburg's Information.

- Dr. Myerburg's Information did not contain any novel or proprietary information that would cause Medtronic, in a good faith negotiation to compensate Dr. Myerburg, to pay anything beyond a traditional consulting fee. The idea to participate in the automatic external defibrillator ("AED") market was not a novel concept and had been long considered by Medtronic, which made an equity investment in, and had a **joint marketing arrangement with**, an AED manufacturer since 1996. Further, Medtronic had already been presented with the idea to acquire an AED manufacturer, **Physio-Control, prior to Medtronic's** March 19, 1998 meeting with Dr. Myerburg.

- The "royalty rate" approach proposed by Dr. McClave is an inappropriate measure of damages in this case and grossly overstates the value of Dr. Myerburg's Information and his economic harm assuming liability. The payment of running royalty based upon product revenue for nothing more than a business plan is extremely uncommon, if not unheard of, in the field of intellectual property licensing. Further, Dr. McClave's use of the "25% rule of thumb" resulting in an 18% royalty rate is flawed and misguided given the facts in this case. In the field of intellectual property licensing, a royalty rate of this magnitude would not be justified without a strong arsenal of intellectual property rights, such as patents, to provide the licensee with a unique and protected competitive advantage.

In reaching his opinions, Mr. McGavock relied on some or all of the following materials:

a. The Complaint in this action
b. The Motion to Dismiss in this action.
c. The "Executive Summary" of Dr. Myerburg
d. The deposition of Dr. Myerburg
e. The deposition of Mike Ellwein
f. The Physio-Control-Morgan Stanley Retention Letter
g. The Physio-Control Proxy Statement/Prospectus of August 27, 1998.

2

h. The McClave Expert Report and references contained in that Report

It is anticipated that Mr. McGavock will also rely on the deposition of Richard Martin, when it becomes available and on the deposition of Dr. McClave when it becomes available, along with any additional references identified in those depositions.

Mr. McGavock has also relied on his many years of experience in the field of intellectual property and the knowledge derived from that experience and on his own publications to the extent that they are germane to the issues in this case.

Mr. McGavock's curriculum vitae is attached hereto as Exhibit "A."

2.  H. Michael Cohen
    Deutsch Banc Alex Brown, Inc.
    101 California Street
    48th Floor
    San Francisco, CA  94111

Summary of the expert's anticipated testimony, including the substance of facts and opinions and a summary of the grounds for each opinion:

Mr. Cohen will testify regarding the factors considered in determining entitlement to and the appropriate level of compensation for a person who or entity which is the procuring cause or otherwise brings about or meaningfully effectuates a merger or acquisition. Among the factors considered are the timing of any introduction between companies, the extent, if any, to which the party seeking compensation actually contributed to the final transaction, the novelty of the proposed transaction, the specificity of the proposal, the ability of the person or entity seeking compensation to effectuate the transaction, the willingness of the proposed partner to participate in the transaction, the terms of any proposed compensation and the nature of the relationship among the various parties.

Mr. Cohen is expected to testify that under the norms and standards governing mergers and acquisitions, Dr. Myerburg will be entitled to no compensation whatsoever under the facts and circumstances of this case. Morgan Stanley was retained by Physio-Control in December of 1997 for the purpose of identifying and locating a purchaser for Physio-Control. This retention began long before Dr. Myerburg made his presentation to members of Medtronic's tachyarrhythmia marketing group. In fact, Medtronic had already visited Physio-Control in Washington for purposes of pursuing the transaction before Dr. Myerburg even came to Medtronic.

Dr. Myerburg's plan did not mention Physio-Control and did not limit itself to an acquisition or merger. He merely mentioned the prospect of some form of arrangement with an AED company. Medtronic had had an arrangement with an AED company since 1996 and had the proposed arrangement with Physio-Control well under way before being given Dr. Myerburg's plan.

3

Dr. Myerburg had no apparent arrangement with Physio-Control and no knowledge of any interest it would have in any potential transaction.

Under the facts as understood by Mr. Cohen, Dr. Myerburg's plan did not serve as the basis in any way for the ultimate merger between Medtronic and Physio-Control nor did it contribute in any way to Medtronic's decision to pursue the merger. Under these circumstances Dr. Myerburg would be entitled to no compensation whatsoever. He contributed no value to what occurred.

In reaching his opinions, Mr. Cohen relied on some or all of the following materials:

a. The Complaint in this action
b. The Motion to Dismiss in this action
c. Dr. Myerburg's "Executive Summary"
d. The deposition of Dr. Myerburg
e. The deposition of Mike Ellwein
f. The Physio-Control-Morgan Stanley Retention Letter
g. The Physio-Control Proxy Statement/Prospectus of August 27, 1998.
h. Plaintiff's Expert Reports in this action

It is anticipated that Mr. Cohen will also rely on the deposition of Richard Martin, when it becomes available and on the deposition of Plaintiff's experts when they become available, along with any additional references identified in those depositions.

Mr. Cohen will rely extensively on his own experience and involvement in mergers and acquisitions, with emphasis on his experience in the area of medical devices. Mr. Cohen's experience and education is listed below:

## EXPERIENCE

1) Deutsch Banc Alex Brown, Inc., Managing Director
West Coast Health Care Investment Banking Effort (1999-present)
Responsible for the origination and execution of financings and mergers & acquisitions of healthcare client.

2) Cowen & Co., Director
Health Care Investment Banking (1997-99)
Responsible for the origination and execution of financings and mergers & acquisitions of healthcare client.

3) Union Bank of Switzerland
Health Care Investment Banking (1994-97)

4) Booz, Allen & Hamilton, Associate in Health Care Group (1992-1994)
Conducted strategic studies on behalf of pharmaceutical and medical device companies; involved in marketing, strategic, and portfolio reviews and acquisition assessments.

4

CASE No. 03-20616-CIV-LENARD/SIMONTON

5) Hambrecht & Quist, Research Analyst
Medical Device and Biotech Industry (1988-90)

6) Lehman Brothers, Bond Trading Desk (1987-88)

## EDUCATION

B.A., Economics, University of Vermont (1987)
Masters in Business Administration, Columbia (1992)


3.      Kurt H. Kruger
        20 Apple Tree Trail
        Westport, Connecticut  06880

Summary of the expert's anticipated testimony, including the substance of facts and opinions and a summary of the grounds for each opinion:

        Mr. Kruger will testify regarding the ICD market and the factors that have contributed to the growth in ICD sales, market-wide, over the past five to six years.  He will discuss the relationship between ICD implantation and 1) positive clinical studies and 2) broadening reimbursement for procedures, discussing how increased use of the device is attributable to the fact that studies have shown a clear survival benefit and reimbursement has consequently expanded for implantation of such devices for a number of new medical indications.

        Mr. Kruger will testify that sales of AEDs have remained largely flat over the past several years and that there appears to be little relationship, if any, between sales of AEDs and the increase in sales of ICDs.  In his opinion sales of a company's AEDs do not give rise to "market recognition" in such a fashion as to lead to the sale of an ICD manufactured by the same company.  That is, the brand or make of an AED that might have been used to resuscitate a victim of sudden cardiac arrest has no direct relationship to the brand or make of an ICD subsequently implanted in the survivor.  An increase in survivor rates would generally impact the ICD market across the board and would not lead to an increase in market share of any particular ICD manufacturer, even if that manufacturer also manufactures AEDs.

        Mr. Kruger will testify regarding Medtronic's market share in the ICD market relative to the market share of other ICD manufacturers since Medtronic's merger with Physio-Control.  He will indicate that there are no data to support the conclusion that Medtronic's merger with Physio-Control has had any direct impact on the sale of ICDs.

        Mr. Kruger will rely on his knowledge of the medical device industry as a medical technology research analyst as well as numerous analysts' reports and other readily available market information.

        In addition to these materials, in preparing for this case Mr. Kruger has reviewed:

5

CASE No. 03-20616-CIV-LENARD/SIMONTON

a. The Complaint in this case
b. Dr. Myerburg's "Executive Summary"
c. The deposition of Dr. Myerburg
d. Publicly available information regarding Medtronic's financial performance.
e. Discovery materials in this case.

Mr. Kruger's curriculum vitae is attached hereto as Exhibit "B."

Dated this 31st day of March, 2004.

Respectfully submitted,

STEEL HECTOR & DAVIS LLP
200 S. Biscayne Blvd., Suite 4000
Miami, Florida 33131
Tel.:   305.577.7057
Fax.    305.577.7001

Counsel for the Defendant

By: _____
    Alvin B. Davis, P.A.
    Florida Bar No. 218073
    abd@steelhector.com
    Digna B. French
    Florida Bar No. 0148570
    dfrench@steelhector.com

6

CASE No. 03-20616-CIV-LENARD/SIMONTON

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served by U.S. Mail this $31^{\underline{st}}$

day of March, 2004, upon counsel for the plaintiff: Guy B. Bailey, Jr., Esq., Bailey

& Dawes L.C., Continental Plaza, Suite 301, 3250 Mary Street, Coconut Grove, Miami,

Florida 33133.

By:

Digna B. French

MIA2001 275491v1

7

# EXHIBIT A



## DANIEL M. McGAVOCK, MANAGING DIRECTOR

### CONSULTING EXPERIENCE

For the past 18 years, Mr. McGavock has specialized in the valuation and strategic management of intellectual property (IP). He has valued IP in the context of infringement litigation, license and joint venture transactions, mergers and acquisitions, corporate restructuring, inter-company transfer pricing, and a variety of tax-related transactions. He has provided expert testimony in Federal Court, State Court, Tax Court and in arbitration proceedings on the subjects of economic damages and IP valuation issues. He has served as a financial advisor in all phases of IP-intensive transactions, including partner screening, negotiation support, financial structuring and post-agreement compliance.

Building on his experience in a broad range of IP matters, Mr. McGavock led the firm's development and launch of a strategic consulting practice dedicated to helping clients manage and extract value from IP assets, currently referred to as InteCap's IP Business Advisory Services (IPBAS℠). Deploying multi-disciplinary teams and best-in-class tools, his assignments have included the formation and operation of IP holding companies, IP portfolio inventory and strategic mapping, competitive assessment and benchmarking, and the development and execution of business plans and commercialization strategies.

### EDUCATIONAL BACKGROUND AND SELECTED AFFILIATIONS
- B.S., Accounting, Indiana University
- C.P.A., State of Illinois
- American Institute of Certified Public Accountants
- Illinois CPA Society
- Arbitrator, American Arbitration Association
- Advisory Council, Intellectual Property Management Institute
- Board of Advisors, National Patent Board
- Intellectual Property Owners Association, Arbitration and Mediation Committee (2004-05)
- National Membership Chairman and International Delegate, Licensing Executives Society, U.S.A./Canada (LES)
- Chairman, Valuation and Taxation Committee, LES (1990-95)
- Chairman, IP Planning and Asset Utilization Committee, LES (1996-97)
- Founding Chairman, Financial Markets Committee, LES (1998-2000)
- Entrepreneur in Residence, Indiana University School of Business (1990)
- International Trademark Association, Taxation Task Force (1992-94)
- National Technology Transfer Center (NTTC), Technology Assessment Course Content Reviewer and NASA Technology Commercialization Review Team (1996-97)
- National Association of Business Economists, Financial Roundtable

### ADDITIONAL INFORMATION

Mr. McGavock has addressed numerous professional groups in the U.S. and abroad on a variety of topics, including IP valuation, strategy and damages assessment in litigation. Prior to IP consulting, Mr. McGavock's professional experience includes audit work with the U.S. General Accounting Office and a financial analyst position with a manufacturer of chemical products.



### DANIEL M. MCGAVOCK
#### Publications

1. "Intangible Assets: A Ticking Time Bomb," <u>Chief Executive</u>, November 2002.

2. "IP Survey Finds 'Gap' In Information," <u>les Nouvelles</u>, Volume XXXIII No.3, Licensing Executives Society, September 1998, with Michael J. Lasinski.

3. "Tax Strategies for Protecting Value of Intellectual Property," <u>les Nouvelles</u>, Volume XXXII No. 1, Licensing Executives Society, March 1997, with Robert T. Carney.

4. "Intangible Asset Valuation and Royalty Rates," <u>Transfer Pricing Handbook</u>, 1995 Cumulative Supplement #2, with Francis X. Burns and David A. Haas.

5. "Emerging Topics in the Calculation of Economic Damages in Patents Litigation," The John Marshall Law School 37th Annual Conference on Developments in Intellectual Property Law, February 25, 1993, with Rochelle Kopp, reprinted in The Journal of <u>Proprietary Rights</u>, March 1993.

6. "Unrelated-Party Licensing Practices and Factors Affecting Royalty Rates: Results of a Survey" Bureau of National Affairs, Tax Management-Transfer Pricing, Special Report, Vol. 1, No. 17, Report No. 3. January 6, 1993.

7. "Factors Affecting Royalty Rates," <u>les Nouvelles</u>, Volume XXVII, No. 2, June 1992, Licensing Executives Society.

8. "Licensing Practices, Business Strategy, and Factors Affecting Royalty Rates: Results of a Survey," <u>Licensing Law and Business Report</u>, Vol. 13, No. 6, March-April 1991, with David A. Haas and Michael P. Patin.

9. "Intangible Asset Valuation: Why Do It?" International Trade and Technology New Action, Volume 5, Number 1, Winter 1990, with David A. Hass.



### DANIEL M. MCGAVOCK
### Prior Testimony

1. Nestlé USA, Inc. f/k/a Nestlé Food Company and Nestec Ltd. aka Nestec S.A. or Nestec AG v. Sara Lee Bakery Group, f/k/a The Earthgrains Co., a Division of Sara Lee Corporation, U.S. District Court for the Northern District of Ohio Eastern Division, Case No. 1:01 CV 2074.

2. V.P. Intellectual Properties, L.L.C., v. Nobel Biocare USA, Inc., Implant Innovations, Inc., Implant Innovations International Corporation, Astra Tech, Inc., and Imtec Corporation, U.S. District Court for the District of New Jersey, Civil Action No. 99-03136 (WHW).

3. Ondeo Nalco Company v. Eka Chemicals Inc., U.S. District Court for the District of Delaware, Civil Action No. 01-537-SLR.

4. DePuy, Inc. v. Zimmer Holdings, Inc. and Zimmer, Inc., U.S. District Court, Northern District of Illinois, Eastern Division, Civil Action No. 02-C-4023.

5. EOS GmbH Electro Optical Systems v. DTM Corporation, Compression, Inc., and 3D Systems, Inc., U.S. District Court, Central District of California, Case No. SACV 00-1230 DOC (MLGx).

6. The Chamberlain Group, Inc. vs. Interlogix, Inc., U.S. District Court, Northern District of Illinois, Eastern Division, Civil Action No. 01-C-6157.

7. The University of Colorado Foundation, Inc., The University of Colorado, The Board of Regents of The University of Colorado, Robert H. Allen, and Paul A. Seligman v. American Cyanamid Company, U.S. District Court for the District of Colorado, Civil Action No. 93-K-1657.

8. Overhead Door Corporation and GMI Holdings, Inc. v. The Chamberlain Group, Inc., U.S. District Court for the Northern District of Texas Dallas Division, Civil Action No. 3:95-CF-1648-D.

9. Smith Engineering Company, Inc. v. Eisenmann Corporation, U.S. District Court for the Central District of California, Civil Action No. CV 98-3937 CM (SHx).

10. Eisenmann Corporation v. Regenerative Environmental Equipment Company, Inc.; Elam Company, Inc.; and Durr Environmental, Inc., U.S. District Court for the Northern District of Illinois Eastern Division, Civil Action No. 98 C 1014.

11. Donald J. Avery & Vessell-Structure Container Systems, Inc., v. The Procter & Gamble Company, Missouri Circuit Court, Twenty-Second Judicial Circuit, St. Louis City, Cause No. 972-8471.

# INTECAP

12. Arthur A. Corry v. CFM Majestic Inc., U.S. District Court for the Eastern District of Virginia, Civil Action No. 98-407-A.

13. Schukra of North America, Ltd. v. Textron Automotive Functional Components, Inc., U.S. District Court, Eastern District of Michigan, Southern Division, Civil Action No. 97-73743.

14. Albert L. Wokas v. Gilbarco, Inc., U.S. District Court for the Middle District of North Carolina, Civil Action No. 1:98CV00236.

15. Bard Manufacturing Company v. Crispaire Corporation, U.S. District Court for the Northern District of Ohio, Western Division, Civil Action No. 3:95-CV-74103.

16. Texas Instruments Incorporated v. Hyundai Electronics Industries Co., Ltd., U.S. District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:98CV0074-TH.

17. Prinsco, Inc. v. Hancor, Inc., U.S. District Court, District of Minnesota, Fourth Division, Civil Action No. 3-96-79.

18. Centillion Data Systems, Inc. v. AT&T Corporation, U.S. District Court for the Southern District of Indiana, Civil Action No. IP 96-0394C B/S.

19. Marquip, Inc., v. Fosber America, Inc., Fosber SpA, and United Container Machinery, Inc., U.S. District Court, Western District of Wisconsin, Civil Action No. 96-C-726-S.

20. Mobil Oil Corporation v. BPI Packaging Technologies Inc., Inteplast Corporation and Integrated Bagging Systems Corporation, U.S. District Court, District of Delaware, Civil Action No. 95-737.

21. Thorn EMI North America v. Advanced Micro Devices, U.S. District Court, District of Delaware, Civil Action No. 95-548 (RRM).

22. Intelectron Incorporated, et al. v. Heath Company, Inc., U.S. District Court, Northern District of California, San Jose Division, Case No. C-95-20442 JW.

23. Nartron Corporation v. Amway Corporation, State of Michigan in the Circuit Court for Osceola County, File No. 90-005238-CK.

24. BYOP, Inc. and Great Lakes Business Forms of Illinois, Inc. v. Hardware Wholesalers, Inc., U.S. District Court, Northern District of Illinois, Eastern Division, Civil Action No. 94C 6228.

25. Grain Processing Corporation v. American Maize-Products Company, U.S. District Court, Northern District of Indiana, Hammond Division, Civil Action No. H81-237.

INTECHP

26. Standard Manufacturing Company v. The United States, U.S. Court of Federal Claims, Case No. 641-85C.

27. Paye Tech, Inc. and Stephen Jones v. Snap Edge Corporation, Fred Strobl, Albert J. Litwin, Jack Glatt and Bradley Legare, U.S. District Court, Northern District of Illinois, Eastern Division, Civil Action No. 90C1067.

28. James River Corporation of Virginia v. Hallmark Cards, Inc., U.S. District Court, Eastern District of Wisconsin, Civil Action No. 93-C-1330.

29. Monarch Marking Systems, Inc. v. Independent Machine Service of Minnesota, Inc., Townsend Pricing, Inc., and Mark-Rite Corporation, U.S. District Court, Southern District of Ohio, Western Division, Civil Action No. C-3-91-485.

30. Indian Head Industries, Inc. v. Ted Smith Equipment Company, Inc. and T.S.E. Brakes, Inc., U.S. District Court, Eastern District of Michigan, Southern Division, Case No. 92-CV-74367.

31. Chemonics Industries, Inc. v. Monsanto Company, U.S. District Court, Central District of California, Case No. SACV-91-641 GLT (RWRx).

32. Miller Electric Mfg. Co. v. Lincoln Electric Co., U.S. District Court, Western District of Wisconsin, Civil Action No. 91-C-557-S.

33. Insta-Foam Products Inc. v. Universal Foam Systems, Inc., U.S. District Court, Eastern District of Wisconsin, Case No. 83-C-1952.

34. Structural Rubber Products Company v. Park Rubber Co. and International Metals & Machines, Inc., U.S. District Court, Northern District of Illinois, Eastern Division, Case No. 79-C-1223.

35. Safekeeper, Inc. v. Safemark, U.S. District Court, Florida.

36. Cipher Data Products Inc. and Archive Corporation, American Arbitration Association, San Diego, Case No. 73-133-0155-88 P.

37. Wallace Computer Services, Inc. v. Uarco, Inc., U. S. District Court, Northern District of Illinois, Eastern Division, Case No. 80-C-3397.

38. Intermedics, Inc. v. Medtronic Inc., U.S. District Court, Southern District of Texas, Galveston Division, Civil Action No G-80-294, Civil Action No. G-80-295.

39. Hook Estate v. International Harvester, U.S. District Court, Albany N.Y.